## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, a resident of the District of Columbia, )
currently incarcerated at )
Rivers Correctional Institution )
145 Parker's Fishery Rd. )
Winton, NC 27986 )
    )
REON HOLLOWAY, a resident of the District of )
Columbia, currently incarcerated at )
Rivers Correctional Institution )
145 Parker's Fishery Rd. )
Winton, NC 27986 )
    )   Civ. No. _____
DAVID ROGERS, a resident of the District of Columbia, )
currently incarcerated at )   **COMPLAINT**
Rivers Correctional Institution, )
145 Parker's Fishery Rd. )   **JURY TRIAL DEMANDED**
Winton, NC 27986 )
    )
BENJAMIN HAMILTON, a resident of the District of )
Columbia, currently incarcerated at )
Rivers Correctional Institution )
145 Parker's Fishery Rd. )
Winton, NC 27986 )
    )
CARL BUTLER, a resident of the District of Columbia, )
currently incarcerated at )
FCI Petersburg )
1060 River Rd. )
Hopewell, VA 23860 )
    )
HAROLD ROBINSON, a resident of the District of )
Columbia, currently incarcerated at )
Rivers Correctional Institution )
145 Parker's Fishery Rd. )
Winton, NC 27986 )
    )
CHARLES LEWIS, a resident of the District of )
Columbia, )
234 35th Street, NE, Apt #4 )
Washington, DC 20019 )
    )
JOHN DOE, a resident of the District of Columbia )
    )

JOHN ROE, a resident of the District of Columbia )
 )
and )
 )
JIMMIE FOWLER, a resident of the District of )
Columbia, currently incarcerated at )
FCI Petersburg )
1060 River Rd. )
Hopewell, VA 23860 )
 )
Each individually and on behalf of all others similarly )
situated, )
 )
                     *Plaintiffs,* )
 )
        v. )
 )
GEO GROUP INC., a Florida for-profit corporation )
c/o Corporation Service Company )
1090 Vermont Ave., N.W. )
Washington, DC 20005 )
 )
UNITES STATES OF AMERICA, through its )
department, the FEDERAL BUREAU OF PRISONS, )
320 First St., N.W. )
Washington, DC 20534 )
 )
and )
 )
HARLEY LAPPIN, in his official capacity as Director of )
the United States Bureau of Prisons, )
320 First St., N.W. )
Washington, DC 20534, )
 )
                     *Defendants.* )
 )
_____ )

## CLASS ACTION COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND FOR DAMAGES

### PRELIMINARY STATEMENT

1.      The Named Plaintiffs bring this class action lawsuit to remedy the grossly inadequate and inhumane level of medical care at the Rivers Correctional Institution ("Rivers"), where the Named Plaintiffs are held as prisoners by Defendants. The system of delivering health care at Rivers has placed men there at substantial and ongoing risk of serious injury or premature death, and has caused permanent physical damage and profound mental and physical pain to Named Plaintiffs and other persons incarcerated there.

2.      Rivers is a private, for-profit correctional facility that is owned and operated by Defendant GEO GROUP, INC. ("GEO"). GEO houses approximately 900 residents of the District of Columbia at Rivers pursuant to a contract with Defendant the Federal Bureau of Prisons (the "BOP").

3.      The health care system at the Rivers facility is broken.    Medical professional staffing levels at Rivers are grossly inadequate. Defendants routinely refuse to provide prisoners at Rivers with treatment for their serious chronic medical conditions. When men arrive at Rivers, Defendants routinely and arbitrarily switch and discontinue drug regimens that were carefully developed and calibrated by medical professionals at other correctional institutions and by private medical professionals, without consultation with the affected patients and without regard to the negative therapeutic consequences. When prisoners' medications are not arbitrarily discontinued, Defendants' dysfunctional system for distributing them forces sick and disabled men to stand outside for hours in all weather, and sometimes requires them to choose between receiving their drugs and eating

3

their meals. The facility has a policy of confiscating prescribed medical devices, such as braces and orthopedic shoes, for no penological reason, even when such devices have been prescribed and provided by other correctional institutions. Defendants then fail to replace these devices, causing previously ambulatory persons to rely on wheelchairs for mobility. Rivers provides no physical therapy; its personnel simply disregard explicit instructions in prisoners' sentencing reports and medical records to provide this treatment. Serious mental health needs are ignored even when specifically identified in sentencing documents or other medical records.

4.     By allowing this broken medical system to continue as detailed in this Complaint, Defendants have permanently harmed many men at Rivers; have precipitated numerous and otherwise avoidable acute medical crises; have caused many men at Rivers to experience chronic and debilitating pain and suffering; and have contributed to the needless disfigurement, increased morbidity, and serious physical injury of hundreds of men.

5.     Men incarcerated at Rivers depend upon their custodians, both federal and private, to provide Constitutionally adequate care. GEO has also specifically agreed in its contract with Defendant BOP that it will provide Plaintiffs with medical services that are commensurate with community standards. Defendants' generally applicable policies, guidelines, and practices have all contributed to GEO's failure to respond adequately to prisoners' serious medical needs.     Through these unlawful policies and practices, Defendants have manifested a pervasive and deliberate indifference to the medical, dental, and mental health needs of their charges. As a result, Defendants have knowingly

and willfully denied Plaintiffs their right to adequate medical care in violation of the U.S. Constitution, federal law, common law, and contract.

6.     Prisoners with disabilities at Rivers suffer doubly at the hands of Defendants because in addition to being denied adequate health care, they are also subject to discrimination: they are excluded from and denied access to the programs, services, facilities, and activities at Rivers, because Defendants refuse to make reasonable accommodations for them.   Defendants' discriminatory acts against prisoners with disabilities include their refusal to add ramps to common areas; their decision to build an inadequate number of common area bathrooms accessible to persons with disabilities; their placement of tables in the dining hall and classroom in a manner that prevents access by prisoners with disabilities; their failure to provide exercise and other therapeutic equipment accessible to and appropriate for persons with disabilities; their failure to install internal doors, which prisoners must use to move from one part of the facility to another, that can be opened by persons with disabilities; and their failure to provide adequate mental health services and treatment to prisoners with disabilities.

7.     Upon information and belief, the deficiencies and deprivations described above and detailed in this Complaint are the result both of Defendant GEO's aggressive efforts to cut costs and boost profits, and of Defendant BOP's glaring failure to ensure that GEO fulfills the federal duty it has undertaken to provide.  Because the harms caused by Defendants' policies and practices will continue without the aid of the Court, plaintiffs seek relief.

## PARTIES

A.    **Plaintiffs**

8.    Plaintiffs represent and are members of a class of persons including past, current, and future prisoners at Rivers who, during their incarceration at Rivers, are dependent upon the organizations, systems, policies, practices, and institutional conditions of Defendants for their receipt of medical, dental, and mental health care.

9.    Plaintiffs Holloway, Rogers, Butler, Robinson, Doe, and Roe represent and are members of a sub-class of the Class who are "individuals with a disability," as that term is defined in Section 504 of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 794, *et seq*. (the "Rehabilitation Act"), and the regulations promulgated under that statute, and who have been subjected to discrimination and excluded from and denied access to the programs, services, facilities, and activities at Rivers due to their disabilities, in violation of Section 504 of the Rehabilitation Act.

10.    Plaintiff KEITH MATHIS:  Mr. Mathis is a 32-year old D.C. resident incarcerated at Rivers.  He has been assigned Federal Registration # 35973-007.  Mr. Mathis arrived at Rivers in March 2006 and is not scheduled to be released from Rivers, at the earliest, until March 2008. As a result of his incarceration at Rivers, Mr. Mathis was and is wholly dependent on Defendants for the delivery of care to address his health care needs.  Mr. Mathis sought treatment for a cavity shortly after he arrived at Rivers. Though the Rivers dentist concluded in March 2006 that "oral surgical procedures" were required, Mr. Mathis was not treated by the dentist until May 24, 2006, by which time the tooth had worsened.  The dentist refused Mr. Mathis's request to pull the tooth and told Mr. Mathis that he would "take care of it" with a filling.   The dentist applied the filling

6

material over the tooth without first drilling and removing the diseased tooth material. Although Mr. Mathis was unable to bite or chew normally, his request to see the dentist for a follow-up appointment was denied; he was told by a member of the medical staff that he would "just have to suffer." Shortly thereafter, Mr. Mathis began experiencing severe pain, and a knot-like growth appeared on his neck near the infected tooth. His face and neck began to swell from infection. Mr. Mathis sought medical treatment by going directly to the infirmary, but a nurse refused him treatment and sent him back to his cell. The next day the swelling was visibly worse and began to spread up his face toward his eye. Mr. Mathis made repeated attempts to seek medical treatment from Defendants and was repeatedly denied care for another week. By July 2006, he was in constant pain and could not fully open his mouth or chew properly. During this period an open sore had also formed on the inside of Mr. Mathis' mouth and had started oozing "green slime." Mr. Mathis began feeling faint and was shaking and sweating. A guard took Mr. Mathis to the Rivers infirmary, where, for the first time in months of repeated pleas for medical care, Mr. Mathis was treated with antibiotics and pain medication. On July 19, 2006, Mr. Mathis was in such severe pain that he twice sought medical attention from Defendants, who had done nothing to address the swelling and abscess that they noted in their medical records. Sweating and feverish, with his face and neck swollen from an infected sore oozing green slime, and weakened from hunger, Mr. Mathis was finally transported to a local hospital later that same evening. A few hours after arriving at the hospital the swollen side of Mr. Mathis's face "burst open." Mr. Mathis underwent emergency surgery and spent three days in the hospital. He was told that his condition was so serious that the doctors had been forced to cut open his face to remove a raging

7

infection. As a direct result of Defendants' inaction and indifference, Mr. Mathis suffered excruciating pain for several months, has lost feeling on the affected side of his face, cannot fully open his mouth, cannot bite or chew properly, drools uncontrollably, and bears a permanent scar down one side of his face.

11.    Plaintiff REON HOLLOWAY: Mr. Holloway is a 25-year old D.C. resident incarcerated at Rivers who has been assigned Federal Registration # 36620-007. Mr. Holloway arrived at Rivers in December 2005 and is not scheduled to be released from Rivers, at the earliest, until August 2008. As a result of his incarceration at Rivers, Mr. Holloway was and is wholly dependent on Defendants for the delivery of care to address his health care needs. Mr. Holloway is immobilized from the waist down, experiences frequent seizures, and suffers from severe twitching and intense pain in his legs. Before arriving at Rivers, Mr. Holloway had received physical therapy for his conditions and had progressed to the point that he was able to walk with the help of a walker, leg braces, and orthopedic shoes that integrate with those braces. Mr. Holloway had also been prescribed medication for pain management and bone loss by doctors at the National Rehabilitation Hospital ("NRH"). Defendants informed Mr. Holloway upon his arrival at Rivers that no physical therapy is available at the facility, explaining that although "it would be good" for him to get therapy, "we just don't have it here." Defendants told Mr. Holloway that his orthopedic shoes were the wrong color (gray) and confiscated them for 18 months. Without orthopedic shoes, Mr. Holloway was unable to use his leg braces and walker. Defendants returned Mr. Holloway's orthopedic shoes shortly after Mr. Holloway met with attorneys investigating the medical conditions at Rivers; however, by that point, his inability to walk for 18 months, coupled with the

absence of physical therapy, had weakened his legs to the point that he was no longer able to use the orthopedic devices. Now reliant on a wheelchair, Mr. Holloway is unable to access many of the facilities at Rivers because they are not accessible to persons with disabilities. There are no ramps at Rivers. Traveling from the recreation area to the main area requires Mr. Holloway and other prisoners with physical disabilities to surmount a large curb. Mr. Holloway cannot maneuver around this obstacle in his wheelchair without assistance. Additionally, many of the common area bathrooms are not accessible to persons with physical disabilities such as Mr. Holloway. The few bathrooms accessible to Mr. Holloway and other prisoners with physical disabilities are not easily accessible from most common areas at Rivers, and in some instances require them to navigate a path with curbs and other obstacles that impede their trips such that they often cannot reach an accessible bathroom in time to use it. The shower facilities do not include hand-held shower heads and adequate seating in order to accommodate a person in a wheelchair. The tables in the dining hall and classroom are not designed to accommodate persons with physical disabilities; the gym lacks equipment usable by persons with physical disabilities; and many doors that men must use to move from one part of the facility to another cannot be opened by persons with physical disabilities. As a result of Defendants' failure to provide truly accessible facilities, Mr. Holloway has been denied equal access to and receipt of the facilities, programs, services, and activities at Rivers. In addition, Defendants refused to continue Mr. Holloway's medication regimen for bone deterioration prescribed by the National Rehabilitation Hospital; they offered to replace his bone loss medication with an antacid. Defendants also confiscated the sophisticated regime of prescription pain medication that had been prescribed for Mr. Holloway's

chronic leg pain at a D.C. correctional facility, offering to replace it with ibuprofen. As a consequence of Defendants' conduct, Mr. Holloway's physical condition has deteriorated severely. Mr. Holloway has been needlessly forced to rely on a wheelchair, has lost the range of mobility he had developed in his legs, has suffered considerable pain, and has been prevented from utilizing the facilities, programs, services, and activities at Rivers.

12.    Plaintiff DAVID ROGERS: Mr. Rogers is a 43-year-old D.C. resident incarcerated at Rivers who has been assigned Federal Registration # 12648-007. Mr. Rogers arrived at Rivers in April 2006 and is not scheduled to be released from Rivers, at the earliest, until September 2007. As a result of his incarceration at Rivers, Mr. Rogers was and is wholly dependent on Defendants for the delivery of care to address his health care needs. A car accident in 2000 left Mr. Rogers paralyzed from the neck down, but through extensive physical therapy, he eventually regained the ability to walk with the assistance of a walker. On information and belief, his sentencing order from the D.C. courts states that he should be housed in a medical facility that can provide physical therapy services. Mr. Rogers's former doctor at Kernan Orthopedics and Rehabilitation Hospital of the University of Maryland warned Defendants that without continued physical therapy and treatment, Mr. Rogers might lose his hard-won mobility, because his legs would spasm and contract into a seated position. However, when he arrived at Rivers, Mr. Rogers was told that no physical therapy services were available at the facility, and that none would be provided. In response to his request for physical therapy, medical staff suggested that he locate and tie a water jug to his leg and, without medical supervision or instruction, do exercises. Upon information and belief, the Rivers staff also refused to continue Mr. Rogers's medication regime, which had been developed by

10

NRH doctors. Without physical therapy or necessary medications, Mr. Rogers' condition has deteriorated severely. As a consequence, he has become unable to walk or to straighten his legs past a 90-degree angle – precisely the outcome that his doctor warned of – and now must rely on a wheelchair. He is unable to access many of the facilities at Rivers because they are not accessible to persons with physical disabilities. There are no ramps at Rivers. Traveling from the recreation area to the main area requires Mr. Rogers and other prisoners with physical disabilities to surmount a large curb. Mr. Rogers cannot maneuver around this obstacle in his wheelchair without assistance. Additionally, many of the common area bathrooms are not accessible to persons with physical disabilities such as Mr. Rogers. The few bathrooms accessible to Mr. Rogers and other prisoners with physical disabilities are not easily accessible from most common areas at Rivers, and in some instances require them to navigate a path with curbs and other obstacles that impede their trips such that they often cannot reach an accessible bathroom in time to use it. The shower facilities do not include hand-held shower heads and adequate seating in order to accommodate a person in a wheelchair. The tables in the dining hall and classroom are not designed to accommodate persons with physical disabilities; the gym lacks equipment usable by persons with physical disabilities; and many doors that men must use to move from one part of the facility to another cannot be opened by persons with physical disabilities. As a result of Defendants' failure to provide truly accessible facilities, Mr. Rogers has been denied equal access to and receipt of the facilities, programs, services, and activities at Rivers.

      13.    Plaintiff BENJAMIN HAMILTON: Plaintiff Benjamin Hamilton is a 47-year-old D.C. resident incarcerated at Rivers who has been assigned Federal Registration

# 32071-007. Mr. Hamilton arrived at Rivers in March 2003 and is not scheduled to be released from Rivers, at the earliest, until March 2020. As a result of his incarceration at Rivers, Mr. Hamilton was and is wholly dependent on Defendants for the delivery of care to address his health care needs. In December 2004 Mr. Hamilton discovered a bump on his leg. Within three days his entire leg was swollen. A nurse told him to put a hot compress on his leg; he received no medication or other treatment. Several more boils began to appear on his leg, and by January 2005, both of his legs were covered in boils. The nursing staff told Mr. Hamilton to continue using hot compresses; he received no medication or other treatment. In February 2005, another prisoner told Mr. Hamilton that it looked like Mr. Hamilton had Methicillin-resistant Staphylococcus aureus (commonly referred to as "MRSA"), a highly contagious staph infection. MRSA has garnered a considerable amount of media attention because of the danger it can pose to the general public when persons infected with MRSA are released from prison. The other prisoner advised Mr. Hamilton that many other men at Rivers were suffering from the same symptoms, and that Mr. Hamilton should get the boils cultured in accordance with standard medical protocols. However, despite numerous large, painful boils on his body and repeated requests to Defendants for medical treatment, Mr. Hamilton was not allowed to see a doctor until February 2005 -- two months after he first sought medical treatment. He was not diagnosed with MRSA until April 2005 -- four months after he first sought treatment. While Mr. Hamilton was initially put on antibiotics, which temporarily halted the symptoms, Defendants discontinued the antibiotics after five days, leading the boils to return twice more in Spring 2005, and again in Spring 2006, this time on his penis. When he reported the outbreak to a nurse, she responded, without

12

examining him, that this was just a fact of aging and a normal problem for older men. By Fall 2006, Mr. Hamilton had begun to develop a boil on his face. He has yet to receive treatment for any of this condition. The boils caused great pain and permanent scarring. Mr. Hamilton has also sought medical treatment for severe and continuing pain in one knee. Without conducting any physical examination or tests, a doctor at Rivers told Mr. Hamilton that it was arthritis, and suggested that he purchase some ibuprofen from Defendant GEO at the facility commissary. On another occasion Mr. Hamilton asked for an eye examination to update the prescription for his glasses, which had last been updated at the D.C. Jail prior to his arrival at Rivers. An ophthalmologist has diagnosed Mr. Hamilton with a type of refractive error known as presbyopia, which renders him unable to focus on objects. Mr. Hamilton has worn glasses for many years and cannot function normally without them. Without examining Mr. Hamilton, a Rivers nurse told him that his eyesight was fine, and that he didn't need glasses.

14.    Plaintiff CARL BUTLER: Mr. Butler is a 27-year old D.C. resident who was incarcerated at Rivers until May 22, 2007, when he was transferred to the Federal Correctional Institution in Petersburg, Virginia. Mr. Butler faces the possibility of returning to Rivers under federal requirements that a certain number of D.C. prisoners be held in private facilities. He is assigned Federal Registration # 31298-007, and his release date is January 10, 2008. Mr. Butler is paralyzed from the chest down and uses a wheelchair. During his incarceration at Rivers, he was wholly dependent on Defendants for the delivery of care to address his health care needs. Before he arrived at Rivers Mr. Butler had received physical therapy one to two times each week, and had been placed on a complex medication regime to control pain and acute asthma attacks. As part of his

sentencing the D.C. courts specifically recommended that Mr. Butler receive "medical treatment (defendant is in wheelchair), psychological counseling, [and] drug treatment." Upon his arrival at Rivers, Mr. Butler was advised by Defendants that no physical therapy was available.  Defendants substantially altered his medication regime and replaced his prescription pain medications with ibuprofen.  Despite the specific judicial recommendation for psychological counseling and Mr. Butler's repeated requests for mental health care, Mr. Butler never received this treatment during his time at Rivers. Furthermore, although he is paralyzed and in a wheelchair and suffers from seizures and chronic pain, Defendants required Mr. Butler to wait outside for up to 90 minutes, multiple times each day, exposed to the elements, to receive his medications during his time at Rivers.  Further, Mr. Butler was unable to access many of the facilities at Rivers because they are not accessible to persons with physical disabilities.  There are no ramps at Rivers.  Traveling from the recreation area to the main area requires Mr. Butler and other prisoners with physical disabilities to surmount a large curb.  Mr. Butler cannot maneuver around this obstacle in his wheelchair without assistance.  Additionally, many of the common area bathrooms are not accessible to persons with physical disabilities such as Mr. Butler.  The few bathrooms accessible to Mr. Butler and other prisoners with physical disabilities are not easily accessible from most common areas at Rivers, and in some instances require them to navigate a path with curbs and other obstacles that impede their trips such that they often cannot reach an accessible bathroom in time to use it. The shower facilities do not include hand-held shower heads and adequate seating in order to accommodate a person in a wheelchair.  The tables in the dining hall and classroom are not designed to accommodate persons with physical disabilities; the gym lacks equipment

14

usable by persons with physical disabilities; and many doors that men must use to move from one part of the facility to another cannot be opened by persons with physical disabilities. As a result of Defendants' failure to provide truly accessible facilities, Mr. Butler has been denied equal access to and receipt of the facilities, programs, services, and activities at Rivers.

15.     Plaintiff HAROLD ROBINSON:  Mr. Robinson is a 50-year-old D.C. resident incarcerated at Rivers who has been assigned Federal Registration # 03180-000. Mr. Robinson arrived at Rivers in September 2006 and is not scheduled to be released from Rivers, at the earliest, until August 2007.  As a result of his incarceration at Rivers, Mr. Robinson was and is wholly dependent on Defendants for the delivery of care to address his health care needs.  Mr. Robinson suffered a serious back injury in an automobile accident in 2006.  Following the accident Mr. Robinson received extensive physical therapy at a local hospital, and he continued to see a physical therapist at a D.C. jail facility.  This therapy helped relieve the severe pain from his back injury.  When he arrived at Rivers his physical therapy was halted because Rivers does not offer physical therapy.  Since then Mr. Robinson has repeatedly requested physical therapy and has repeatedly been denied any such therapy by medical staff.   As a result of the discontinuation of physical therapy, he has experienced a loss of mobility and severe and steadily worsening pain, for which the medical staff have suggested that he take ibuprofen.  A few days before Mr. Robinson was scheduled to meet with attorneys investigating the medical conditions at Rivers in January 2007, he was called to the infirmary and given Vicodin, a strong painkiller; this medication was halted shortly after the attorneys left the facility.  Despite Mr. Robinson's disability, Defendants have denied

15



Mr. Robinson's request for a chair with back support to replace his standard-issue stool; a member of the medical staff told him that he has "a snowball's chance in hell" of ever getting such a chair from the facility.

16.    Plaintiff CHARLES LEWIS: Mr. Lewis is a 57-year-old D.C. resident who was incarcerated at Rivers until March 2006. While incarcerated, Mr. Lewis was assigned Federal Registration # 035334-007. During the time of his incarceration at Rivers, Mr. Lewis was wholly dependent on Defendants for the delivery of care to address his health care needs. Prior to being incarcerated at Rivers, Mr. Lewis had been diagnosed as suffering from Bell's Palsy and had suffered three heart attacks and two strokes. As result of these conditions, his left side was substantially weakened and the left side of his face drooped, which altered his speech. While incarcerated in D.C. jail facilities prior to his arrival at Rivers, Mr. Lewis was evaluated by a specialist and sent to a local hospital for physical and speech therapy three times per week; was under the care of cardiology and neurology specialists; and was on a carefully calibrated, extensive medication regime. Mr. Lewis also used a physician-prescribed back brace and a knee brace. As a result of his medical care, his weakened left side became progressively stronger. As part of his sentencing the D.C. courts specifically took note of Mr. Lewis's medical conditions and recommended treatment. Upon his arrival at Rivers, Mr. Lewis was placed in disciplinary segregation for possessing the nitroglycerine pills prescribed to him by the D.C. Jail for his heart condition and chest pains. His physician-prescribed back brace and knee brace were confiscated and never returned or replaced. Despite the fact that Mr. Lewis arrived with refillable prescriptions for his medications, Defendants refused to provide Mr. Lewis with some of his medications, and dramatically changed

others, causing Mr. Lewis to experience dizziness and disorientation. When Mr. Lewis reported these side effects, the Rivers doctor provided no medical assessment or treatment. In December 2005, the dizziness was so severe that Mr. Lewis fell and injured his head while trying to sit on a bench. When he sought medical attention for his injuries he was offered ibuprofen by a nurse. Mr. Lewis advised the doctor at Rivers that the D.C. courts had recommended special medical treatment as part of his sentencing, and that he had been provided with physical therapy while at the D.C. Jail. In response, the Rivers doctor stated that physical therapy services were not provided at Rivers. During his incarceration at Rivers, Mr. Lewis never saw a neurologist, cardiologist, or physical therapist as he had regularly done before arriving at Rivers. As a result of the medical care that he received at Rivers, the strength that Mr. Lewis developed in his left side before he arrived at Rivers was lost. He also frequently had to skip meals and wait outdoors in a "pill line," in all weather, in order to get his medications three times per day. Despite his multiple chronic and severe medical conditions, and despite seeking medical care on numerous occasions, Mr. Lewis was never treated by a medical specialist for his conditions while at Rivers.

17.    Plaintiff JOHN DOE: Mr. Doe is a D.C. resident who was incarcerated at Rivers until earlier this year. During the time of his incarceration at Rivers, Mr. Doe was wholly dependent on Defendants for the delivery of care to address his health care needs. At the time of his arrival at Rivers, Mr. Doe had previously been diagnosed as HIV positive, diabetic, hypertensive, and suffering from Hepatitis C, and had suffered from a prior stroke. As a result of his conditions, at the time of his arrival at Rivers Mr. Doe was being treated with a carefully calibrated medication regime prescribed by doctors at the

17

Federal Medical Center in Rochester, New York (a facility affiliated with the Mayo Clinic) and maintained by the D.C. Jail, including at least eight (8) prescription medications and a special diet. Mr. Doe arrived at Rivers with a complete 30-day supply of all his medications. Defendants promptly confiscated those medications and denied Mr. Doe all medication for the first week of his incarceration at Rivers. Despite Mr. Doe's frail health, Defendants required Mr. Doe to stand outside in the "pill line" multiple times a day to receive his medications. As a result of Defendants' faulty system, Mr. Doe was forced on a routine basis to miss his special dietary meal so that he can obtain his medications. As a consequence, Mr. Doe lost over 15% of his body weight at Rivers, and suffered from such severe weakness that he was unable to participate in outdoor activities or walk normally.

18.    Plaintiff JOHN ROE: Mr. Roe is a D.C. resident who was incarcerated at Rivers until earlier this year. During the time of his incarceration at Rivers, Mr. Roe was wholly dependent on Defendants for the delivery of care to address his health care needs. At the time of his arrival at Rivers, Mr. Roe had previously been diagnosed as suffering from depression and schizophrenia. As a result of his mental health conditions Mr. Roe had attempted suicide on at least three occasions. Mr. Roe's chronic depression, paranoia and frequent hallucinations (when denied medications) affect his ability to concentrate and to interact with other people, resulting in limitations of major life activities including thinking, reading, communicating with prison staff and others, following directions, and protecting himself from harm. Mr. Roe also suffered from a number of chronic, preexisting physical conditions. During his incarceration at Rivers, Mr. Roe repeatedly sought medical and mental health care from Defendants. He was only permitted to see a

mental health professional on a handful of occasions, and his psychotropic medications were either discontinued or replaced because, he was told, "This is not the jail. You're not in the community. This is a business." On several occasions during his incarceration Mr. Roe asked to be seen by the prison doctor regarding his chronic physical conditions and was simply refused care. As a result of this failed system, Mr. Roe suffered from insomnia and hallucinations, and continued to experience heightened chronic pain from his various physical conditions.

19.     Plaintiff JIMMIE FOWLER:  Mr. Fowler is a 50-year-old D.C. resident who was incarcerated at Rivers from November 2005 until May 2007, when he was transferred to the Federal Correctional Institution in Petersburg, Virginia. Mr. Fowler faces the possibility of returning to Rivers under federal requirements that a certain number of D.C. prisoners be held in private facilities. He has been assigned Federal Registration # 00472-000 and is not scheduled to be released from federal custody, at the earliest, until July 2009. During his incarceration at Rivers, Mr. Fowler was wholly dependent on Defendants for the delivery of care to address his health care needs. At the time of his arrival at Rivers, Mr. Fowler had previously been diagnosed with and was being treated for both diabetes and high blood pressure. As a result of these conditions, Mr. Fowler was required to conduct multiple "finger prick" tests each day to monitor his blood sugar levels, take insulin pills throughout each day, and take medication daily for his high blood pressure. When he arrived at Rivers, Mr. Fowler's diabetes and high blood pressure medications were confiscated and not returned. For several weeks, Mr. Fowler was forced to borrow insulin pills from other diabetic prisoners at Rivers to avoid hypoglycemic shock, which meant that neither Mr. Fowler nor the prisoners who shared

their insulin received proper medication. Despite repeated requests by Mr. Fowler, Defendants continue to refuse to allow daily monitoring of Mr. Fowler's blood sugar levels, requiring him instead to submit sick call requests for the following day each time he wanted to be monitored. Defendants advised Mr. Fowler that the blood pressure medication that he had been prescribed was "too expensive." They replaced it with an alternate medication that caused Mr. Fowler severe headaches, dizziness and swelling in his extremities. The actions of Defendants described here caused Mr. Fowler substantial pain and suffering, and increased his risk of serious and potentially life-threatening complications from his chronic conditions.

20.    As a result of their incarceration at Rivers, each of the Named Plaintiffs, as well as the Class and the Disability Sub-Class, were and are wholly dependent on Defendants for the delivery of care to address their health care needs. Named Plaintiffs are victims of the systemic failures of Defendants to provide lawfully required health care services to Rivers residents, and have been injured as a result of Defendants' conduct. Each of the Named Plaintiffs with disabilities and the Disability Sub-Class have also suffered and continue to suffer injuries as a result of the Defendants' discriminatory conduct in excluding them from and denying them access to the programs, services, facilities, and activities at Rivers based on their disabilities.

**B.    Defendants**

21.    Defendant GEO GROUP, INC. is a for-profit corporation formed and existing under the laws of the State of Florida, and having its principal place of business in the State of Florida. GEO is in the business of building, owning, operating, and managing correctional, detention, mental health, and residential treatment facilities in the

20

United States and around the world. GEO is a publicly-traded corporation and is listed on the New York Stock Exchange under ticker symbol "GEO." As of December 2006, GEO reports that it operates a total of 62 correctional, detention and mental health facilities, with a capacity of over 54,000 beds. In 2006, GEO had revenues totaling over $860 million and profits of over $30 million. One of the correctional facilities built, owned, operated, and managed by GEO, pursuant to a written contract with the BOP, is Rivers. At all times relevant to this Complaint, Defendant GEO had undertaken the duty to provide Constitutionally adequate medical care owed to Plaintiffs by Defendant UNITED STATES OF AMERICA acting through the BOP.

22.    Defendant the UNITED STATES OF AMERICA, pursuant to federal law, has mandated that its department, the BOP, have the responsibility for over-seeing, controlling, managing, and supervising the federal prison system, including Rivers, and those persons incarcerated therein.

23.    Defendant HARLEY LAPPIN is employed by the BOP as its Director. As the Director of the BOP, Defendant LAPPIN is charged with the custody and care of each Plaintiff as well as each member of the Class and Sub-Class while incarcerated at Rivers. Defendant LAPPIN is responsible for overseeing the administration of the BOP and approving all BOP policies relating to the treatment of persons under its care, including those persons incarcerated at Rivers. At all times relevant to this Complaint, Defendant LAPPIN was acting as an employee and agent of Defendant UNITED STATES OF AMERICA.

21

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343.

25.    This Court has personal jurisdiction over each of the Defendants.

26.    Venue of this action properly lies in the District of Columbia pursuant to 28 U.S.C. §§ 1391 (b), (c) and (e).

## STATEMENT OF FACTS

**A.    The District of Columbia, the BOP, and Private Prisons**

27.    Until 2001, persons convicted of a felony violation of the District of Columbia Code (the "D.C. Code") were generally incarcerated at prison facilities operated by or for the District of Columbia, and located in or near the District.

28.    In 1997, as part of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 11 Stat. 251, the United States Congress enacted Title XI, the National Capital Revitalization and Self-Government Improvement Act of 1997, 111 Stat. 712 (the "Revitalization Act"). Now codified in part at D.C. Code § 24-101, the Revitalization Act requires that any person who is sentenced in the District of Columbia to incarceration as a consequence of a D.C. felony conviction, or as a consequence of a violation of the conditions of parole or supervised release relating to a D.C. felony conviction, be committed to the custody of the BOP and housed in a BOP institution. The vast majority of D.C. Code felony offenders are residents of the District of Columbia.

29.    Pursuant to federal law, the BOP generally has the authority to designate the place of any prisoner's incarceration. However, Section 11201 of the Revitalization Act requires that the BOP house at least half of D.C. Code felony offenders in private,

22

for-profit contract facilities. By housing a portion of its population of D.C. Code felony offenders at private prisons such as Rivers, the federal government is able to reduce its expenditures for those prisoners, meet budget constraints imposed by Congress, and thereby benefit financially from contracting out services to the lowest bidder.

**B.    GEO Competes for and Wins a Contract to House D.C. Offenders at Rivers**

30.    GEO is the second largest private prison operator in the United States. Approximately one-third of its business is with agencies of the U.S. government that are headquartered in the District of Columbia, including the BOP, U.S. Marshals Service, and U.S. Immigration and Customs Enforcement. On information and belief, GEO, acting through its employees and agents, actively and continuously solicits business from these federal agencies in the District of Columbia by providing them with targeted sales and marketing proposals; responding to Requests for Proposals ("RFPs"); meeting with federal officials to discuss GEO's commercial capabilities; and engaging in other written, telephonic and electronic communications in and directed at the District of Columbia that are intended to further GEO's commercial interests. In its corporate documents GEO highlights the company's "long-term customer relationships" with these federal agencies, and states that GEO "intend[s] to capitalize on our long-term relationships with governmental agencies to continue to grow our correctional, detention and mental health facilities management services and to become a preferred provider of complementary government-out-sourced services." Through its commercial sales and marketing efforts targeted at customers in the District of Columbia, GEO has successfully competed for more than a dozen federal contracts from federal agencies in the District of Columbia. GEO maintains a registered agent in the District of Columbia. On information and belief,

23

GEO, acting through its employees and agents, maintains a permanent business presence in the District of Columbia.

31.     In 1998, the Federal Bureau of Prisons issued an RFP seeking a private contractor to house a portion of the 50 percent of D.C. Code felony offenders who by law must be incarcerated in private prisons. On information and belief, GEO submitted a response to that RFP in the District of Columbia, and negotiated with the BOP over the commercial and other terms of such an agreement in the District of Columbia, including GEO's obligations with respect to the provision of medical, dental, and mental health care. GEO's offer was accepted, and a contract between GEO and BOP to house prisoners at Rivers (the "Rivers Contract") was formed, in the District of Columbia.

32.     Pursuant to the Rivers Contract, GEO has agreed, under BOP supervision and control, to house low-security, male, D.C. Code felony offenders at GEO's Rivers facility. Rivers is a private, for-profit correctional facility owned and operated by GEO. It is located at 145 Parker's Fishery Rd., Winton, N.C. 27986. The BOP has sent thousands of D. C. Code felony offenders to Rivers since the facility opened in 2001. Rivers currently houses approximately 1,300 persons, the large majority of whom are D.C. Code felony offenders.

33.     The Rivers Contract provides for the involuntary relocation of D.C. residents from the District of Columbia to Rivers, thereby rendering those individuals wholly dependent on GEO for their medical, dental, and mental health care and related services. By entering into the Rivers Contract, GEO, under BOP supervision and control, assumed responsibility for the medical treatment of persons incarcerated at the Rivers facility, and voluntarily submitted to long-term regulation and oversight by the BOP in

24

the District of Columbia.  The initial term of the Rivers Contract was three years with seven one-year options exercisable by the BOP which, on information and belief, has led GEO to engage in further sales, marketing, and other commercial activity in the District of Columbia related to the Rivers Contract each year since 2002, in their successful efforts to persuade BOP to extend the Rivers Contract for additional periods.

34.     GEO has performed and is obligated to perform substantial and material obligations under the Rivers Contract in the District of Columbia.  By way of example only, GEO is obligated to:  (a) provide periodic performance reports to the BOP in the District of Columbia; (b) report to the BOP in the District of Columbia certain defined events that occur at Rivers, such as the death of a prisoner; (c) seek and obtain approval from the BOP in the District of Columbia before sending a Rivers prisoner outside the facility for medical treatment; (d) submit to the BOP in the District of Columbia all Rivers policies and procedures relating to medical, dental, and mental health treatment, and obtain BOP approval for all such policies; and (e) seek approval from the BOP in the District of Columbia before releasing a prisoner.  GEO submits monthly invoices for services provided at the Rivers facility to the BOP in the District of Columbia, and the BOP approves and makes payment to GEO in the District of Columbia.

**C.     GEO's Obligation to Provide Medical, Dental, and Mental Health Care under the Supervision and Control of the BOP**

35.     The Rivers Contract spells out in great detail the services that GEO is required to provide to, and for the benefit of, Rivers prisoners.  Pursuant to the Rivers Contract:

a.     GEO is required to provide "all essential health services" and to adhere to "the U.S. Constitution," and "all applicable Federal, state and local laws

and regulations governing the delivery of health services and establish the necessary quality controls to ensure all policies and procedures are designed and implemented in a manner to promote orderly and efficient delivery and management of health services to the inmate population."

       b.     GEO is required to have written plans and procedures for "providing urgent medical, health, mental health and dental services . . . includ[ing] but not limited to, the following: (1) 24 hour-a-day, seven day-a-week emergency medical, health, mental health and dental care; (2) initial health screening; (3) health appraisal examination; (4) daily triaging of complaints; (5) sick call procedures; (6) special medical programs and services for, but not limited to, inmates with chronic needs or requiring convalescent care; (7) mental health and substance abuse services; (8) staffing/health care specialist; (9) ancillary services – radiology, laboratory, etc.; (10) dental services – routine and emergency; (11) pharmaceutical services and supplies; (12) optometric services; (13) health education; (14) medical diets; (15) infectious diseases; and (16) quality control/peer reviews."

       c.     GEO is required to submit "all plans, policies and procedures" at Rivers, including but not limited to training materials, to the BOP for "review and concurrence." GEO is prohibited from making modifications to those plans, policies and procedures without BOP acknowledgement.

       d.     GEO is required to submit all proposed hirings of personnel at Rivers to the BOP. The BOP alone may grant approval for the employment of

any personnel at Rivers. The BOP is "the final approval authority for all [GEO] staff who work with Federal inmates. . . ."

    e.    "[E]ach phase of the services rendered under [the Rivers Contract] is subject to BOP inspection both during [GEO's] operations and after completion of the tasks." The contract provides for on-site BOP personnel to "monitor contract performance" by GEO.

    f.    The Rivers Contract provides that an on-site BOP representative, known as the "Contracting Officer's Representative," act as the "contract monitor" and be "responsible for the technical direction of the performance of all work under [the Rivers] contract."

    g.    The contract mandates that GEO comply with the Uniform Building Code, the Building Officials and Code Administrators National Building Code (BOCA), and the Standard Building Code if mandated by the State of North Carolina, and if not, BOCA, as well as the Architectural Barriers Act of 1968, the Rehabilitation Act of 1973, and the Uniform Federal Accessibility Standards.

    h.    GEO is required to submit final "design/construction documents" to the BOP, and allow "periodic visits during construction [by the BOP] to verify . . . compliance with contract requirements."

    36.    The Rivers Contract is a fixed price contract providing for a set payment to GEO per time period, irrespective of GEO's costs of providing the services, including health care services, required by the BOP. Thus, to the extent that GEO is able to reduce the costs of the medical, dental, and mental health services offered at Rivers, GEO's profits are increased.

27

**D.    Defendants' Unconstitutional and Illegal Organizations, Systems, Patterns and Practices at Rivers**

37.    It is well known to Defendants that the population of persons incarcerated in federal prisons suffer from the full spectrum of routine medical problems found in the general population, such as fractures, abdominal pains, and infections, as well as chronic diseases such as asthma, hypertension, epilepsy, diabetes, tuberculosis, and HIV. It is also well known to Defendants that prisoners suffer from a higher rate of serious medical, dental, and mental health problems, chronic conditions, and injuries than does the American population as a whole. Defendants are also aware that the population at Rivers is of greater average age than typical prison populations, and suffers from a higher incidence of health problems than the general American prison population.

38.    Defendants are deliberately indifferent to Plaintiffs' serious medical needs. Defendants' indifference has produced and perpetuates today a health care delivery system at Rivers that is so grossly inadequate as to violate the legal rights of the Plaintiffs, the Class, and the Sub-Class. The systemic failure of the Rivers health care delivery system is illustrated by the following:

a.    <u>Wholly Insufficient Staffing, Training and Supervision</u>—The number of qualified health care staff at Rivers is wholly inadequate to provide care to Rivers' 1,300 residents. On information and belief, the lone medical doctor who treats and supervises the care of all the prisoners at Rivers also maintains a full-time medical practice in a local community. There is only one part-time dentist on staff, who sees patients less frequently than does the doctor. There are no trained dental assistants to provide back-up support and dental services. There is no physical therapist on staff or available on a contract basis

28

for prisoners. There is only one part-time psychologist who attends to prisoners at Rivers on an irregular basis. The number of medical staff is grossly inadequate to meet the significant and documented medical, dental and mental health needs of the men at Rivers. This inadequate staffing is due, in part, to the fact that Defendants: (i) do not actively attempt to recruit and hire sufficient, competent medical staff; (ii) fail to train and supervise medical personnel; and (iii) are unable to retain those medical staff members who are hired. On information and belief, as a consequence of the severe staffing shortage, corrections offers with little or no health care training may serve as the gatekeepers for Plaintiffs' access to routine and even emergency medical care, leading to acute medical crises.

b.    <u>Grossly Inadequate Access to Health Care</u>—Defendants routinely and knowingly fail to provide prisoners with access to essential health care. Prisoners suffering from serious and even acute conditions are habitually and indiscriminately denied treatment. When prisoners do manage to see the part-time Rivers doctor, they are frequently denied care for complex, multi-symptom ailments on the arbitrary ground that the doctor will not treat more than one condition per appointment. There is a substantial backlog of requests for routine and emergency medical and dental care, resulting in frequent and dangerously lengthy delays in accessing care. Members of the Class face substantial delays and regular denials of treatment when they want to see a primary physician; when they need a referral to see a specialist; when they need to be transported to a specialist for examination after obtaining a referral; when they need to obtain medical testing; and when they need treatment. Mental health care services are

inadequate, and physical therapy services are simply not offered. Prisoners who have worn glasses for years are told that they no longer need them. On information and belief, necessary health care has in some cases been denied based solely on a prisoner's expected release date, even when this date is over one year away, in an effort to avoid the cost of such care.

     c.     <u>Denial of Access to Qualified Medical Services Outside the Facility</u>— Rivers medical staff routinely refuse to refer prisoners to outside health care providers even in situations where the prisoner's medical, dental, or mental health conditions far exceed the therapeutic capabilities of Defendants or their facilities, and where treatment would be a necessary component of Defendants' obligation to provide legally mandated care. Defendants' failure to refer prisoners to off-site specialists has in some cases resulted in great suffering by prisoners, and has led to serious, and entirely avoidable, medical complications. On information and belief, laboratory and other medical testing services at Rivers are routinely delayed, never done, or not reported. By way of example, infectious conditions such as MRSA are not typically cultured, even though BOP guidelines recognize that this is an essential step in diagnosing MRSA, determining an effective antibiotic or treatment regimen, and avoiding the creation of resistant strains of the infections and outbreaks among the prisoners.

     d.     <u>Failure to Provide Proper Medications and Arbitrary Discontinuation of Prescription Drugs</u>—Arriving prisoners' prescription medications are routinely confiscated without regard to the impact on the prisoner's health. Prisoners often have to wait a week or more before receiving

substitute medications at Rivers. Determinations regarding medication regimens, and the composition of those regimens, are made based on the cost of the medications to GEO rather than the best interests of the patient. Prisoners' medications are arbitrarily changed to less expensive medications without proper follow up to assess the efficacy and side effects of the new medications. Upon information and belief, many prisoners have simply been denied necessary medication altogether as a cost-saving measure for the facility.

  e.  The Faulty Medication Distribution System: The "pill line"— Prisoners at Rivers may only obtain certain medications by standing in the "pill line." The pill line forms outside a window from which a nurse dispenses most medication available at the prison. The pill line window opens to an outside walkway that is open to the elements, except for a partial roof covering the walkway. Because the pill line moves very slowly, sick, disabled, and elderly prisoners must wait outdoors for 60 to 90 minutes for each dose of their needed medicines; for a person receiving three doses a day, this can add up to more than three hours a day waiting in the pill line. Further, because of the extreme delays in distributing medication, prisoners are sometimes forced to choose between remaining in the pill line to receive their medication, or leaving the pill line to obtain food. Men who leave the pill line to obtain food are often punished for failing to take their medication. Men who have helped sick or elderly persons or persons with disabilities go to the front of the pill line have also been punished by Defendants. The pill line is a failed system for providing necessary medical care

that has directly contributed to the poor health and declining condition of many prisoners at Rivers, particularly the sick and elderly.

  f.  Failure to Provide Chronic Care— GEO staff at Rivers fail to adequately administer and supervise the facility's "chronic care" and other medical rotations designed to help prisoners manage illnesses such as diabetes, heart disease, hypertension, hepatitis, and HIV. Problems include but are not limited to: (i) failure to provide appropriate facilities for infirmary or long-term inpatient care; (ii) failure to instruct and assist prisoners in following the strict regimens needed to take their drug combinations successfully; (iii) irregular, untimely, and sometimes incorrect administration of medications; (iv) pill line procedures that effectively require chronically ill prisoners to choose between obtaining nourishment or obtaining the medications necessary to treat their conditions; (v) failure to adequately monitor and treat secondary infections; (vi) failure to provide adequate long-term mental health facilities and treatment; and (vii) failure to provide physical therapy treatment.

  g.  Failure to Contain or Treat Infectious Diseases

  On information and belief, Rivers has no established protocols for addressing outbreaks of MRSA, a highly contagious staphylococcus infection that is often found in prisons and other institutional settings. Because MRSA is resistant to certain standard antibiotic treatments, health care professionals are instructed to take a sample of a potential infection site and "culture" it to determine which bacterial organism caused the infection, and which antibiotic treatment will be most effective. On information and belief, such cultures are

seldom if ever taken at Rivers. Prisoner complaints of possible MRSA boils are often disregarded, and some prisoners have been instructed to apply hot compresses or "shower with Dial soap" to rid themselves of such boils. When antibiotics are provided, they are generally prescribed for only brief periods and without benefit of any kind of laboratory test. As a result, many prisoners have experienced chronic and persistent MRSA infections, leaving them scarred and potentially exposed to life-threatening illnesses.

      h.     <u>Failure of Quality Controls and Integrity of Medical Records</u>—On information and belief, Rivers does not have in place adequate quality control procedures with respect to health care provided at the facility. An adequate quality control system would include physician peer review, quality assurance programs, and "death reviews" (an investigation and report on deaths that occur in custody, which helps medical staff learn from and avoid fatal mistakes). Further, the medical staff that Defendants have put in place at Rivers lack sufficient knowledge about medical care delivery systems to properly monitor and assess the delivery of medical care. When deficiencies are identified, there is inadequate follow-up to prevent future problems. In some instances Defendants refuse to obtain the historical medical records of prisoners that are necessary to render proper diagnoses and treatment and to avoid certain well known risks, such as prescribing conflicting medications or ordering other dangerous courses of treatment.

      i.     <u>Failure to Provide Meaningful Grievance Process</u>—The Rivers administrative grievance system often does not provide timely or adequate

responses to complaints about medical, dental, or mental health care. Prisoners wishing to grieve about medical care they have received (or have not received) are frequently stymied by counselors who tell them that "today is not a good day to file this grievance," or who state that they are "too busy" to take or process written complaints. Some prisoners have been cautioned that they will no longer receive care because they have grieved, and have accordingly chosen not to pursue grievances for fear that they will be denied the care they need. Upon information and belief, others have had their grievances destroyed or disposed of when they attempted to submit them to Rivers staff. Prisoners who complain frequently about the deficiencies in health care have been punished with "administrative segregation"—solitary confinement—which is punitive to the prisoner. By erecting obstacles to filing a grievance, and through threats and acts of retribution, Rivers staff have effectively discouraged or foreclosed meaningful access to the grievance process for many prisoners.

39.     Despite Defendants' actual and constructive knowledge of these and other significant failures and deficiencies in the organizations, systems, policies and practices for the delivery of medical, dental, and mental health services at Rivers, Defendants have refused or consciously ignored the need to take immediate actions to protect Plaintiffs, the Class, and the Sub-Class from ongoing and future harm.

## CLASS ACTION ALLEGATIONS

**A.     The Class**

40.     Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of a class of

persons comprised of past, current, and future prisoners of Rivers who, during their incarceration at Rivers, are dependent upon the organizations, systems, policies, practices, and institutional conditions of Defendants for their receipt of medical, dental, and mental health care ("the Class").

41.    As a result of their confinement at Rivers, members of the Class, including Plaintiffs, have been, are, and will be subjected to violations of their legal rights as described in this Complaint. Each Plaintiff has been injured by the unlawful and grossly inhumane level of medical care at Rivers that has resulted from Defendants' dysfunctional organizations, systems, policies, practices, and institutional conditions. Plaintiffs represent the Class seeking primarily declaratory and injunctive relief to correct or eliminate the organizations, systems, policies, practices, and institutional conditions that deprive them of their rights.

42.    The proposed Class is so numerous and fluid that joinder of all members is impracticable. There are currently approximately 1,300 men at Rivers, each of whom depends upon Defendants to receive needed medical, dental, and mental health care while incarcerated. All members of the Class are at risk of developing serious medical conditions while at Rivers due to the inadequate care provided. The size and membership of the Class exhibits an inherent instability of composition as a consequence of prisoner transfers and releases and the incarceration of new prisoners.

43.    All Class members are equally subject to the conditions described in this Complaint, and common questions of law and fact exist as to all Class members. These common questions include, but are not limited to: (a) whether Defendants provide systemically inadequate medical, mental health, and dental care to the Class members; (b)

whether Defendants have been deliberately indifferent to the serious medical, mental health, and dental needs of the Class members; (c) whether Defendants have placed Class members at unreasonable risk of developing serious medical, mental health, and dental problems; (d) whether Defendants have violated Class members' rights to be free of cruel and unusual punishment under the Eighth Amendment; (e) whether Defendants provide medical, mental health, and dental care that is comparable or substantially equivalent to the care provided to other federal prisoners and the community at large; and (f) whether the inadequacies in the provision of medical, mental health, and dental care at Rivers arise from Defendants' arbitrary efforts to reduce costs and, in the case of GEO, to boost profits.

44.    The organizations, systems, policies, practices, and institutional conditions that form the basis of this Complaint as to the Class are common to all members of the Class, and the relief sought will apply to all of them. Moreover, each member of the Class has a common interest in preventing the recurrence of the wrongful conduct described herein.

45.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the Class they represent have been directly injured by Defendants' unconstitutional and unlawful organizations, systems, policies, practices, and institutional conditions with respect to health care.

46.    Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs have no interests separate from the Class, and seek no relief other than the relief sought on behalf of the Class. Plaintiffs' counsel are experienced in the protection and enforcement of the legal rights of prisoners.

47.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications which would establish incompatible standards of conduct for the Defendants.

48.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members which would, as a practical matter, substantially impair the ability of other members to protect their interests.

49.    Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate injunctive and declaratory relief with respect to the Class as a whole. Moreover, Defendants' actions described herein may be viewed as part of a consistent pattern of activity that has been established under a regulatory scheme that is common to all members of the Class.

50.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to any other available method for the fair and efficient adjudication of the controversy presented here.

**B.    The Disability Sub-Class**

51.    Plaintiffs Holloway, Rogers, Butler, Robinson, Doe, and Roe ("the Sub-Class Plaintiffs") bring claims under Section 504 of the Rehabilitation Act on behalf of themselves and, pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of all prisoners who have been denied access to the programs, services, facilities, and activities at Rivers because of Defendants' failures to adequately diagnose, monitor, treat and/or accommodate their serious medical conditions, in

37

violation of Section 504 of the Rehabilitation Act ("the Sub-Class"). As a result of their confinement at Rivers, members of the Sub-Class, including Sub-Class Plaintiffs, have been, are, or will be subjected to violations of their legal rights as described in this Complaint. Sub-Class Plaintiffs represent a class of qualified persons seeking declaratory and injunctive relief to correct or eliminate Defendants' organizations, systems, policies, practices, and institutional conditions that deprive them of their rights under Section 504 of the Rehabilitation Act; and damages ancillary to that injunctive relief.

52.    Plaintiffs meet the requirements for certification as a sub-class pursuant to Fed. R. Civ. P. 23 (c)(4).

53.    Upon information and belief, a substantial percentage of the men at Rivers suffer from severe mental illnesses or physical impairments that substantially limit one or more major life activities. Each of these persons is a "qualified individual with a disability" under Section 504 of the Rehabilitation Act, as amended, and is represented by the proposed Sub-Class Plaintiffs. Like the Class, the proposed Sub-Class is so numerous and fluid that joinder of all members is impracticable.

54.    All Sub-Class members are equally subject to the conditions described in this Complaint, and common questions of law and fact exist as to all Sub-Class members. These common questions include, but are not limited to: (a) whether Defendants systemically exclude Sub-Class members from access to, participation in, and the benefits of, any program, service, facility, or activity at Rivers solely by reason of their disabilities; (b) whether Defendants systematically deny access to, participation in, and the benefits of, any part of Rivers or its programs, services, facilities, or activities to Sub-Class members solely by reason of their disabilities; (c) whether Defendants have

38

subjected Sub-Class members to discrimination solely by reason of their disabilities; and (d) whether Defendants have violated Section 504 of the Rehabilitation Act.

55.    The organizations, systems, policies, practices, and institutional conditions that form the factual basis of the Rehabilitation Act claim are common to all members of the Sub-Class, and the relief sought will apply to all of them. Each member of the Sub-Class has a common interest in preventing the recurrence of the wrongful conduct described herein.

56.    Sub-Class Plaintiffs' claims are typical of the claims of the Sub-Class. Sub-Class Plaintiffs are persons suffering from serious mental illnesses and/or physical impairments typical of the Sub-Class as a whole. Sub-Class Plaintiffs and the Sub-Class they represent have been directly injured by Defendants' unlawful organizations, systems, policies, practices, and institutional conditions with respect to health care.

57.    Sub-Class Plaintiffs will fairly and adequately represent the interests of the Sub-Class. Sub-Class Plaintiffs have no interests separate from the Sub-Class, and seek no relief other than the relief sought on behalf of the Sub-Class and the Class. Sub-Class Plaintiffs' counsel are experienced in the protection and enforcement of the legal rights of prisoners.

58.    The prosecution of separate actions by individual members of the Sub-Class would create a risk of inconsistent and varying adjudications which would establish incompatible standards of conduct for the Defendants.

59.    The prosecution of separate actions by individual members of the Sub-Class would create a risk of adjudications with respect to individual members which

would, as a practical matter, substantially impair the ability of other members to protect their interests.

60.    Defendants have acted or refused to act on grounds generally applicable to the Sub-Class, making appropriate injunctive and declaratory relief with respect to the Sub-Class as a whole.  Moreover, Defendants' actions described herein may be viewed as part of a consistent pattern of activity that has been established under a regulatory scheme that is common to all members of the Sub-Class.

61.    The questions of law and fact common to the members of the Sub-Class predominate over any questions affecting only individual members, and a class action is superior to any other available method for the fair and efficient adjudication of the controversy presented here.

## CLAIMS FOR RELIEF

### First Claim for Relief

(Constitutional Violations—All Defendants)

62.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs of this Complaint.

63.    Defendants' deliberate indifference to Plaintiffs' serious medical, dental, and mental health needs has caused and continues to cause avoidable pain, mental suffering, and deterioration of Plaintiffs' health.  In some instances, Defendants conduct has resulted in serious physical injury, and, upon information and belief, premature death.

64.    Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

40

65.     Defendants' organizations, systems, policies, procedures, practices, acts, and omissions place Plaintiffs and Class and Sub-Class members at unreasonable, continuing, and foreseeable risk of developing or exacerbating serious medical, dental, and mental health problems, and of suffering needless pain, injury, and premature death.

66.     As a proximate result of Defendants' organizations, systems, policies, procedures, practices, acts, and omissions, Plaintiffs, the Class and the Sub-Class have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological and emotional injury, and the risk of premature death.

67.     Because it has undertaken the government's Constitutional duty to provide adequate medical care to prisoners in its custody, Defendant GEO GROUP was and is a government actor with respect to all its actions and omissions complained of herein.

68.     By virtue of his employment by the United States government, Defendant LAPPIN was and is a government actor acting in his official capacity with respect to all his actions and omissions complained of herein.

69.     Because Defendants know that Plaintiffs and all other prisoners at Rivers live under conditions creating an unreasonable risk of future harm, but have not responded reasonably to this situation, Plaintiffs seek a preliminary and permanent injunction compelling Defendants to immediately furnish them, the Class, and the Sub-Class with organizations, systems, policies, procedures, and practices for the delivery of constitutionally adequate medical, dental, and mental health care.



**Second Claim for Relief**

(Violations of the Rehabilitation
Act—Defendants BOP and GEO)

70.     Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs of this Complaint.

71.     Sub-Class Plaintiffs Holloway, Rogers, Butler, Robinson, Doe, and Roe, and each member of the Sub-Class, are "qualified individual[s] with a disability" under Section 504 of the Rehabilitation Act, as amended.

72.     The Rehabilitation Act, as amended, and its regulations, prohibit recipients of federal funding and any program or activity conducted by any executive agency of the United States from discriminating against people with disabilities.   The Rehabilitation Act, 29 U.S.C. § 794(a), provides, in pertinent part: "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ."

73.     Defendant GEO operates a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act, namely, Rivers, and all of the operations, programs, services, facilities, and activities conducted at the facility constitute a program or activity within the meaning of Section 504.

74.     Defendant BOP is an executive agency of the United States government, providing funding and financial assistance to Defendant GEO, and Rivers, and the programs and activities conducted at Rivers, fall within the ambit of the Rehabilitation Act, as amended.

75.    Defendants BOP and GEO have made these Sub-Class Plaintiffs' and the Sub-Class' access to, equal participation in, and receipt of the benefits of, the programs and activities identified above unduly burdensome solely by reason of their disabilities, in violation of the Rehabilitation Act, as amended, and its regulations.

76.    Defendants BOP and GEO have subjected Sub-Class Plaintiffs and the Sub-Class to discrimination solely by reason of their disabilities.

77.    As a result of Defendants BOP's and GEO's organizations, systems, policies, practices, and institutional conditions, which result in the provision of wholly inadequate health care, these Sub-Class Plaintiffs and all members of the Sub-Class have been excluded from a variety of programs, services, facilities, and activities at Rivers, including but not limited to, substance abuse programs, educational programs, vocational programs, recreation activities, dining hall and other meals, yard time, visitation, discipline, telephone, emergency procedures and other programs and activities for which they are otherwise qualified, and that Defendants BOP and GEO provide to individuals without disabilities under their custody and control, thereby subjecting these Sub-Class Plaintiffs and the Sub-Class to discrimination in violation of the Rehabilitation Act, as amended, and its regulations.

78.    By engaging in the conduct described above, Defendants BOP and GEO have either intentionally discriminated against these Sub-Class Plaintiffs and the Sub-Class, or have been deliberately indifferent to the strong likelihood that its organizations, systems, policies, procedures, and practices would result in violations of federally protected rights.

43

79.    These violations of the Rehabilitation Act by Defendants establish a claim for declaratory and injunctive relief and compensatory damages against Defendants BOP and GEO pursuant to Section 505 of the Rehabilitation Act.

### Third Claim For Relief
(Negligence—Defendant GEO)

80.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs of this Complaint.

81.    Because of the custodial relationship between GEO and the Rivers prisoners, persons incarcerated at Rivers were and are entirely dependent on GEO for medical care. As a consequence of the custodial relationship, and by virtue of GEO's explicit contractual duty to provide medical care to inmates that was commensurate with the well-established standards of care in the community, within the broader correctional industry, and under federal law, GEO has a duty to provide reasonable medical care and treatment to the men at Rivers.

82.    Through its organizations, systems, policies, practices, institutional conditions, acts, and omissions, GEO has systematically deprived the men at Rivers of adequate medical, dental and mental health care, all in breach of its duty of care to those persons. GEO's acts and omissions constitute a breach of the standard of care owed by a reasonably prudent person in similar circumstances. Defendants GEO's breaches include but are not limited to:  (a) negligence in the hiring, training, supervision and retention of employees; (b) the failure to maintain an adequate level of qualified health care staff at Rivers; (c) the failure to monitor the actions and practices of health care staff; (d) the failure to oversee the treatment prescribed and administered by health care staff; (e) the

failure to establish an adequate and reasonable method for distributing medication; (f) the failure to maintain adequate and reasonable policies and procedures governing prisoners' timely access to medical care; (g) the failure to provide physical therapy and/or mental health counseling, even when such therapy or counseling is directed by treating physicians or a Court; (h) the failure to maintain adequate medicines and/or medical supplies and equipment; and (i) the failure to comply with numerous other statutory, regulatory, contractual, governmental, and industry standards with respect to the provision of medical, dental and mental health care in correctional facilities.

83.    As a proximate result of Defendant GEO's acts and omissions in breach of GEO's duty of care, Plaintiffs and the Class have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological and emotional injury, and heightened risk of premature death.  GEO's negligent conduct has been and will continue to be a substantial factor in bringing about such harms, and a person of ordinary prudence could have reasonably foreseen that such harms would result.

### **Fourth Claim for Relief**

(Third-party beneficiary—Defendant GEO)

84.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs of this Complaint.

85.    GEO and BOP entered into the Rivers Contract with the intent to confer a direct benefit on the Plaintiffs, the Class, and the Sub-Class, namely, the provision of adequate medical, dental, and mental health care.

45

86. GEO has breached and continues to breach its express and implied contractual obligations to the Plaintiffs, Class, and Sub-Class by failing to provide adequate health care

87. As a direct result of GEO's material breaches, the Plaintiffs, Class, and Sub-Class, as the intended beneficiaries of the Rivers Contract, have suffered and continue to suffer physical and mental pain and injury.

88. The Plaintiffs, Class, and Sub-Class have performed any all conditions precedent to the bringing of this action, or such conditions have been waived or excused by action of GEO.

89. Because GEO's breach is continuing in nature, and because the harm caused by this breach is irreparable, Plaintiffs, the Class, and the Sub-Class are entitled to injunctive relief requiring GEO to perform its obligations to provide adequate health care under the Rivers contract. Ancillary to this injunctive relief, the Class and the Sub-Class are entitled to such damages as may be allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs, the Class and the Sub-Class request that this Court grant them the following relief:

a. Declare the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1) – (3) as to the Class and the Sub-Class;

b. Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

46

c.      Adjudge and declare that the organizations, systems, policies, practices, and conditions described above violate the rights of Plaintiffs, the Class, and the Sub-Class under the Eighth Amendment to the United States Constitution;

d.      Adjudge and declare that the organizations, systems, policies, practices, and conditions described above violate the rights of the Sub-Class Plaintiffs and the Sub-Class, under Section 504 of the Rehabilitation Act, as amended;

e.      Adjudge and declare that the organizations, systems, policies, practices, and conditions constitute actionable negligence;

f.      Adjudge and declare that the organizations, systems, policies, practices, and conditions breach a contractual duty owed to Plaintiffs, the Class and the Sub-Class;

g.      Preliminarily and permanently enjoin Defendants, their agents, employees and all persons acting in concert with them, from subjecting the named Plaintiffs and any member of the Class or Sub-Class to the organizations, systems, policies, practices, and institutional conditions that have caused and continue to cause the delivery of constitutionally inadequate and unlawful medical, dental, and mental health services at Rivers;

h.      Award Plaintiffs, the Class and the Sub-Class such monetary damages, including punitive damages, as allowed by law pursuant to their Second, Third and Fourth Claims for Relief;

i.      Award Plaintiffs the costs of this suit, including reasonable attorneys' fees incurred herein;

47

j.      Retain jurisdiction of this matter until Defendants demonstrate that they have fully complied with the orders of this Court, and that there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

k.      Award such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

Respectfully Submitted,

Donald L. Kahl (DC Bar # 489472)
Philip Fornaci (DC Bar # 434824)
Deborah Golden (DC Bar # 470578)
Ivy A. Lange (DC Bar # 488147)
WASHINGTON LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle N.W.
Suite 400
Washington, D.C. 20036
202.319.1000 (ph)
202.319.1010 (fax)

Anthony N. Herman (DC Bar # 424643)
Donald J. Ridings Jr. (DC Bar # 466808)
Danielle Estrada (DC Bar # 494517)*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
202.662.6000 (ph)
202.778.6000 (fax)

*Admitted to the Bar of the District of Columbia, but not admitted to practice before this Court. Petition for admission is pending.

*Counsel for Plaintiffs*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Keith Mathis; Reon Holloway; David Rogers Benjamin Hamilton Carl Butler; Harold Robinson; Charles Lewis; John Doe; John Roe; and Jimmie Fowler individually and on behalf of others similarly situated.

## DEFENDANTS

GEO Group Inc.; United States of America through its department, the Federal Bureau of Prisons; and Harley Lappin, in his official capacity as Director of the United States Bureau of Prisons.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Anthony N. Herman,
Covington & Burling LLP
1201 Pennsylvania Avenue N.W., Washington, D.C. 20004

Donald A. Kahl,
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 Dupont Circle N.W., Suite 400, Washington, D.C. 20036

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    **OR**    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ⊙ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original    ○ 2 Removed    ○ 3 Remanded from    ○ 4 Reinstated    ○ 5 Transferred from    ○ 6 Multi district    ○ 7 Appeal to
   Proceeding      from State       Appellate Court        or Reopened       another district        Litigation          District Judge
                   Court                                                      (specify)                                   from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Plaintiffs bring suit under the Eighth Amendment and the Rehabilitation Act to address inadequate medical care at the Rivers Correctional Institute.

| **VII. REQUESTED IN COMPLAINT** | ☒ | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ | Check YES only if demanded in complaint |
|---|---|---|---|---|
| | | | **JURY DEMAND:** | YES ☒    NO ☐ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

**DATE** June 27, 2007    **SIGNATURE OF ATTORNEY OF RECORD**

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.