# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KEITH MATHIS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01155-RMU |
| | ) | |
| GEO GROUP INC., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS FEDERAL BUREAU OF PRISONS' AND HARLEY LAPPIN'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

Respectfully submitted,

Donald L. Kahl (DC Bar # 489472)
Philip Fornaci (DC Bar # 434824)
Deborah Golden (DC Bar # 470578)
Ivy A. Lange (DC Bar # 488147)
WASHINGTON LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle N.W.
Suite 400
Washington, D.C. 20036
202.319.1000 (ph)
202.319.1010 (fax)

Anthony Herman (DC Bar # 424643)
Donald J. Ridings Jr. (DC Bar # 466808)
Danielle M. Estrada (DC Bar # 494517)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
202.662.6000 (ph)
202.778.6000 (fax)

*Counsel for Plaintiffs*

October 26, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

ARGUMENT ................................................................................................................ 6

I.    PLAINTIFFS HAVE STATED CLAIMS AGAINST THE FEDERAL
      DEFENDANTS UNDER THE EIGHTH AMENDMENT TO THE U.S.
      CONSTITUTION AND SECTION 504 OF THE REHABILITATION ACT. ................. 6

      A.    Plaintiffs Have Alleged Facts Sufficient to State Eighth Amendment
            Claims Against the Federal Defendants. ................................................................ 8

            1.    The Complaint Adequately Alleges that Federal Defendants Were
                  Deliberately Indifferent to Plaintiffs' Serious Medical Needs. ................. 9

            2.    Because the Provision of Medical Care to Prisoners Is a Uniquely
                  Governmental Function, GEO Is a Government Actor with Respect
                  to the Conduct Alleged in the Complaint. ................................................. 12

            3.    The GEO Contract Cannot Insulate the Federal Defendants from
                  Liability for Constitutional Violations. ...................................................... 16

      B.    Plaintiffs Adequately Pleaded Rehabilitation Act Claims Against the
            Federal Defendants. ................................................................................................ 18

            1.    The Disabled Named Plaintiffs Adequately Allege that They Have
                  Been Subjected to Discrimination Solely by Reason of Disability. ......... 19

            2.    The Complaint Adequately Alleges that the Programs and
                  Activities at Issue Either Receive Federal Financial Assistance or
                  Are Conducted by the Federal Government. ............................................. 22

II.   SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' DAMAGES
      CLAIMS FOR VIOLATIONS OF SECTION 504 OF THE REHABILITATION
      ACT. ........................................................................................................................ 27

III.  THE COMPLAINT MAY NOT BE DISMISSED UNDER THE DOCTRINES
      OF STANDING OR MOOTNESS. .............................................................................. 30

IV.   THE DISTRICT OF COLUMBIA IS THE PROPER VENUE FOR THIS CASE. ........ 32

      A.    Plaintiff's Choice of Forum Is Entitled to Deference. ........................................... 33

B.     Ease of Access to Sources of Proof Counsels in Favor of the District of
Columbia as the Forum. ....................................................................................... 35

CONCLUSION ................................................................................................................................ 36

REQUEST FOR HEARING ........................................................................................................... 36

# TABLE OF AUTHORITIES

### CASES

Page

Air Line Pilots Association v. Eastern Air Lines, 672 F. Supp. 525 (D.D.C. 1987) .................... 32

Alexander v. Choate, 469 U.S. 287 (1985) ............................................................. 19, 20

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) ............................................ 32

American Council of the Blind v. Paulson, 463 F. Supp. 2d 51 (D.D.C. 2006)............... 20, 27, 29

American Council of The Blind v. Snow, 311 F. Supp. 2d 86 (D.D.C. 2004) ............................ 19

Behrens v. Pelletier, 516 U.S. 299 (1996) ...................................................................... 7

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)........................................... 6-7

Bellamy v. Roadway Express, Inc., 668 F. Supp. 615 (N.D. Ohio 1987) ...................... 22, 25, 29

Blum v. Yaretsky, 457 U.S. 991 (1982) ...................................................................... 14

Bowers v. NCAA, 9 F. Supp. 2d 460 (D. N.J. 1998)................................................... 25

Brentwood Academy v. Tennessee Secondary School Athletic Association,
    531 U.S. 288 (2001)................................................................................... 13

Brown v. Small, 2005 WL 736530 (D.D.C. 2005) ................................................. 18, 19

Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.,
    148 F.3d 1080 (D.C. Cir. 1998) ...................................................................... .36

Cason v. District of Columbia Department of Corrections,
    477 F. Supp. 2d 141 (D.D.C. 2007) ............................................................. 9-10

Chamber of Commerce v. Reich, 74 F.3d 1322 (D.C. Cir. 1996) ............................... 27

Commodity Futures Trading Commission v. Nahas, 738 F.2d 487 (D.C. Cir. 1984) ............ 27-28

Conley v. Gibson, 355 U.S. 41 (1957)................................................................. 6-7

Conner v. Donnelly, 42 F.3d 220 (4th Cir. 1994) ..................................................... 14

Dage v. Leavitt, 2007 WL 81961 (D.D.C. 2007) ..................................................... 19

Deposit Guaranty National Bank v. Roper, 445 U.S. 326 (1980) ............................... 31

<u>Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority</u>, 239 F.R.D. 9 (D.D.C. 2006) ................................................................ 32, 34

<u>Disabled in Action of Pennsylvania v. Pierce</u>, 606 F. Supp. 310 (E.D. Pa. 1985) ................ 19, 20

<u>Donnell v. Illinois State Board of Education</u>, 829 F. Supp. 1016 (N.D. Ill. 1993)....................... 21

<u>Dorsey v. United States Department of Labor</u>, 41 F.3d 1551 (D.C. Cir. 1994) .......................... 29

<u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614 (1991).......................................................... 15

<u>EEOC v. St. Francis Xavier Parochial School</u>, 117 F.3d 621 (D.C. Cir. 1997) ............................ 7

<u>Erickson v. Pardus</u>, 127 S. Ct. 2197 (2007)................................................................................... 7

<u>Estelle v. Gamble</u>, 429 U.S. 97 (1976) .............................................................................. 8, 9, 13

<u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).............................................................................. 10, 12

<u>Firestone v. Firestone</u>, 76 F.3d 1205 (D.C. Cir. 1996) ................................................................ 36

<u>Foman v. Davis</u>, 371 U.S. 178 (1962) ......................................................................................... 36

<u>Fowler v. District of Columbia</u>, 122 F. Supp. 2d 37 (D.D.C. 2000) .............................................. 5

<u>Franklin v. Gwinnett County Public Schools</u>, 503 U.S. 60 (1992)............................................... 28

<u>Giron v. Corrections Corporation of America</u>, 14 F. Supp. 2d 1245 (D.N.M. 1998).................. 15

<u>Griffith v. Bowen</u>, 678 F. Supp. 942 (D. Mass. 1998)................................................................. 31

<u>Henthorn v. Department of Navy</u>, 29 F.3d 682 (D.C. Cir. 1994) ................................................... 7

<u>Herbert v. National Academy of Sciences</u>, 974 F.2d 192 (D.C. Cir. 1992) ................................ 28

<u>Holly v. Scott</u>, 434 F.3d 287 (4th Cir. 2006) ........................................................................ 15-16

<u>In re United Mine Workers of America Employee Benefit Plans Litigation</u>,
854 F. Supp. 914 (D.D.C. 1994)........................................................................................ 7

<u>Jackson v. District of Columbia</u>, 89 F. Supp. 2d 48 (D.D.C. 2000) ............................................ 33

<u>Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Administration</u>,
402 F.3d 1249 (D.C. Cir. 2005).......................................................................................... 28

<u>Key v. Grayson</u>, 179 F.3d 996 (6th Cir. 1999) ........................................................................... 18

<u>Lane v. Pena</u>, 518 U.S. 187 (1996)....................................................................................27, 28-29

Logue v United States, 412 U.S. 521 (1973) ........................................................16-17

Love v. McBride, 896 F. Supp. 808 (N.D. Ind. 1995) ...........................................21-22

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) ................................................ 12

Makenta v. Affiliated Computer Services, 2007 WL 2818818
     (D.D.C. Sept. 26, 2007) ................................................................................ 13

Mansfield, Coldwater & Lake Michigan Railway Co. v. Swan, 111 U.S. 379 (1884)............... 28

Mass v. Martin Marietta, 805 F. Supp. 1530 (D. Colo. 1992) .......................................... 23

McGill v. Munoz, 203 F.3d 843 (D.C. Cir. 2000) .......................................................... 19

McNally v. Prison Health Services, 46 F. Supp. 2d 49 (D. Me. 1999).......................................... 21

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) ................................................... 32, 34

Papasan v. Allain, 478 U.S. 265 (1986)............................................................................ 7

Paralyzed Veterans of America v. Civil Aeronautics Board,
     752 F.2d 694 (D.C. Cir. 1985) ...................................................................... 22

Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998)................................. 19

Redd v. Rubin, 34 F. Supp. 2d 1 (D.D.C. 1998)................................................25-26, 27

Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000) ..............................................25-26

Rendell-Baker v. Kohn, 457 U.S. 830 (1982)............................................................ 14

Richardson v. McKnight, 521 U.S. 399 (1997) ........................................................ 15

Samuels v. District of Columbia, 770 F.2d 184 (D.C. Cir. 1985) ................................ 31

Sarro v. Cornell Corrections, Inc., 248 F. Supp. 2d 52 (D.R.I. 2003) .......................... 15

Scheuer v. Rhodes, 416 U.S. 202 (1974) ................................................................. 28

Schuler v. United States, 617 F.2d 605 (D.C. Cir. 1979) ............................................ 7

Shakur v. Federal Bureau of Prisons, 950 F. Supp. 3 (D.D.C. 1997)............................ 33

Simmat v. United States Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005).............................. 27

Stern v. Federal Bureau of Prisons, 2007 WL 1555830 (D.D.C. Mar. 22, 2007) ........................ 33

Stern v. Federal Bureau of Prisons, 2007 WL 2983804 (D.D.C. Oct. 15, 2007) ........................ 34

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961) .................................................. 35

Tozzi v. Environmental Protection Agency, 148 F. Supp. 2d 35 (D.D.C. 2001) ........................ 28

Trudeau v. Federal Trade Commission, 456 F.3d 178 (D.C. Cir. 2006) ..................................... 27

Twelve John Does v. District of Columbia, 117 F.3d 571 (D.C. Cir. 1997) ........................... 30-31

U.S. Department of Transportation v. Paralyzed Veterans of America,
    477 U.S. 597 (1986)............................................................................................................ 22

United States Parole Commission v. Geraghty, 445 U.S. 388 (U.S. 1980)............................. 30-31

United States v. Baylor University Medical Center, 736 F.2d 1039 (5th Cir. 1984) ................. 23

United States v. Gaubert, 499 U.S. 315 (1991) ........................................................................... 28

United States v. University Hospital of the State University of New York
    at Stony Brook, 575 F. Supp. 607 (E.D.N.Y. 1983) ...................................................... 23-24

United States v. Wallace, 250 F.3d 738 (5th Cir. 2001) .............................................................. 15

Vacco v. Mid Hudson Medical Group, 877 F. Supp. 143 (S.D.N.Y. 1995).......................... 23, 24

West v. Atkins, 487 U.S. 42 (1988)....................................................................................... 13-16

Young v. Director, United States Bureau of Prisons, 367 F.2d 331 (D.C. Cir. 1966)................. 34

FEDERAL STATUTES

5 U.S.C. § 702 ............................................................................................................................. 27

29 U.S.C. § 794....................................................................................................... 1, 18, 27, 28

29 U.S.C. § 794a .......................................................................................................................... 28

FEDERAL REGULATIONS

28 C.F.R. § 39.130................................................................................................................ 26, 27

OTHER AUTHORITIES

Fed. R. Civ. P. 8(a) ....................................................................................................................... 7

Fed. R. Civ. P. 15(a) .................................................................................................................... 36

Fed. R. Evid. 201 ......................................................................................................................... 35

U.S. Dept. of Justice, Federal Prison System, FY 2008 Performance Budget at 61, <u>available at</u>
http://www.usdoj.gov/jmd/2008justification/pdf/38_bop_se.pdf ................................ 5, 35

Plaintiffs respectfully submit this Memorandum in opposition to the motion to dismiss or to transfer filed by Defendants Federal Bureau of Prisons and Harley Lappin.

## INTRODUCTION

The Plaintiffs have brought this case to remedy the unlawful and grossly inadequate level of medical, dental, and mental health care at the Rivers Correctional Institution, a private prison operated under contract with the Federal Bureau of Prisons. All of the Named Plaintiffs, as well as a majority of the current and past prisoners at the Rivers facility, are District of Columbia Code ("D.C. Code") offenders and residents who were sentenced in the District of Columbia before being committed to federal custody and sent to Rivers. The Complaint names as defendants the GEO Group, Inc. ("GEO"), which owns and operates the private prison; the United States Bureau of Prisons ("BOP"), to whose custody the Plaintiffs were committed; and the BOP's director, Harley Lappin.

The 48-page Complaint chronicles numerous instances of gross and deliberate indifference by the Defendants to the medical needs of the prisoners at Rivers. It alleges in detail how the broken health care delivery system at Rivers places prisoners at substantial and ongoing risk of serious injury or premature death, and has caused permanent physical damage and profound physical and mental pain to the Plaintiffs and other Rivers prisoners. The Complaint alleges that the Defendants' conduct violates the Eighth Amendment to the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 794. It further alleges that GEO's conduct constitutes common-law negligence, and that GEO breached its contract with the BOP to operate Rivers ("GEO Contract"), of which Plaintiffs are intended third-party beneficiaries. The systemic deficiencies described in the Complaint are alleged to permeate the Rivers facility, and in a motion filed on September 25, 2007, the Named Plaintiffs asked the Court to certify a class

consisting of all former, current, and future inmates in BOP custody confined at Rivers.  <u>See</u> Pl.'s Mot. Class Certification (Docket No. 31).

　　　　The BOP and Director Lappin (the "federal Defendants") have moved the Court to dismiss the Plaintiffs' Eighth Amendment and Rehabilitation Act claims.  The federal Defendants' motion invokes an unsustainable array of different legal theories, which are united by a common theme:  that by contracting with a private company to house federal prisoners and provide them with medical, dental, and mental health treatment, the federal government has effectively insulated itself and its contractor from liability for Constitutional and statutory violations committed against those federal prisoners.  If adopted, this far-reaching principle would create two classes of federal prisoners:  those committed to federal prisons who enjoy Constitutional rights, and those sent to private prisons, operated under contract with the BOP, who do not.

　　　　The Court should reject this principle and deny the federal Defendants' motion. The motion to dismiss the Plaintiffs' Eighth Amendment claim should be denied because the Complaint adequately alleges that the federal Defendants exhibited deliberate indifference to prisoners' serious medical needs, and because the federal Defendants delegated to GEO a Constitutional duty to provide adequate medical care, thereby making GEO a government actor for purposes of the conduct alleged in the Complaint.  The motion to dismiss the Plaintiffs' Rehabilitation Act claim should be denied because the Complaint contains detailed allegations supporting each element of that claim, and because the Named Plaintiffs' claims for monetary damages are not barred by sovereign immunity as the federal Defendants contend.  Finally, the Court should deny the motion to dismiss the claims for injunctive relief brought by seven of the ten Named Plaintiffs on standing and mootness grounds, because a contrary rule would allow the

federal Defendants to moot out a prisoner's equitable claims simply by transferring him to another prison, and because issues of standing in a class action such as this are properly resolved in the context of class certification.

The BOP's alternative motion to transfer venue should also be rejected because the private and public interest factors weigh heavily in favor of this forum. The federal Defendants address only two of the eleven factors that govern venue transfer motions; both of those factors weigh decisively in favor of litigating this case in the District of Columbia.

## BACKGROUND

Until 2001, persons convicted of felony violations of the D.C. Code were generally incarcerated at prison facilities operated by or for the District of Columbia, and located in or near the District. See Compl. ¶ 27. In 1997, as part of the District of Columbia Revitalization Act, Congress mandated that all D.C. Code felony offenders be committed to the custody of the BOP and housed in a BOP-supervised institution. See id. ¶ 28. Congress also directed that the BOP enter into contracts with private, for-profit entities to house at least half of these offenders. See id. ¶ 29.

The BOP has contracted with GEO to house low-security, male, D.C. Code felony offenders at Rivers. See Compl. ¶¶ 31–32. Since the Rivers facility opened in 2001, the BOP has housed thousands of D.C. prisoners who are in federal custody there, including all ten Named Plaintiffs in this case. See id. ¶¶ 10–19; 31. Rivers currently houses approximately 1,300 men, the vast majority of whom are D.C. Code felony offenders in the custody of the federal Defendants. See id. ¶ 32.

The Plaintiffs' 48-page Complaint details the facility-wide breakdown in the delivery of medical care that has occurred at the Rivers facility. Problems begin immediately upon arrival for men at Rivers. See Compl. ¶ 3. During intake, the facility routinely and

arbitrarily switches and discontinues drug regimens that have been carefully developed and calibrated by private and correctional medical and mental health professionals, without consultation with the affected patients, and without regard to the therapeutic consequences of the substitutions.  See id. ¶¶ 3, 11, 14, 16–19, 38(d).  When prisoners' medications are not arbitrarily discontinued, the facility's dysfunctional system for distributing medications causes injury.  See id. ¶¶ 3, 14, 16–17, 19, 38(d)–(f).  It forces sick and disabled men to stand outside for hours in all weather, and sometimes requires them to choose between receiving their drugs or eating their meals.  See id. ¶¶ 3, 16–17, 38(e).  The facility has a policy of confiscating prescribed medical devices, such as braces and orthopedic shoes, for no penological reason, even when such devices have been prescribed and provided by other correctional institutions.  See id. ¶¶ 3, 11, 16.  The facility fails to replace these devices, causing previously ambulatory persons to rely on wheelchairs for mobility.  See id.

The broken health care system at Rivers does not end at the front gate.  Prisoners at Rivers receive inadequate medical, dental, and mental health care for the duration of their incarceration at Rivers.  See Compl. ¶¶ 3, 10–19, 38(a)–(g).  Facility staff ignore serious mental health needs and chronic medical conditions, even when those conditions have been specifically identified in sentencing documents or other medical records.  See id. ¶¶ 3, 11–12, 14, 16.  The overall medical professional staffing levels at Rivers are grossly inadequate to address the needs of Rivers prisoners, who are older, sicker, and in greater need of care than the average prison population.  See id. ¶¶ 3, 38(a).

Disabled prisoners at the facility are routinely denied meaningful access to prison medical services and other programs, services, facilities, and activities at Rivers as a consequence of their disabilities.  The Rivers facility lacks ramps that would make its common

areas accessible, accessible bathrooms and showers, accessible dining halls and classrooms, and gym equipment usable by persons with disabilities. <u>See</u> Compl. ¶¶ 6, 11–12, 14. The prison health center denies disabled plaintiffs necessary medical services such as physical therapy, which is crucial for physically disabled patients, and fails to implement and maintain the more complicated medical regimens that disabled patients require. <u>See id.</u> ¶¶ 6, 11, 12, 14–19.

The unlawful conduct described in the Complaint occurs under the direct daily monitoring and oversight of BOP staff on-site at Rivers. <u>See</u> Compl. ¶ 35(e)& (f).. As part of the GEO Contract, the BOP undertook to monitor and oversee GEO's execution of its work, including its provision of "all essential health services" to Rivers prisoners, in accordance with the custodial and legal responsibility that the BOP bears for prisoners in its custody. <u>Id.</u> ¶ 35(a). The BOP accordingly established both on-site and central branch oversight of the Rivers facility, and instituted extensive reporting requirements for GEO to supplement its contractual oversight responsibilities. <u>See id.</u> ¶ 35(e) & (f); U.S. Dept. of Justice, Federal Prison System, FY 2008 Performance Budget at 61, <u>available at</u> http://www.usdoj.gov/jmd/2008justification/pdf/ 38_bop_se.pdf.[1] The BOP opened an office at Rivers that is staffed by full-time BOP employees who have daily access to the facility, and who perform numerous management and oversight functions. <u>See</u> Compl. ¶ 35(e) & (f); Reply Mem. of P. & A. in Supp. of Def. GEO Group, Inc.'s Mot. to Dismiss and Mot. to Transfer, Ex. 2 (Docket No. 23). In D.C., the BOP charged a division in its central office, called the Privatization Management Branch, with broad oversight of the operations of Rivers and the duty to ensure that the facility follows the BOP's established

---

[1] The court may take judicial notice of a public record at any stage in the proceeding. <u>See</u> Fed. R. Evid. 201(f); <u>see also</u> <u>Tampa Elec. Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 332 & n.10 (1961) (taking judicial notice of a government publication); <u>see also</u> <u>Fowler v. District of Columbia</u>, 122 F. Supp. 2d 37, 40 & n.4 (D.D.C. 2000) (taking judicial notice of a government agreement).

standards and guidelines. <u>See</u> U.S. Dept. of Justice, Federal Prison System, FY 2008 Performance Budget at 61 (setting out the subagency's purpose to "oversee the operation of secure contract facilities[, and] ensure that contractors adhere to established performance standards and facilitate communications between contract facilities and the BOP."). The BOP also conducts regular audits of the facility; requires GEO to report any deaths or emergency transports of prisoners within very short time frames; and retains supervision and control over GEO's hiring decisions, recordkeeping responsibilities, construction of the facility's physical plant, and other aspects of day-to-day operation at Rivers. <u>See</u> Compl. ¶¶ 34–35.

The federal Defendants have custodial and legal responsibility for the prisoners at Rivers. Despite their authority to direct activity at Rivers, particularly with regard to medical care, the federal Defendants have failed to take measures to correct the unlawful conditions at Rivers and to prevent harm to Plaintiffs. <u>See</u> Compl. ¶ 39. The federal Defendants' deliberate indifference to the medical needs of Rivers inmates has perpetuated a health care delivery system that has become a "systemic failure." <u>Id.</u> ¶ 38. The federal Defendants also have abdicated their responsibility to enforce the Rehabilitation Act and ensure that GEO complies with that law. The BOP has continued, however, to provide financial assistance to GEO to operate "all of the operations, programs, facilities, and activities conducted at the Rivers facility, including the provision of medical care." Compl. ¶¶ 73–74.

## <u>ARGUMENT</u>

I.    **PLAINTIFFS HAVE STATED CLAIMS AGAINST THE FEDERAL DEFENDANTS UNDER THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION AND SECTION 504 OF THE REHABILITATION ACT.**

This Court may not dismiss Plaintiffs' claims under Rule 12(b)(6) unless it appears beyond doubt that "no set of facts in support of [Plaintiffs'] claim would entitle [them] to relief." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. ___, 127 S. Ct. 1955, 1967, 1969 (2007) (quoting

<u>Conley v. Gibson</u>, 355 U.S. 41, 45–46 (1957).  The Federal Rules of Civil Procedure require only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Twombly</u>, 127 S. Ct. at 1964 (quoting <u>Conley</u>, 355 U.S. at 47); <u>accord</u> Fed. R. Civ. P. 8(a); <u>Erickson v. Pardus</u>, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (<u>per curiam</u>).  Thus, while "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion to dismiss, and a plaintiff must demonstrate only that it has alleged "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  <u>Twombly</u>, 127 S. Ct. at 1964–65; <u>see also</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

        In considering the federal Defendants' motion to dismiss Plaintiffs' Eighth Amendment and Rehabilitation Act claims for failure to state a claim, the Court must construe the Complaint in the light most favorable to the Plaintiffs, and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  <u>In re United Mine Workers of Am. Employee Benefit Plans Litig.</u>, 854 F. Supp. 914, 915 (D.D.C. 1994); <u>see also</u> <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged.").  The Court may consider facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. <u>See</u> <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997).  Factual allegations in memoranda of law -- such as those contained in the federal Defendants' brief -- may not be considered when deciding a Rule 12(b)(6) motion, particularly when those assertions contradict the allegations in the complaint.  <u>Henthorn v. Dep't</u>

of Navy, 29 F.3d 682, 688 (D.C. Cir. 1994); cf. Behrens v. Pelletier, 516 U.S. 299, 309 (1996)

(when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

     As shown below, Plaintiffs have alleged facts sufficient to state claims under the

Eighth Amendment and the Rehabilitation Act.  Dismissal is therefore improper.

    **A.**    **Plaintiffs Have Alleged Facts Sufficient to State Eighth Amendment Claims Against the Federal Defendants.**

     Plaintiffs state a claim against the federal Defendants under the Eighth

Amendment to the United States Constitution because the Complaint alleges "acts and

omissions" by the federal Defendants that are "sufficiently harmful to evidence deliberate

indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

     In their Motion, the federal Defendants claim that they should not be held liable

for violations of Plaintiffs' Eighth Amendment rights because (i) GEO, with which the BOP

entered into a contract to house prisoners, is not a government actor; or, alternatively, (ii) if GEO

is a government actor, then the BOP exercises only supervisory authority over GEO, and that

under precedent dealing with "municipal liability" there is no "supervisory" Constitutional

liability.  See Fed. Def. Mem at 14–21.

     They are wrong.  Contrary to the BOP's portrayal of this case, Plaintiffs have

neither alleged that BOP is liable in a "supervisory" capacity, nor that a theory of "municipal

liability" should apply to these federal Defendants.[2]  Rather, Plaintiffs allege that the BOP is

directly liable for the injuries detailed in the Complaint, and those allegations are sufficient under

---

[2]  Nor do Plaintiffs allege that the BOP is liable for Constitutional violations on the basis of "constructive knowledge," as the federal Defendants assert.  See Fed Def. Mem. at 17.  At ¶ 69 of the Complaint, Plaintiffs allege direct knowledge by Defendants with respect to the Eighth Amendment claim.  Plaintiffs referred to "constructive" knowledge at Compl. ¶ 39 for purposes of Plaintiffs' non-Constitutional claims, such as Plaintiffs' negligence claim against GEO.

controlling case law to support a claim that the federal Defendants violated Plaintiffs' Eighth

Amendment right to adequate medical treatment while in federal custody.  First, the Complaint

alleges that federal Defendants were deliberately indifferent to Plaintiffs' serious medical needs.

Second, because providing medical care to federal prisoners is uniquely a governmental function,

GEO is a government actor with respect to the conduct alleged in the Complaint.  Finally, the

federal Defendants' assertion that the GEO Contract insulates them from Constitutional liability

for injuries suffered by federal prisoners in federal custody is meritless.

Ultimately, the federal Defendants attempt to prove too much:  if their view of the

law were correct, then the Plaintiffs would be left without legal recourse for any Constitutional

violations arising out of their federal custody simply because the BOP chose to place them in a

private prison rather than a BOP facility.  That is not the law, and the federal Defendants' motion

to dismiss the Plaintiffs' Eighth Amendment claim must be denied.

      1.     **The Complaint Adequately Alleges that Federal Defendants Were Deliberately Indifferent to Plaintiffs' Serious Medical Needs.**

To state an Eighth Amendment claim, Plaintiffs must allege facts that, if proven at

trial, would show that prison officials were "deliberately indifferent" to their serious medical

needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  This showing has both an objective and a

subjective component.  See Cason v. District of Columbia Dep't of Corrs., 477 F. Supp. 2d 141,

144–45 (D.D.C. 2007).  To satisfy the objective component, Plaintiffs must allege that they

suffered deprivation "sufficiently serious to be considered cruel and unusual" and that their

medical needs either had been "diagnosed by a physician as mandating treatment or [were] so

obvious that a lay person easily would recognize the necessity of a doctor's attention."  Id. at

144.  The federal Defendants do not dispute that Plaintiffs allege facts sufficient to meet the

objective component of deliberate indifference.  See Compl. ¶¶ 10–19; 38.

To satisfy the subjective component, Plaintiffs must allege that the BOP was deliberately indifferent to Plaintiffs' serious medical needs. A prison official is deliberately indifferent when he or she "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Cason, 477 F. Supp 2d at 145. Specifically, Plaintiffs must allege facts sufficient to conclude that "the official [was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also [drew] that inference." Farmer, 511 U.S. at 837. Knowledge of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842.

Plaintiffs have alleged facts sufficient to support an inference that the federal Defendants were deliberately indifferent to their serious medical needs. The Complaint alleges that the broken medical system at Rivers created a substantial risk of serious harm; that this risk was obvious and well known to both the federal Defendants and GEO; and that the federal Defendants and GEO failed to take steps to prevent or mitigate this obvious risk. See Compl. ¶¶ 10–19; 37–39. The Plaintiffs have further alleged the many ways in which the federal Defendants, through their on-site supervision and control over activities at the Rivers facility, must have known of the substantial risk of serious harm alleged in the Complaint. See Compl. ¶¶ 34–35 (alleging that the GEO Contract required GEO to report to the federal Defendants any deaths or emergency transports of prisoners within very short time frames, and gave the federal Defendants control over GEO's hiring decisions, recordkeeping, and many other aspects of day-to-day operation at Rivers).

10

As GEO acknowledged in a previous filing to this Court, BOP representatives are on site <u>daily</u> at the Rivers facility.  <u>See</u> Compl ¶ 35(e) & (f); Reply Mem. of P. & A. in Supp. of Def. GEO Group, Inc.'s Mot. to Dismiss and Mot. to Transfer, Ex. 2 (Docket No. 23).  BOP employees review and approve key decisions at the facility, including ones (such as hiring) that give rise to the claims in this lawsuit.  <u>See</u> Compl ¶¶ 34–35.  The Constitutional violations alleged in the Complaint, moreover, were systemic, widespread, open, and notorious, and included:  prisoners obviously sick and in distress who were unable to access medical treatment; sick and disabled prisoners waiting outdoors for hours in all weather to receive medication; disabled prisoners in wheelchairs struggling to make their way over high curbs and around stairs, and getting stuck in the facility's heavy doors; and a chronic shortage of medical staff at the facility.  <u>See id.</u> ¶ 11–19, 38.  Based on the detailed allegations in the Complaint, the Court may reasonably infer that these conditions were known to the federal Defendants and their employees who work on site at Rivers, and whose job it is to monitor operations at the Rivers facility.  By disregarding the obvious and serious medical needs that are alleged in the Complaint, the federal Defendants exhibited deliberate indifference within the meaning of the Eighth Amendment.  <u>See id.</u> ¶¶ 62–69.

Plaintiffs also have alleged facts showing that the federal Defendants had the power to prevent the Constitutional harm alleged by Plaintiffs.  The federal Defendants had the final hiring authority over any "contractor staff who works with federal inmates."  Compl. ¶ 35(d).  The federal Defendants could inspect the provision of medical services at Rivers.  <u>See id.</u> ¶ 35(e).  They had daily access to the facility by way of the on-site BOP personnel, who were charged with "monitor[ing] contract performance" by GEO in all respects, including the provision of medical care.  <u>Id.</u> ¶ 35(e)–(f).  The Complaint further alleges that although the

11

federal Defendants unquestionably had the authority to prevent the unlawful conduct alleged in the Complaint, they failed to do so.  See id. ¶ 39.  Any argument that the federal Defendants simply neglected to perform their monitoring function, or failed to investigate the risk of harm, is no defense to a claim of deliberate indifference to serious medical needs under the Eighth Amendment.  Farmer, 511 U.S. at 843 n.8.

In sum, the Plaintiffs have alleged facts sufficient to state an Eighth Amendment claim against the federal Defendants by alleging that the federal Defendants directly violated Plaintiffs' Constitutional rights.  This claim is based neither on a theory of supervisory liability nor on a theory of municipal liability, and the arguments that the federal Defendants have marshaled against these two non-theories of Plaintiffs' case, see Fed. Defs Mem. at 17–21, are but straw men.

**2.      Because the Provision of Medical Care to Prisoners Is a Uniquely Governmental Function, GEO Is a Government Actor with Respect to the Conduct Alleged in the Complaint.**

Contrary to the federal Defendants' assertions, GEO's status as a private corporation cannot shield the federal Defendants from their Eighth Amendment obligation to ensure that prisoners in federal custody receive Constitutionally adequate medical treatment.  As Plaintiffs allege in their Complaint (¶ 21), because the federal Defendants vested GEO with this Constitutional responsibility, GEO is a government actor.  Accordingly, for purposes of this claim, GEO must be treated like a federal officer who represents the government in an official capacity.

Within the framework that the Supreme Court uses to analyze whether the actions of a private actor may be "fairly attributable" to the government, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982), GEO's status as a government actor is a matter of established law.  GEO has undertaken one of the most commonly recognized affirmative Constitutional

12

duties of the government:  the provision of medical care to persons that the government imprisons.  In a case involving that very duty, the Supreme Court decided in favor of government action, holding that a private doctor who provided health care under contract to state prisoners could be sued for an Eighth Amendment violation.  West v. Atkins, 487 U.S. 42 (1988).  The Court ruled that the provision of health care to prisoners constituted a "public function," id. at 51–54, and that by undertaking this public function, the doctor had become a government actor. Id.; see also Brentwood Academy v. Tennessee Secondary Sch. Athletic Assoc., 531 U.S. 288, 296 (2001) (recognizing continuing validity of the "public function" test for government action).

The Court's decision in West controls here.  To reach its holding, the Court focused not on the "precise terms of [the doctor's] employment," but on his "function within the state system."  West, 487 U.S. at 55–56.  The doctor's status as an "independent contractor" thus had no effect on the Court's decision in West, because when the government contracts out the duty to provide prisoners with Constitutionally adequate medical care, it vests its contractors with its own Constitutional obligations.  As the Court put it:  "Contracting out prison medical care does not relieve the State of its Constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."  West, 487 U.S. at 56.

The West decision rests on sound precedent.  The Court based its holding on Estelle v. Gamble, 429 U.S. 97 (1976), which held that when the government deprives persons of the liberty to care for their own medical needs, it thereby undertakes a Constitutional obligation to provide these persons with adequate medical services.  Estelle, 429 U.S. at 103–04, 104 n.9. Drawing on this precedent, the West Court reasoned that if prisoners receive Constitutionally inadequate care, it is because the government has "exercise[d] its right to punish [the prisoner]

13

by incarceration." West, 487 U.S. at 56; see also Makenta v. Affiliated Computer Servs., No. 06-1093 (JR), 2007 WL 2818818, at *1 (D.D.C. Sept. 26, 2007) (explaining that the doctor in West was a government actor because he "was the essential carrier of the state's responsibility to care for the health and safety of its prisoners").

West is therefore controlling authority. The entity that has deprived a prisoner of liberty -- in this case, the federal Defendants -- still owes the prisoners this Constitutional duty, and it cannot sidestep that duty by contract with a private party, such as GEO.

The federal Defendants fail to discuss West, or even to cite it. Instead, they rely on two earlier Supreme Court cases for the proposition that GEO is not a government actor, both of which are distinguishable -- and which were expressly distinguished in West. See Blum v. Yaretsky, 457 U.S. 991 (1982), and Rendell-Baker v. Kohn, 457 U.S. 830 (1982), established the principle that, generally, a private entity that is under contract to the government, receives government funding, or is subject to government regulation, without more, is not a government actor. Blum, 457 U.S. at 1004; Rendell-Baker, 457 U.S. at 841–42. But in West, the Court made clear that the delegation of a uniquely governmental function such as the provision of medical care to prisoners provides an exception to the rule established in Blum and Rendell-Baker. West, 487 U.S. at 52 n.10 (distinguishing Blum and Rendell-Baker, and further observing that those two earlier cases "provide no support for [the] argument that a physician, employed by the State to fulfill the State's Constitutional obligations, does not act under color of state law merely because he renders medical care in accordance with professional obligations") (emphasis added); see also Conner v. Donnelly, 42 F.3d 220, 224 (4th Cir. 1994) ("[the] provision of medical services to inmates is the state's exclusive prerogative for the same reason

it is its Constitutional duty: a prisoner has no alternative means of acquiring medical care other than those provided by the state.").

Nor does the fact that there have been private prisons in the past prevent a finding that GEO is a government actor. See Fed. Defs. Mem. at 15–16. Thus, Richardson v. McKnight, which held that private prison employees were not entitled to qualified immunity in part because prisons have not always been publicly operated, is inapposite here. 521 U.S. 399, 405 (1997). As numerous courts have recognized, a public function need not always have been exclusively performed by the government in order to confer government actor status on those who carry out that function. See, e.g., Sarro v. Cornell Corrections, Inc., 248 F. Supp. 2d 52, 60 (D.R.I. 2003); Giron v. Corrections Corp. of Am., 14 F. Supp. 2d 1245, 1248 (D.N.M. 1998); cf. Edmondson v. Leesville Concrete Co., 500 U.S. 614 (1991) (civil litigant's racially motivated use of peremptory challenges was state action, even though such challenges had never been an exclusively public function). In Richardson, moreover, the Court did not reach the issue of Constitutional liability, and instead limited its holding to the issue of qualified immunity, see 521 U.S. at 412–13, and that issue is not presented in this case because Plaintiffs do not seek damages from individual defendants.[3]

The federal Defendants' reliance on Holly v. Scott is equally misplaced. See 434 F.3d. 287 (4th Cir. 2006) (distinguishing West, and concluding that the Rivers physician and warden were not government actors). Importantly, the defendants in Holly were GEO

---

[3] Indeed, the federal government recently relied on West to argue that Richardson should not allow private prison employees to avoid Constitutional liability. See Brief for the United States as Appellee at 22, United States v. Wallace, 250 F.3d 738 (5th Cir. 2001) (No. 00-40243), 2000 WL 34030245 ("The basis for the decision in Atkins is not . . . that historically only a sovereign (and not private parties) had provided medical services to inmates, but that adequate medical services is an obligation owed by the State under the Eighth Amendment to inmates incarcerated by the State.").

employees, sued in their individual capacities for damages, and were under contract not with the government, but with GEO.  Id. at 291–92 (concluding that that the government actor test was not satisfied because "[d]efendants are not federal officials, federal employees, or even independent contractors in the service of the federal government.")  Here, in sharp contrast, Plaintiffs are suing GEO in its official capacity for injunctive relief.  As an "independent contractor in the service of the federal government," GEO stands in the same relationship to the federal government that the prison doctor in West stood to the state.

In sum, federal Defendants cannot take shelter from Constitutional liability behind GEO's status as a private corporation.  According to Supreme Court precedent, GEO became a government actor when it undertook the federal Defendants' Constitutional duty to provide adequate medical care to persons imprisoned under their authority.

### 3.    The GEO Contract Cannot Insulate the Federal Defendants from Liability for Constitutional Violations.

The federal Defendants incorrectly argue in the alternative that their contractual relationship with GEO insulates them from liability.  As discussed above, taking the allegations in the Complaint as true, West compels a finding that GEO is a government actor deputized by the federal government to carry out a uniquely governmental function, no matter what the contractual relationship might be between GEO and the federal Defendants.

The federal Defendants rely on and quote selectively from Logue v United States, 412 U.S. 521 (1973), Def. Mem. 15–16, but their reliance on that case is misplaced.  Logue is readily distinguishable.

In Logue, a federal prisoner committed suicide while being held at a county prison that was under contract with the BOP.  The prisoner's parents brought suit against the United States under the Federal Tort Claims Act ("FTCA"), arguing that the federal government

16

should be held liable for the prisoner's death under a negligence theory.  Because the FTCA

applies only to conduct by an "employee of the [federal] Government," the issue before the

Supreme Court was whether the employees of a county prison under contract with the BOP

should be treated as federal employees for purposes of FTCA liability.  Id. at 526 ("For the

Government to be liable for the negligence of an employee of the Nueces County jail, he must be

shown to be an 'employee of the Government' as that term is used in the Federal Tort Claims

Act.").  In resolving this question, the Court first observed that the text of the FTCA expressly

distinguished between employees of a "Federal agency" and employees of  "any contractor with

the United States," and expressly excluded the latter from the scope of the statute.  Id. at 526.

The Court then noted that the contract between the BOP and the county "gives the United States

no authority to physically supervise the conduct of the jail's employees" or any other substantive

authority apart from the right to conduct periodic inspections.  Id. at 530.  On these facts, the

Court concluded "that the sheriff's employees were employees of a 'contractor with the United

States,' and not, therefore, employees of a 'Federal agency'" for purposes of negligence liability

under the FTCA.  Id.

         Here, by contrast, the contract between GEO and the BOP affords the BOP with

substantial oversight and authority over GEO.  As discussed above, Plaintiffs have alleged that

the GEO contract provides for daily on-site contract supervision by BOP employees, and gives

the BOP final decision-making authority over GEO's hiring decisions.  See Compl. ¶¶ 34–35.

Thus, unlike in Logue, BOP employees are in a position "to physically supervise" contract

performance at Rivers.  The Supreme Court's holding in Logue that employees of a contractor

were not "federal employees" for purposes of statutory liability under the FTCA neither

addresses nor resolves the question here:  whether, on the facts of this case and in light of the

terms of the GEO contract, GEO is a government actor for purposes of the Eighth Amendment,

and BOP can be held liable for the Eighth Amendment violations Plaintiffs have alleged.

      For all these reasons, the GEO Contract cannot insulate federal Defendants from

Constitutional liability in this case.  The federal Defendants' motion to dismiss Plaintiffs' Eighth

Amendment claim should therefore be denied.

      **B.**      **Plaintiffs Adequately Pleaded Rehabilitation Act Claims Against the Federal Defendants.**

      The federal Defendants' motion to dismiss the Plaintiffs' Rehabilitation Act claim

also should be denied.

      To state a claim under section 504(a) of the Rehabilitation Act, a plaintiff must

allege:  (1) that he is an individual with a disability; (2) that he is otherwise qualified to

participate in the activity or program or to enjoy the services or benefits offered; (3) that he has

been excluded from participation in, denied the benefits of, or subjected to discrimination under

any program or activity by reason of his disability; and (4) that the program or activity at issue

either is conducted by the federal government or receives federal financial assistance.  See 29

U.S.C. § 794(a).[4]

      Aside from the Rehabilitation Act's requirement of federal government

participation,  "[t]he standards for determining a [Rehabilitation Act] violation are the same as

those applied under the . . . ADA."  Brown v. Small, No. 02-1268 (RWR), 2005 WL 736530, at

*2 (D.D.C. Mar. 31, 2005).  Because "[m]odern prisons provide inmates with many recreational

'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least

theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded

---

[4] The federal Defendants do not challenge the sufficiency of plaintiffs' allegations with respect to the first two elements.

from participation in')," <u>Pennsylvania Dept. of Corrs. v. Yeskey</u>, 524 U.S. 206, 210 (1998) (citation omitted), it is "established that the ADA and the Rehabilitation Act apply to prisoners." <u>Key v. Grayson</u>, 179 F.3d 996, 997 (6th Cir. 1999) (citing <u>Yeskey</u>, 115 S. Ct. at 1956).

### 1. The Disabled Named Plaintiffs Adequately Allege that They Have Been Subjected to Discrimination Solely by Reason of Disability.

As the Supreme Court explained in <u>Alexander v. Choate</u>, 469 U.S. 287, 303 (1985), "Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance." To that end, section 504 requires that disabled persons be "provided with meaningful access to the benefit" through reasonable accommodation. <u>Id.</u> at 301. Plaintiffs seeking relief under the Rehabilitation Act must accordingly allege that they have been "subjected to discrimination by reason of [their] disabilit[ies]." <u>McGill v. Munoz</u>, 203 F.3d 843, 845 (D.C. Cir. 2000) (citations omitted); <u>Dage v. Leavitt</u>, No. 04-0221 (JCP), 2007 WL 81961, at *8 (D.D.C. Jan. 9, 2007); <u>see also</u> <u>Brown</u>, 2005 WL 736530, at *2 (applying same standards to Rehabilitation Act and ADA claims).

Decisions from this court and from other jurisdictions make clear that a plaintiff's pleading burden at the motion to dismiss stage is not onerous. In <u>American Council of the Blind v. Snow</u>, 311 F. Supp. 2d 86, 87 (D.D.C. 2004), the plaintiffs alleged that the Department of Treasury violated section 504 of the Rehabilitation Act by failing to design and issue currency that could be identified by visually impaired persons. The court denied the defendant's motion to dismiss, citing allegations that the plaintiffs were "<u>disproportionately burdened</u> by the current form of the currency and that this burden may constitute denial of meaningful access." <u>Id.</u> at 89 (observing that the "inquiry beyond that point [wa]s necessarily fact-specific."); <u>see also</u> <u>Disabled in Action of Pennsylvania v. Pierce</u>, 606 F. Supp. 310, 315 n.7 (E.D. Pa. 1985)

(explaining that "[i]t is sufficient at the pleading stage for plaintiffs to make <u>potentially</u> <u>meritorious allegations of preclusion</u> from HUD's programs or activities."). In a related case, the Court later confirmed that the "plaintiffs [did] not need to prove 'no access'" in order to prevail on their Rehabilitation Act claims; it was sufficient to demonstrate a lack of "meaningful access" by virtue of their disabilities. <u>American Council of the Blind v. Paulson</u>, 463 F. Supp. 2d 51, 59 (D.D.C. 2006) (citing <u>Choate</u>, 469 U.S. at 300); <u>cf.</u> <u>Disabled in Action of Pennsylvania</u>, 606 F. Supp. at 315 ("[S]o long as [plaintiffs] allege, as they have, that their inaccessibility to HUD activities or programs is the result of improper physical barriers, plaintiffs may maintain an action pursuant to § 504.").

   Plaintiffs' Complaint adequately alleges that disabled Named Plaintiffs do not receive evenhanded treatment at Rivers. According to the Complaint, disabled prisoners are denied meaningful access to a variety of programs, services, facilities, and activities at Rivers, including substance abuse programs, educational programs, vocational programs, recreation activities, dining hall and other meals, yard time, visitation, telephone, emergency procedures, and other programs and activities for which they are otherwise qualified. Compl. ¶ 77. Among other things, the Complaint alleges that disabled prisoners are denied meaningful access to services due to the lack of ramps to common areas, the lack of accessible bathrooms and showers, the lack of accessible dining halls and classrooms, and the lack of gym equipment usable by persons with disabilities. <u>See</u> Compl. ¶¶ 6, 11–12, 14. Plaintiff Rogers specifically alleges that the lack of ramps at Rivers prevents him from being able to "access many of the facilities" at Rivers. <u>Id.</u> ¶ 12. He further alleges that he is unable to use the shower facilities because those facilities do not include hand-held shower heads or seating to accommodate a person in a wheelchair; that his access to tables in the dining hall and classroom is limited

because they are not designed to accommodate persons with physical disabilities; that he is excluded from accessing the gym because no equipment is usable by persons with physical disabilities; and that he gets trapped in the prison's doors due to their non-compliant design. Id. The Complaint further alleges that the prison health center denies disabled plaintiffs necessary medical services, including access to doctor-prescribed physical therapy and to certain other medical regimens that disabled patients require. Id. ¶¶ 6, 11–12, 14–15, 17–18. Thus, while non-disabled prisoners who suffer routine ailments may be able to obtain simple medical services, disabled plaintiffs cannot.[5]

Federal courts routinely have permitted prisoners to pursue ADA and Rehabilitation Act claims where --as here -- disabled plaintiffs have alleged that they lack access to prison services, including medical services. See, e.g., McNally v. Prison Health Servs., 46 F. Supp. 2d 49, 59 (D. Me. 1999) (denying summary judgment to prison health center on ADA claim because the prison's pill distribution policy "effectively denies HIV-positive prisoners access to [the health center's] prescription program and adequate services because of their particular disability"); Love v. McBride, 896 F. Supp. 808, 810 (N.D. Ind. 1995) (upholding jury verdict of ADA violation by prison where the evidence showed that plaintiff was not provided "full access to services, programs and activities," and "plaintiff's disability was the reason he was not receiving full access to those programs"); Donnell v. Illinois State Board of Educ., 829 F. Supp. 1016, 1017 (N.D. Ill. 1993) (denying state's motion to dismiss pretrial detainees' claims

---

[5]  The Court should reject out of hand the federal Defendants' contention that Plaintiffs have failed to state a Rehabilitation Act claim because the Complaint alleges that all Plaintiffs, including those who are disabled, receive equally abysmal medical care. See Fed. Defs. Mem. at 13–14. As this section makes clear, the Complaint specifically alleges numerous ways in which disabled Plaintiffs are uniquely burdened by conditions at the Rivers facility.

of Rehabilitation Act violation based on allegations that they have been denied access to "regular

and special educational services during their period of pretrial detention.").

   The Complaint adequately alleges that disabled prisoners lack access to prison

services and that their "disability was the reason [they did] not receiv[e] full access to those

programs." Love, 896 F. Supp. at 810. The federal Defendants' argument to the contrary must

be rejected.

   **2.**  **The Complaint Adequately Alleges that the Programs and Activities
at Issue Either Receive Federal Financial Assistance or Are
Conducted by the Federal Government.**

   A Rehabilitation Act claim also requires allegations that the program or activity at

issue is attributable to the federal government, either (a) because it receives federal financial

assistance, or (b) because it is conducted by the federal government itself. The allegations in the

Complaint satisfy this element as well.

   **a)**  **GEO Receives Federal Financial Assistance Within the
Meaning of the Rehabilitation Act.**

   The Complaint alleges that the federal Defendants "provid[e] funding and

financial assistance" that enables GEO to conduct "all of the operations, programs, facilities, and

activities" at the Rivers facility, including the provision of medical care. Compl. ¶¶ 73–74. The

term "federal financial assistance" is not defined in the Rehabilitation Act, but the D.C. Circuit

has emphasized that "section 504 and the civil rights statutes with which it shares a common

language and heritage must be liberally construed in order that their beneficent objectives may be

realized to the fullest extent possible." Paralyzed Veterans of Am. v. Civil Aeronautics Bd., 752

F.2d 694, 710 (D.C. Cir. 1985) (internal quotations and citations omitted), overruled on other

grounds by United States Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597 (1986);

see also Bellamy v. Roadway Express, Inc., 668 F. Supp. 615, 618 (N.D. Ohio 1987) ("[T]he

term 'federal financial assistance' has been very broadly construed to encompass assistance of any kind.") (collecting cases).

Courts in this Circuit have yet to consider the precise question at issue in this case: whether the federal government's payment to a privately owned prison to provide medical services for the benefit of prisoners constitutes "federal financial assistance" within the meaning of the Rehabilitation Act. Case law from other contexts confirms, however, that when GEO contracted with the federal government to provide medical services to prisoners, it received "federal financial assistance" within the meaning of the Act because the monies paid for a federal government benefit to third parties.

Several courts have concluded that federal funding for statutorily mandated government health services provided by contractors to third parties constitutes "federal financial assistance" under Section 504. For example, in United States v. Baylor University Medical Center, 736 F.2d 1039, 1049 (5th Cir. 1984), the Fifth Circuit held that Medicare and Medicaid payments to health care providers are federal financial assistance for purposes of Section 504 because those payments benefit third parties who have a statutory entitlement to services under those federal programs. A federal district court in Colorado similarly concluded that Medicaid and Medicare payments were "federal financial assistance," and distinguished those payments from payments made to a defense contractor on the ground that "[w]hen the government provides Medicare or Medicaid payments to a hospital, it receives no goods or services in return." Mass v. Martin Marietta, 805 F. Supp. 1530, 1542 (D. Colo. 1992); see also Vacco v. Mid Hudson Med. Group, 877 F. Supp. 143 (S.D.N.Y. 1995) (same); United States v. Univ. Hosp. of the State Univ. of New York at Stony Brook, 575 F. Supp. 607 (E.D.N.Y. 1983) (same).

23

The defendants in <u>University Hospital</u> raised arguments similar to those raised by the federal Defendants this case, contending that payments to providers of medical services do "not constitute [federal financial] assistance because they are merely payments for services rendered rather than gifts." 575 F. Supp. at 612 (citation omitted). The court rejected this argument, explaining:

> all forms of federal financial assistance within the meaning of the Rehabilitation Act are designed to enable the recipient to provide certain services to the class of persons that Congress intends to benefit. The mere fact that the recipient of funds provides some service to justify receipt of such funds does not mean that the recipient is not receiving federal assistance.

<u>Id.</u> In holding that private hospitals are recipients of "federal financial assistance" under Section 504, the court distinguished the role of ordinary procurement contractors from that of providers of federally-financed health care in the context of Medicare and Medicaid payments: "Recipients of federal financial assistance . . engage in the types of activities which governments are created to provide, and therefore, even if only in a very limited sense, may be said to fulfill the aim of the federal programs." <u>Id.</u> at 613 (emphasis added); <u>see also</u> <u>Vacco</u>, 977 F. Supp. at 149–50 (rejecting defendant's argument that federal reimbursements to hospitals are analogous to payments made under procurement contracts).

The same principle applies by analogy to the federal monies paid to GEO for the provision of medical services. Plaintiffs specifically alleged that under the Rivers Contract, GEO "assumed responsibility for the medical treatment of persons incarcerated at the Rivers facility" and agreed to comply with the Rehabilitation Act. Compl. ¶¶ 33–34. Like the health care providers in the cases discussed above, by providing health care to prisoners in federal custody, GEO engages in the very type of activity that "governments are created to provide."

The "subsidy" cases from other jurisdictions that are cited in the federal Defendants' brief, Fed. Defs. Mem. at 11–12, are therefore inapposite.

In all events it would not be proper to resolve this issue against the Plaintiffs on a motion to dismiss.  See Bellamy, 668 F. Supp. at 618 (the issue of federal financial assistance "ordinarily cannot be resolved" on a motion to dismiss because discovery is often "necessary to determine" whether there has been federal assistance within the meaning of Section 504).  See also Bowers v. NCAA, 9 F. Supp. 2d 460, 493 (D. N.J. 1998) (denying the defendant's motion for summary judgment on the plaintiff's Rehabilitation Act claim because "contracts which in actuality subsidize . . . may result in the receipt of federal financial assistance" and the plaintiff "may learn more during discovery as to the nature of the contracts with the federal government and may reveal the existence of such subsidies.").

> b)   **The Program and Activity at Issue Is Conducted by the Federal Government Within the Meaning of the Rehabilitation Act.**

Even if the Court concluded that the allegations in the Complaint were not sufficient to satisfy the "federal financial assistance" requirement, dismissal nonetheless would be improper at the pleading stage because the Complaint alleges facts sufficient to conclude that the provision of medical care to Rivers prisoners under the GEO Contract constitutes a federally conducted "program or activity."

The D.C. Circuit has held that a contract with a federal agency "may constitute a federal program or activity" under the Rehabilitation Act, and thereby give rise to federal liability.  See Redd v. Summers, 232 F.3d 933, 941 (D.C. Cir. 2000).  In Redd, a tour guide employed by a temporary employment agency under contract with the U.S. Bureau of Engraving and Printing alleged that the Bureau employees who supervised and monitored the agency's employment contract had ordered her termination from the tour guide program because she was

disabled.  See id. at 936; Redd v. Rubin, 34 F. Supp. 1, 2–4 (D.D.C. 1998).  Redd thus alleged

that the government had denied her participation in the tour guide contract, a federally conducted

program or activity.  On review of the government's motion to dismiss her Rehabilitation Act

claims, the district court permitted Redd's section 504 claim to proceed, reasoning that she had

stated a claim that the federal defendant had engaged in "discriminatory administrative methods

through its contract with [the private contractor]" that had led to her injury.  34 F. Supp. at 8.

            In reaching this result, the district court noted that the Bureau of Engraving and

Printing had issued a regulation implementing the Rehabilitation Act, and making clear that the

government's obligation to comply with the statute extends not only to its direct actions but also

to its contractual relationships.  Id. at 8.  The Department of Justice ("DOJ") (the BOP's parent

agency) likewise has issued a regulation entitled "Enforcement of Nondiscrimination on the

Basis of Handicap in Programs or Activities Conducted by the Department of Justice:  General

Prohibitions Against Discrimination" that prohibits the agency from discriminating on the basis

of disability either "directly or through contractual … arrangements."  See 28 C.F.R.

§ 39.130(b)(1) (emphasis added).   This regulation, like the one at issue in Redd, mandates that

DOJ and its subagencies, including the BOP, may not, when "providing any aid, benefit, or

service," "deny a qualified handicapped person the opportunity to participate in or benefit from

the aid, benefit or service."  Id. (i).  It also mandates that DOJ and BOP may not "provide a

qualified handicapped person with an aid, benefit or service that is not as effective in affording

equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of

achievement as that provided to others," or "otherwise limit a qualified handicapped person in

the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others."

Id. (iii) & (vi) (emphasis added).  The regulations provide that the BOP may not avoid any of its

obligations under the Rehabilitation Act through its contract for programs and services at Rivers.

Because the federal Defendants may be held responsible under the Rehabilitation

Act for "discriminatory administrative methods through [their] contract with [a private

contractor]," Redd, 34 F. Supp. at 8, because their obligations expressly extend to discrimination

that occurs "directly or through contractual . . . arrangements," 28 C.F.R. §39.130(b)(1), and

because the Complaint alleges that through specific acts and omissions the federal Defendants

discriminated against the disabled Named Plaintiffs, see Compl. ¶¶ 75–77, the motion to dismiss

the Rehabilitation Act claim must be denied.

## II.    SOVEREIGN IMMUNITY DOES NOT BAR PLAINTIFFS' DAMAGES CLAIMS FOR VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT.

The federal Defendants also have moved to dismiss the Plaintiffs' claim for

money damages under the Rehabilitation Act on grounds of sovereign immunity.[6]  That

argument should be rejected because in cases such as this one in which the federal government

funds a program or activity challenged under Section 504 of the Rehabilitation Act, 29 U.S.C.

§ 794, federal sovereign immunity does not bar claims for damages.

---

[6]  The federal Defendants have raised sovereign immunity only with respect to Plaintiffs' monetary claims under the Rehabilitation Act.  Fed. Defs. Mem. at 7-9.  The Administrative Procedure Act's waiver of federal sovereign immunity at 5 U.S.C. § 702, applies to all claims for declaratory and injunctive relief against the federal government.  See Trudeau v. FTC, 456 F.3d 178, 186 (D.C. Cir. 2006); Simmat v. United States Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005); Chamber of Commerce v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  With respect to Plaintiffs' Rehabilitation Act claims, at least one court in this District has specifically concluded that Lane v. Pena, 518 U.S. 187 (1996) would not prohibit claims against the federal government for declaratory and injunctive relief.  Am. Council of the Blind v. Paulson, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006) (explaining that the waiver of sovereign immunity extends to claims for injunctive relief).

In considering the federal Defendants' claim of sovereign immunity, the Court may not dismiss Plaintiffs' claims if Plaintiffs have "affirmatively allege[d] in [their] pleadings the facts showing the existence of jurisdiction . . . ." Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487, 492 n.9 (D.C. Cir. 1984) (citing Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)).  While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, see Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992), the court must still "accept all of the factual allegations in [the] complaint as true," United States v. Gaubert, 499 U.S. 315, 327 (1991); Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin., 402 F.3d 1249, 1254 (D.C. Cir. 2005); and "attribute all reasonable inferences to the plaintiffs." Tozzi v. EPA, 148 F. Supp. 2d 35, 41 (D.D.C. 2001) (citing Scheuer v. Rhodes, 416 U.S. 202 (1974)).  As shown below, federal Defendants' effort to obtain dismissal of Plaintiffs' Section 504 damages claim on the ground of sovereign immunity should be rejected.

Section 504 of the Rehabilitation Act prohibits discrimination against individuals on the basis of disability "under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a). Section 505(a)(2) provides the same remedies for a violation of § 504(a) that are provided under title VI of the Civil Rights Act of 1964.  See 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [§ 504.]")  Those remedies include awards of monetary damages.  See Lane v. Pena, 518 U.S. 187, 191 (1996) (citing Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 70 (1992)).

Given the express language of the statute, the Supreme Court has explained that "Congress has waived the Federal Government's immunity against monetary damages awards [in] the . . . category of § 504(a) violations committed by federal funding agencies acting" as "'Federal provider[s] of financial assistance." Lane, 518 U.S. at 192–93 (quoting 29 U.S.C. § 794a(a)(2)); see also American Council of the Blind v. Paulson, 463 F. Supp. 2d 51, 57 (D.D.C. 2006) (citing Lane, 518 U.S. at 187). Thus, contrary to federal Defendants' assertion, both the text of the statute and Supreme Court precedent distinguish cases in which the federal agency funds, rather than conducts, the challenged program or activity.[7]

Here, as in Lane, the decisive question for sovereign immunity purposes is whether the federal Defendants are "Federal providers" of financial assistance with respect to the challenged program or activity -- in this case, the medical services provided at Rivers. The term "federal financial assistance" is broadly construed. See Bellamy, 668 F. Supp. at 618 ("[T]he term 'federal financial assistance' has been very broadly construed to encompass assistance of any kind.") (collecting cases). The Complaint specifically alleges that Defendant BOP "is an executive agency of the United States government providing funding and financial assistance to Defendant GEO" to operate "all of the operations, programs, facilities, and activities" conducted at the Rivers facility, including the provision of medical care. Compl. ¶¶ 73–74. For these reasons and the reasons discussed in Section I.B.2 above, the federal Defendants are "federal providers of financial assistance" with respect to the medical services provided by the Rivers

---

[7] In light of this distinction, the Federal Defendants' reliance on Dorsey v. United States Department of Labor, 41 F.3d 1551 (D.C. Cir. 1994), a decision that pre-dated the Supreme Court's sovereign immunity analysis in Lane, is misplaced. Unlike the present case, Dorsey concerned a program or activity -- the Job Corps -- that was conducted by an executive agency, the Department of Labor. Id. at 1553.

facility for purposes of the Rehabilitation Act.  Sovereign immunity accordingly does not bar the Plaintiffs' claims for money damages.[8]

## III.    THE COMPLAINT MAY NOT BE DISMISSED UNDER THE DOCTRINES OF STANDING OR MOOTNESS.

The federal Defendants contend that the claims for equitable relief brought by seven of the ten Named Plaintiffs who have been transferred or released from the Rivers facility are barred under the doctrines of standing, or mootness, or both.  This argument is premature and does not impact the class claims asserted against the federal Defendants.

*First*, the federal Defendants do not dispute that an Article III case or controversy exists with respect to the other three Named Plaintiffs, one of whom is also a member of proposed Disability Sub-Class.  See Fed. Defs. Mem. at 21.  Accordingly, the federal Defendants' standing and mootness objections do not provide a basis for dismissing this lawsuit.

*Second*, the seven Named Plaintiffs who are the subject of the federal Defendants' challenge indisputably have live claims for money damages resulting from the Defendants' unlawful systems, policies, and procedures governing the delivery of medical care at Rivers. They are indisputably proper Named Plaintiffs in this case.

*Third*, there is no merit to the federal Defendants' argument that the federal Defendants can moot a claim for equitable relief by transferring the complaining prisoner to another facility before his claim is heard by a court.  In class actions involving prisoners, it is well established that the removal or release of a named plaintiff, even prior to class certification, does not eliminate the named plaintiff's personal stake in obtaining class certification or moot

---

[8]  Plaintiffs acknowledge that should the Court conclude that the GEO contract constitutes a "program or activity" that is "conducted by" the federal government and does not constitute "federal financial assistance" under the Rehabilitation Act, then sovereign immunity would bar the Plaintiffs claim for monetary damages under the statute.

the claims of the unnamed class members.  See <u>United States Parole Comm'n v. Geraghty</u>, 445

U.S. 388, 404 (1980) (an action brought on behalf of a class does not become moot upon

expiration of the named plaintiff's substantive claim); <u>Twelve John Does v. District of</u>

<u>Columbia</u>, 117 F.3d 571, 575 (D.C. Cir. 1997) (Applying <u>Geraghty</u>'s logic, the D.C. Circuit

observed that mootness of individual equitable claims would not pose a bar to transferred

prisoners seeking to represent an as-yet-uncertified subclass because "movants have not sought

to vindicate only their individual concerns."); <u>Samuels v. District of Columbia</u>, 770 F.2d 184,

193 n.5 (D.C. Cir. 1985) (holding that the class claims were not mooted despite the resolution of

individual plaintiff claims, where the complaint alleged that defendants "systematically" violated

the law on a "classwide basis").

   This rule makes sense in the context of prisoner litigation because it ensures that

unlawful conditions of confinement are not insulated from review simply because those injured

by the unlawful conduct may be due to be released or transferred before their claims are heard by

a court or jury.  In doing so, it prevents the mischief that could occur if the government were able

to moot prison conditions cases simply by transferring named plaintiffs to different facilities.

Such attempts to avoid judicial scrutiny have been rejected by courts in many different contexts.

See <u>Deposit Guaranty Nat'l Bank v. Roper</u>, 445 U.S. 326, 339 (1980) (expressing concern that

defendants might attempt to defeat class actions by mooting the individual claims of the named

plaintiffs, and recognizing that such tactics would "frustrate the objectives of class actions" and

"invite waste of judicial resources."); <u>Griffith v. Bowen</u>, 678 F. Supp. 942, 947 (D. Mass. 1988)

("[W]hen a class action suit has been filed and certification has not yet been acted on, attempts to

'pick off' the named plaintiffs will not moot the case where there is an ongoing controversy between the proposed class and the defendant.").[9]

In sum, the federal Defendants do not contend that any of the Named Plaintiffs lack standing to prosecute this lawsuit, the standing challenge is not dispositive, and the federal Defendants' standing challenge focuses only on whether some (but not all) Named Plaintiffs lack standing to bring some (but not all) claims based on the timing of their individual transfer or release from the facility. See Fed. Defs' Mem. at 22–23. Under these circumstances, the Court may properly defer these issues until the class certification stage. See Amchem Prods. v. Windsor, 521 U.S. 591, 612 (1997); Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) ("[C]lass certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first."); see also Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 239 F.R.D. 9, 16 (D.D.C. 2006) (concluding that the court should consider class certification before standing under certain circumstances).

## IV.     THE DISTRICT OF COLUMBIA IS THE PROPER VENUE FOR THIS CASE.

The BOP has moved in the alternative to transfer this case to the Eastern District of North Carolina. This request also should be denied.

As the moving party on a § 1404(a) motion, the BOP must demonstrate that the transferee forum is clearly superior to the one that Plaintiffs have chosen. See Air Line Pilots Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987). That analysis requires a

---

[9]  The cases cited by the federal Defendants on page 24 of their motion are inapposite because none involved the situation present here -- where other named Plaintiffs not subject to challenge clearly have standing to pursue claims on behalf of themselves and the class. See Fed. Defs. Mem. at 24.

balancing of 11 public and private interest factors, but the federal Defendants focus on just two

of them:  1) the Plaintiffs' choice of forum, and 2) the ease of access to sources of proof.  <u>See</u>

Fed. Defs. Mem. at 27–29.  The federal Defendants' failure to analyze the remaining nine factors

renders their argument wholly unpersuasive, and, as demonstrated in Plaintiffs' Opposition to

GEO's venue motion, venue is proper in the District of Columbia.[10]  Below we address only the

two factors that are discussed in BOP's alternative motion.

        **A.**      **Plaintiff's Choice of Forum Is Entitled to Deference.**

As federal Defendants acknowledge, courts in the District of Columbia place

substantial emphasis on the plaintiffs' choice of forum in prisoners' rights litigation.  <u>See</u> Fed.

Defs. Mem. at 27.  This Court has stated that "it is almost a truism that a plaintiff's choice of a

forum will <u>rarely be disturbed</u> . . . unless the balance of convenience is strongly in favor of the

defendant."  <u>Jackson v. District of Columbia</u>, 89 F. Supp. 2d 48, 52–53 (D.D.C. 2000) (emphasis

added), <u>vacated on other grounds</u>, 254 F.3d 262 (D.C. Cir. 2001); <u>see also</u> <u>Shakur v. Federal Bur.</u>

<u>of Prisons</u>, 950 F. Supp. 3, 4 (D.D.C. 1997).

Federal Defendants wrongly assert that the Court should "give substantially less

deference [to a plaintiff's forum choice] when the forum preferred by the plaintiff is not his

home forum."  <u>See</u> Fed. Defs. Mem at 27–28 (citing <u>Stern v. Fed. Bur. of Prisons</u>; No. 07-00564,

2007 WL 1555830, at *1 (D.D.C. Mar. 22, 2007)).  First, three of the Named Plaintiffs presently

reside in the District.  Second, BOP's key authority on this issue, <u>Stern</u>, is inapposite, because

the plaintiff in that case was neither incarcerated <u>nor</u> sentenced in the District of Columbia, the

District was not his home forum, and his claims arose out of discrete acts that occurred entirely

---

[10]  See Plaintiffs' Opposition to GEO Group's Motion to Dismiss and Motion to Transfer
(Docket No. 9).  Plaintiffs incorporate those arguments by reference here.

outside of the District.  Stern v. Fed. Bur. of Prisons, No. 07-0609 (RMU), 2007 WL 2983804, at

*3 (D.D.C. Oct. 15, 2007).  Unlike the plaintiff in Stern, all ten Named Plaintiffs in this case

were originally sentenced in the District of Columbia.  Many were also residents of the District

of Columbia at the time of their sentencing.  Finally, the acts and omissions giving rise to

Plaintiffs' claims against the BOP are alleged to have occurred in large measure in the District of

Columbia.  See Compl. ¶¶ 10–19.[11]

      The D.C. Circuit has indicated that venue is proper in the District of Columbia

even when the D.C. offender is incarcerated at a facility outside of this judicial district.  See

Young v. Director, United States Bureau of Prisons, 367 F.2d 331, 333, n.8 (D.C. Cir. 1966)

(holding that "because of its unique relationship to the District of Columbia, different

considerations may well apply to actions instituted by inmates of the Lorton Reformatory,

Lorton, Virginia").  Because this litigation concerns GEO's management of a facility that, like

Lorton Reformatory, was built to house persons outside of the District of Columbia who were

sentenced by the District of Columbia courts for violations of District of Columbia law; because

the D.C. Circuit has made clear that its courts should defer to a plaintiff's choice of forum; and

because the BOP fails to meet its heavy burden to overcome this presumption in favor of the

plaintiff's choice, this factor weighs heavily against transfer.

---

[11]  Federal Defendants assert that the Court should afford little weight to the fact that Named
Plaintiffs reside in the District because those Plaintiffs lack standing to pursue claims for
injunctive relief or their claims are moot.  As discussed above, each Named Plaintiff has standing
to pursue claims in this case, and in any event this argument is premature because questions of
standing and mootness are properly decided in the context of ruling on Plaintiffs' motion for
class certification (Docket No. 31).  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999);
Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 239 F.R.D. 9,
16 (D.D.C. 2006).

**B.      Ease of Access to Sources of Proof Counsels in Favor of the District of Columbia as the Forum.**

Finally, the federal Defendants assert that because "any relevant BOP policy or custom affected plaintiffs only through implementation at Rivers" and "[b]ecause all events relevant to plaintiffs' claims occurred at Rivers, the medical and other records and most witnesses are located there." Fed. Defs Mot. at 28.  This assertion ignores allegations in the Complaint that principal sources of proof will be drawn from the District (and other locations), including:  (i) testimony from Plaintiffs residing in the District; (ii) testimony from medical providers in the District that treated Plaintiffs before or after they were transferred to Rivers; (iii) records and witnesses located at the BOP's central office in the District of Columbia; (iv) records and witnesses located at the Rivers facility in North Carolina; and (v) records and witnesses located at GEO's headquarters in Florida.  See Compl. ¶¶ 10–19, 30–31, 34, 38.  It is telling that the BOP's own Privatization Management Branch -- located in the BOP's central office in the District -- "oversees the operation of secure contract facilities [and] ensure[s] that contractors adhere to established performance standards and facilitate communications between contract facilities and the BOP."  See U.S. Dept. of Justice, Federal Prison System, FY 2008 Performance Budget at 61.

For all these reasons, the interests of justice do not favor transfer of this action from the U.S. District Court for the District of Columbia.  The BOP's motion to transfer this case to the Eastern District of North Carolina should therefore  be denied.

## CONCLUSION

The Court should deny the federal Defendants' motion to dismiss or, in the

alternative, to transfer this case to another judicial district.[12]

## REQUEST FOR HEARING

Plaintiffs respectfully request a hearing on the BOP's motion to dismiss or, in the

alternative, to transfer this case.


Dated: October 26, 2007                              Respectfully submitted,


                                            _____s/ Danielle M. Estrada_____

Donald L. Kahl (DC Bar # 489472)            Anthony Herman (DC Bar # 424643)
Philip Fornaci (DC Bar # 434824)            Donald J. Ridings Jr. (DC Bar # 466808)
Deborah Golden (DC Bar # 470578)            Danielle M. Estrada (DC Bar # 494517)
Ivy A. Lange (DC Bar # 488147)              COVINGTON & BURLING LLP
WASHINGTON LAWYERS' COMMITTEE FOR           1201 Pennsylvania Avenue N.W.
   CIVIL RIGHTS AND URBAN AFFAIRS           Washington, D.C.  20004
11 Dupont Circle N.W.                       202.662.6000 (ph)
Suite 400                                   202.778.6000 (fax)
Washington, D.C.  20036
202.319.1000 (ph)
202.319.1010 (fax)

                                            *Counsel for Plaintiffs*

---

[12] Should the Court rule that the pleadings are deficient, Plaintiffs should be granted leave to amend their complaint and afforded an opportunity to cure perceived pleading deficiencies because "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962).  While the decision to grant leave to amend lies within the discretion of a district court, Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996), the court must heed Rule 15's mandate that leave is to be "freely given when justice so requires." Fed. R. Civ. P. 15(a); Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1083 (D.C. Cir. 1998).  A court therefore may deny a request for leave to amend only if such amendment would be futile or if some other compelling circumstance is present, such as undue delay, bad faith, dilatory motive, or undue prejudice.  Id.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEITH MATHIS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01155-RMU |
| | ) | |
| GEO GROUP INC., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## <u>ORDER</u>

This matter comes before the Court on Defendants Federal Bureau of Prisons' and Harley Lappin's ("Federal Defendants") Motion to Dismiss, or in the Alternative, to Transfer. Upon consideration of the motion, opposition thereto, and the entire record herein, it is hereby

ORDERED that Federal Defendants' Motion to Dismiss, or in the Alternative, to Transfer is DENIED.

ORDERED, this _____ day of _____, 2007.

_____
The Honorable Ricardo M. Urbina
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, *et al.*,                    )
                                           )
                          *Plaintiffs*,    )
                                           )
          v.                               )    Case No. 1:07-cv-01155-RMU
                                           )
GEO GROUP INC., *et al.*,                  )
                                           )
                          *Defendants*.    )
                                           )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS FEDERAL BUREAU OF PRISONS' AND HARLEY LAPPIN'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER**

# EXHIBIT

# Unpublished Decisions

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 2983804 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

Stern v. Federal Bureau of Prisons
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Ronald STERN, Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, Defendant.
**Civil Action No. 07-0609 (RMU).**

Oct. 15, 2007.

Ronald Stern, Jessup, GA, pro se.
Thomas S. Rees, U.S. Attorney's Office, Washington, DC, for Defendant.

RICARDO M. URBINA, United States District Judge.

**\*1** The Federal Bureau of Prisons (the Bureau) requests that the court transfer the plaintiff's suit to the Southern District of Georgia. The plaintiff, an inmate in the Federal Correctional Institute in Jesup, Georgia, challenges the Bureau's statutory authority to promulgate 28 C.F.R. § 545.11(a)(2), a regulation through which the Bureau has established restitution payment schedules. Because the Bureau has not shown that the convenience of the parties and the interest of justice would be better served by resolving this case in the Southern District of Georgia, the court denies the Bureau's motion to transfer.

On January 21, 2005, Judge Gary A. Feess of the United States District Court for the Central District of California sentenced the plaintiff, Ronald Stern, to 84 months in prison and ordered him to pay $2,139,860.12, later reduced to $1,888,161.62, in restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Def.'s Mot. to Transfer (Def.'s Mot.) at 2. The Bureau enrolled the

plaintiff in its Inmate Financial Responsibility Program (IFRP) pursuant to 28 C.F.R. § 545.11(a)(2) and established a schedule for the plaintiff's payments. Pl.'s Opp'n to Def.'s Mot. to Transfer (Pl.'s Opp'n) at 2.

While detained at a correctional facility in Jesup, Georgia, on March 16, 2007, the plaintiff filed a complaint in this court challenging the Bureau's authority to set payment schedules for restitution ordered pursuant to the MVRA. Compl. ¶ 8. The Bureau subsequently filed a motion to transfer the case to the United States District Court for the Southern District of Georgia, which the plaintiff opposes. The court turns to the pending motion.

**A. Legal Standard for Venue under 28 U.S.C. § 1391(b) and Transfer Pursuant to 28 U.S.C. § 1404(a)**

When federal jurisdiction is not premised solely on diversity, 28 U.S.C. § 1391(b) controls venue, establishing that venue is proper in:
(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

In an action where venue is proper, 28 U.S.C. § 1404(a) nonetheless authorizes a court to transfer the action to any other district where it could have been brought for the convenience of parties and witnesses, in the interest of justice[.] 28 U.S.C. § 1404(a).Section 1404(a) vests discretion in the district court to adjudicate motions to transfer according to [an] individualized, case-by-case consideration of convenience and fairness.Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 27 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 2983804 (D.D.C.)    Page 2
**(Cite as: --- F.Supp.2d ----)**

**\*2** Accordingly, the defendant must make two showings to justify transfer. First, the defendant must establish that the plaintiff originally could have brought the action in the proposed transferee district. _Van Dusen, 376 U.S. at 622._ Second, the defendant must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that district. _Trout Unlimited,_ 944 F.Supp. at 16. As to the second showing, the statute calls on the court to weigh a number of case-specific private and public-interest factors. _Stewart Org., 487 U.S. at 29._ The private-interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. _Trout Unlimited,_ 944 F.Supp. at 16 (citing _Jumara v. State Farm Ins. Co.,_ 55 F.3d 873, 879 (3d Cir.1995), _Heller Fin., Inc. v. Riverdale Auto Parts, Inc.,_ 713 F.Supp. 1125, 1129 (N.D.Ill.1989), 15 FED. PRAC. & PROC. § 3848). The public-interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. _Id._

**B. The Court Denies the Bureau's Motion to Transfer**

The instant case involves an action under the Administrative Procedure Act (APA), 5 U.S.C. § 706. Specifically, the plaintiff seeks a declaratory judgment that the Bureau lacks authority to set payment schedules for orders of restitution issued under the MVRA. Compl. ¶ 9. The Bureau views this claim as a veiled attempt to bring a habeas petition and contends that the proper venue is in the Southern District of Georgia, where the plaintiff is incarcerated. Def.'s Mot. at 3. The plaintiff counters that the claim does not resound in habeas corpus, but is a run of the mill APA action, raising purely legal questions. Pl.'s Opp'n at 1, 5. The court agrees with the plaintiff.

The Bureau proffers numerous arguments for transfer, all of which fall flat.[FN1] The Bureau begins by requesting this court to construe the plaintiff's challenge to the Bureau's authority to promulgate 28 C.F.R. § 545.11(a)(2) as a petition for habeas corpus.

Def.'s Mot. at 3. While the argument may have traction in other contexts, it clearly does not here, where the success of the plaintiff's claim would not affect the fact or length of the plaintiff's confinement. _Dominguez v. Bureau of Prisons,_ 2006 WL 1445041, at \*4 (D.D.C. May 26, 2006) (determining that a challenge to the Bureau's policy that affects conditions of confinement and would not affect the length of sentence would not be construed as a petition for a writ of habeas corpus). Indeed, judgment in favor of the plaintiff would merely invalidate the Bureau's IFRP, but would not in any way alter the plaintiff's sentence issued by Judge Feess of the United States District Court for the Central District of California. Thus, the court is not persuaded that the plaintiff's claim is a disguised petition for writ of habeas corpus.

> FN1. The Bureau is correct, however, in asserting that venue would be proper in the Southern District of Georgia. Def.'s Mot. to Transfer (Def's Mot.) at 6.

**\*3** The Bureau next argues that the convenience of the parties and the interest of justice will be best served by the transfer of the case to the U.S. District Court for the Southern District of Georgia. Def.'s Mot. at 5. Specifically, the Bureau contends that transfer is appropriate because the plaintiff was not convicted here; he is not incarcerated here; and the documents and witnesses pertaining to his claim are not located here. _Id._ The Bureau fails to recognize, however, that these factors are irrelevant where, as here, the only issues before the court are legal and pertain to the Bureau's authority to promulgate 28 C.F.R. § 545.11(a)(2).See _Starns v. McGuire,_ 512 F.2d 918, 931 (noting that in cases in which it is clear that testimony by the prisoner will not be required ... transportation will be irrelevant). The Bureau does not, and cannot, explain why documents and witnesses in the Southern District of Georgia would be relevant to such a legal challenge.[FN2]Additionally, communications between plaintiff and counsel do not appear to weigh in favor of transfer because the _pro se_ plaintiff presents cogent arguments and is not proceeding _in forma pauperis. See_ LCvR 83.11(b)(3) (stating that [w]hen leave has been granted ... for a _pro se_ litigant to proceed _in forma pauperis,_ the judge to whom the case is assigned may, on application by the _pro se_ party or otherwise, appoint an attorney). Accordingly, the Bureau has not met its burden of proving that transfer is convenient and in the interest of justice, and the court denies its motion. _See Trout Unlimited,_ 944 F.Supp. at 16.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                  Page 3
--- F.Supp.2d ----, 2007 WL 2983804 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

       <u>FN2.</u> The Bureau mischaracterizes the plaintiff's claim as a challenge to the *implementation* of the policy to enroll prisoners in the IFRP. Def.'s Mot. at 7. The complaint states that the [Bureau's] use of the IFRP to set payment schedules for restitution under the MVRA is ... in excess of statutory authority and requests a declaratory judgment to that effect. Compl. ¶¶ 8-9.

For the foregoing reasons, it is this 15th day of October, 2007,

**ORDERED** that the defendant's motion to transfer is **DENIED.**

**SO ORDERED.**

D.D.C.,2007.
Stern v. Federal Bureau of Prisons
--- F.Supp.2d ----, 2007 WL 2983804 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 2818818 (D.D.C.)
**(Cite as: Slip Copy)**

Makenta v. Affiliated Computer Services
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Nefretiti MAKENTA, Plaintiff,
v.
AFFILIATED COMPUTER SERVICES, et al.,
Defendants.
**Civil Action No. 06-1093(JR).**

Sept. 26, 2007.

Donald M. Temple, Donald M Temple, P.C.,
Washington, DC, for Plaintiff.
Frederick D. Cooke, Jr., Michael P. Bruckheim,
Rubin, Winston, Diercks, Washington, DC, for
Defendants.

JAMES ROBERTSON, United States District Judge.
*1 The only federal claim remaining in this case
(after the dismissal of the District of Columbia
defendants) is that, by allegedly helping the police to
apprehend meter vandals, agents of Affiliated
Computer Services ("ACS") acted "under color of
state law," and can thus be liable under 42 U.S.C. §
1983 for the constitutional tort of false arrest without
probable cause. That claim must be rejected as a
matter of law.

West v. Atkins, 487 U.S. 42 (1998), and Lugar v.
Edmondson Oil Co., 457 U.S. 922 (1982), hold that,
in order to demonstrate state action, " 'the
deprivation must be caused by the exercise of some
right or privilege created by the State ... or by a
person for whom the State is responsible,' " and "
'the party charged with the deprivation must be a
person who may fairly be said to be a state actor.' "
West, 487 U.S. at 49 (emphasis added). Plaintiff has
not shown or attempted to show that the District was
"responsible" for those actions of ACS employees
which allegedly led to plaintiff's arrest.

The more expansive language of United States v.
Price, 383 U.S. 787 (1966), cannot be applied to the
facts of this case. In Price, the Court said:
Private persons, *jointly engaged* with state officials in
the prohibited action, are acting 'under color' of law
for purposes of the statute. To act 'under color' of

law does not require that the accused be an officer of
the State. It is enough that he is a willful participant
in *joint activity* with the State or its agents.

*Id.* at 794 (emphasis added). In that case, however,
the private citizens were held liable for *conspiring*
with police officers to assault and kill three men
immediately following their release from jail. *Id.* at
790.The private actors were held to be within the
scope of federal civil rights statutes because they
acted in a concerted design with agents of the state to
*intentionally* deprive others of their civil rights.
Nothing of that sort is alleged here.

Plaintiff's claim is that an ACS employee assisting in
an investigation of meter vandalism provided
information to a District police officer in reckless
disregard of whether that information was true, and
that this information resulted in plaintiff's false and
unlawful arrest. She alleges no conspiracy. The only
act immediately connected to her injury is the arrest
itself-an action taken by the officer, not by the ACS
employee-and the only "responsibility" of the District
of Columbia with regard to that arrest was to ensure
that it was based upon probable cause. In the absence
of conspiracy facts such as those in *Price,* that
responsibility extended only to the actions of its
agents, and not to the eye-witness accounts of private
citizens.

In *West,* the case upon which plaintiff principally
relies, the Supreme Court held that a medical
professional under contract to provide services to a
prison could be treated as state actor. The medical
professional was the essential carrier of the state's
responsibility to care for the health and safety of its
prisoners; he was providing medical services directly
to them. He was "a person for whom the state [was]
responsible,"487 U.S. at 49. Here, the ACS
employees were not persons for whom the District
was responsible.

*2 In the absence of a viable federal claim, I am free
to decline to exercise supplemental jurisdiction,
*see*28 U.S.C. § 1367(c)(3), and in this case I will do
so, because what remains of plaintiff's case seem
likely to raise a novel and undecided question of
District of Columbia law if it proceeds further. *See*28
U.S.C. § 1367(c)(1). Plaintiff alleges that an ACS
employee gave false information to a District police
officer with sufficient recklessness that his actions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2007 WL 2818818 (D.D.C.)
**(Cite as: Slip Copy)**

constituted malice and ill will. Complaint [Dkt. 1] at ¶ 21. An informer who *knowingly* gives false information leading to an unlawful arrest can be held liable for a false arrest claim. *Vessels v. District of Columbia*, 531 A .2d 1016, 1020 (D.C.1987). But whether the reckless provision of false information is sufficient for a claim of false arrest, even if it is malicious, is not only an open question but one that has been expressly reserved. *Id.* at 1020 n. 13.("Specifically, we do not rule on the question whether the cause of action will lie when, as in appellant's complaint, the defendant's action is labeled "malicious" but not necessarily knowing.").[FN1]

> [FN1.] Indeed, if I were to exercise supplemental jurisdiction and this open question turned out to be dispositive, the issue would have to go first to our Court of Appeals and then across the street to the District of Columbia Court of Appeals-a procedure that would take about two years. *See, e.g., Johnson v. Washington Metropolitan Area Transit Authority,* 98 F.3d 1423 (D.C.Cir.1996) (certifying question to D.C. Court of Appeals where "a question of District of Columbia law will be determinative."); *see also* D.C.Code § 11-723.

An appropriate order accompanies this memorandum.

D.D.C.,2007.
Makenta v. Affiliated Computer Services
Slip Copy, 2007 WL 2818818 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 1555830 (D.D.C.)
(Cite as: Slip Copy)

**Stern** v. **Federal Bureau** of **Prisons**
D.D.C.,2007.
Only the Westlaw citation is currently
available.Ronald **STERN**, Plaintiff,
v.
**FEDERAL BUREAU** OF **PRISONS**, Defendant.
**No. 1:07-cv-00564.**

March 22, 2007.

Ronald **Stern**, Jessup, GA, pro se.

SULLIVAN, United States District Judge.
**\*1** This matter comes before the Court upon
consideration of plaintiff's *pro se* complaint and
application to proceed *in forma pauperis*. Plaintiff is
an inmate at the Federal Correctional Institution in
Jesup, Georgia ("FCI-Jesup"). He is challenging the
validity of the Inmate Financial Responsibility
Program ("IFRP") implemented by the Bureau of
Prisons ("BOP"). Because the Court concludes that
venue is more appropriate in the Southern District of
Georgia, the case will be transferred.

The BOP instituted the IFRP for the purpose of
encouraging "each sentenced inmate to meet his or
her legitimate financial obligations ." 28 C.F.R. §
541.10. These financial obligations include special
assessments, court-ordered restitution, and fines. *Id.,*
§ 541.11(a). Under the program, prison staff assist
an inmate in developing a financial plan and monitor
the inmate's progress in meeting the financial
obligations. *Id.,* § 541.11. The financial plan can
impose a minimum payment of $25.00 per quarter to
a maximum of 50% of an inmate's monthly UNICOR
pay. *Id.,* § 545.11(b).[FN1]

> FN1. UNICOR is a program that provides
> work and training opportunities for federal
> inmates. *Id.,* § 345.11(a).

The inmate is responsible for making satisfactory
progress in complying with the financial plan and
providing documentation of his payments. *Id.* Prison
staff are required to monitor an inmate's progress to
assess his level of responsible behavior. *Id.,* §
545.11(c). An inmate's refusal to participate in the

IFRP or to comply with his financial plan may result
in negative consequences, such as the denial of
furloughs and employment, commissary spending
limitations, unfavorable housing, and the refusal of
placement in a community-based program. *Id.,* §
545.11(d).

Under 28 U.S.C. § 1404(a) a court may transfer a
case to any other district where it might have been
brought "[f]or the convenience of parties and
witnesses, in the interests of justice." In considering
whether transfer would be proper, the court considers
the following factors:
[T]he convenience of the witnesses of plaintiff and
defendant; ease of access to sources of proof;
availability of compulsory processes to compel the
attendance of unwilling witnesses; the amount of
expense for the willing witnesses; the relative
congestion of the calendars of potential transferor and
transferee courts; and other practical aspects of
expeditiously and conveniently conducting a trial.

*SEC v. Page Airways, Inc.,* 464 F.Supp. 461, 463
(D.D.C.1978). Even though a court should typically
give deference to a party's forum choice, it may give
substantially less deference when the forum preferred
by the plaintiff is not his home forum. *Piper Aircraft,
Co. v. Reyno,* 454 U.S. 235, 255-56 (1981); *Boers v.
United States,* 133 F.Supp.2d 64, 65 (D.D.C.2001).
Plaintiff's residence for purposes of venue is the place
of his incarceration. *Starnes v. McGuire,* 512 F.2d
918, 925 n. 7 (D.C.Cir.1974) (en banc). FCI-Jesup is
located in the Southern District of Georgia. *Dorman
v. Thornburgh,* 740 F.Supp. 875, 880 (D.D.C.1990),
*aff'd in part, dismissed in part, on other grounds,* 955
F.2d 57 (D.C.Cir.1992). "Many, if indeed not most,
petitions filed by prisoners not confined in the
District of Columbia and not sentenced here
originally, will tend to involve factors that make
transfer to the place of incarceration
appropriate." *Starnes,* 512 F.2d at 926.

**\*2** In addition to being Plaintiff's place of residence,
FCI-Jesup is also where all the events that gave rise
to this action occurred. Any relevant witnesses would
be personnel at that institution. Consequently, this
action might have been brought in the Southern
District of Georgia. And although this case involves a
matter of BOP national policy, that factor is not
determinative. *Huskey v. Quinlan,* 785 F.Supp. 4, 7
(D.D.C.1992). "[T]he advantages of litigating a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 2
Slip Copy, 2007 WL 1555830 (D.D.C.)
**(Cite as: Slip Copy)**

national policy issue in the forum where that policy has been developed must be weighed against the factors suggesting" a transfer of venue. *Starnes,* 512 F.2d at 929. "[T]here is certainly no reason why all cases involving the construction or constitutionality of a federal statute should be litigated in the District of Columbia."*Id.* at 925 n. 7. Moreover, because the implementation of the national policy occurred in Butner, North Carolina, venue is more appropriate there. *See Zakiya v. United States,* 267 F.Supp.2d 47, 59 (D.D.C.2003); *Huskey,* 785 F.Supp. at 7. Accordingly, it is

ORDERED that the case be transferred to the Southern District of Georgia. Whether plaintiff should be allowed to proceed *in forma pauperis* is a matter to be decided by the transferee court.

D.D.C.,2007.
Stern v. Federal Bureau of Prisons
Slip Copy, 2007 WL 1555830 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
(Cite as: Slip Copy)

Page 1

**C**

Dage v. Leavitt
D.D.C.,2007.

United States District Court,District of Columbia.
Elbert Leroy DAGE, Plaintiff,
v.
Michael O. LEAVITT, Administrator, Environmental
Protection Agency, Defendant.
**Civil Action No. 04-0221 (JGP).**

Jan. 9, 2007.

**Background:** Employee brought action against employer alleging disability discrimination and retaliation in violation of the Rehabilitation Act and Title VII. Employer moved for judgment on the pleadings or in the alternative for summary judgment.

**Holdings:** The District Court, Penn, J., held that:

(1) employee administratively exhausted his claims regarding employer's adoption of alternate work space program;

(2) employer's alleged failure to recognize that employee was a qualified person with a disability was not a cognizable claim under the Rehabilitation Act;

(3) employee failed to establish that his requested accommodations were reasonable;

(4) employer's requirement that employees participating in program submit medical evidence bi-annually did not violate the Rehabilitation Act; and

(5) employer's adoption of program without employee's input did not constitute an adverse personnel action.

Motion granted.

**[1] Civil Rights 78 ☞1514**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

78k1512 Exhaustion of Administrative Remedies Before Resort to Courts
    78k1514 k. Particular Cases. Most Cited Cases
Employee administratively exhausted his remedies with respect to claims regarding employer's adoption of alternate work space policy by filing administrative complaint challenging disability discrimination, retaliation, and harassment allegedly suffered after employer implemented policy, but did not exhaust administrative remedies regarding alleged disability discrimination occurring prior to effective date of policy.

**[2] Civil Rights 78 ☞1220**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1220 k. Particular Cases. Most Cited Cases
Employer's alleged failure to recognize that employee was a qualified person with a disability under the Rehabilitation Act was not a cognizable claim under the Rehabilitation Act. Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701.

**[3] Civil Rights 78 ☞1225(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1225 Accommodations
                78k1225(3) k. Particular Cases. Most Cited Cases
Employee failed to establish that his requested accommodations of being able to participate in meetings via teleconferencing, being allowed to participate in forum, and being provided a new computer for home office and use of a scooter were reasonable, as required to establish prima facie case that employer failed to provide him with reasonable accommodations for his disability in violation of the Rehabilitation Act; employee did not establish that requested accommodations were needed in order to carry out essential functions of job. Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701.

**[4] Civil Rights 78 ☞1218(4)**

Slip Copy                                                                              Page 2
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

78 Civil Rights
    78II Employment Practices
      78k1215 Discrimination by Reason of Handicap, Disability, or Illness
        78k1218 Who Is Disabled; What Is Disability
          78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases

**Civil Rights 78 🔑1225(2)**

78 Civil Rights
    78II Employment Practices
      78k1215 Discrimination by Reason of Handicap, Disability, or Illness
        78k1225 Accommodations
          78k1225(2) k. What Are Reasonable Accommodations; Factors Considered. Most Cited Cases
Employer's policy that all employees participating in alternate work space (AWS) program submit medical evidence bi-annually to employer demonstrating continued need to remain in AWS program did not constitute disability discrimination in violation of the Rehabilitation Act, since participants in AWS program also received benefit of either working from home or from specially equipped office space indefinitely. Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701.

**[5] Civil Rights 78 🔑1246**

78 Civil Rights
    78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
        78k1246 k. Particular Cases. Most Cited Cases
Employer's adoption of alternate work space (AWS) program without employee's input, even though employee had sent a letter to administrator discussing his concerns about new policy, did not constitute an adverse personnel action, as required for employee to establish a prima facie case of retaliation under the Rehabilitation Act. Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701.

Michael George Shaw, Terris, Pravlik & Millian, LLP, Washington, DC, for Plaintiff.
Darrell C. Valdez, U.S. Attorney's Office, Washington, DC, for Defendants.

JOHN GARRETT PENN, United States District Judge.
*1 This comes before the Court on **Defendant's Motion for Judgment on the Pleadings, or in the Alternative for Summary Judgment [# 44]** ("Def.'s Mot.").[FN1] The Environmental Protection Agency ("EPA" or "Agency") moves for dismissal of the Complaint on the grounds that Elbert Leroy Dage failed to exhaust his administrative remedies with respect to his administrative Complaint ("EEO Complaint"), and failed to set forth sufficient facts to support his discrimination and retaliation claims. Def.'s Mot., at 1. Within Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings, or in the Alternative for Summary Judgment and Request for Oral Hearing [# 51] ("Pl.'s Opp."), Dage argues that the Court should not dismiss his Complaint because he exhausted his administrative remedies, and there are material facts which remain in dispute. Pl.'s Opp., at 1.

> FN1. Hereinafter, when citing the Memorandum of Points and Authorities in Support of Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, the Court will use the abbreviation "Def.'s Memo."

The Court concludes that the instant Motion should be granted because Dage has failed to exhaust some of his administrative remedies, and where he has not, there are no material facts in dispute which merit his case proceeding to trial. The Court's conclusions are fully explained below.

Dage, who holds a masters degree in civil engineering from Howard University, was hired by the EPA in 1975 at grade 7. Complaint and Jury Demand ("Complaint"), at ¶ ¶ 10-12; *accord* Answer, at ¶ ¶ 10-12. He currently works at the Agency as an Environmental Scientist within the Existing Chemicals Assessment Branch of the Risk Assessment Division in the Office of Pollution Prevention and Toxics ("OPPT") in the Office of Prevention, Pesticides and Toxic Substances ("OPPTS"). Complaint, at ¶ 11. Having consistently received promotions, above-average performance ratings and numerous awards throughout his tenure at the EPA, Dage was promoted to grade 13 on September 7, 1980, where he remains today. *Id.* at ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

Page 3

12.

Dage was injured during the late 1980's by his occupancy of office space at the Agency's Waterside Mall headquarters facility. Answer, at ¶ 15; *see* Complaint, at ¶ 15. It is Dage's contention that he was injured specifically due to exposure "to chemicals and toxins from the installation of new carpeting and to microorganisms" at the Waterside Mall facility, "including mold and bacteria in the Heating Ventilation Air Conditioning ('HVAC') system."Complaint, at ¶ 15. As a result, Dage further contends that from roughly January 1988 to the present,
[he has] experienced eight episodes of upper respiratory infections [,] .... symptoms of allergy and asthma[,].... Anaphylaxis [,] .... coughing, watery eyes, sinus irritation, drowsiness, [ ] repetitive sneezing, difficulty breathing, dermatitis, rashes, redness of the skin, itching, fatigue, eye irritation, headaches, hives, runny nose, throat itch and drainage, itching in the ears, and bronchitis.

Complaint, at ¶¶ 17, 25, 27; *see also* Answer, at ¶ 17 ("[S]ome time in 1989, Plaintiff began reporting respiratory issues to the EPA Health Unit, where his complaints were documented."); Affidavit of Elbert Leroy Dage, November 7, 2001 ("Dage Affid."), at 6 (same).

*2 Dage underwent a series of medical evaluations in the EPA Health Unit at Waterside Mall in early 1989, and was diagnosed, *inter alia*, as demonstrating "mild obstructive disease[.]" Dage Affid ., at 3. He was also diagnosed at the Health Unit shortly thereafter as having "probable atopy, allergic rhinitis, history of hypersensitivity pneumonitis, and 'Tight Building' symptoms."Complaint, at ¶ 18; *accord* Answer, at ¶ 18. Dage sought outside medical treatment in 1990 from Dr. Edward Yanowitz, a physician at the George Washington University Medical Center. *See* Dage Affid., at 4-5; Letter Written by Dr. Edward Yanowitz, July 6, 2001 ("Yanowitz Letter"), at 1. Dr. Yanowitz provided a clinical assessment, which Dage then presented to his supervisors at the EPA, stating that because of the severity and permanency of his disability [FN2], it was necessary for him to be removed from the Waterside Mall facility for the duration of his employment. *Id.* at 5.

FN2. Dage describes his disability as being "chronic retroactive airway disease, asthma, severe allergies, and anaphylaxis."*Id.* at 1.

Later in 1990, Dage requested emergency relief from flooding, mold, and dust in his office in the Waterside Mall facility. Dage Affid., at 11. His immediate supervisor granted this request for reasonable accommodation by arranging for the removal of carpeting and re-tiling the filtration machine in Dage's office. *Id.* On July 11, 1991, Dage formally requested temporary Alternate Work Space ("AWS") relocation to the EPA's Crystal Station location because his respiratory problems were worsening with his continued presence at the Waterside Mall facility.[FN3]Complaint, at ¶ 23. The EPA relocated him to the Crystal Station site effective July 31, 1991, Answer, at ¶ 23, which Dage has also characterized as a reasonable accommodation. Dage Affid., at 12. One month later, Dage requested an answering machine, as well as a computer and printer to use in his temporary office in Crystal Station. Dage Affid., at 12. The EPA granted this accommodation request as well, also arranging for direct delivery of mail to Dage at Crystal Station. *Id.* Despite the relocation and fulfillment of a number of other reasonable accommodation requests, however, the Agency required Dage to return to the Waterside Mall facility several times each week on work-related matters from August 1991 to August 1993. *Id.* Dage formally requested that his relocation to Crystal Station be made permanent in July of 1993, which his EPA supervisor also granted. *Id.* at 13.

FN3."AWS is an arrangement allowing employees to perform work from either their home using telephone and computer equipment or from a specially equipped EPA office space designed to minimize potential exposures to chemicals, allergens and indoor air pollution. EPA established such an AWS at Crystal Station in Arlington, Virginia."Complaint, at ¶ 20.

Since August 1993, the EPA has further reasonably accommodated Dage by allowing him to attend "any meetings" held in the Waterside Mall facility by teleconference, and also by arranging for personnel to "routinely" bring items which Dage needs out of the building to him. *Id.* The Agency also provided Dage the reasonable accommodation of restructuring his job because Crystal Station is not a Toxic Substance Control Act Confidential Business Information-secured area. *Id.* at 15.

On February 1, 1999, the EPA implemented a new AWS Policy.[FN4]Complaint, at ¶ 46. Among other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

things, the 1999 AWS Policy requires that its participants submit medical examinations "within the first six months of the policy and thereafter at least once every two years....*"Id.* at ¶ 68;*accord* Answer, at ¶ 68 ("[A]ny employee desirous of continued occupancy of AWS space must submit a bi-annual recertification, supported by medical evidence, demonstrating that he/she is still unable ... to occupy his/her regular assigned office space.").

> FN4. When referencing this policy, the Court will use the abbreviations "1999 AWS Policy" and "new AWS Policy."

**\*3** On September 2, 1999, Dage filed an administrative Complaint which alleges, *inter alia,* that before enactment of the 1999 AWS Policy, he had been receiving reasonable accommodation through the former AWS policy "since 1991." EEO Complaint, at 2; *see* Statement of Material Facts Not in Genuine Dispute ("Def.'s Fact Statement"), at ¶ 3. The administrative Complaint also alleges that the new AWS Policy "discriminated and retaliated against him and other EPA employees as a result of their disabilities[.]" Def.'s Fact Statement, at ¶ 4; *accord* EEO Complaint, at 2. The Agency dismissed Dage's administrative Complaint in March of 2000.<sup>FN5</sup>*See* Def.'s Fact Statement, at ¶¶ 6-7.

> FN5. Although the Equal Opportunity Employment Commission ("EEOC") remanded Dage's case to the EPA, *id.,* it "issued no decision" as of the filing of the instant action. Complaint, at ¶ 7; *accord* Answer, at ¶ 7.

On February 12, 2004, Dage filed his Complaint which alleges that the 1999 AWS Policy violates the Federal Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, et seq. ("the Rehabilitation Act" or "the Act") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). Complaint, at ¶ 1. The EPA filed its Answer on April 29, 2004.

A motion for judgment on the pleadings is appropriately granted "only if, after the close of the pleadings, no material fact remains in dispute, and the moving party is entitled to judgment as a matter of law."*Transworld Prods. Co. v. Canteen Corp.,* 908

F.Supp. 1 (D.D.C.1995) (citing *Peters v. Nat'l R.R. Passenger Corp.,* 296 U.S.App. D.C. 202, 204, 966 F.2d 1483, 1485 (D.C.Cir.1992); Fed.R.Civ.P. 12(c))."The standard of review on a motion for judgment on the pleadings is virtually identical to the standard for a motion to dismiss."*Id.* at 2 (citing *UPS v. Int'l Bhd. of Teamsters,* 859 F.Supp. 590, 592 & n. 1 (D.D.C.1994); Fed.R.Civ.P. 12(c), 12(b)(6); (other citation omitted)). That is, "[t]he Court will not dismiss plaintiff's complaint unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle plaintiff to relief."*Id.* (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (other citation omitted)). Further, under this standard, "[t]he Court must accept as true all factual allegations and *all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."Id.* (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (other citations omitted) (emphasis added)). When considering a motion for judgment on the pleadings, "[t]he Court may not consider evidence 'outside the scope of the complaint.' " *Gasser v. Ramsey,* 125 F.Supp.2d 1, 3 (D.D.C.2000) (quoting *Terry v. Reno,* 322 U.S.App. D.C. 124, 135, 101 F.3d 1412, 1423 (D.C.Cir.1996)).

Similar to a motion for summary judgment, a motion for judgment on the pleadings "may be granted only if the pleadings and evidence 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Paquin v. Fannie Mae,* 20 F.Supp.2d 94, 95 (D.D.C.1998) (quoting Fed.R.Civ.P. 56(c)). "In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered *in the light most favorable to the nonmoving party." Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis added)). Notwithstanding, " 'the mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff to defeat a motion for summary judgment." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)) (brackets in original)). Finally, when considering a motion for summary judgment, unlike a motion for judgment on the pleadings, the Court is not limited to reviewing evidence within the scope of the complaint. *Id.; see also Gasser,* 125 F.Supp.2d at 3.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

Page 5

### I. Exhaustion of Administrative Remedies

*4 [1] The Court first addresses the EPA's exhaustion argument. Specifically, the Agency argues that claims one and two of the Complaint should be dismissed, and claims three and four should "be limited solely to the issue regarding the adoption of the 1999 AWS policy...." Def.'s Memo, at 7. From the EPA's perspective, Dage did not allege during the administrative phase that the Agency failed to reasonably accommodate his disability, "nor did he allege that he was discriminated or retaliated against *prior to the adoption of the 1999 AWS policy.*"*Id.* at 8 (emphasis added). Dage counters that the Court should not dismiss or limit the four claims because they "are like or *reasonably related* to the allegations in his administrative Complaint" such that "defendant was *on notice* of the claims."Pl.'s Opp., at 3 (emphasis added); *see Loe v. Heckler*, 247 U.S.App. D.C. 292, 300, 768 F.2d 409, 418 (D.C.Cir.1985). According to Dage, his administrative complaint is "considerably broader" than the AWS policy. Pl.'s Opp., at 3. Despite Dage's interpretation of the breadth of the administrative Complaint, the Court is not convinced that its plain language could have reasonably put the EPA on notice that he would bring suit regarding events which occurred prior to the new AWS Policy's adoption date of February 1, 1999.

In *Loe*, the D.C. Circuit reiterated that administrative agencies must have "notice" of a plaintiff's allegation, "and a fair opportunity to provide full redress or to attempt an informal accommodation."*247 U.S.App. D.C. at 300, 768 F.2d at 418* (other citations omitted); *see Bolden v. Ashcroft*, 2005 U.S. Dist. LEXIS 16874, at *6 (D.D.C. July 15, 2005) (dismissing on exhaustion grounds "plaintiff's claims based upon *theories that did not appear in the administrative complaint....*" (emphasis added); *Miller v. Smith*, 584 F.Supp. 149, 154 (D.D.C.1984) (same). Put differently, a plaintiff must have "exhausted his administrative remedies" before a claim can properly be considered by a Court.[FN6]*Broderick v. Donaldson*, 369 U.S.App. D.C. 374, 374, 437 F.3d 1226, 1226 (D.C.Cir.2006).

FN6. This "basic demand on the complainant" still persists even when "the agency [is] given ... technically flawed[ ] notice of the grievance."*Bethel v. Jefferson,*

191 U.S.App. D.C. 108, 121, 589 F.2d 631, 644 (D.C.Cir.1978).

Returning to the facts of the instant case, claim one of Dage's Complaint, entitled, "Failure to Recognize Plaintiff as Disabled," encompasses events which occurred from approximately 1989 to 2004. *See* Complaint, at ¶ 95 ("[D]efendant refused to recognize plaintiff as disabled under the Rehabilitation Act *for 14 years.*" (emphasis added)). Claim two, entitled, "Failure to Provide Reasonable Accommodations for Disability," also pertains to events beginning in 1989. *Id.* at ¶ ¶ 97-98.While claims three and four of the Complaint, entitled, "Disability Discrimination" and "Retaliation" respectively, do not specifically make reference to a time period in which Dage alleges his injuries occurred, both claims nonetheless also appear to span the 1989 to 2004 time period "[a]s set forth above" in claims one and two. *Id.* at ¶ ¶ 101, 105.

*5 However, in contrast to the expansive scope of the Complaint, Dage clearly limited his administrative Complaint to only challenging the "discrimination, retaliation and harassment" that he and other AWS employees allegedly suffered *because of* the implementation of the 1999 AWS Policy. EEO Complaint, at 2. And since nothing in the administrative Complaint refers to events which occurred before February 1, 1999, the EPA by definition had no "notice" of any grievance predating the new AWS Policy. *Loe*, 247 U.S.App. D.C. at 300, 768 F.2d at 418;*see* EEO Complaint, at 2 ("*I have been receiving reasonable accommodations* through the Alternative Workspace [*sic* ] ... policy here at EPA *since August 1991.*" (emphasis added)). Nonetheless, because claims one and two of the Complaint also reference events which occurred *after* February 1, 1999, and claims three and four are *ambiguous* regarding their exact period of reference, the Court will consider all four claims, but only to the extent that they pertain to injuries which Dage alleges were caused by the EPA's adoption of the new AWS Policy.

### II. Claims Following Adoption of 1999 AWS Policy

The Court next turns to the following arguments advanced by the EPA with respect to Dage's four claims: the first claim, which alleges failure to recognize Dage as disabled, is not a cause of action under the Rehabilitation Act; the second claim, which alleges that the EPA failed to provide Dage with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

reasonable accommodations, goes beyond the 1999 AWS Policy and Dage's workstation, and includes allegations "unrelated to his workspace[;]" and with respect to the third and fourth claims, Dage fails to demonstrate adverse employment action. Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment [# 61] ("Def.'s Reply"), at 4-16.

In response, Dage asserts the following: the first claim should not be dismissed because the EPA failed to make a determination that he was "a qualified person with a disability under the Rehabilitation Act[,]" and therefore failed to provide him with reasonable accommodations under the law. Pl.'s Opp., at 7-13. Dage asserts that the second claim should not be dismissed because since 1999, he has been denied participation in meetings via teleconferencing, denied an opportunity to participate in a Science Forum, provided "substandard" workstation equipment, "forced" to purchase a new computer for his home office, and ignored with respect to his request for a scooter to use at the Agency's Federal Triangle complex. *Id.* Dage further asserts that claims three and four should not be dismissed because the administrative Complaint alleges both disability discrimination and retaliation.[FN7] Pl.'s Opp., at 7-13. Below, the Court addresses each of Dage's claims and the EPA's arguments for their dismissal.[FN8]

FN7. Although not set forth within the "Claims" section, the Complaint also alleges that from June 2000 until November 2001, Jennifer Seed ("Seed"), Dage's immediate supervisor at the EPA, "took all professional substantive work away from [him]" and he was "denied a fair opportunity to compete for promotion to grade 14[.]" Complaint, at ¶¶ 58, 73. Both of these allegations are addressed below. *See infra* ANALYSIS, II., B.

FN8. The Court notes that some of the authority that it relies upon in addressing the claims are cases in which courts have applied the Americans with Disabilities Act ("ADA"), not the Rehabilitation Act. However, "[b]y statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination."*McPherson v. Michigan High Sch. Athletic Assoc., Inc.,*

119 F.3d 453 (6th Cir.1997)."If [an individual] may be found to be disabled under the ADA, then [ ]he may be found to be disabled under the Rehabilitation Act."*Pritchard v. Southern Co. Serv.,* 92 F.3d 1130, 1134 (11th Cir.1996); *accord Dorchy v. Washington Metro. Area Transit Auth.,* 45 F.Supp.2d 5, 9 (D.D.C.1999).

**A. Claim One: Failure to Recognize Plaintiff as Disabled**

*\*6 [2]* The Complaint first challenges the EPA's refusal to recognize Dage as disabled under § § 501 and 505(a)(1) of the Rehabilitation Act. Complaint, at ¶ 95. Notwithstanding, Dage provides no authority, and the Court knows of none, which demonstrates that this is a legally cognizable cause of action under either section.

In *Barth v. Gelb,* 303 U.S.App. D.C. 211, 2 F.3d 1180 (D.C.Cir.1993), the D.C. Circuit discussed the "three ... various categories of handicap discrimination cases that *may be brought* " under § 501, stating:
The first is one in which *the employing agency asserts that it refused a job application, or denied an employee a promotion or discharged him,* for reasons unrelated to the person's handicap.... A second category involves suits in which *the employer challenges a plaintiff's claim that he is a qualified handicapped person who, with reasonable accommodation, can perform the essential functions of the position in question....* In these cases, the agency will usually contend that no reasonable accommodation is available.... In a third category we have those cases ... in which *the employing agency offers the affirmative defense of undue hardship on the operation of its program.*

303 U.S.App. D.C. at 217, 2 F.3d at 1186 (citations and internal quotation marks omitted) (emphasis added); *see also Carr v. Reno,* 306 U.S.App. D.C. 217, 222, 23 F.3d 525, 530 (D.C.Cir.1994) (holding that "section 501 demands a great deal from federal employers in the way of accommodation[,]" including allowing employees to "*work at home,* as well as *reassignment in another position,* as potential forms of accommodation." (emphasis added)). Further, the Court in *Guinn v. Bolger,* 598 F.Supp. 196 (D.D.C.1984) explained that the function of section 505(a)(1) is to "establish a *private cause of action* in favor of persons pursuing claims under Section 501 of the Rehabilitation Act...."598 F.Supp. at 199 (emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

Page 7

In this case, Dage does not allege that he was refused a job application, denied a promotion [FN9] or discharged from his job because of the adoption of the 1999 AWS Policy. *Barth,* 303 U.S.App. D.C. at 217, 2 F.3d at 1186. He also does not allege that following adoption of the new AWS Policy, the EPA challenged his claim that he is "a qualified handicapped person who, with reasonable accommodation, can perform the essential functions of the position in question."*Id.; see* EEO Complaint, at 2 ("I am a 'qualified handicapped person with a disability'.... I have a record of *...management acceptance and acknowledgment,* and *working with reasonable accommodations.*" (emphasis added)); *see* Complaint, at ¶¶ 93-94 (same). And Dage makes no allegation that the Agency put forth the defense of undue hardship on its program as justification for not affording him reasonable accommodation for his disability after it adopted the new AWS Policy [FN10].*Barth,* 303 U.S.App. D.C. at 217, 2 F.3d at 1186. Pursuant to the foregoing legal standard, then, the first claim fails to state a claim. *See Arbaugh v. Y & H Corp.,* --- U.S. ----, 126 S.Ct. 1235, 1240 (2006) ("A defense of failure to state a claim upon which relief can be granted *...may be made in any pleading...* or by motion for judgment on the pleadings, or at the trial on the merits."(alterations in original) (emphasis added)).

FN9. The Court notes here that Dage claims he was denied the opportunity to compete for a promotion, but in fact he did not apply for a promotion. *See, e.g.,* Pl.'s Opp., at 27-29.

FN10. In fact, as Dage himself states, the EPA took the recommended measures under section 501 of allowing him to work at home following the adoption of the new AWS Policy as a form of accommodation. *Carr,* 306 U.S.App. D.C. at 222, 23 F.3d at 530;*accord* Complaint, at ¶ 39 (On "February 13, 2003, [the] EPA reassigned plaintiff to work at home full time as a reasonable accommodation for plaintiff's disability."). Also, some six years before it adopted the new AWS Policy, the Agency permanently reassigned Dage to the AWS site at Crystal Station. *Carr,* 306 U.S.App. D.C. at 222, 23 F.3d at 530;*accord* Dage Affid., at 13 ("My assignment to Crystal Station ... was made permanent, and I have never been required to re-enter ... the

Waterside Mall office areas."). In addition to these reasonable accommodations, the EPA also issued Dage handicap parking permits "beginning in December 2002." Complaint, at ¶ 40.

***7** Additionally, the instant claim cannot properly be brought here in this Court because the administrative Complaint does not assert or reasonably relate to the assertion that the EPA failed to recognize Dage as disabled following the adoption of the new AWS Policy. *See generally* EEO Complaint; *see Loe,* 247 U.S.App. D.C. at 300, 768 F.2d at 418;*Bethel,* 191 U.S.App. D.C. at 121, 589 F.2d at 644. Accordingly, the first claim should be dismissed.

**B. Claim Two: Failure to Provide Reasonable Accommodations for Disability**

[3] It is well-settled that in asserting discrimination based on failure to accommodate, the moving party must establish that " 'an accommodation was needed' in order to carry out *the essential functions of the position.*"*Bissell v. Reno,* 74 F.Supp.2d 521, 528 (D.Md.1999) (quoting *Gaines v. Runyon,* 107 F.3d 1171, 1175 (6th Cir.1997) (emphasis added)). "Essential functions" are "the fundamental job duties of a position that an individual with a disability is actually required to perform."*Salmon v. Dade County Sch. Bd.,* 4 F.Supp.2d 1157, 1160-61 (D.Fla.1998) (citation omitted)."For example, a job function may be considered essential because the reason the position exists is to perform that function[,]" or "a job function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed."*Id.* (citations omitted). Moreover, "*an employer does not have to choose the best accommodation available or the accommodation that the employee prefers.*"*Id.* (citations omitted) (emphasis added). Measured against this legal standard, Dage has failed to establish his claim.

Dage asserts that he was prohibited by the Agency from participating in teleconferencing meetings, Pl.'s Opp., at 7, denied "substantive work" from June 2000 until November 2001, Complaint, at ¶ 58, and denied the opportunity to compete for a promotion to grade 14. *Id.* at ¶ 73.Dage also asserts "that he was told by his supervisor [ ] that he could obtain professional assignments if he worked in a building, *other than the AWS offices,* which are designed to protect persons like plaintiff suffering from exposures to chemicals, allergens, and indoor air pollution...." Pl.'s

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

Opp., at 25 (emphasis added). The following month, Dage *chose to be assigned* to the Federal Triangle complex. *Id.* However, he has presented no evidence to the Court that the Federal Triangle complex was injurious to his health in any way. *See generally* Yanowitz Letter. Moreover, Dage has not addressed or disputed the EPA's explanations regarding the preceding assertions within his Statement of Material Facts or other such pleadings, which, if true, would not violate the Rehabilitation Act. Therefore, the Court treats the following explanations as concessions.

With regard to the teleconferencing meetings, the EPA responds that it suffered problems with its communication system just after OPPT's relocation to the Federal Triangle complex, which "*affected all employees,*" but that it has effectively fixed the problem. Answer, at ¶ 80 (emphasis added). With regard to the work assignments, the EPA responds that Dage "devoted *significant time* working on activities to support the employment of persons with disabilities in OPPT and EPA[,]" and that these assignments were not "voluntary." *Id.* at ¶ 70 (emphasis added). According to the Agency, Dage received assignments commensurate with his title and level of experience. *See id.*And with regard to the alleged denial of the opportunity for a promotion, the EPA responds that Dage has had numerous opportunities to compete for a promotion to grade 14, but that he "has *chosen not to compete* for a promotion....."*Id.* at ¶ 73 (emphasis added). Again, pursuant to the Court's Local Civil Rules, by not addressing or disputing the Agency's above explanations, Dage has constructively "admitted" them. LCvR 7(h) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party ... are admitted, unless such a fact is controverted" by the nonmoving party "in opposition to the motion.").

**\*8** Furthermore, Dage has failed to establish that participation in a science forum, a computer equaling the "new computer" which was stolen from his office [FN11], or a scooter for him to use at the Federal Triangle complex are accommodations that he "*needed* in order to carry out the *essential functions* " of his job. *Bissell,* 74 F.Supp.2d at 528 (citation and internal quotation marks omitted) (emphasis added).[FN12] Thus, he has not established that these accommodation requests are reasonable.[FN13]Differently put, it appears as if Dage has merely established that the EPA failed to provide him with "the *best* " accommodations or the accommodations that he "*prefers* " since adoption of

the new AWS Policy. *Salmon,* 4 F.Supp.2d at 1161 (emphasis added); *see Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir.2000) (explaining that "the use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires."). In any event, assuming *arguendo* that the Court were to consider the forgoing accommodation requests as necessary for Dage to perform his job, it is also quite clear that they were not first exhausted administratively. *See generally* EEO Complaint; *see Loe,* 247 U.S.App. D.C. at 300, 768 F.2d at 418. Consequently, the issues which comprise this claim are not properly before the Court. *See Bethel,* 191 U.S.App. D.C. at 121, 589 F.2d at 644. Thus, the second claim should also be dismissed.

FN11. The Court notes that the Agency provided Dage with an older model computer which Dage finds objectionable.

FN12. Dage contends within his Complaint that "[a]lthough EPA provides such scooters to other people with disabilities for their use at the EPA Federal Triangle complex, EPA has not provided this accommodation to the plaintiff."Complaint, at ¶ 11. He also makes the following contention within his Affidavit: "The AWS policy has a *disparate impact* on one particular group of disabled employees.... Other disabled employees requiring similar accommodations, but the origin of whose disability is not related to working for the EPA, are not subjected to repeated medical testing."Dage Affid., at 29 (emphasis added). Despite these contentions, "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."*Modderno v. King,* 317 U.S.App. D.C. 255, 258, 82 F.3d 1059, 1062 (D.C.Cir.1996) (quoting *Traynor v. Turnage,* 485 U.S. 535, 549, 108 S.Ct. 1372, 1382, 99 L.Ed.2d 618 (1988)). Moreover, membership in the AWS program is not the same as being disabled under the law.

FN13. In a July 6, 2001 letter submitted to the EPA, Dr. Yanowitz only recommended that Dage remain within the AWS program and use "special equipment to reduce further [ ] exposure to allergens and respiratory

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

irritants."Complaint, at ¶ 55 (emphasis added)). Dr. Yanowitz made no mention of a scooter. *See generally* Yanowitz Letter.

### C. Claim Three: Disability Discrimination[FN14]

FN14. The Court notes at this point in the analysis that unlike claims one and two of the Complaint, Dage does raise the *general* issues which comprise claims three and four, *i.e.,* disability discrimination and retaliation, within the administrative Complaint. *See* EEO Complaint, at 2 ("EPA has subjected me and other AWS employees to *discrimination,* harassment and *retaliation* for engaging in protected activities."(emphasis added)). For this reason, these claims are properly before the Court.*Bethel,* 191 U.S.App. D.C. at 121, 589 F.2d at 644.

[4] The Rehabilitation Act prohibits "discrimination against individuals with disabilities by recipients of federal funds."*Chevron U.S.A. v. Echazabal,* 536 U.S. 73, 82 n. 4, 122 S.Ct. 2045, 2051 n. 4, 153 L.Ed.2d 82 (2002). The Supreme Court has "limited the application of the term 'discrimination' in the Rehabilitation Act to a person who is a member of a protected group and faces discrimination 'by reason of his handicap'."*Olmstead v. L.C. by Zimring,* 527 U.S. 581, 619, 119 S.Ct. 2176, 2196, 144 L.Ed.2d 540 (1999) (citation omitted). The purpose of the Act "is to guarantee that individuals with disabilities receive *evenhanded treatment* relative to those persons without disabilities."*Id. at* 620 (citation and internal quotation marks omitted) (emphasis added).[FN15]

FN15.*But cf. General Motors Corp. v. Tracy,* 519 U.S. 278, 298, 117 S.Ct. 811, 824, 136 L.Ed.2d 761 (1997) ("Conceptually, of course, any notion of discrimination assumes a comparison of *substantially similar entities* " (emphasis added)).

Preliminarily, all parties to this action are in agreement that Dage qualifies as disabled within the meaning of the Rehabilitation Act. *See* Seed Affid., at 2 ("Yes, I knew [Dage] had a disability prior to February 1, 1999. When I became his immediate supervisor we talked about his disability.")."The term 'individual with a disability' is defined by 29 U.S.C.

§ 705(20)(B) to mean 'any person who ... has a physical or mental impairment which substantially limits one or more of the person's major life activities....'" *E.g., Boone v. Reno,* 121 F.Supp.2d 109, 111 (D.D.C.2000) (citation omitted) (alterations in original). Also, it appears that all participants in the AWS program do not necessarily qualify as "disabled" under the Rehabilitation Act because the 1999 AWS Policy does not explicitly or implicitly require its participants to have "a physical or mental impairment which substantially limits one or more of the [participant]'s *major life activities[.]* "*Boone,* 121 F.Supp.2d at 111 (emphasis added); *see* Answer, at ¶ 47 ("The standard for being disabled under the Rehabilitation Act is that an individual suffer from a serious impairment in one of life's major activities, and ... a person who simply is unable to work from Waterside Mall ... would not satisfy this test."); *see also* Complaint, at ¶ 20.

\*9 The threshold question here is whether the EPA discriminated against Dage on the basis of his disability by adopting the new AWS Policy. Complaint, at ¶ 101. Put another way, the Court's present task is to determine whether the new AWS Policy's requirement that all AWS participants submit medical evidence bi-annually to the EPA demonstrating a continued need to remain in the AWS program violates the Rehabilitation Act. Despite some objection to the new AWS Policy [FN16], it does not.

FN16. Seed and others apparently also share Dage's displeasure with the new AWS Policy. *See* Affidavit of Jennifer Seed, November 5, 2001 ("Seed Affid."), at 4 ("[The 1999 AWS Policy] is not beneficial or effective for the employee. [It] requires a medical expense every two (2) years...."); Def.'s Memo, at 2 n. 1 ("Plaintiff's EEO complaint was *one of a group of identical complaints simultaneously filed by other EPA employees* [ ] challenging the 1999 AWS policy."(emphasis added)). The Court has no additional information about these complaints other than the fact that they were remanded to the Agency.

To be sure, all participants in the AWS program are subject to the *requirement* of a bi-annual re-certification, while non-disabled employees are not subject to the bi-annual re-certification requirement. *See* Answer, at ¶ 68. However, AWS program participants also receive the *benefit* of either working

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

from home or from specially equipped EPA office space at Crystal Station *indefinitely,* Complaint, at ¶ 20, while non-disabled employees do not receive the same benefit. *See, e.g., Seed Affid.,* at 7 ("There is [an] agency flexi place policy which is designed to allow people to work at home *up to two days per week....* " (emphasis added)). In this respect, the 1999 AWS Policy achieves " 'evenhanded treatment' " as envisioned by controlling cases which have interpreted the Rehabilitation Act. *Olmstead,* 527 U.S. at 619 (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979)).

Additionally, Dr. Yanowitz has undercut Dage's argument that the 1999 AWS argument is overly "burdensome" and has caused him, among other things, undue medical costs and other inconvenience. Complaint, at ¶ ¶ 10 1-02. Dr. Yanowitz did so by stating the following in pertinent part below:
The needs and recommendations of Mr. Dage's work environment are *expected to remain the same for the duration of his employment,* and the workplace recommendations do not need to be re-evaluated unless Mr. Dage experiences significant symptoms which require additional measures. The two-year re-certification period specified by EPA policy for the Alternate Work Space program is sufficient. In the interim, Mr. Dage may continue his *pattern of regular follow-up visits* to support symptomatic treatment of his allergies and asthma.

Yanowitz Letter, at 2 (emphasis added). At bottom, the Court interprets the foregoing language, which was provided to the EPA by Dage's own physician, to mean that his disability is indeed chronic and perhaps getting worse. The Court is therefore unclear how the new AWS Policy-which requires bi-annual doctor's visits-has actually *injured* Dage given Dr. Yanowitz's prognosis that Dage's "pattern of regular" doctor's visits to manage his chronic disability will continue, at a minimum, "for the duration" of his employment. *Id.; cf. McConnell v. FEC,* 540 U.S. 93, 225, 124 S.Ct. 619, 707, 157 L.Ed.2d 491 (2003) ("[A] plaintiff must demonstrate an *injury in fact,* which is concrete, distinct and palpable, and actual or imminent."(citation and internal quotation marks omitted) (emphasis added)).

**\*10** For these reasons, Dage has failed to establish a genuine issue as to any material fact with respect to the third claim. Thus, this claim should likewise be dismissed.

### D. Claim Four: Retaliation

[5] Courts analyze retaliation claims using a variant of the burden-shifting framework first set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).*See Holbrook v. Reno,* 339 U.S.App. D.C. 4, 12, 196 F.3d 255, 263 (D.C.Cir.1999); *Darby v. Bratch,* 287 F.3d 673, 679 (8th Cir.2002). The court of appeals has said:
To establish a *prima facie* case of unlawful retaliation, the plaintiff must show: " '1) that [he] engaged in a statutorily protected activity; 2) that the employer took an *adverse personnel action;* and 3) that a causal connection existed between the two.' " *Morgan v. Federal Home Loan Mortgage Corp.,* 356 U.S.App. D.C. 109, 328 F.3d 647, 651 (D.C.Cir.2003) (quoting *Mitchell v. Baldrige,* 245 U.S.App. D.C. 60, 759 F.2d 80, 86 (D.C.Cir.1985)).

*Singletary v. District of Columbia,* 359 U.S.App. D.C. 1, 5, 351 F.3d 519, 524 (D.C.Cir.2003) (brackets in original) (emphasis added)."Once this burden has been met," the defendant "must articulate a legitimate, nondiscriminatory reason for the personal action."*Newman v. University of District of Columbia,* 1989 U.S. Dist. LEXIS 12346, at * 17 (D.D.C. October 18, 1989) (citation omitted). Applying the three-pronged *McDonnell Douglas* test for retaliation to the facts of this case, Dage has failed to meet his burden.

In support of his retaliation claim, Dage makes the allegation below:
[P]laintiff experienced a *reduction in responsibilities* that persisted for a long duration. Indeed, plaintiff claims that he was not merely assigned work below his grade level but that *all professional work was removed from him for a period of 17 months....* [Defendant] claims that the reduction of plaintiff's work was the result of a reorganization and was merely temporary Moreover, *plaintiff alleges that he was told by his supervisor Ms. Seed that he could obtain professional assignments if he worked in [the Federal Triangle complex]....* The following month, plaintiff, agreed, in order to save his career to be assigned a part-time office space in a building to where his organization was being relocated.... In doing so, plaintiff acted contrary to the recommendation of his doctor that it would be injurious to his health. [ ] In his request, plaintiff included a letter from his doctor that indicated the accommodations that should be made.... It was not until after plaintiff began to work part of each week at an office other than the AW S office that he was

Slip Copy
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10
**(Cite as: Slip Copy)**

Page 11

given substantive work. [ ]

....

In addition, *plaintiff alleges that he was denied promotion based on the denial of professional work, training, and failure to provide adequate equipment and teleconferencing capabilities.*
*11 Pl.'s Opp., at 25, 26-27 (emphasis added).

Dage's allegations of reduction in work responsibilities, the complete denial of substantive work and of opportunities to compete for a promotion have been previously addressed by the Court. *See supra,* ANALYSIS, II., B. No material fact is in dispute regarding these allegations. *Id.* The only remaining allegation of potentially retaliatory conduct which the Court can identify from Dage's pleadings is as follows.

By his own account, Dage engaged in the protected activity of sending the EPA Administrator a letter on January 2, 1999 which discussed his concerns about the new AWS policy. EEO Complaint, at 2. Dage also requested a meeting with the Administrator. *Id.* Approximately one month later, after the Administrator refused the requested meeting, the EPA adopted the new AWS Policy without Dage's input. *See* Complaint, at ¶ 46. Nonetheless, this act by the Agency does not constitute an "adverse personnel action" under the law. *Singletary,* 359 U.S.App. D.C. at 5, 351 F.3d at 524. In *Stewart v. Evans,* 348 U.S.App. D.C. 382, 275 F.3d 1126 (D.C.Cir.2002), the court of appeals explained that an agency action is not " 'an actionable adverse action ... unless there is a tangible change in [ ] duties or working conditions constituting a material employment disadvantage.' " 348 U.S.App. D.C. 382, 390, 275 F.3d 1126, 1134 (D.C.Cir.2002) (quoting *Walker v. WMATA,* 102 F.Supp.2d 24, 29 (D.D.C.2000) (alterations in original)).[FN17]

FN17. Moreover, as explained *supra,* Dage has failed to establish that a doctor's visit *once every two years* for re-certification under the new AWS Policy, especially in light of his "pattern of regular" doctor's visits to manage his chronic disability, rises to the level of "a tangible change in the duties or working conditions constituting a material employment disadvantage[.]"*Stewart,* 348 U.S.App. D.C.

at 340, 275 F.3d at 1134.

As with the above claim, then, the fourth claim should also be dismissed because no genuine issue as to any material fact remains in dispute. The EPA is therefore entitled to judgment as a matter of law.

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings, or in the Alternative for Summary Judgment [# 44] should be granted. An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Dage v. Leavitt
Slip Copy, 2007 WL 81961 (D.D.C.), 34 NDLR P 10

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
**(Cite as: Not Reported in F.Supp.2d)**

Brown v. Small
D.D.C.,2005.

United States District Court, District of Columbia.
Lavonia A. BROWN, Plaintiff,
v.
Lawrence SMALL, Secretary, Smithsonian
Institution, Defendant.
**No. Civ.A. 02-1268(RWR).**

March 31, 2005.

Lavonia A. Brown, Bethesda, MD, pro se.
Paul A. Mussenden, Sherri Evans Harris, U.S.
Attorneys Office for the District of Columbia,
Washington, DC, for Defendant.

ROBERTS, J.

*1 In this employment discrimination case, plaintiff,
proceeding *pro se*, alleges that defendant
discriminated against her based on her disability, in
violation of the Rehabilitation Act of 1973, 29 U.S.C.
§ 701 *et seq.*[FN1] Defendant moves to dismiss or for
summary judgment. Upon consideration of the
parties' submissions and the voluminous record, the
Court will grant defendant's motion for summary
judgment.[FN2]

> FN1. Plaintiff voluntarily dismissed claims
> brought under Title VII of the Civil Rights
> Act of 1964, 42 U.S.C. § 2000e *et seq. See*
> Amended Complaint at 2. To the extent
> plaintiff is complaining about the
> administrative processing of her complaint,
> *see id* at 4-6, Title VII does not provide for
> an independent cause of action arising
> therefrom. *See Carter v. Greenspan*, 304
> F.Supp.2d 13, 31 (D.D.C.2004) (citing
> *Nelson v. Greenspan*, 163 F.Supp.2d 12, 18
> (D.D.C.2001)).

> FN2. In distilling the facts and claims, the
> Court has liberally considered together
> plaintiffs filings, namely, the original
> Complaint [Dkt. No. 1], the Amended
> Complaint [Dkt. No. 81], A More Definite
> Statement [# 17], her 65-page Affidavit

(Defendant's Memorandum of Points and
Authorities in Support of Defendant's
Motion to Dismiss or, in the Alternative, for
Summary Judgment ("Deft's Mem."), Ex. 9
("Brown Aff.")), and Plaintiff's Factual
Background in Opposition to the
Defendant's Motion for Summary Judgment
[Dkt. No. 82].

I. BACKGROUND

In May 1997, plaintiff was hired by the Smithsonian
Institution as a Grade 12 personnel management
specialist "under Schedule A 213 .3102 U, an
appointment specifically for individuals who are
severely handicapped."Defendant's Memorandum of
Points and Authorities in Support of Defendant's
Motion to Dismiss or, in the Alternative, for
Summary Judgment ("Deft's Mem.") at 3. Plaintiff
alleges that her "letter of eligibility spelled out the
kind of accommodation [she] needed which was to
avoid jobs that required heavy lifting and to be
allowed to sit and stand intermittently."Plaintiff's
More Definite Statement at 4. The events forming the
basis of the complaint appear to have begun on
December 16, 1997, when plaintiff injured her back
while moving computer monitors and boxes of books
to make room for work space. Plaintiff claims that
despite her restrictions against heavy lifting, she had
no choice but to move the items because no one else
was available to move them and she needed a place
to work. *See id.* at 11-12.Plaintiff alleges that on
December 17 following a doctor's appointment, she
informed her supervisor that her doctor told her that
she "would need extensive treatment, physical
therapy and a chair with lumbar support."Deft's
Mem., Ex. 9 ("Brown Aff.") at 6, ¶ 7. Plaintiff was
provided workers' compensation and placed on
partial disability from December 15, 1997 through
January 9, 1998. She was placed on total disability
from January 9 through January 24, 1998. When she
returned to work in late January, plaintiff alleges that
her supervisor, Chet Henderson, refused her request
for a chair with lumbar support. *Id.* at 11, ¶ 14.The
chair provided her caused "excruciating pain." *Id.*
After allegedly threatening Henderson with a lawsuit,
plaintiff received a chair on February 10 that enabled
her "to work a full day almost pain free." *Id.* at 12, ¶
13.Plaintiff alleges that after filing EEO charges
beginning in December 1997, defendant, primarily
through Henderson, subjected her to a hostile work

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
**(Cite as: Not Reported in F.Supp.2d)**

environment.

Effective February 1, 1998, plaintiff was removed from an alternative (flexible) work schedule. Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Deft's Mot."), Defendant's Statement of Material Facts With Respect to Which There is No Genuine Dispute ("Deft's Facts") ¶ 2. On July 2, 1998, plaintiff was suspended without pay for three days because of "insolent conduct." Deft's Mem., Ex. 18. On September 15, 1998, plaintiff was placed on leave restriction for six months. Deft's Facts ¶ 3. On November 9, 1998, plaintiff was suspended without pay for seven days for failure to follow leave procedures and for being absent without leave ("AWOL") for a little over six hours," *id.* ¶ 4, and, on December 29, 1998, plaintiff was suspended for fourteen days for failure to follow leave procedures and for being AWOL for a little over 84 hours. *Id.* ¶ 5. On March 24, 1999, defendant informed plaintiff of its decision to remove her effective April 2, 1999. Deft's Ex. 17. Her removal was held in abeyance pending the outcome of her application for disability retirement, which plaintiff alleges she was forced to file as a result of the hostile work environment. Plaintiff's application was approved, and she retired on disability effective June 5, 1999.

## II. DISCUSSION

**\*2** Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). A party seeking summary judgment must provide the district court with a factual record sufficient to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may support its motion successfully if it " 'inform[s] the district court of the basis for its motion, and identif[ies] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." ' *Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1032 (D.C.Cir.1988) (citing *Celotex,* 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)). In this case, the Court must determine whether defendant, as the movant, has provided sufficient evidence that no dispute exists concerning those facts relevant to assessing plaintiff's claim under the Rehabilitation Act.

### 1. *Disability Discrimination Claim*

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability ... be subjected to discrimination ... by any Executive Agency."*See*29 U.S.C. § 794(a). The language "solely by reason of" requires plaintiff to establish a "causal link ... [that] the employer ... acted with an awareness of the disability itself."*Crandall v. Paralyzed Veterans of America,* 146 F.3d 894, 897 (D.C.Cir.1998). The standards for determining a violation are the same as those applied under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101*et seq. See*29 U.S.C. § 794(d). In order to prove a violation of the ADA, the alleged discrimination "must occur in regard to some adverse personnel decision or other term or condition of employment."[FN3]*Marshall v. Federal Express Corp.,* 130 F.3d 1095, 1099 (D.C.Cir.1997). To establish a *prima facie* case of discrimination based on failure to accommodate, plaintiff must show that (1) she is disabled within the meaning of the Act; (2) her employer was aware of her disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) she was denied a reasonable accommodation. *Scarborough v. Natsios,* 190 F.Supp.2d 5, 19 (D.D.C.2002) (citations omitted).

FN3. An adverse employment action is one that resulted in a "diminution in pay or benefits [or] 'some other materially adverse consequences affecting the terms, conditions, or privileges of her employment ... such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." ' *Bailey v. Henderson,* 94 F.Supp.2d 68, 72 (D.D.C.2000) (quoting *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999)); *see also Currier v. Postmaster,* 304 F.3d 87, 89 (D.C.Cir.2002) ("[T]he employee must be worse off after the personnel action than before it; otherwise, he has suffered no objectively tangible harm"); *Brodetski v. Duffey,* 141 F.Supp.2d 35, 42-47 (D.D.C.2001) (finding no adverse employment actions from, *inter alia,* decisions denying an employee's requests for administrative leave, alterations to work schedule, and choice of workspace, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

employer's refusal to intervene in several incidents of alleged co-worker harassment, uneven redistribution of work assignments, and negative criticism).

Defendant argues that plaintiff has failed to establish that she was disabled within the meaning of the statute. Deft's Mem. at 20-24. The Rehabilitation Act defines a disability as a "physical or mental impairment that substantially limits one or more major life activities."29 U.S.C. § 705(9)(B). "Major life activities" are defined by regulation as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."29 C.F.R. § 1630.2(i). The Act's terms are "interpreted strictly to create a demanding standard for qualifying as disabled."*Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).<u>FN4</u> In analyzing the issue, the Court must "ask whether [plaintiff's] impairments prevented or restricted her from performing tasks that are of central importance to most people's daily lives."*Id.* at 187.

> <u>FN4.</u> Although the *Toyota* case involved ADA claims, the Supreme Court looked to the regulations interpreting the Rehabilitation Act as one of "two potential sources of guidance...." *Toyota,* 534 U.S. at 193.

**\*3** Plaintiff has withdrawn her claim that she was substantially limited in working. *See* Amended Complaint at 8. She claims to suffer from "fibromyalgia which is a chronic illness that causes pain in the joints, muscles, tendons, and other soft tissues. It is also characterized by diffuse excruciating body wide pain, stiffness and severe fatigue."*Id.* Plaintiff asserts that this condition and "associated" illnesses, *id.* at 9, substantially limits her in "the major life activities of sleeping, running, standing, walking, sitting, lifting, carry[ing] things, climbing steps and elimination,"*id.,* and of maintaining "balance or staying up right ... due to my impairment disequilibrium which [is] another impairment that exist[s] co-morbidly with fibromyalgia."*Id.* at 11.Plaintiff claims that although fibromyalgia"is difficult to diagnose and until recently little was know[n] about it,"*id.* at 8, she has suffered from its effects for ten years. *Id.* at 10.In addition, plaintiff claims to suffer from depression "dating back to 14 years of age," which substantially limits her ability to concentrate and to tend to her

personal care needs. *Id.* at 11.She claims to have suicidal thoughts that require treatment and "sometimes" hospitalization. *Id.*

The Court will assume that plaintiff has established that she is physically disabled under the statute. The Court need not reach the more difficult question of whether plaintiff was a qualified individual because her claim fails on the second and fourth elements of a *prima facie* showing. Plaintiff has not provided any evidence that at the time of the adverse decisions, namely, her suspensions without pay effective July 2, 1998 (for three days), November 9, 1998 (for seven days), and December 28, 1998 (for fourteen days), defendant was aware of any physical limitations and failed to reasonably accommodate her.<u>FN5</u> To the contrary, plaintiff's Schedule A appointment revealed no physical disabilities and plaintiff admits that in late October 1997, she told her supervisor who had specifically asked "how [she] was doing and if [she] needed any type of accommodation" that she needed no accommodation. Brown Aff. at 5, ¶ 5.<u>FN6</u> She told him that she had "a little trouble with my sleep/wake cycle but that it had gotten better recently and that I needed no accommodation at this time."*Id.* Plaintiff admits that she requested an alternative work schedule, which was granted. *Id.* Plaintiff also admits that she was accommodated for her back injury sustained in December 1997 when she received a chair with lumbar support "around February 10." *Id.* at 12, ¶ 14.<u>FN7</u> It is not apparent from the allegations in plaintiff's submissions what, if any, other accommodations she required for her physical limitations set forth in the amended complaint. Plaintiff therefore has failed to create a genuine issue of material fact with respect to the agency's otherwise appropriate responses to her physical disabilities.

> <u>FN5.</u> Plaintiff appears to assert that Henderson's negative performance evaluation of her during a counseling session in February 1998, *see infra* at 10, was an adverse employment action, but she has presented no evidence from which a trier of fact could reasonably find that the evaluation caused her "objectively tangible harm." *Brown v. Brody,* 199 F.3d at 457-58 (citing cases "refut[ing] the notion that formal criticism or poor performance evaluations are necessarily adverse actions").

> <u>FN6.</u> Henderson avers, apparently about the interview process, that he "knew [plaintiff]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
(Cite as: Not Reported in F.Supp.2d)

had a disability, which was in remission, although I did not know what it was ... I believe it might have been lupus."Deft's Mem., Ex. 2, Affidavit of Chester Henderson ("Henderson Decl.") at 1, ¶ 3.

FN7. Plaintiff suggests that the agency outright refused her request, but the record establishes otherwise. Plaintiff alleges that from December 17, 1997 to January 27, 1998, she "made numerous requests" for the support chair. Brown Aff. at 14. It appears that the agency's delay in providing the chair was attributable to steps taken to determine the appropriateness of the request and plaintiff's own actions. During plaintiff's absence on disability leave, the agency considered her request as part of its ergonomic survey. It inspected the chair the agency had originally proposed for her use to determine if it was "a suitable orthopedic chair." It was suggested that plaintiff be consulted before ordering a chair. After talking with plaintiff upon her return from disability leave, the agency determined that "she had a need for the special chair she had requested and [ ] immediately ordered it."Henderson Decl. at 3 ¶ 7; see also Deft's Mem. Ex. 11, Declaration of Susan Stockwell at 3 ("After I got a copy of [plaintiff's] doctor's certificate ... I ordered the chair Ms. Brown had requested. I then found out that Ms. Brown had already ordered and had told the vendor that we would pay for it. This delayed delivery of the chair.").

*4 Plaintiff appears to claim that her mental impairment of severe depression substantially limited her in performing the major life activities of working (which she has withdrawn) and caring for herself. As it did with the physical impairments, the Court will assume that plaintiff has established that she is disabled under the statute, but will not address whether she was a qualified individual with a disability because the claim fails on the notice requirement.

The Rehabilitation Act protects an employee from discrimination only when it is shown that the employer acted with "an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability."Crandall v. Paralyzed Veterans of America, 146 F.3d at 897.

"Reports about which the defendant employer had absolutely no knowledge nor access prior to [acting] cannot serve as the sole evidentiary basis of establishing an element of a prima facie case of disability discrimination."Weigert v. Georgetown University, 120 F.Supp.2d 1, 8 (D.D.C.2000)."An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."Flemmings v. Howard University, 198 F.3d 857, 861 (D.C.Cir.1999).

Defendant claims that it did not know about plaintiff's depression until receiving her memorandum to Henderson dated October 29, 1998. See Deft's Mem., Ex. 3; Henderson Decl. at 1, ¶ 3 ("[Plaintiff] should have informed [the agency during the interview process] that she also had a mental disability and was mentally restored so that we could have considered this factor accordingly in the selection process"). Plaintiff has proffered no evidence to the contrary. The events leading up to the suspensions occurred well before October 29. Effective February 1, 1998, the agency removed plaintiff from an alternative work schedule ("AWS") to a standard work schedule because of concerns about her "productivity related to [her] AWS, as well as other scheduled and unscheduled leave impacting [her] attendance."Deft's Mem., Ex. 24.FN8On June 1, 1998, Henderson recommended the three-day suspension because of plaintiff's "insolent conduct on May 12, 1998" toward another employee. Deft's Mem., Ex. 18 at 3. The recommendation was adopted on July 2, 1998, and plaintiff was suspended without pay from July 10 through July 12. Effective September 15, 1998, the agency placed plaintiff on leave restriction for six months based on "earlier conversations" between plaintiff and her supervisor and the supervisor's "expressed concerns about [plaintiff's] pattern leave usage."Deft's Mem., Ex. 16. Over the course of eight months, plaintiff had used 262.25 hours of unscheduled leave. Id. Plaintiff was suspended twice again, in November and December of 1998, for failing to follow leave procedures and for being AWOL. See Deft's Mem., Exs. 19, 21.

FN8. On the AWS, plaintiff worked "45 hours one week and 44 hours the next while taking one day off.... By taking her off AWS[,] it meant she did not have the guaranteed extra day off every two weeks and that would be one more day I would expect her to be at work. Taking her off

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
(Cite as: Not Reported in F.Supp.2d)

AWS was a management prerogative."Henderson Decl. at 6, ¶ 18.

**\*5** Given plaintiff's dubious work record, the documented evidence of progressive discipline, and the lack of any evidence that the decision-maker was aware of plaintiff's depression before initiating the series of proposals to suspend her without pay, no reasonable juror could find that the suspensions occurred "solely" because of plaintiff's mental or physical impairments. The Court will grant summary judgment to defendant on plaintiff's disability discrimination claim.

*2. Hostile Work Environment Claim*

Plaintiff alleges that she was subjected to a hostile work environment. She also appears to assert that the work environment led to her decision to retire on disability, amounting to a constructive discharge claim. Whether the Rehabilitation Act provides a cause of action for a hostile work environment is not definitively decided. *See Kuraner v. Mineta, 2001 WL 936369 (D.C.Cir.2001)* (assuming, without deciding, that the claim exists); *see also Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 667, n. 2 (3d Cir.1999)* (citing cases where courts have proceeded on the same assumption). Title VII, from which the Rehabilitation Act emanates, forbids employers from creating a workplace sufficiently abusive to affect a " 'term, condition, or privilege' of employment."*Davis v. Coastal Intern. Sec. Inc., 275 F.3d 1119, 1122 (D.C.Cir.2002)*."A claim for harassment based on disability, ... would require a showing that: (1) [plaintiff] is a qualified individual with a disability ...; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [defendant] knew or should have known of the harassment and failed to take prompt effective remedial action."*Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d at 667.* In reviewing this claim, the Court must consider the totality the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).*"[C]ourts are without authority to 'second-

guess an employer's personnel decision absent demonstrably discriminatory motive." ' *Waterhouse v. District of Columbia, 298 F.3d 989, 995 (D.C.Cir.2002)* (quoting *Fischbach v. District of Columbia Dep't of Corr., 86 F.3d 1180, 1182 (D.C.Cir.1996)*) (other citation omitted).

Plaintiff's harassment claim appears to stem from Henderson's counseling session in February 1998 in which plaintiff "was told that [she] had no visible work product and that for this reason [her] performance was at issue [and that her] attendance record was poor which was an indication of a conduct problem."Complaint at 5 (internal quotation marks omitted); *see also* Henderson Decl. at 5, ¶ 15. Plaintiff alleges that Henderson harassed her by monitoring her work closely, talking to her in a derogatory manner during meetings, and rescinding her alternative work schedule. Complaint at 5. She alleges that "[t]his was the situation in my office during May 1998. I was taunted and harassed by [Henderson] on a daily basis and had little control over my work."Amended Complaint at 7. Plaintiff appears to claim that a proposed three-day suspension on June 1, 1998 (and her eventual suspension from July 10-12) was harassment. Complaint at 7. Henderson agrees that after the February meeting, he "began to monitor Ms. Brown's work closely and to attend meetings ... with her because she could not handle the work."Henderson Decl. at 6, ¶ 19. He also admits that he rescinded her alternative work schedule, which "was a management prerogative." *Id.,* ¶ 18.

**\*6** As with the discrimination claim, plaintiff's harassment claim fails because no reasonable individual could find a causal link between the alleged harassment and the disability where the harassment is alleged to have occurred before defendant received notice of the disability. Plaintiff claims that she asked repeatedly "for reassignment because of the harassment and also as an accommodation. These request[s] were denied citing business necessity."Amended Complaint at 7. Plaintiff has provided no time frame for her requests. In a supplement to her More Definite Statement, Dkt. # 19, plaintiff states that she "asked Bernice Abrams, my second line supervisor for a reassignment away from the harasser, my supervisor Chet Henderson," but, even if true, plaintiff does not provide any evidence that Abrams was authorized to make such a decision. She therefore has failed to provide any competent evidence to refute defendant's evidence that it first received notice about plaintiff's mental disability and request for accommodation for liberal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

leave through plaintiff's memo to Henderson dated October 29, 1998. *See* Def't's Mem. at 32 (citing Ex. 3).

Even if defendant had sufficient notice of plaintiff's mental disability, the claim would fail because no reasonable individual could find from the allegations that Henderson's alleged conduct was sufficiently severe or pervasive as to have created a hostile or abusive work environment. Plaintiff's examples of the alleged taunting and derogatory statements, *see* More Definite Statement at 75-81, do not come close to the type of conduct rising to the level of a hostile or abusive work environment. *See, e.g., Richard v. Bell Atlantic Corp.* 209 F.Supp.2d 23, 35 (D.D.C.2002) ("rude comments, unjust criticism, and stressful working conditions, amount to 'ordinary tribulations of the workplace' that [are] insufficient as a matter of law for a hostile environment case") (citing *Barbour v. Browner,* 181 F.3d 1342, 1348-49 (D.C.Cir.1999)). Rather, they "amounted to little more than everyday workplace disputes" that, while unpleasant, are insufficient to sustain a hostile work environment claim. *Brodetski v. Duffey,* 141 F.Supp.2d 35, 49 (D.D.C.2001). The record establishes Henderson's conduct as nothing more than a supervisor's reasonable responses to his employee's questionable performance. The Court will grant summary judgment to defendant on the hostile work environment claim and, to the extent it is preserved, the constructive discharge claim.[FN9]

FN9. "To establish a claim for constructive discharge, the plaintiff [ ] must not only show discrimination but also that the employer deliberately made work conditions intolerable, leading the employee to quit involuntarily." *Katradis v. Dav-El of Washington, D.C.,* 846 F.2d 1482, 1485 (D.C.Cir.1988) (internal citation and quotation marks omitted).

*3. Retaliation Claim*

Retaliation actions in employment discrimination cases are governed by the procedural framework established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Brown v. Brody,* 199 F.3d 446, 452-53 (D.C.Cir.1999). Plaintiff first must establish a prima facie case of retaliation. If plaintiff succeeds, defendant may rebut plaintiff's prima facie case by disputing the facts or by offering a "legitimate, nondiscriminatory reason" for their actions.

*McDonnell Douglas,* 411 U.S. at 802; accord *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). If defendant sets forth a successful rebuttal, plaintiff must prove that the reasons defendant offered for its actions were merely pretextual. *McDonnell Douglas,* 411 U.S. at 804. This burden shifting framework, initially established to cover private discrimination claims under Title VII, also applies to federal employees claiming retaliation. *See, e.g., Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (holding that federal government employee successfully established prima facie case of retaliation under *McDonnell Douglas* but failed to prove employer's proffered reason was pretextual); accord *Brown v. Brody,* 199 F.3d at 425.

*7 To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in activity protected by Section 704(a) of Title VII, (2) she suffered an adverse job action as a result, and (3) a causal link exists between the employment action and the protected activity. *See Mitchell v. Baldrige,* 759 F.2d at 86; *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1423 (D.C.Cir.1988); *Ferguson v. Small,* 225 F.Supp.2d 31, 36-37 (D.D.C.2002). Causation may be established by showing that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige,* 759 F.2d at 86; *see also Cones v. Shalala,* 199 F.3d 512 (D.C.Cir.2000) (strong timing evidence alone is sufficient to show a causal connection). "Temporal proximity is often found sufficient to establish the requisite causal connection" for retaliation claims. *Gleklen v. Democratic Congressional Campaign Committee, Inc.,* 199 F.3d 1365, 1368 (D.C.Cir.2000).

Plaintiff filed five EEO complaints, Def't's Mem. at 34,[FN10] and plaintiff's three suspensions without pay constituted adverse job actions. Plaintiff has provided no evidence, though, that reasonably links her suspensions with her EEO activity. In any event, she has not rebutted with any competent evidence defendant's legitimate non-discriminatory reasons for the suspensions. Plaintiff has "offered nothing [in rebuttal] beyond her own speculations and allegations." *Brown v. Brody,* 199 F.3d at 458. She therefore has failed to create a genuine issue of material fact on defendant's legitimate non-discriminatory reasons for the suspensions. *See id. at 459* (finding "a plaintiff's mere speculations [ ] insufficient" to avoid summary judgment in the face

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62
**(Cite as: Not Reported in F.Supp.2d)**

of the defendant's legitimate non-discriminatory reasons for its decisions) (citation omitted). The Court therefore will grant summary judgment to defendant on this claim.

> FN10. Plaintiff filed EEO complaints on February 9, 1998, June 12, 1998, October 21, 1998, November 25, 1998, and July 13, 1999. *See* Deft's Mem., Exs. 4-7.

### III. CONCLUSION

For the preceding reasons, the Court grants defendant's motion for summary judgment on all claims. A separate Order accompanies this Memorandum Opinion.

D.D.C.,2005.
Brown v. Small
Not Reported in F.Supp.2d, 2005 WL 736530 (D.D.C.), 30 NDLR P 62

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.