# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, et al.,            )
                                             )

                         Plaintiffs,     )
                                             )

      v.                           )    Case No. 1:07-cv-01155-RMU
                                           )

GEO GROUP INC., et al.,        )
                                           )

                         Defendants.   )
                                           )

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

Donald L. Kahl (DC Bar # 489472)
Philip Fornaci (DC Bar # 434824)
Deborah Golden (DC Bar # 470578)
Ivy A. Lange (DC Bar # 488147)
WASHINGTON LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle N.W.
Suite 400
Washington, D.C.  20036
202.319.1000 (ph)
202.319.1010 (fax)

Anthony Herman (DC Bar # 424643)
Donald J. Ridings Jr. (DC Bar # 466808)
Danielle M. Estrada (DC Bar # 494517)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C.  20004
202.662.6000 (ph)
202.778.6000 (fax)

Counsel for Plaintiffs

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARGUMENT .................................................................................................................. 3

I.    DEFENDANTS HAVE APPLIED THE WRONG LEGAL STANDARD TO
      PLAINTIFFS' MOTION FOR CLASS CERTIFICATION................................................ 3

II.   ALL OF THE INJURIES AT ISSUE IN THIS ACTION ARISE OUT OF
      UNLAWFUL POLICIES OR PRACTICES THAT ARE COMMON TO ALL
      MEMBERS OF THE CLASS............................................................................................ 4

III.  PLAINTIFFS HAVE ESTABLISHED THAT THE PROPOSED CLASS
      SHOULD BE CERTIFIED................................................................................................ 8

      A.    Defendants' Challenge to Plaintiffs' Class and Sub-Class Definitions
            Fails.......................................................................................................................... 9

            1.    The Proposed Class Is Properly Defined. .................................................. 9

            2.    The Proposed Sub-Class Is Properly Defined............................................ 11

      B.    The Proposed Class and Sub-Class Satisfy the Prerequisites of Rule 23(a)......... 12

            1.    The Class Is So Numerous that Joinder Is Impractical. ............................. 13

            2.    The Sub-Class Is Also So Numerous that Joinder Is Impractical............. 13

            3.    Questions of Law and Fact Are Common to the Class and Sub-
                  Class............................................................................................................ 14

            4.    The Claims of the Named Plaintiffs Are Typical of the Claims of
                  the Class and Sub-Class.............................................................................. 18

            5.    The Defendants Erroneously Argue that Certain Named Plaintiffs
                  Are Inadequate Class Representatives. ...................................................... 20

      C.    The Proposed Class and Sub-Class Satisfy the Prerequisites of Rule 23(b)......... 20

            1.    Certification of the Proposed Class and Sub-Class Is Appropriate
                  Under Rule 23(b)(1)(A) or (b)(2). ............................................................ 21

                  a)    GEO Fails to Articulate a Reason Why Plaintiffs' Class and
                        Sub-Class May Not Be Certified Under Rule 23(b)(1)(A)........... 21

                  b)    Defendants Fail to Articulate a Reason Why Plaintiffs'
                        Class and Sub-Class May Not Be Certified Under Rule
                        23(b)(2). ...................................................................................... 22

c)    Any Monetary Relief Sought By the Sub-Class Should Not Preclude Class Certification........................................................ 23

CONCLUSION................................................................................................................ 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abramovitz v. Ahern, 96 F.R.D. 208 (D. Conn. 1982) ....................................................21

Adair v. England, 209 F.R.D. 5 (D.D.C. 2002) ...........................................................9, 21

Adashunas v. Negley, 626 F.2d 600 (7th Cir. 1980) ........................................................12

Aliotta v. Gruenberg, 237 F.R.D. 4 (D.D.C. 2006) ...................................................4, 9, 14

Anderson v. Garner, 22 F. Supp. 2d 1379 (N.D. Ga. 1997) .............................................23

Armstrong v. Davis, 275 F.3d 849 (9th Cir. 2001)................................................11, 16, 17

Baby Neal v. Casey, 43 F.3d 48 (3d Cir. 1994)..........................................................16, 17

Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975)..............................................................3

Brooks v. Ward, 97 F.R.D. 529 (W.D.N.C. 1983) ...........................................................22

Bynum v. District of Columbia, 214 F.R.D. 27 (D.D.C. 2003)............................15, 19, 23

Califano v. Yamasaki, 442 U.S. 682 (1979) .....................................................................16

In re Cardizem CD Antitrust Litig., 200 F.R.D. 297 (E.D. Mich. 2001)............................9

Clarkson v. Coughlin, 145 F.R.D. 339 (S.D.N.Y. 1993)..............................................11, 14

Coleman v. Pension Benefit Guar. Corp., 196 F.R.D. 193 (D.D.C. 2000).......................15

Coleman v. Wilson, 912 F. Supp. 1282 (E.D. Cal. 1995)............................................11, 22

DeBoer v. Mellon Mortgage Co., 64 F.3d 1171 (8th Cir. 1995) ......................................21

Dean v. Coughlin, 107 F.R.D. 331 (S.D.N.Y. 1985)...................................................10, 16

Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.,
    239 F.R.D. 9 (D.D.C. 2006)..................................................8, 11, 13, 19, 24

Does I Through III v. District of Columbia, 232 F.R.D. 18 (D.D.C. 2005) ...............17, 24

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ..........................................................4

Eubanks v. Billington, 110 F.3d 87 (D.C. Cir. 1997).......................................................23

Flynn v. Doyle, No. 06-537, 2007 WL 805788 (E.D. Wis. Mar. 14, 2007) ....................12

Franklin v. Barry, 909 F. Supp. 21 (D.D.C. 1995) ...........................................................22

Garcia v. Veneman, 211 F.R.D. 15 (D.D.C. 2002) ............................................................23

Hispanics United v. Village of Addison, Ill., 160 F.R.D. 681 (N.D. Ill. 1995) ................20

Ingles v. City of New York, No. 01-CIV-8279 (DC), 2003 WL 402565 (S.D.N.Y.
     Feb. 20, 2003) ..........................................................................................................21

J.B. ex rel. Hart v. Valdez, 186 F.3d 1280 (10th Cir. 1999) ...............................................3

Jones 'El v. Berge, No. 00-C-421-C, 2001 WL 34379611 (W.D. Wis. Aug. 14,
     2001) ....................................................................................................................10, 16

Littlewolf v. Hodel, 681 F. Supp. 929 (D.D.C. 1988) .........................................................4

In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12 (D.D.C. 2001) ................4

Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662 (S.D.N.Y. 1996) ..............................15

McCarthy v. Kleindienst, 741 F.2d 1406 (D.C. Cir. 1984) ...............................................24

McClendon v. City of Albuquerque, 272 F. Supp. 2d 1250 (D.N.M. 2003) .....................11

Montez v. Romer, 32 F. Supp. 2d 1235 (D. Colo. 1999) ...................................................11

Pendleton v. Schlesinger, 73 F.R.D. 506 (D.D.C. 1977) ...................................................15

Penland v. Warren Co. Jail, 797 F.2d 332 (6th Cir. 1986) ................................................10

Pigford v. Glickman, 182 F.R.D. 341 (D.D.C. 1998) .....................................................8, 12

Probe v. State Teachers' Ret. Sys., 780 F.2d 776 (9th Cir. 1986) .....................................20

Ramos v. Lamm, 639 F.2d 559 (10th Cir. 1980) ...............................................................10

Robert E. v. Lane, 530 F. Supp. 930 (N.D. Ill. 1981) ..................................................10, 16

Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656 (2d Cir. 1978) ........................3

Shook v. Bd. of County Comm'rs., No. 02-651, 2006 WL 1801379 (D. Colo.
     June 28, 2006) ...........................................................................................................12

Shook v. El Paso County, 386 F.3d 963 (10th Cir. 2004) ..................................................23

Streicher v. Prescott, 103 F.R.D. 559 (D.D.C. 1984) .......................................................19

Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33 (D.D.C. 2007)..............................24

Thomas v. Christopher, 169 F.R.D. 224 (D.D.C. 1996)..............................................13, 18

In re Vitamins Antitrust Litig., 209 F.R.D. 251 (D.D.C. 2002).....................................4, 18

## FEDERAL STATUTES

Fed. R. Civ. P. 23 ........................................................................................................ passim

## MISCELLANEOUS

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
and Procedure § 1760......................................................................................................8

1 Alba Conte, Herberg Newberg, Newberg on Class Actions § 3:16 (4th ed.
2007) .....................................................................................................................3, 20

The Defendants have filed a combined total of 79 pages in opposition to the Plaintiffs' class certification motion. Among the litany of challenges to certification, Defendants argue that some (but not all) Named Plaintiffs are inappropriate class representatives to pursue some (but not all) claims or to seek some (but not all) forms of relief; that the proposed Class and Sub-Class definitions are too broad; that the proposed Class and Sub-Class are insufficiently well-defined; that any damages ancillary to the injunctive and declaratory relief sought by the Plaintiffs should not be determined on a class basis; and that injunctive relief would not benefit all class members. These arguments, like most of the Defendants' objections to certification, concern the shape and contours of the Class and Sub-Class, not whether this case is appropriate for class treatment.

Both Defendants also argue, however, that the case should not proceed as a class action at all because the ten Named Plaintiffs, and the members of the putative class, have all suffered in different ways from the challenged policies and practices at the Rivers facility. Defendants contend that there are no common issues that link the Plaintiffs' claims together, and that class treatment is therefore inappropriate. This argument is variously packaged, and re-packaged, in the Defendants' briefs as challenges to typicality, adequacy of representation, and the existence of common questions of fact or law.[1]

However packaged, the argument is wrong. The Court should categorically reject this argument because its core premise – that there are no common issues alleged in this lawsuit – cannot be sustained. The Complaint alleges that there has been a fundamental

---

[1] GEO also makes a near-frivolous numerosity argument, asserting that certification is precluded because the 1,300 current prisoners at Rivers, together with the other members of the putative class, do not satisfy the numerosity requirement. We address this and Defendants' related objection to the numerosity of the proposed Sub-Class in Section III below.

breakdown in the <u>system</u> of providing and overseeing medical, dental, and mental health services at the Rivers facility.  The Complaint also identifies the specific policies and practices that have contributed to that breakdown.  Defendants' argument that no prisoners have suffered identical harms misses the mark entirely.  The reason this case is appropriate for class certification is that the harm to the prisoners is the product of the same system.  All prisoners are subjected to the challenged policies and practices:  the Pill Line; the arbitrary confiscation of medication and medical devices; the failure to hire, train, and supervise adequate medical staff; the refusal to provide physical therapy even when it has been mandated by court order; and the other unlawful policies and practices identified in the Complaint.  Of course, no prisoners will have been injured by those unlawful policies and practices in precisely the same way.  But as the allegations in the Complaint make clear, the focus of Plaintiffs' case is on remedying the persistent, systemic deficiencies that continue to deprive class members of the medical services and reasonable accommodations to which the law entitles them.  This is precisely the type of case that is well-suited for class treatment.

We demonstrated in our opening brief that because the proposed Class and Sub-Class have satisfied the requirements of Rule 23, the Class and Sub-Class should be certified. We show below that (1) the Defendants seek to apply the wrong legal standard to the Plaintiffs' class certification motion; (2) this case presents common issues of fact and law because all of the claims in this case involve specific policies and practices applicable to all prisoners; and (3) none of the Defendants' other challenges to certification under Rule 23 has merit.  Accordingly, Plaintiffs' Motion for Class Certification should be granted.

## ARGUMENT

**I.     DEFENDANTS HAVE APPLIED THE WRONG LEGAL STANDARD TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.**

GEO insists that the Plaintiffs are required to provide extrinsic evidence in support of their class certification motion, and both Defendants assert that in order to resolve the motion the Court must consider the merits of Plaintiffs' claims.  Neither assertion is correct.

The Court should reject out of hand GEO's repeated assertion that Plaintiffs are required to provide evidentiary proof beyond the pleadings to support their allegations.  See, e.g., GEO Opp'n at 6; id. at 13 ("Plaintiffs have not provided any evidentiary support for their motion for class certification.").  GEO misapprehends the standard that governs Plaintiffs' motion at this preliminary stage of the proceedings.  It is black-letter law that, in assessing the class certification motion, the court must take the substantive allegations of the complaint alone as true, and may consider matters beyond the pleadings only in order to ascertain whether the asserted claims or defenses are susceptible of resolution on a class-wide basis.  See J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n. 15 (2d Cir. 1978); Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir. 1975).  The cases that GEO relies on, GEO Opp'n at 12-13, all involved post-discovery motions for class certification, where the movants had sought and obtained extensive internal evidence, such as confidential audits and studies concerning the conditions at public prison facilities.  Those cases are therefore inapposite.

Defendants' suggestion that the Court should delve into the merits of the case on this class certification motion, see GEO Opp'n at 6-7, Fed Defs. Opp'n at 5, is also wrong.  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of

3

Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (citations omitted); see also Aliotta v. Gruenberg, 237 F.R.D. 4, 10 (D.D.C. 2006) (Urbina, J.); In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 21 (D.D.C. 2001).  The Supreme Court and courts in this Circuit have made clear that Plaintiffs are not required to "prove" their case during the certification process, or undergo a "preliminary inquiry into the merits" of their claims.  See Eisen, 417 U.S. at 177 ("Nothing in either the language or history of Rule 23 … gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); In re Vitamins Antitrust Litig., 209 F.R.D. 251, 257 (D.D.C. 2002) ("The Court will not make a preliminary inquiry into the merits of the plaintiffs' claim in determining [] whether to certify the class.")  (citing Eisen, 417 U.S. at 177-78); Littlewolf v. Hodel, 681 F. Supp. 929, 938 (D.D.C. 1988) ("the propriety of class certification does not depend on the merits of the underlying suit; all the Court may consider is whether the movant has met the requirements of Rule 23."), aff'd on other grounds sub nom. Littlewolf v. Lujan, 877 F.2d 1058 (D.C. Cir. 1989).

        Controlling case law thus establishes that the court's sole objective when reviewing a class certification motion is to determine whether the proposed class satisfies the requirements of Rule 23.  The detailed allegations in Plaintiffs' 48-page complaint provide ample basis for certifying the proposed Class and Sub-Class.

## II.     ALL OF THE INJURIES AT ISSUE IN THIS ACTION ARISE OUT OF UNLAWFUL POLICIES OR PRACTICES THAT ARE COMMON TO ALL MEMBERS OF THE CLASS.

        The Defendants' principal argument against class certification is that the Named Plaintiffs have described a series of "isolated" medical complaints that do not add up to a "common policy or pattern of misconduct."  Fed. Defs. Opp'n at 30; GEO Opp'n at 36 ("Plaintiffs attempt to cobble together a unified claim from various discrete events.").

Defendants assert that each of the incidents alleged in the Complaint would require "individualized showings," and that "individualized determinations" would be required for each class member.  See GEO Opp'n at 7; Fed. Defs. Opp'n at 2.

Defendants have selectively and unfairly mischaracterized the allegations in the Complaint in a strained effort to support their attack.  The Complaint alleges that because Defendants have instituted and perpetuated systemic facility-wide deficiencies in medical services at the Rivers facility, the Named Plaintiffs and all putative Class and Sub-Class members have been deprived of the medical care and reasonable accommodations to which they are legally entitled.  The Complaint specifies the policies, practices, and patterns of conduct that are the subject of this lawsuit.  See, e.g., Compl. ¶ 38.  And to illustrate the basis for these claims, the Complaint includes no fewer than 14 pages of detailed allegations describing the experiences of ten Rivers prisoners who have suffered from the very policies, practices, and patterns of conduct at the Rivers facility that are challenged in this lawsuit, see Compl. ¶¶ 10-19, which include:

- Rivers' policy or practice of routinely and intentionally denying Class members access to essential health care services.  Id. ¶ 38(b).  Class members face "substantial delays and regular denials of treatment when they want to see a primary physician; when they need a referral to see a specialist; when they need to be transported to a specialist for examination after obtaining a referral; when they need to obtain medical testing; and when they need treatment."  Id.

- Rivers' policy or practice of refusing to refer prisoners to outside health care providers, even in situations where the prisoner's need for care far exceeds the therapeutic capabilities of Defendants or their facilities, and where treatment would be a necessary component of Defendants' obligation to provide legally mandated care.  Id. ¶ 38(c).  For example, several Class and Sub-Class

members including Named Plaintiffs require regular physical therapy due to their mobility impairments or recent injuries, but Defendants fail to offer this basic service.  <u>Id</u>. at ¶¶ 11, 12, 14, 15, 16.

- Rivers' policy or practice of routinely failing to provide proper medications, and of arbitrarily discontinuing the use of certain prescription drugs.  <u>Id.</u> ¶ 38(d).  These determinations are often made based on the cost of the medication rather than in the best interests of the patient.  <u>Id.</u>  As a result of this policy or practice, several Named Plaintiffs have suffered from side effects, deterioration of existing conditions, increased risk of heart attacks and other life-threatening outcomes, and recurrence of old medical conditions.  <u>See id</u>. ¶¶ 11, 14, 16, 17, 18, and 19.

- Rivers' policy or practice of severely understaffing the medical department, failing to train medical workers, and failing to supervise the medical services provided at Rivers.  <u>Id.</u> ¶ 38(a).  To treat and supervise the care of over 1,300 prisoners, Defendants have hired a single doctor who also maintains a separate, full-time medical practice in the local community.  <u>Id.</u>  Defendants have engaged one part-time dentist, one part-time psychologist, and very few trained and qualified medical personnel.  Class members' access to physical and mental health care services is wholly inadequate, and they have no access to physical therapy.  <u>Id.</u>  These deficiencies have resulted in harm to all the Named Plaintiffs and an increased risk of serious harm to every prisoner at Rivers.  <u>Id.</u>

- Rivers' medication distribution system is dysfunctional and contributes to unnecessary delays in the receipt of medications and prescription drugs.  <u>Id.</u> ¶ 38(e).  Defendants typically distribute medications in a single "Pill Line" that is exposed on one side to the elements.  <u>Id.</u>  As a result, Class and Sub-Class members must wait outdoors in all weather for up to 90 minutes before they can receive a single dose of the medicines they need.  <u>Id.</u>  Because of their unique vulnerabilities, Sub-Class members are disproportionately harmed by

6

the Pill Line.  For example, Named Plaintiff Carl Butler typically had to wait outside to receive medication even though he is paralyzed, in a wheelchair, and suffers from seizures and chronic pain.  See id. ¶ 14.

- Rivers' medical staff fails adequately to administer and supervise a "chronic care" program.  Id. ¶ 38(f).  Class members experience significant setbacks in their physical and mental health as a result of Defendants' failure to monitor and treat class members' chronic conditions.  See id. ¶¶ 11, 12, 16, 17, 18, and 19.

- Rivers' medical care system has no established protocols that are followed for containing or treating infectious diseases.  Id. ¶ 38(g).  Outbreaks of Methicillin-resistant Staphylococcus aureus ("MRSA"), a highly contagious staphylococcus infection, have been widespread at Rivers, but the medical staff has offered no appropriate medical response.  Id.

- Rivers' medical services lack quality control procedures, such as monitoring, recordkeeping, and assessment of the delivery of medical care.  Id. ¶ 38(h).

- Rivers' administrative grievance system does not provide timely or adequate responses to complaints about medical, dental, or mental health care.  Id. ¶ 38(i).

There is simply no merit to Defendants' assertion that the Plaintiffs' challenges to the common policies and practices identified in the Complaint raise individual issues that cannot be resolved on a class basis.  See Fed Defs. Opp'n at 31, GEO Opp'n at 23.  To take just one example among the multiple allegations described above, several of the Named Plaintiffs (as well as hundreds of other prisoners) have been subjected to the "Pill Line," Defendants' unlawful method for dispensing pharmaceuticals.  It is certainly true that no two prisoners will have had identical experiences with the Pill Line:  different prisoners will suffer different harms as a result of being deprived of medication, being forced to choose between eating and waiting to obtain

medication, and being compelled to wait outside in all weather.  But it would make no sense to

bring hundreds of different lawsuits to correct this single unlawful condition, when the root

cause of the injuries – the Pill Line – is common to all of those claims.

Because the alleged injuries of the Named Plaintiffs and the members of the

putative class all stem from common policies and practices challenged in the Complaint, no

"individualized determinations" or "individualized showings" need be made in order to certify

the proposed Class and Sub-Class.

## III.    PLAINTIFFS HAVE ESTABLISHED THAT THE PROPOSED CLASS SHOULD BE CERTIFIED.

GEO asserts that the Plaintiffs view class certification as a "a perfunctory

exercise," where "an inmate's desire for class certification is automatically granted by a

deferential court."  GEO Opp'n at 6.  GEO's assertion is but a caricature of Plaintiffs' position.

As we point out in our opening brief and in this section, the Court's analysis must be guided by

elements of Rule 23.  And as we also show, the case law teaches that, under Rule 23, the

proposed class should be certified.

Courts in this jurisdiction have observed that the test under Rule 23 is "not

designed to be a particularly stringent test." Pigford v. Glickman, 182 F.R.D. 341, 346 (D.D.C.

1998).  The Rule requires only that plaintiffs establish that the "general outlines of the

membership of the class are determinable at the outset of the litigation." Id. (quoting 7A Charles

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760).  The

proposed class must also be "sufficiently discrete and identifiable so as to make management of

the class administratively feasible." Disability Rights Council of Greater Wash. v. Wash. Metro.

Area Transit Auth., 239 F.R.D. 9, 25 (D.D.C. 2006).  If the court has some doubt, it should err in

favor of class certification. See Aliotta, 237 F.R.D. at 10 (citing In re Cardizem CD Antitrust

Litig., 200 F.R.D. 297, 303 (E.D. Mich. 2001); Adair v. England, 209 F.R.D. 5, 8 (D.D.C. 2002)

(Urbina, J.) (same).  The Court has considerable flexibility in certifying a class: it may certify a

class with respect to only certain issues in the case; certify sub-classes, see Fed. R. Civ. P.

23(c)(4); or "modify or divide the class action as the litigation progresses and more information

is known about the appropriate method for bringing the suit."  Aliotta, 237 F.R.D. at 13 (citation

omitted).

### A.    Defendants' Challenge to Plaintiffs' Class and Sub-Class Definitions Fails.

#### 1.    The Proposed Class is Properly Defined.

The Defendants challenge the class definition on the ground that the proposed

class includes former prisoners who may not benefit from injunctive or declaratory relief.  See

GEO Opp'n at 15, Fed Defs. Opp'n at 27.  In doing so, they effectively concede that claims for

injunctive relief may properly be brought on behalf of a class of present and future prisoners.

Plaintiffs have included former prisoners within the definition of the class in order to ensure that

former prisoners who have suffered from the Defendants' unlawful conduct are not excluded

from benefiting from any ancillary damage award that may accompany the requested injunctive

and declaratory relief, which is the principal focus of this lawsuit.  Importantly, there is no

serious question that the class as presently framed is readily ascertainable.

GEO also argues that future inmates are not permitted to seek monetary relief for

injuries not yet sustained.  GEO Opp'n at 15.  Plaintiffs agree, and this issue can be addressed

once the common issues giving rise to liability have been established at trial.  But this is no

impediment to certification.  If certification could be defeated simply by showing that every class

member may not be able to benefit from every form of relief sought, then the fluid nature of

prison populations would prevent any class from ever being certified in a prison conditions case.

Without citing legal authority, GEO also criticizes the proposed class as overbroad because it may include prisoners who "do not wish to receive medical care at Rivers," or who have not sought such care. GEO Opp'n at 17. Suffice it to say that we are unaware of any court that has declined to certify a class based on a prison operator's speculation that some of the prisoners committed to its care may not want to receive proper medical treatment.

These arguments simply ignore the mountain of cases in which courts have certified similar classes in cases brought by prisoners, including cases like this one that challenge prison health care, mental health care, and dental care. See, e.g., Ramos v. Lamm, 639 F.2d 559, 562, 577 (10th Cir. 1980) (certifying class challenge to constitutionally inadequate mental health care); Penland v. Warren Co. Jail, 797 F.2d 332, 333-35 (6th Cir. 1986) (certifying (b)(2) class of "present and future prisoners" to challenge conditions of confinement, including health care); Robert E. v. Lane, 530 F. Supp. 930, 941-44 (N.D. Ill. 1981) (certifying (b)(2) class of "all persons who are or will be incarcerated at Stateville and who need or will need mental health services"); Dean v. Coughlin, 107 F.R.D. 331, 332-35 (S.D.N.Y. 1985) (certifying (b)(2) class of "all persons who are or will be inmates" to challenge inadequate dental care); Jones 'El v. Berge, No. 00-C-421-C, 2001 WL 34379611, at *12-13 (W.D. Wis. Aug. 14, 2001) (certifying (b)(2) class of prisoners subject to "systemic" unconstitutional conditions of confinement, including inadequate medical, mental health, and dental care).

In sum, Defendants' challenges to the class definition do not persuade. The membership of the proposed Class is readily ascertainable from records in the possession of the Defendants, and is certainly "administratively feasible" from a case management perspective. The Defendants' objections to the Class definition therefore should be rejected.

## 2.    The Proposed Sub-Class is Properly Defined.

Defendants' challenge to the Sub-Class definition is equally without merit.  There is no dispute that courts may properly certify a class (or sub-class) of present and future disabled prisoners seeking injunctive relief based on violations of federal anti-discrimination law.  All of the parties have cited such cases.[2]

The dispute in this case thus centers not on whether a disability Sub-Class may properly be certified, but on how it should be defined.  The Plaintiffs define the Sub-Class to include all prisoners who have been denied access to the programs, services, facilities, and activities at Rivers because Defendants' have failed adequately to diagnose, monitor, treat, or accommodate their disabilities.  Defendants assert that this definition is too indefinite because the Court will not be able to determine which Plaintiffs are "disabled" without individualized inquiries, and because the term "disabled" is not further defined.  See Fed. Defs. Opp'n at 7-15; GEO Opp'n at 17-18.  But settled case law categorically refutes these arguments.  See McClendon v. City of Albuquerque, 272 F. Supp. 2d 1250, 1252 (D.N.M. 2003) (certifying class of "all persons with mental and/or developmental disabilities" incarcerated in county jail without setting forth a definition for "disabilities" beyond a statutory definition); Coleman v. Wilson, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995) (certifying class of "all inmates with serious mental

---

[2]  See Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) (affirming certification of class of all California state prisoners and parolees with mobility, vision, hearing, developmental, and learning disabilities in a lawsuit claiming that the policies and practices for parole proceedings violated the ADA and the Rehabilitation Act); Montez v. Romer, 32 F. Supp. 2d 1235, 1237 (D. Colo. 1999) (noting certification of class of state prisoners with various disabilities claiming that the prison system failed to provide them access to programs in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act); Clarkson v. Coughlin, 145 F.R.D. 339, 347-48 (S.D.N.Y. 1993) (certifying class of deaf and hard-of-hearing prisoners claiming disability-based discrimination).  Cf. Disability Rights Council, 239 F.R.D. at 25 (certifying a class of transit riders bringing an ADA claim).

disorders who are now or who will in the future be confined within the California Department of Corrections" without setting forth a definition for "serious mental disorders," a term not defined by statute); Flynn v. Doyle, No. 06-537, 2007 WL 805788, at *4 (E.D. Wis. Mar. 14, 2007) (certifying class of "all prisoners with disabilities" without setting forth a definition apart from the statutory definition for "disabilities").[3]

      Moreover, Plaintiffs expect that discovery will show that Defendants already have a mechanism for identifying disabled persons pursuant to the requirements of the Rehabilitation Act, and that such records are maintained in the ordinary course of business. If not, the parties and the Court can re-visit the definition of the Sub-Class once discovery is sufficiently advanced.

      Either way, the law requires only that Plaintiffs provide the "general outlines of the membership of the class" at this stage of the proceeding. Pigford, 182 F.R.D. at 346. Because numerous courts have certified classes of prisoners with disabilities, and because the Defendants may also possess records sufficient to identify current and former Rivers prisoners who are members of the Sub-Class, certification of the Sub-Class is proper.

    **B.**     **The Proposed Class and Sub-Class Satisfy the Prerequisites of Rule 23(a).**

      Asserting an array of supposed deficiencies in the proposed class definition, Defendants argue that the Plaintiffs satisfy none of the four requirements of Rule 23(a), and none of the three subsections of Rule 23(b). The Court should reject those arguments.

---

[3] The cases cited by Defendants involved proposed class definitions that were less precise than the one proposed here. See Shook v. Bd. of County Comm'rs., No. 02-651, 2006 WL 1801379, at *7 (D. Colo. Jun. 28, 2006) (rejecting proposed class defined as all inmates "with serious mental health needs" who are not receiving care because the term "serious mental health needs" is vague); Adashunas v. Negley, 626 F.2d 600, 603-04 (7th Cir. 1980) (distinguishing a readily definable class of learning-disabled children already identified by the school district from a group of children who had not been so identified.)

### 1.    The Class Is So Numerous that Joinder Is Impractical.

Only Defendant GEO challenges the numerosity of the proposed Class.  GEO

Opp'n at 18-19.  The objection is baseless.  The Complaint alleges that approximately 1,300

prisoners are currently incarcerated at Rivers, all of whom are subject to the unlawful policies

and practices at issue in this lawsuit.  Compl. ¶¶ 32, 42.  This number amply satisfies the

numerosity requirement.  See Thomas v. Christopher, 169 F.R.D. 224, 237 (D.D.C. 1996)

("[N]umerosity is generally satisfied by a proposed class of at least 40 members"), rev'd in part

on other grounds, 139 F.3d 227 (D.C. Cir. 1998); cf. Disability Rights Council, 239 F.R.D. at 25

(holding that there is "no specific threshold" number).[4]

### 2.    The Sub-Class Is Also So Numerous that Joinder Is Impractical.

Defendants argue that Plaintiffs should be required to present extrinsic evidence

of the number of potential Sub-Class members, see GEO Opp'n at 20, Fed Defs. Opp'n at 15, but

Rule 23 and the case law interpreting it contain no such requirement.  See Fed. R. Civ. P. 23;

Clarkson v. Coughlin, 145 F.R.D. 339, 347 (S.D.N.Y. 1993) (certifying class of female deaf and

hearing-impaired prisoners although only seven female inmates were identified by plaintiffs,

because the composition of the prison population is inherently fluid).

The Complaint chronicles detailed allegations of systemic harms that

disproportionately affect all of the physically and mentally disabled prisoners at Rivers.  Compl.

¶ 12 (describing the lack of accessible bathrooms, common area ramps, shower facilities, dining

hall facilities, classroom facilities, and gym equipment for physically disabled prisoners); id.

¶¶ 18, 38(d) (describing the effect on persons with disabling mental illness of the Rivers policy

---

[4]  Because the class also includes future and past prisoners, the size of the class will exceed
1,300.

of discontinuing prescription medication). Defendants do not dispute that the Named Plaintiffs include persons with disabilities, nor do they dispute that the Complaint alleges that disabled persons are so numerous as to make joinder impractical. id. ¶ 53. Those allegations are consistent with recent Congressional testimony submitted by the warden of the Rivers facility, which stated that approximately 55 prisoners at Rivers suffer from severe mental illnesses that require psychotropic medication; and by a BOP report stating that approximately seven percent of prisoners suffer from mental illness affecting major life activities and two percent of prisoners suffer from "mobility impairment[s] requiring the use of a cane, walker, wheelchair, or other aids to do daily activities." [5]

Plaintiffs will not be able to determine the exact number of Sub-Class members without discovery from Defendants. At this early stage of the proceeding, however, there is a sufficient basis for concluding that the number of disabled prisoners is so numerous as to make joinder impractical.[6]

### 3. Questions of Law and Fact Are Common to the Class and Sub-Class.

Defendants assert that Plaintiffs have made an "insufficient [factual showing] to support [their] allegations of systemic deficiencies" to permit the court to infer that members of the class suffered from a common policy of discrimination. Fed. Defs. Opp'n at 29; GEO Opp'n at 20 ("[T]he broad nature of Plaintiffs' claims . . . preclude[s] a finder of commonality."). As a fallback position, Federal Defendants also argue that if the Court concludes that Plaintiffs have

---

[5] See Written Statement of Warden Snyder at 2-3 (Ex. A); Laura M. Maruschak, U.S. Dep't of Justice, Medical Problems of Jail Inmates 1 (Nov. 2006) (Ex. B).

[6] The Court may always revisit and revise a class definition as the litigation progresses. See Aliotta v. Gruenberg, 237 F.R.D. 4, 13 (D.D.C. 2006) (Urbina, J.) (citing D'Alauro v. GC Services Ltd. P'ship, 168 F.R.D. 451, 459 (E.D.N.Y. 1996)) (holding a court may "modify or divide the class action as the litigation progresses and more information is known about the appropriate method for bringing the suit.")

alleged common facts and issues of law, they have done so only with regard to Defendant GEO. Both arguments misconstrue the allegations in Plaintiffs' Complaint, concerning the systemic flaws in the delivery of medical services at Rivers, see Section II, supra, and ignore controlling precedent which requires only that Plaintiffs allege at least one common issue of law or fact to meet Rule 23(a)(2)'s requirement.

The case law decided by this Court and others instructs that Rule 23(a)(2)'s commonality requirement permits certification of a class action where there is at least one common issue of law or fact, and the resolution of that issue will affect all or a significant number of the putative class. See Coleman v. Pension Benefit Guar. Corp., 196 F.R.D. 193, 198 (D.D.C. 2000). As long as Plaintiffs allege "a single aspect or feature of the claim is common to all proposed class members," any "factual variations among the class members will not defeat the commonality requirement[.]" Bynum v. District of Columbia, 214 F.R.D. 27, 34 (D.D.C. 2003); see also Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 690 (S.D.N.Y. 1996), aff'd, 126 F.3d 372 (2d Cir. 1997) ("Rule 23(a)(2) will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. Indeed, a single common question may be sufficient to satisfy this rule.") (citations omitted); Pendleton v. Schlesinger, 73 F.R.D. 506, 509 (D.D.C. 1977), aff'd, 628 F.2d 102 (D.C. Cir. 1980) ("In passing on commonality, it is not appropriate to examine the likeness or relation of the several claims of all members of the class and their representatives. The only proper inquiry is, as the language [of Rule 23(a)(2)] suggests, whether there is some aspect or feature of the claims which is common to all."). The Supreme Court has "squarely rejected" arguments that the individualized circumstances of members of the putative class can defeat commonality where, as here, "'[i]t is unlikely that differences in the factual background of each claim will affect the

15

outcome of the legal issue.'"  <u>Baby Neal v. Casey</u>, 43 F.3d 48, 57 (3d Cir. 1994) (quoting

<u>Califano v. Yamasaki</u>, 442 U.S. 682, 701 (1979)).

             Our opening brief identified some of the many common issues of fact and law

presented in this case, including whether Defendants provide systematically inadequate medical,

mental health, and dental care to Class members, and whether Defendants have been deliberately

indifferent to Class members' serious medical needs.  <u>See</u> Pl. Br. at 11-12.  The Defendants

counter that the putative Class lacks cohesion because the "factual descriptions in [Plaintiffs']

Complaint regarding the treatment of ten individuals simply are insufficient to support these

allegations of systemic deficiencies," Fed. Defs. Opp'n at 29, GEO Opp'n at 24 (criticizing

Plaintiffs for "relying on claims of 'systemic failures' which are too amorphous to form the basis

of a finding of commonality.")  But this same argument has been categorically rejected in a the

many prisoner cases holding that plaintiffs satisfy the commonality prong of Rule 23 by alleging

that system-wide practices affected all putative class members, just as the Plaintiffs have alleged

here.  <u>See</u> <u>Armstrong v. Davis</u>, 275 F.3d 849, 868 (9th Cir. 2001) (holding that "commonality is

satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the

putative class members," and observing that "individual factual differences among the individual

litigants or groups of litigants will not preclude a finding of commonality."); <u>Jones 'El v. Berge</u>,

No. 00-C-421-C, 2001 WL 34379611, at *12-13 (W.D. Wis. Aug. 14, 2001) (certifying (b)(2)

class of prisoners subject to "systemic" unconstitutional conditions of confinement, including

inadequate medical, mental health, and dental care); <u>Robert E. v. Lane</u>, 530 F. Supp. 930, 941-44

(N.D. Ill. 1981) (certifying (b)(2) class of "all persons who are or will be incarcerated at

Stateville and who need or will need mental health services"); <u>Dean v. Coughlin</u>, 107 F.R.D.

331, 332-35 (S.D.N.Y. 1985) (certifying (b)(2) class of "all persons who are or will be inmates" to challenge inadequate dental care).

In certifying a class action, the court in Armstrong, supra, like many others, relied upon the Third Circuit decision in Baby Neal. 43 F.3d 48 (3d Cir. 1994). In Baby Neal, the Third Circuit reversed a lower court's refusal to certify a putative class of children in the legal care and custody of Philadelphia's Department of Human Services ("DHS"). Id. at 53. In ruling that the class should be certified, the court identified numerous system-wide policies and practices, including the low number of trained caseworkers, foster parents, medical personnel, and other service personnel. Relying on the Supreme Court's Falcon decision, the Third Circuit held that class members share a common legal claim that systemic deficiencies resulted in widespread violations of class members' statutory and constitutional rights. Id. at 58. Significantly, the court reached this conclusion despite the widely varying nature of plaintiffs' individual complaints. As the court explained:

> Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all of the injuries are shown to result from the practice.
>
> * * *
>
> Falcon merely requires that the class representative prove that there is a pervasive violation and that the various injuries alleged all stem from that common violation.

Id. That same standard has been applied repeatedly in Rule 23 decisions by this Court.[7]

_____

[7] See, e.g., Does I Through III v. District of Columbia, 232 F.R.D. 18, 26-27 (D.D.C. 2005) ("Because the commonality requirement may be satisfied by a single common issue, courts have noted that it is often easily met. . . . [I]t is commonly understood that class actions seeking injunctive and declaratory relief, as here, 'by their very nature' present common questions of law (continued…)

The Complaint adequately alleges that the Named Plaintiffs have suffered injuries as a result of specific unlawful policies and practices at the Rivers facility to which all Rivers prisoners are subject.  At this early stage in the proceedings, that is all the law requires.

Finally, the Court should reject the Federal Defendants' assertion that Plaintiffs have alleged common issues of fact and law only concerning GEO.  See Fed Defs. Opp'n at 30.  In fact, Plaintiffs have alleged that the BOP supervises and monitors the operations at Rivers.  See Compl. ¶¶ 10–19; 37–39.  Plaintiffs further have alleged that the Federal Defendants are aware of but have ignored the substantial risk of serious harm that is presented by the broken medical system at Rivers; that the substantial risk of serious harm was obvious to Federal Defendants through their on-site supervision and monitoring under the terms of the GEO Contract, see Compl. ¶¶ 34–35; and that the Federal Defendants exercised control over GEO's hiring decisions, recordkeeping, and many other aspects of day-to-day operation at Rivers that give rise to Plaintiffs' claims.  Id.

Because the Complaint raises numerous common questions of law and fact with respect to all Defendants, the commonality requirement is easily satisfied.

### 4.    The Claims of the Named Plaintiffs Are Typical of the Claims of the Class and Sub-Class.

Defendants' assertion that typicality is lacking under Rule 23(a)(3) is also without merit for the same reasons discussed above.  The purpose of the typicality requirement is to evaluate whether a class action can be efficiently maintained and to ensure that the interests of the unnamed plaintiffs will be protected.  It is satisfied when the claims arise from a common set of challenged policies and practices.  See Thomas v. Christopher, 169 F.R.D. 224, 238 (D.D.C.

---

and fact.") (other internal citations omitted); In re Vitamins Antitrust Litig., 209 F.R.D. 251, 259 (D.D.C. 2002) (same).

1996), rev'd in part on other grounds sub nom. Thomas v. Albright, 139 F.3d 227, 236 (D.C. Cir.

1998) (holding the requirement satisfied where "the class representatives have suffered injuries

in the same general fashion as absent class members,"); Streicher v. Prescott, 103 F.R.D. 559,

561 (D.D.C. 1984) (holding it is met where the class representatives "challenge a general

practice . . . which give[s] rise to the claims of all class members."); Disability Rights Council,

239 F.R.D. at 27 (same).  Because the challenged policies and practices alleged in the Complaint

apply equally to the Named Plaintiffs and to all the other members of the Class and Sub-Class,

and because the injuries suffered by the Named Plaintiffs stem from the same course of conduct

that is alleged to have injured class members, the typicality requirement is satisfied.

GEO nonetheless asserts that typicality is absent because the Named Plaintiffs

have complained about different aspects of the medical care delivery system, and it argues that

similar factual variations will be present among members of the proposed class.  GEO Opp'n at

27-28.  But Rule 23's typicality requirement may be met despite factual distinctions in the claims

of the Named Plaintiffs and the claims of the proposed class.  See Bynum, 214 F.R.D. at 34

("Factual variations between the claims of class representatives and the claims of other class

members . . . do not negate typicality.").  Here, while the practical consequences of Defendants'

unlawful conduct may vary on an individual-by-individual basis, the harm suffered by each

Plaintiff and each putative class member is caused by a common set of unlawful policies and

practices to which all prisoners have been subjected.  See Part II, infra.

Finally, Federal Defendants argue that because certain Named Plaintiffs may

pursue some forms of relief but not others, typicality is missing for the group of Named

Plaintiffs.  Fed Defs. Opp'n at 21, 33.  But typicality focuses on claims, not relief, and any

variations in remedies can be addressed once liability has been established.  Moreover, Federal

Defendants do not dispute that at least three Named Plaintiffs can properly pursue all forms of relief sought by the Class; and that one Named Plaintiff can properly pursue all forms of relief brought on behalf of the Sub-Class. The Defendants' typicality objection is without merit.

5.    **The Defendants Erroneously Argue that Certain Named Plaintiffs Are Inadequate Class Representatives.**

Defendants also contend that certain of the proposed Named Plaintiffs would not be adequate representatives of the Class because the relief that they seek is not identical to the relief sought by all class members. <u>See</u> Fed. Defs. Opp'n at 34; GEO Opp'n at 29. This is no bar to certification. <u>Probe v. State Teachers' Ret. Sys.</u>, 780 F.2d 776, 780-81 (9th Cir. 1986); <u>accord</u> <u>Hispanics United v. Village of Addison, Ill.</u>, 160 F.R.D. 681, 690 (N.D. Ill. 1995); 1 Alba Conte, Herberg Newberg, <u>Newberg on Class Actions</u> § 3:16 (4th ed. 2007) (listing cases in which courts have rejected arguments that difference in remedies bar class certification). All Class members are challenging the same facility-wide policies and practices, and there is no indication that the Class representatives have interests that are antagonistic to the class. Moreover, as discussed above, at least three Named Plaintiffs can pursue all forms of relief and properly represent every claim brought by the Class. Defendants' adequacy argument should be rejected.

C.    **The Proposed Class and Sub-Class Satisfy the Prerequisites of Rule 23(b).**

GEO argues that both the proposed Class and the proposed Sub-Class fail to satisfy the requirements of Rule 23(b). Federal Defendants challenge only the ability of the Sub-

Class to meet the requirements for certification under Rule 23(b). None of Defendants' objections has merit.[8]

### 1. Certification of the Proposed Class and Sub-Class Is Appropriate Under Rule 23(b)(1)(A) or (b)(2).

#### a) GEO Fails to Articulate a Reason Why Plaintiffs' Class and Sub-Class May Not Be Certified Under Rule 23(b)(1)(A).

Only GEO argues that Plaintiffs' class claims may not be certified under Rule 23(b)(1)(A). GEO's assertion rests on the erroneous ground that if these claims were brought in hundreds of separate lawsuits, there would be no risk of inconsistent adjudications. GEO Opp'n at 32. But Plaintiffs are pursuing claims for injunctive and declaratory relief to remedy systemic problems in the medical care at Rivers, not individual medical malpractice claims. Litigating Plaintiffs' equitable claims in hundreds of different cases would certainly create a substantial risk that different courts – or perhaps even multiple courts within a single circuit – would order different and even incompatible relief with respect to the facility-wide policies and practices that are at issue in this lawsuit. Proceeding as a class protects against the risk that a different courts will order Defendants to provide "different and incompatible affirmative relief." Abramovitz v. Ahern, 96 F.R.D. 208, 215 (D. Conn. 1982).

It is for that very reason that courts routinely certify classes of prisoners alleging violation of Constitutional or statutory rights under Rule 23(b)(1)(A). See Ingles v. City of New York, No. 01-CIV-8279 (DC), 2003 WL 402565, at *7 (S.D.N.Y. Feb. 20, 2003) (granting class

---

[8]  Plaintiffs have requested that the Class and Sub-Class be certified under one of the subsections of Rule 23(b). Because certification is proper under Rule 23(b)(1)(A) and Rule 23(b)(2), the Court need not decide whether certification would also be appropriate under Rule 23(b)(3). Adair v. England, 209 F.R.D. 5, 11-12 (D.D.C. 2002) (Urbina, J.) ("When either subsection (b)(1) or (b)(2) is applicable, . . . b(3) should not be used, so as to avoid unnecessary inconsistencies and compromises in future litigation.") (quoting DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1175 (8th Cir. 1995)).

certification to a class of prisoners in the New York City jails pursuant to Rule 23(b)(1)(A));

Franklin v. Barry, 909 F. Supp. 21, 31 (D.D.C. 1995) (finding class certification appropriate

under Rule 23(b)(1)(A) for a class of Hispanic prisoners alleging Constitutional violations

including allegations of inadequate medical care); Coleman v. Wilson, 912 F. Supp. 1282, 1293

(E.D. Cal. 1995) (noting certification, under Rule 23(b)(1)(A), of class of mentally ill state

prisoners challenging violations of their constitutional rights); Brooks v. Ward, 97 F.R.D. 529,

534 (W.D.N.C. 1983) (finding class certification appropriate under Rule 23(b)(1)(A) and (b)(2)

in prison conditions case where "individual prosecution of the claims of unconstitutional

conditions runs risks of varying results which would establish incompatible standards of

conduct" for prison officials.).

> **b)** **Defendants Fail to Articulate a Reason Why Plaintiffs' Class and Sub-Class May Not Be Certified Under Rule 23(b)(2).**

Certification is proper under Rule 23(b)(2) when "[t]he party opposing the class

has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive and declaratory relief with respect to the class as a whole."  Fed. R.

Civ. P. 23(b)(2).

Repackaging its "commonality" objection, GEO contends that certification is

improper under Rule 23(b)(2) because the Plaintiffs do not bring common claims or seek

common relief.  GEO Opp'n at 38.  We responded to that argument above and will not burden

the Court by repeating that response here.  It suffices to say here that, because the only adequate

remedy for these systemic harms is through appropriate class-wide declaratory and injunctive relief, certification is proper under Rule 23(b)(2).[9]

> **c)     Any Monetary Relief Sought By the Sub-Class Should Not Preclude Class Certification.**

Federal Defendants join GEO in a separate challenge to the commonality of Sub-Class members.  Defendants argue that the damages sought by Sub-Class members require individualized inquiries that prevent certification.  This argument focuses only on the damages sought by the class members, and does not consider the primary and common injunctive and declaratory relief sought by the Sub-Class.

The fact that Sub-Class plaintiffs seek damages ancillary to their claims for injunctive and declaratory relief provides no basis to bar class certification.  Certification pursuant to Rule 23(b)(2) is appropriate even when monetary damages are sought, so long as the monetary relief <u>does not predominate</u>.  <u>See</u> <u>Eubanks v. Billington</u>, 110 F.3d 87, 92 (D.C. Cir. 1997).  While this Circuit has yet to adopt a test for evaluating predominance, <u>see</u> <u>Bynum</u>, 214 F.R.D. at 38 (listing cases by circuit), the present case is easily distinguishable from cases in which this court has found that monetary damages outweigh injunctive relief.  For example, in <u>Garcia v. Veneman</u>, 211 F.R.D. 15 (D.D.C. 2002), the court found that money damages predominated when plaintiffs sought $1 million per class member and sought a declaration only that the class was denied farm program benefits and had a right to timely enforcement of their

---

[9] GEO also argues without citation that certification is improper because of the Prison Litigation Reform Act's ("PLRA") limitations on the scope of injunctive relief.  GEO Opp'n at 39.  GEO's argument is meritless.  <u>See</u> <u>Shook v. El Paso County</u>, 386 F.3d 963, 974 (10th Cir. 2004) ("We hold that the PLRA does not add new elements to the class certification analysis."); <u>Anderson v. Garner</u>, 22 F. Supp. 2d 1379, 1383 (N.D. Ga. 1997) (stating that the PLRA does not "in any way affect[]" the consideration of class certification, leaving courts to apply "existing law governing class certification").

civil rights discrimination complaints. Here, in sharp contrast, the primary interest of the class is freedom from the policies and practices that have caused and will continue to cause Plaintiffs to be deprived of legally adequate medical care. The ancillary damages sought in connection with the Rehabilitation Act claim are intended to compensate the class for harms suffered due to system-wide deficiencies, and are no bar to certification.[10]

## **CONCLUSION**

Because the proposed class meets all of the requirements of Rule 23, Plaintiffs respectfully request that the Court certify this case as a class action.

---

[10] Once liability is established on a class-wide basis, the Court would be free to order class-wide injunctive and declaratory relief, while requiring that any ancillary damages be separately determined during a damages phase. See McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984) (considering "such well-established methods as bifurcating the trial into liability and damages phases before denying certification."). This approach has been widely adopted in this Circuit. See Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 44 (D.D.C. 2007) ("If the plaintiffs succeed in establishing liability in the first phase, the court may order class-wide injunctive and declaratory relief" and afterwards make monetary damage determinations); Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 239 F.R.D. 9, 29 (D.D.C. 2006) (noting the many benefits of certifying this type of class, namely allowing "the litigation to move forward efficiently" and allowing "for a more robust record to be developed, which will assist the court in its later assessment of the certification question as to plaintiffs' legal remedies."); Does I through III v. District of Columbia, 232 F.R.D. 18 (D.D.C. 2005) (adopting partial certification for a class seeking compensatory damages).

Dated: November 30, 2007                    Respectfully submitted,


                                            _____s/ Danielle M. Estrada_____
Donald L. Kahl (DC Bar # 489472)            Anthony Herman (DC Bar # 424643)
Philip Fornaci (DC Bar # 434824)            Donald J. Ridings Jr. (DC Bar # 466808)
Deborah Golden (DC Bar # 470578)            Danielle M. Estrada (DC Bar # 494517)
Ivy A. Lange (DC Bar # 488147)              COVINGTON & BURLING LLP
WASHINGTON LAWYERS' COMMITTEE FOR           1201 Pennsylvania Avenue N.W.
    CIVIL RIGHTS AND URBAN AFFAIRS          Washington, D.C.  20004
11 Dupont Circle N.W.                       202.662.6000 (ph)
Suite 400                                   202.778.6000 (fax)
Washington, D.C.  20036
202.319.1000 (ph)
202.319.1010 (fax)

                                            Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KEITH MATHIS, <u>et al.</u>,                                    )
                                                               )
                                    <u>Plaintiffs</u>,          )
                                                               )
            v.                                                 )    Case No. 1:07-cv-01155-RMU
                                                               )
GEO GROUP INC., <u>et al.</u>,                                 )
                                                               )
                                    <u>Defendants.</u>         )
                                                               )

**<u>PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
CERTIFICATION</u>**

# <u>EXHIBIT 1</u>

# Declaration of Danielle M. Estrada

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEITH MATHIS, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01155-RMU |
| | ) | |
| GEO GROUP INC., <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF DANIELLE M. ESTRADA**

Danielle M. Estrada, under penalty of perjury, hereby declares as follows:

I am an associate in the law firm of Covington & Burling LLP, attorneys for Plaintiffs in this matter. I am licensed to practice law in the District of Columbia, and am a member in good standing of the bar of the United States District Court for the District of Columbia. I submit this Declaration in support of Plaintiffs' Motion for Class Certification.

1.    Attached as Exhibit A is a true and correct copy of written testimony of George E. Snyder, Warden, Rivers Correctional Institution. Warden Snyder's testimony was presented to the House Committee on Oversight and Government Reform Subcommittee on the Federal Workforce, Postal Service, and the District of Columbia for a hearing on October 16, 2007 entitled "Doing Time: Are DC Prisoners Being Adequately Prepared for Re-Entry?". The written testimony was obtained from the Subcommittee's website at http://federalworkforce.oversight.house.gov/documents/20071016152207.pdf (last viewed on November 30, 2007).

2.    Attached as Exhibit B is a true and correct copy of a report entitled Medical Problems of Jail Inmates, by Laura M. Maruschak of the United States Department of

Justice, Office of Justice Programs.  The report provides the results of a survey of inmates concerning medical issues.  The report was obtained from the Department of Justice's website at http://www.ojp.gov/bjs/pub/pdf/mpji.pdf (last viewed on November 30, 2007).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of November, 2007 in Washington, D.C.

/s/ Danielle M. Estrada
Danielle M. Estrada

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, <u>et al.</u>,           )
                                      )
                    <u>Plaintiffs</u>,  )
                                      )
        v.                            )     Case No. 1:07-cv-01155-RMU
                                      )
GEO GROUP INC., <u>et al.</u>,          )
                                      )
                    <u>Defendants</u>.  )
                                      )

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
<u>CERTIFICATION</u>**

# <u>EXHIBIT A</u>

# Written Statement of George E. Snyder, Warden Rivers Correctional Institution



**The GEO Group, Inc.**

Written Testimony Of

George E. Snyder, Warden

Rivers Correctional Institution


Before


The House Committee On Oversight And Government Reform

Subcommittee On The Federal Workforce, Postal Service, And The

District of Columbia


Regarding


Program Offerings At Rivers Correctional Institution

**Chairman Davis and Distinguished Members of the Subcommittee:**

My name is George Snyder, Warden of Rivers Correctional Institution, Winton, North Carolina. On behalf of The GEO Group, Inc., I thank you for the opportunity to testify today regarding the various programs offered to inmates housed in our facility.

Let me first, though, provide you with an overview of our company and the history of how Rivers Correctional Institution came into existence.

The GEO Group, Inc. is a world leader in the delivery of correctional, detention, and residential treatment services to federal, state, and local governmental agencies around the globe. GEO offers a turnkey approach that includes design, construction, financing, and operations. GEO represents government clients in the United States, Australia, South Africa, Canada, and the United Kingdom. GEO's worldwide operations include 68 correctional and residential treatment facilities with a total design capacity of approximately 59,000 beds.

The National Capital Revitalization Act of 1997 mandated that the Bureau of Prisons house a portion of District of Columbia, sentenced felons in private contract facilities. The BOP subsequently adopted a course of action that included soliciting bids for contract facilities, closing the existing Lorton, Virginia facility, and transferring inmates to contracted facilities.

On March 7, 2000, the BOP signed a contract with The GEO Group, Inc. to design, build, finance, own, operate and manage a low security, adult male facility in Winton, North Carolina. We received our first DC inmates in March of 2001. Located on a 257-acre tract in rural Hertford County, the facility is a campus design with four housing buildings, indoor and outdoor recreational areas, a central programs building, a prison industries building, and an administrative building. The design enables cost-effective utilization of security staff supplemented by modern electronic surveillance, which in turn allows enhanced programmatic activities without significant budgetary implications. Our average inmate population is 1350, with approximately 54 percent of the inmates coming from the District of Columbia. Rivers Correctional Institution is 226 miles from Washington, D.C.

The facility is accredited by the American Correctional Association and the Joint Commission on Accreditation of Healthcare Organizations.

# RIVERS CORRECTIONAL INSTITUTION PROGRAMS

**Psychology Department:**

All inmates admitted to the institution are provided an initial assessment by psychology staff. During this assessment, it is determined if an inmate is in need of additional psychological services, to include individual counseling, group counseling, substance abuse counseling, and/or psychiatric services. Currently, approximately 55 inmates are prescribed psychotropic

medication for a variety of mental illnesses from depression to schizophrenia.

At any given time, approximately sixty inmates are receiving regular bi-weekly to monthly individual counseling sessions, focusing on topics including problem-solving, conflict resolution, parenting skills, bereavement, victim empathy, relationship difficulties, and sex offender treatment.

A variety of staff and inmate-facilitated groups are offered, including Anger Management, Stress Management, and Doing Time with the Right Mind (DTRM), a Therapeutic Film Group, and a Fathers Support Group. DTRM is a 9-week, inmate-facilitated program that emphasizes improving communication between staff and inmates. It also helps inmates to use their time in prison wisely to better prepare themselves for release. The Therapeutic Film Group uses the themes of contemporary films as a therapeutic tool to illicit emotions and provide a foundation on which to discuss these emotions and other related issues. The Fathers Support Group is an ongoing self-help group that focuses on improving parenting skills.

Over the course of the past six months, 42 inmates have participated in the Anger Management Group, 6 inmates have successfully completed the Stress Management Group, and 32 inmates have participated in the Therapeutic Film Group. In April and August 2007, graduations for the DTRM Program were held with a combined total of 108 inmates graduating and receiving certificates of completion. Currently, 60 inmates are participating in DTRM, and 13 in the Fathers Support Group.

Additional services provided by psychology staff include, but are not limited to, crisis intervention, suicide assessments, psychiatric referrals, ongoing mental status assessments in the Special Housing Unit (SHU), psychological evaluations for US Parole Commission, and marriage evaluations.

**New Beginning Drug Treatment Program:**

RCI offers a nine-month residential drug treatment program that provides a continuum of treatment services to inmates with a documented history of substance abuse problems. The philosophy of the program holds that both substance abuse and recovery have a cause, a course, and a predictable outcome. This comprehensive program is conducted within a highly structured regimen of a modified therapeutic community composed of inmates with similar problems living and working together, elements critical to building a sense of community and cohesiveness among participants and staff, and promoting conformity and compliance with program rules and philosophy. Drug treatment staff are also based in the inmate housing unit in order to further the sense of community and cohesiveness.

The program has three phases of treatment:

Phase I – Orientation: Designed to acquaint the new inmate with the basic concepts of the therapeutic community and chemical dependency treatment. The inmate begins to participate in the development of an individual treatment plan, setting goals and accepting responsibility for his own behavior.

Phase II – Main Treatment: Focuses on the exploration of chemical dependency and associated recovery issues. The inmate continues the process of self-examination and works toward developing positive attitudes and behaviors.

Phase III – Re-entry: Provides a period for solidifying new behaviors and attitudes into lasting habits, which will support this lifelong process of recovery. The inmate develops relapse prevention and aftercare plans, addressing all areas of his life, i.e., family, employment, housing, individual recovery, and use of community resources.

Throughout participation in the program, inmates are required to participate in weekly NA/AA meetings. These meetings may be facilitated by staff, inmates, or outside volunteers.

After completing the program, inmates are provided with an opportunity to continue their involvement in treatment through the Aftercare Program. Participation in weekly aftercare meetings provides a forum for inmates to practice skills acquired during treatment and prevents inmates from slowly returning back to old behavior patterns.

The program can accommodate 57 inmates in active treatment, with three additional inmates serving in the role as "cadre." Cadre inmates have completed treatment and are assigned as counselor aides, performing duties such as lectures and group facilitation. Since the program's inception in 2003, 155 inmates have completed the nine-month program.

Participation in the RCI residential drug treatment program does not preclude transfer of an inmate to a BOP facility for participation in the BOP 500-hour drug treatment program.

**40-Hour Substance Abuse Education:** This program provides inmates with information on alcohol and drugs as well as the physical, social and psychological impact of these substances. The course is considered a prerequisite for the therapeutic drug program.

Participation in the program is mandatory if: there is evidence in the Pre-Sentence Investigation that alcohol or other drug use contributed to the commission of the instance offense; alcohol or other drug use was a reason for violation of supervised release, including parole or Residential Re-entry Center placement for which the inmate is now incarcerated; or the inmate was recommended for drug programming during incarceration by the sentencing judge.

Inmates who are not required to participate in the program may request to participate voluntarily. Unit and psychology staff also recommends participation.

**Community Resource Day:**

Court Services and Offender Supervision Agency (CSOSA) is a federal agency providing supervision of adults on probation, parole and supervised release in the District of Columbia. Once a quarter CSOSA joins RCI in presenting a Community Resource Day in an effort to assist inmates with release preparation and transition planning via videoconference or in person.

Groups of over 200 D.C. inmates due to be released within 90 days participate in each resource day.

There are two basic elements of the program: During the morning segment the U.S. Parole Commission staff cover conditions of parole and supervised release; a representative from Hope Village Residential Reentry Center covers rules and responsibilities tied to halfway house residency; CSOSA's Community Supervision Officers explain how they conduct home plan investigations as well as the requirements of community supervision. A representative from Child Support Services Division of the Office of the D.C. Attorney General explains their enforcement policies and the benefits of compliance. The afternoon segment focuses on the critical areas of employment, education, health care and housing.

**Hope House DC Programs:**

Hope House DC was founded to serve the needs of DC inmates by offering programs to keep inmates and their families connected.

**Father-to-Child Reading Program:** Inmate fathers participating in this program are provided a children's book and audio or videotape; the inmate then records the book for his children. The book and the tape are mailed to the child. Parents and caregivers report that children not only enthusiastically listen to the recording, but do so repeatedly, reliving the experience of their father telling them a story.

**Father-to-Child Teleconference Program:** Children are brought to the D.C. Hope House where they may visit with their fathers face-to-face through a live teleconference hookup.

**Father to Child Summer Camp:** One week each summer, children from the D.C. area attend day camp with their fathers at RCI. Hope House staff and camp counselors guide the campers through crafts, drama, games, creative writing and other activities designed to help parent and child reconnect and strengthen the parent-child relationship. In the evening the children and counselors retreat to a local campground where they participate in crafts and recreation.

**Video Mentoring Program:**

A 1997 study showed that in the District of Columbia, one in two African American men ages 18 to 35 were under some form of correctional supervision. Given those statistics, and with an estimated 2,500 inmates returning to the District this year alone, law enforcement and church groups have set up a pilot mentoring program that involves church volunteers. The program pairs inmates with personal mentors to help them navigate the first difficult months out of incarceration, where everything from applying for a driver's license to navigating the Metro can be a frustrating challenge.

Run by the Court Services and Offender Supervision Agency (CSOSA), and a faith-based advisory committee chaired by the Rev. Donald Isaac, Associate Pastor of Southeast Tabernacle Baptist Church, Washington, D.C., this year-old program has so far matched about 100 inmates

and mentors. The idea is to focus intense attention on each inmate in the hope that none returns to drug use or other criminal habits once released.

Agency officers screen inmates still in prison who have volunteered for the program. The inmate/mentor pairs then meet and talk, in person or on the phone, developing a relationship that might last into the future.

**Education Programs:** Approximately 32 percent of the inmate population participates in either vocational or academic programs. Average monthly enrollment for academic education is 261, vocational education 101, and Life Skills 85.

Academic Programs include: English as a second language, adult basic education, pre-GED, and GED, and life skills/parenting. In 2007, 49 students received their General Equivalent Diploma and five students graduated from the English as a Second Language program.

> **English as a Second Language (ESL):** Instruction is provided to non-English speaking and English speaking persons who are not fluent in the English language. Classes focus on survival language skills. The program is designed to enable inmates to function at the equivalent of an eighth grade level of education.

> **Adult Basic Education (ABE):** Designed primarily for adults whose basic skills are below the ninth grade level, ABE classes focus on helping adults function more effectively in today's technological world by improving their reading, writing and math skills. Graduates of this program are encouraged to continue studies in the Pre-General Education Development program.

> **Pre-General Equivalent Diploma (GED):** This course is designed for students who comprehend on or at least a fifth grade level. Students are guided through an individualized process by the instructor and given a six-part examination comprised of all core curriculum courses (Science, Social Studies, Mathematics, Literature and Arts, and Writing Skills). Graduates are encouraged to continue studies in the GED program.

> **General Equivalent Diploma (GED):** This course is offered as a means for adults with educational skills at the high school level to earn the equivalent of a high school diploma. In preparation for the GED Exam, students are guided through an individualized study process and given GED practice tests. Roanoke Chowan Community College, Ahoskie, North Carolina, administers the official GED examination. If he passes, the graduate receives a High School Diploma Equivalency Certificate from the North Carolina Community College System.

> **Life Skills/Parenting:** The Life Skills program focuses on providing students with direction in dealing with many everyday life situations that they may encounter upon release. Students are taught to understand and build their self-esteem while learning to understand other people. They learn procedures for securing a driver's license, how to write checks, financial budgeting, the importance of maintaining a job, how to submit

resumes and apply for jobs.  Parenting focuses on providing parent education in the areas of positive relationships, family values, mutual support and nurturing.

Vocational Programs includes computer technology, woodworking, heating and air conditioning, workforce transition, workforce transition, Corrections Learning Network, and Wheels for the World.

**Keyboarding:**  This course is designed to teach basic keying skills and procedures. Emphasis is placed on the daily use of a computer system to develop skills with concentrated application of these skills to the production of business correspondence.

**Computer Technology I and II:**  These programs are designed to teach students more than just document preparation.  Desktop publishing is a component of this course that teaches the students to produce documents that are more creative, fun and effective in communicating messages.  The student learns skills necessary for writing newsletters, creating styles, outlines, tables and tables of content.  Students learn desktop features and design tips that help them to use art and color and use the drawing toolbar to create original artwork for their documents.   Students are taught how to prepare basic worksheets, and to design, create, retrieve and enhance slides.

**Woodworking:**   In a woodshop setting, the woodworking program focuses on transferable skills and stresses understanding and demonstration of the following elements of woodworking:  planning, technical and product skills, health and safety and environmental issues, concepts of residential framing, residential planning and design and building code requirements.  The student has hands-on instruction in the use of hand tools, operating portable power tools and stationary power woodworking machines.

**Heating, Ventilation and Air Conditioning (HVAC):**  In this course students are introduced to the basic refrigeration process used in mechanical refrigeration and air conditioning systems.  It covers the requirements for EPA certification and examinations and introduces common business and customer relation practices that may be encountered in HVAC.  Some topics include terminology, safety, identification and function of components, refrigeration cycle, tools, instrumentation used in mechanical refrigeration systems, small appliances, and high and low pressure systems.  Upon completion students should be able to identify refrigeration systems and components, explain the refrigeration process, use the tools and instrumentation of the trade, demonstrate knowledge of refrigerants, and be prepared for the EPA certification examination, present themselves to customers in a professional manner, understand how the business operates, complete invoices, and handle complaints.

**Workforce Transition:**  A joint program conducted by the University of the District of Columbia, the Court Services and Offenders Agency and Rivers Correctional Institution staff, the program is a work-readiness program that prepares the individual inmates for resources and actions dedicated to addressing workforce needs and marketable skills. The training workshops include resume assistance, certifications, professional development, interview techniques, educational referrals and the basic job-hunting skills.

**Corrections Learning Network (CLN):**   The CLN program is a distance learning initiative administered by the Educational Service District 101 and funded through a Star School Grant from the U.S. Department of Education.   The Education Service District provides the RCI Educational Department with DVD's to enhance our Life Skills/Parenting, Release Preparation Program, and our Literacy programs.    DVD Resource topics include, but are not limited to:

| | |
|---|---|
| Work Performance | GED Math |
| Problem Solving | Science |
| Workplace Communication | Language Arts, Writing and Reading |
| Lifestyle & Wellness | |

**Wheels for the World:**  Wheels for the world Program, founded by Joni and Friends, is a nonprofit organization located in Agoura Hills, California.  Wheels for the world collects donated wheelchairs from across the United States through an organization called Chair Corps Organization.   Volunteers collect, store and transport wheelchairs to and from various prisons participating in the program.

Rivers Correctional Institution began participating in the Wheels for the World Program in August of 2007.  The program assists inmates in developing the necessary skills to master the basic concepts of wheelchair repair, including wheelchair identification, design, purpose and tool identification.  15 inmates are currently assigned to refurbish and repair wheelchairs.   A total of 63 chairs have been repaired and ready for distribution.

**Conclusion:**  Mr. Chairman, let me conclude by emphasizing that we at Rivers Correctional Institute are committed to providing inmates in our care with treatment and training programs that help them become productive and responsible members of their community upon release.  I appreciate the subcommittee's interest in this important issue, and I am happy to answer any questions the subcommittee members may have.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, et al.,                    )
                                         )
                        Plaintiffs,      )
                                         )
        v.                               )   Case No. 1:07-cv-01155-RMU
                                         )
GEO GROUP INC., et al.,                  )
                                         )
                        Defendants.      )
                                         )

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
CERTIFICATION**


# EXHIBIT B

# Laura M. Maruschak, U.S. Department of Justice, Medical Problems of Jail Inmates

**U.S. Department of Justice**
Office of Justice Programs



Bureau of Justice Statistics
Special Report

November 2006, NCJ 210696

# Medical Problems of Jail Inmates

By Laura M. Maruschak
*BJS Statistician*

In 2002 an estimated 229,000 jail inmates reported having a current medical problem other than a cold or virus. Many of these problems reflect conditions existing before admission. Medical problems reported by inmates included:

- arthritis (13%)
- hypertension (11%)
- asthma (10%)
- and heart problems (6%).

Under 5% of inmates reported cancer, paralysis, stroke, diabetes, kidney problems, liver problems, hepatitis, sexually transmitted diseases, tuberculosis (TB), or human immunodeficiency virus (HIV).

An estimated 227,200 jail inmates reported having impaired functioning, most commonly a learning impairment (22%), such as dyslexia or attention deficit disorder, or having been enrolled in special education classes. Around 2% of jail inmates said they had a mobility impairment, requiring the use of a cane, walker, wheelchair, or other aids to do daily activities. About 8% of jail inmates said they had a mental health condition that kept them from participating fully in school, work, or other activities.

An estimated 83,000 jail inmates reported being injured since admission. About 7% of jail inmates reported being injured in a fight and 7% reported an injury due to an accident.

The findings in this report are based on the 2002 Survey of Inmates in Local Jails. Data are presented separately on medical problems, impairments, and injuries reported by jail inmates.

## Highlights

**More than a third of jail inmates reported having a current medical problem**

|  | Percent of inmates | | |
| --- | --- | --- | --- |
|  | Total | Convicted | Unconvicted |
| Current medical problem* | 36.9% | 35.8% | 37.7% |
| Any impairment | 36.6 | 35.2 | 37.0 |
| Injury since admission | 13.4 | 12.6 | 15.6 |

*Medical problems include at least 1 of 14 specific problems (see note on table 1). Excludes reports of a cold or flu.

**22% of jail inmates reported having a learning impairment; 11% said they had impaired vision**

|  | Percent of jail inmates | | |
| --- | --- | --- | --- |
| Type of impairment | Total | Convicted | Unconvicted |
| Physical | 33.9% | 32.7% | 34.3% |
| Learning | 21.7 | 20.8 | 21.5 |
| Speech | 3.7 | 3.4 | 4.4 |
| Hearing | 6.4 | 6.3 | 6.0 |
| Vision | 11.3 | 10.5 | 12.3 |
| Mobility* | 1.7 | 1.4 | 2.3 |
| Mental | 8.3 | 7.2 | 9.3 |

*Includes use of a cane, wheelchair, walker, hearing aid, or other aids in daily activity.

- 42% of inmates who reported a current medical problem said they had seen a health care professional about the problem.

- Nearly two-thirds of jail inmates said they had been tested for tuberculosis since admission; over a fifth reported being tested for HIV.

- Around 15% of all jail inmates reported having two or more impairments.

- About 1 in 5 jail inmates said they considered themselves to have a disability.

---

- Heart valve damage (290 per 10,000 inmates) and arrhythmia (211 per 10,000) were the most commonly reported types of heart problems.

- About a quarter of convicted (26%) and unconvicted (25%) jail inmates reported having a dental problem.

- Inmates age 24 or younger (17%) were more than twice as likely as those age 45 or older (8%) to report being injured since admission.

- About 61% of inmates age 45 or older reported having a current medical problem; 44% reported an impairment.

- More than half (53%) of female jail inmates reported having a current medical problem, compared to about a third (35%) of male inmates.

- About 5% of female jail inmates said they were pregnant at the time of admission.

- Among inmates who were homeless in the year before their arrest, 49% reported a current medical problem, compared to 35% of those who were not homeless.

- More than 4 in 10 inmates reported having a medical exam since admission to jail.

**22% of jail inmates reported one medical problem; 14%, two or more**

The majority of jail inmates (63%) did not report a current medical problem. Around a fifth (22%) reported having 1 of 14 specific medical problems (See note on table 1) and 14% reported two or more.

| Number of current medical problems | Percent of jail inmates | | |
|---|---|---|---|
| | Total | Male | Female |
| 0 | 63.1% | 65.2% | 47.4% |
| 1 | 22.4 | 21.7 | 28.3 |
| 2 | 8.7 | 8.1 | 13.5 |
| 3 or more | 5.7 | 5.0 | 10.8 |

The prevalence of a current medical problem did not vary by conviction status. Nearly the same percentage of convicted (36%) and unconvicted jail inmates (38%) reported having a current medical problem (table 1).

**Medical problems were highest among female and older inmates**

More than half (53%) of female jail inmates reported having a current medical problem, compared to about a third (35%) of male jail inmates. Male and female inmates were equally likely to report having had surgery since their admission (about 1.4%).

Among jail inmates age 45 or older, 61% reported a medical problem, compared to a quarter of those 24 or younger. Older and younger inmates were equally likely to report having surgery.

**About 1 in 8 jail inmates reported currently having arthritis**

Jail inmates reported a wide-range of medical problems, with arthritis as the most common (13%), followed by hypertension (11%), and asthma (10%) (table 2). Heart problems (6%), followed by kidney problems and tuberculosis (4%) were the next most frequently reported medical conditions. With the exception of paralysis, stroke, and tuberculosis, female inmates reported higher levels of each specific type of medical problem than male inmates.

**Women most likely to report cervical cancer, men skin cancer**

Female inmates reported a higher rate of ever having cancer than males (831 per 10,000 inmates, compared to 108 per 10,000 inmates). By specific type of cancer, 490 per 10,000 female jail inmates reported ever having cervical cancer, 110 per 10,000 reported ovarian cancer, and 91 per 10,000 reported ever having breast cancer.

Male jail inmates most commonly reported ever having skin cancer (37 per 10,000 inmates), followed by lung cancer (15 per 10,000), and testicular and colon cancer (both 13 per 10,000).

| | Rate of those who reported ever having cancer by type per 10,000 inmates | |
|---|---|---|
| Type of cancer | Male | Female |
| Any | 108 | 831 |
| Breast | 2 | 91 |
| Cervical | ~ | 490 |
| Uterine | ~ | 49 |
| Ovarian | ~ | 110 |
| Colon | 13 | 29 |
| Prostate | 11 | ~ |
| Testicular | 13 | ~ |
| Lung | 15 | 16 |
| Skin | 37 | 69 |
| Leukemia | 10 | 34 |
| ~ Not applicable. | | |

**Table 1. Estimated number and percent of jail inmates who reported a medical problem, by conviction status, gender and age, 2002**

| | Current medical problem* | | Had surgery since admission | | Dental problem since admission | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| All inmates | 229,300 | 36.9% | 8,800 | 1.4% | 159,000 | 25.6% |
| **Conviction status** | | | | | | |
| Convicted | 121,700 | 35.8% | 5,500 | 1.6% | 89,900 | 26.5% |
| Unconvicted | 67,800 | 37.7 | 2,000 | 1.1 | 44,700 | 24.9 |
| Both | 38,700 | 39.2 | 1,400 | 1.4 | 23,600 | 23.9 |
| **Gender** | | | | | | |
| Male | 191,500 | 34.8% | 7,600 | 1.4% | 138,400 | 25.2% |
| Female | 37,800 | 52.6 | 1,200 | 1.7 | 20,600 | 28.7 |
| **Age** | | | | | | |
| 24 or younger | 46,600 | 25.0% | 1,700 | 0.9% | 44,200 | 23.7% |
| 25-34 | 66,500 | 33.7 | 3,700 | 1.9 | 49,300 | 25.0 |
| 35-44 | 70,200 | 43.3 | 2,500 | 1.5 | 45,500 | 28.1 |
| 45 or older | 46,000 | 60.5 | 1,000 | 1.3 | 20,000 | 26.4 |

Note: Number of inmates with each problem was estimated and then rounded to the nearest 100. See *Appendix tables* for standard errors for the survey estimates.
*Inmates were determined to have a current medical problem if they reported currently having at least 1 of 14 specific problems: arthritis, asthma, cancer, diabetes, a heart condition, hypertension, kidney problems, liver problems, paralysis, problems due to a stroke, hepatitis, HIV, a sexually transmitted disease, or tuberculosis.

**Table 2. Percent of jail inmates reporting specific current medical problems, by gender and age, 2002**

| | All inmates | Gender | | Age | | | |
|---|---|---|---|---|---|---|---|
| Current medical problem | | Male | Female | 24 or younger | 25-34 | 35-44 | 45 or older |
| Arthritis | 12.9% | 12.0% | 19.4% | 5.3% | 9.4% | 16.6% | 32.5% |
| Asthma | 9.9 | 8.7 | 19.4 | 10.9 | 10.8 | 8.9 | 7.3 |
| Cancer | 0.7 | 0.5 | 2.5 | 0.2 | 0.7 | 0.6 | 2.2 |
| Diabetes | 2.7 | 2.5 | 4.1 | 0.6 | 2.3 | 2.9 | 8.4 |
| Heart problem | 5.9 | 5.5 | 9.2 | 4.4 | 4.6 | 6.4 | 11.7 |
| Hypertension | 11.2 | 10.8 | 14.1 | 5.3 | 8.5 | 14.3 | 26.1 |
| Kidney problems | 3.7 | 3.0 | 8.9 | 2.3 | 4.0 | 4.4 | 4.8 |
| Liver problems | 0.9 | 0.8 | 1.6 | 0.1 | 0.4 | 1.3 | 3.4 |
| Paralysis | 1.3 | 1.3 | 1.3 | 0.3 | 1.3 | 1.7 | 3.1 |
| Stroke | 3.2 | 3.2 | 3.3 | 1.3 | 2.9 | 4.9 | 4.8 |
| Hepatitis | 2.6 | 2.3 | 5.0 | 0.4 | 1.4 | 4.6 | 7.2 |
| HIV | 1.3 | 1.2 | 2.3 | 0.2 | 1.1 | 2.1 | 2.7 |
| Sexually transmitted disease | 0.9 | 0.8 | 2.0 | 0.7 | 0.7 | 1.0 | 1.7 |
| Tuberculosis* | 4.3 | 4.3 | 4.0 | 2.2 | 3.8 | 5.3 | 8.6 |

*Includes all inmates who reported ever having TB.

## Heart valve damage was the most commonly reported heart problem

An estimated 880 jail inmates per 10,000 reported ever having a heart problem, including heart valve damage (290 per 10,000 inmates), arrhythmia (211 per 10,000), and angina (130 per 10,000). About 126 per 10,000 had suffered a heart attack.

| Heart condition | Ever heart problem per 10,000 inmates, by type |
|---|---|
| Any | 880 |
| Angina | 130 |
| Arrhythmia | 211 |
| Hardening of arteries | 38 |
| Heart attack | 126 |
| Heart disease | 95 |
| Valve damage | 290 |
| Tachycardia | 74 |
| Other | 43 |

## Prevalence of a medical problem did not change with time served

Inmates who had served a year or more were as likely as those who had served 7 or fewer days to report a current medical problem (about 38%) (table 3). As time served increased, jail inmates who reported having had surgery or a dental problem since admission increased. Among inmates who had served 7 or fewer days, 0.2% reported surgery since admission, compared to 1.6% who had served from 61 to 180 days. About 3.5% of jail inmates who had served more than a year reported having surgery since admission.

Jail inmates who had served more than a year were nearly 3 and a half times more likely than those who had served 7 or fewer days to report having a dental problem since admission.

## More than a third of jail inmates reported an impairment

An estimated 227,200 jail inmates said they had an impairment, including a learning, speech, hearing, vision, mobility, or mental impairment (table 4). About 1 in 5 jail inmates said they considered themselves to have a disability (not shown in a table).

Around 22% of jail inmates reported a learning impairment, such as dyslexia or attention deficit disorder, or having been enrolled in special education

classes. About 6% of jail inmates reported difficulty hearing a normal conversation even when wearing a hearing aid. Among jail inmates, 11% reported difficulty seeing ordinary newsprint even when wearing glasses.

Based on a single survey question, 8% of jail inmates reported having a mental or emotional condition that kept them from participating fully in school, work, or other activities. In a recent BJS study, an estimated 64% of jail inmates were found to have a mental health problem. This measure was based on a series of survey questions about prior diagnoses of a mental health problem or symptoms of a mental disorder as specified in the Diagnostic and Statistical Manual of Mental Disorder, DSM-IV. It was not restricted to impaired functioning due to a mental health condition. (See *Mental Health Problems of Prison and Jail Inmates*, available at <http://ojp.usdoj.gov/bjs/mhppji.htm>.

## Females most likely to report a physical or mental impairment, males a learning impairment

Overall, 39% of female inmates and 36% of male inmates reported having any physical or mental impairment (table 5). Male inmates were more likely than female inmates to report a learning impairment (22% compared to 18%).

Females more commonly than males reported a vision impairment (14% compared to 11%) or a mental impairment (15% compared to 7%).

## More than 40% of inmates age 45 or older reported an impairment

Inmates age 45 or older were the most likely to report having a physical or mental impairment, followed by those 24 or younger. Forty-four percent of jail inmates age 45 or older and 38% of those age 24 or younger said they had a physical or mental impairment.

Among the specific physical impairments, 12% of jail inmates age 45 or older reported difficulty hearing, 24% reported difficulty seeing, and 7% had a problem with mobility. A tenth of those age 45 or older said they had a mental impairment.

### Table 3. Current medical problems reported by jail inmates, by time served, 2002

| | Percent of inmates | | |
|---|---|---|---|
| | Curent medi- | Since admission | |
| Time since admission | cal problem | Had surgery | Dental problem |
| 7 or fewer days | 38.2% | 0.2% | 12.2% |
| 8-14 days | 34.3 | 0.7 | 15.2 |
| 15-30 days | 37.3 | 0.4 | 19.9 |
| 31-60 days | 36.8 | 0.8 | 24.6 |
| 61-180 days | 37.4 | 1.6 | 30.9 |
| 181-364 days | 35.6 | 3.9 | 35.1 |
| 1 year or more | 37.8 | 3.5 | 42.4 |

### Table 4. Estimated number and percent of jail inmates with an impairment, 2002

| Type of impairment | All inmates | | Convicted | | Unconvicted | | Both[a] | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Any | 227,200 | 36.6% | 119,300 | 35.2% | 66,400 | 37.0% | 40,000 | 40.6% |
| Physical | 210,500 | 33.9 | 110,800 | 32.7 | 61,500 | 34.3 | 36,900 | 37.5 |
| Learning | 133,800 | 21.7 | 70,300 | 20.8 | 38,300 | 21.5 | 24,500 | 25.0 |
| Speech | 23,200 | 3.7 | 11,400 | 3.4 | 7,900 | 4.4 | 3,700 | 3.8 |
| Hearing | 39,900 | 6.4 | 21,200 | 6.3 | 10,800 | 6.0 | 7,300 | 7.5 |
| Vision | 69,700 | 11.3 | 35,400 | 10.5 | 22,000 | 12.3 | 11,600 | 11.8 |
| Mobility[b] | 10,500 | 1.7 | 4,900 | 1.4 | 4,200 | 2.3 | 1,400 | 1.5 |
| Mental | 51,500 | 8.3 | 24,400 | 7.2 | 16,700 | 9.3 | 9,700 | 10.0 |

Note: Number of inmates with each impairment or mental condition was estimated and then rounded to the nearest 100. Detail equals more than total because inmates may have had more than one impairment.
[a]Includes inmates with a prior conviction, but no new conviction for the current charge.
[b]Includes use of a cane, wheelchair, walker, hearing aid, or other aids in daily activity.

Inmates age 24 or younger (28%) were more than twice as likely as those 45 or older (11%) to report a learning disability. Four percent of both inmates age 24 or younger and those age 45 or older reported a speech impairment.

### 15% of jail inmates had 2 or more impairments

Jail inmates typically reported having one impairment (21%). About 10% reported two impairments, and nearly 6% reported having three or more. The number of impairments varied little by age. Inmates age 35 or older (17%) were slightly more likely than those 34 or younger (14%) to have 2 or more impairments.

| Number of impairments | Percent of jail inmates by age | | |
|---|---|---|---|
| | Total | 34 or younger | 35 or older |
| 0 | 63.4% | 64.8% | 61.1% |
| 1 | 21.2 | 20.8 | 21.9 |
| 2 | 9.8 | 9.2 | 10.8 |
| 3 or more | 5.6 | 5.2 | 6.2 |

### Around 1 in 8 jail inmates reported being injured since admission to jail

Overall, an estimated 82,900 jail inmates (13%) reported being injured since admission (table 6). Inmates were equally likely to report that they had been injured in an accident (7%) as to report that they had been injured in a fight (7%).

### Injuries highest among male and younger inmates

Among jail inmates, men (14%) were more likely than women (10%) to report being injured since admission. About 7% of males, compared to 4% of females, reported being injured in a fight. Male and female jail inmates reported nearly the same rate of being injured in an accident.

Jail inmates age 24 or younger (17%) were more than twice as likely to have been injured since admission than inmates age 45 or older (8%). They were more than five times as likely to report being injured in a fight since admission (11% compared to 2%).

The percent of inmates who reported being injured in an accident slightly decreased as age increased. About 8% of inmates age 24 or younger reported being injured in an accident, compared to 6% of those age 45 or older.

### Violent offenders had higher rates of fight-related injuries

About 11% of violent offenders in jail reported being injured in a fight since admission, compared to 6% of property and drug offenders and 5% of public-order offenders.

| Most serious offense | Percent of jail inmates since admission | |
|---|---|---|
| | Injured in an accident | Injured in a fight |
| Violent | 8.8% | 10.8% |
| Property | 7.1 | 6.4 |
| Drug | 7.0 | 6.2 |
| Public-order | 6.6 | 4.6 |

### Inmates with an impairment had higher rates of injuries

Among inmates with an impairment, nearly 10% reported being injured in an accident and 10% reported being injured in a fight. Around 6% of those without an impairment had been injured.

Inmates who reported a mental impairment were almost twice as likely as those not reporting a mental impairment to be injured in a fight or in an accident since admission. Nearly 13% of those with a mental impairment were injured in a fight and 12% were injured in an accident. Among those without a mental impairment, almost 7% had been injured in a fight or in an accident.

| Type of impairment | Percent of jail inmates since admission | |
|---|---|---|
| | Injured in an accident | Injured in a fight |
| Physical | | |
| Yes | 9.7% | 9.8% |
| No | 6.3 | 5.6 |
| Mental | | |
| Yes | 11.6% | 12.9% |
| No | 7.0 | 6.5 |

---

**Table 5. Impairments of jail inmates, by gender and age, 2002**

| | Percent of inmates who reported an impairment | | | | | | |
|---|---|---|---|---|---|---|---|
| | Any impairment | Learning | Speech | Hearing | Vision | Mobility* | Mental |
| **Gender** | | | | | | | |
| Male | 36.3% | 22.1% | 3.8% | 6.3% | 10.8% | 1.7% | 7.5% |
| Female | 38.7 | 18.0 | 3.3 | 7.6 | 14.4 | 1.7 | 14.9 |
| **Age** | | | | | | | |
| 24 or younger | 37.5% | 28.4% | 4.0% | 4.0% | 7.3% | 0.3% | 7.1% |
| 25-34 | 33.0 | 21.1 | 3.3 | 5.2 | 8.2 | 1.0 | 7.2 |
| 35-44 | 36.5 | 19.8 | 3.9 | 8.1 | 13.5 | 1.8 | 10.5 |
| 45 or older | 44.0 | 10.7 | 4.1 | 12.0 | 24.1 | 6.9 | 9.9 |

*Includes use of a cane, wheelchair, walker, hearing aid, or other aids in daily activity.

---

**Table 6. Percent of jail inmates who reported an injury since admission, by conviction status, gender and age, 2002**

| | Percent of inmates who reported an injury since admission | | |
|---|---|---|---|
| Characteristics | Total | In an accident | In a fight |
| Total | 13.4% | 7.4% | 7.0% |
| **Conviction status** | | | |
| Convicted | 12.6% | 7.9% | 5.9% |
| Unconvicted | 15.6 | 7.5 | 8.8% |
| Both | 12.1 | 5.5 | 7.7 |
| **Gender** | | | |
| Male | 13.8% | 7.5% | 7.4% |
| Female | 10.1 | 6.7 | 4.1 |
| **Age** | | | |
| 24 or younger | 17.4% | 8.2% | 10.6% |
| 25-34 | 13.6 | 7.5 | 7.2 |
| 35-44 | 11.2 | 7.1 | 4.8 |
| 45 or older | 7.8 | 5.8 | 2.5 |

## Likelihood of injury increased with time served in jail

Among jail inmates who had served 7 or fewer days at the time of the interview, 4% reported an injury compared to 30% of those jail inmates who had served 1 year or more at the time of the interview (table 7).

The risk of injury due to an accident or a fight increased with time served. About 3% of jail inmates who had served 7 or fewer days reported being injured in an accident, compared to 17% of inmates who had served 1 year or more at the time of interview. Jail inmates who had served 1 or more years at the time of interview were 8 times as likely (16%) to report being injured in a fight as those who had served 7 or fewer days (2%), and about 2½ times as likely as those who had served between 31 and 60 days (7%).

Male inmates incarcerated between 15 days and 1 year were more likely to have been injured than female inmates (figure 1). Among those who had been incarcerated more than 1 year at the time of the interview, females were more likely than males to have been injured.

As time served in jail increased, the prevalence of injuries among inmates age 34 or younger and inmates age 35 or older increased (figure 2). Except for inmates who had served 7 or fewer days, inmates age 34 or younger consistently had higher rates of injuries than those age 35 or older as time served increased.

Jail inmates who reported any impairment had higher rates of injuries than other inmates, regardless of how long they had served in jail (figure 3).

Regardless of the time served in jail, violent jail inmates had higher rates of fight-related injuries than other inmates (figure 4). Among jail inmates who had served 7 or fewer days, nearly 3% of violent offenders and 2% of nonviolent offenders reported having been injured in a fight. Among those inmates who had served a year or more, 22% of violent offenders said they had been injured in a fight, compared to 12% of nonviolent offenders.

| Table 7. Percent of jail inmates who reported an injury since admission, by time served, 2002 | | | |
|---|---|---|---|
| | Percent of inmates who reported an injury | | |
| Time since admission | Total | In an accident | In a fight |
| 7 or fewer days | 4.3% | 2.7% | 2.0% |
| 8–14 days | 5.3 | 3.5 | 2.0 |
| 15–30 days | 7.1 | 3.9 | 3.5 |
| 31–60 days | 13.1 | 7.1 | 6.5 |
| 61–180 days | 16.6 | 9.1 | 9.1 |
| 181–364 days | 21.0 | 11.2 | 11.4 |
| 1 year or more | 30.0 | 17.0 | 15.9 |



**Injuries reported by inmates since admission, by gender and time served**

Figure 1



**Injuries reported by inmates since admission, by age and time served**

Figure 2



**Injuries reported by inmates since admission, by physical impairment or mental and time served**

Figure 3



**Fight-related injuries reported by inmates since admission, by offense and time served**

Figure 4

**Health-related problems more common among homeless or unemployed inmates**

Of jail inmates who reported being homeless or living in a shelter in the year prior to arrest, nearly half said they had a current medical problem or a physical or mental impairment, compared to a third of those who were not homeless (table 8).

Medical problems and physical or mental impairments were also more prevalent among inmates who reported being unemployed before their arrest or receiving government assistance. Nearly 44% of jail inmates who were unemployed in the month prior to their arrest, compared to 34% of those who were employed, reported having a physical or mental impairment. About 41% of inmates who were unemployed and 35% who were employed reported having a current medical problem.

More than half (57%) of jail inmates who received financial support from government agencies in the month prior to arrest reported a current medical problem. About a third (34%)

of jail inmates who received income from wages reported a current medical problem.

Fifty-five percent of inmates who received income from government transfers reported having a physical or mental impairment, compared to 33% of those who were receiving wages.

**Medical problems common among inmates with a history of drug use or dependence**

Jail inmates who reported ever using drugs (38%) were more likely than those who never used drugs (31%) to report a current medical problem. Thirty-eight percent of inmates who ever used drugs, compared to 30% of those who never used drugs, reported an impairment. An estimated 53% of jail inmates who reported ever using a needle to inject drugs said they had a current medical problem, compared to 35% of those who did not use a needle. About 45% of jail inmates who used a needle to inject drugs, compared to 37% of those who did not, reported having a physical or mental impairment.

Among jail inmates dependent on or abusing drugs, 4 in 10 reported having a physical or mental impairment, compared to about 3 in 10 inmates who were not dependent on drugs.

Among jail inmates who were dependent on or abusing alcohol, two-fifths reported a current medical problem, compared to about a third of those who were not dependent or abusing alcohol. About 40% of those dependent on or abusing alcohol had an impairment, compared to 34% of those who were not dependent on or abusing alcohol. Alcohol or drug abuse or dependence is based on symptoms for diagnosing substance dependence or abuse in the Diagnostic and Statistical Manual of Mental Disorders - fourth edition (DSM-IV) (See *Substance Dependence, Abuse, and Treatment of Jail Inmates, 2002*, BJS Special Report, www.ojp.usdoj.gov/bjs/ abstract/sdatji02.htm.)

**Table 8. Health-related conditions reported by jail inmates, by selected background characteristics, 2002**

| | Percent of inmates | | | | |
| | | | Since admission | | |
| | Current medical problem | Impairment | Injured | Surgery | Dental problem |
|---|---|---|---|---|---|
| **Homeless in year before arrest** | | | | | |
| Yes | 48.8% | 48.8% | 16.4% | 2.4% | 31.3% |
| No | 34.9 | 34.6 | 12.9 | 1.3 | 24.6 |
| **Employed in month before offense** | | | | | |
| Yes | 35.0% | 33.5% | 13.6% | 1.5% | 25.3% |
| No | 41.1 | 43.6 | 12.9 | 1.2 | 25.0 |
| **Source of income** | | | | | |
| Wages/salary | 34.1% | 32.5% | 13.2% | 1.3% | 24.6% |
| Government transfers | 57.1 | 54.8 | 16.1 | 1.5 | 27.3 |
| Other | 39.4 | 38.9 | 16.8 | 1.6 | 30.0 |
| **Alcohol dependence or abuse** | | | | | |
| Yes | 39.6% | 40.0% | 13.4% | 1.4% | 27.2% |
| No | 34.5 | 33.6 | 13.5 | 1.5 | 24.0 |
| **Ever used drugs** | | | | | |
| Yes | 38.0% | 38.0% | 14.0% | 1.4% | 27.4% |
| No | 31.2 | 30.0 | 10.5 | 1.5 | 17.0 |
| **Used drugs in month before arrest** | | | | | |
| Yes | 36.9% | 38.4% | 13.8% | 1.9% | 29.0% |
| No | 35.8 | 34.2 | 10.8 | 1.2 | 21.6 |
| **Used needle to inject drugs** | | | | | |
| Yes | 53.1% | 44.5% | 14.4% | 2.1% | 32.7% |
| No | 34.7 | 36.6 | 14.0 | 1.3 | 26.3 |
| **Drug dependence or abuse** | | | | | |
| Yes | 39.0% | 40.3% | 15.6% | 1.8% | 29.5% |
| No | 34.0 | 32.2 | 10.9 | 1.1 | 20.9 |

## Most inmates reported receiving health assessment or medical exams since admission

About 80% of inmates reported that at the time of admission they were questioned about their health or medical history. Nearly half said that staff checked them to see if they were sick, injured, or intoxicated.

More than 4 in 10 jail inmates reported having a medical examination since admission to jail. A third of inmates reported having a blood test since admission. Six in ten inmates said they had been tested for TB, and more than 2 in 10 reported they had been tested for HIV.

| Medical service provided | Percent of all jail inmates |
|---|---|
| At time of admission | |
| Staff checked to see if you were sick, injured, or intoxicated? | 47.3% |
| Staff asked questions about your health or medical history? | 81.1 |
| Staff asked if you had ever thought about suicide? | 79.4 |
| Since admission | |
| Has anyone pricked your skin to test for TB? | 62.6% |
| Have you had a blood test for any reason? | 33.6 |
| Has your blood been tested for HIV? | 21.6 |
| Have you had a medical exam? | 43.1 |

Among jail inmates who reported a current medical problem, 42% also reported visiting a health care professional because of the medical problem. Twenty percent of inmates who had been injured reported seeing a health care professional, as did 21% of those who said they had a dental problem.

| | Percent of inmates who saw a health care professional* |
|---|---|
| Current medical problem | 41.8% |
| Injury | 20.4 |
| Dental problem | 20.5 |

*Of inmates who reported a medical problem.

Since their admission to jail, 44% of female jail inmates reported having a medical examination. Nearly 20% reported having a pelvic exam. About 5% were pregnant at time of admission. Among those female inmates who were pregnant at the time of admission, 48% had received an obstetrics exam since admission and 35% had received some type of pregnancy care, such as instructions on child care, exercises, special diet, medication, or special testing.

| | Percent of female jail inmates |
|---|---|
| Had a medical exam since admission? | 44.0% |
| Had a pelvic exam since admission? | 19.8 |
| Were you pregnant at admission? | 5.2 |
| If yes to pregnant: | |
| Had an obstetric exam? | 48.0% |
| Received pregnancy care? | 34.9 |

## Methodology

Data in this report are based on hour-long personal interviews with jail inmates. As part of an omnibus survey conducted every 5 to 6 years, these questions provide an opportunity to estimate the prevalence of a variety of diseases, illnesses, chronic problems, and other health-related conditions of inmates.

In the 2002 Survey of Inmates in Local Jails, offenders were randomly selected from a nationally representative sample of facilities and were asked questions regarding their current offense and sentence, criminal history, personal and family background, physical impairment and mental condition, and medical problems since admission to prison. Detailed descriptions of the methodology and sample design can be found in *Profile of Jail Inmates, 2002*, available at <http://www.ojp. usdoj.gov/bjs/abstract/pji02.htm>.

The accuracy of the survey estimates presented in this report depends on two types of error: sampling and non-sampling.

Sampling error is the variation that may occur by chance because a sample rather than a complete numeration of the population was conducted.

Nonsampling error can be attributed to many sources, such as nonresponses, differences in the interpretation of questions among inmates, recall difficulties, and processing errors. The accuracy of the estimates depends on the ability and willingness of inmates to report such problems. Inmate self-reported data may underestimate the prevalence of some medical conditions, especially those problems that require more sophisticated diagnosis and those that are more sensitive in nature. In any survey the full extent of the nonsampling error is never known.

The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population. Estimates of the standard errors for selected characteristics have been calculated (see appendix tables at <http://www.ojp. usdoj.gov/bjs/abstract/mpji02.htm>).



**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

Official Business
Peanlty for Private Use $300

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Jeffrey L. Sedgwick is director.

Laura M. Maruschak wrote this report, under the supervision of Allen J. Beck. Lauren E. Glaze provided statistical review. Margaret Noonan verified the report. Tina Dorsey and Carolyn C. Williams edited the report, under the supervision of Doris J. James. Marianne Zawitz provided editorial review. Jayne Robinson prepared the report for final printing.

November 2006, NCJ 210696

This report in portable document format and in ASCII and its related statistical data and tables — [enter description] — are available at the BJS World Wide Web Internet site: <http://www.ojp.usdoj.gov/bjs/abstract/mpji.htm>

**Office of Justice Programs**

Partnerships for Safer Communities
http://www.ojp.usdoj.gov

**Appendix table 1. Standard errors of jail inmates who reported a medical problem, by conviction status, 2002**

| | Standard error for estimated percentages | |
|---|---|---|
| | Convicted | Unconvicted |
| Current medical problem | 0.89% | 1.20% |
| Any impairment | 0.09 | 1.20 |
| Injury since admission | 0.61 | 0.95 |

**Appendix table 3. Standard errors of jail inmates with an impairment, by conviction status, 2002**

| | Percent of jail inmates | |
|---|---|---|
| | Convicted | Unconvicted |
| Any impairment | 0.90% | 1.20% |
| Learning | 0.81 | 1.04 |
| Speech | 0.36 | 0.56 |
| Hearing | 0.45 | 0.59 |
| Vision | 0.61 | 0.82 |
| Mobility | 0.22 | 0.37 |
| Mental | 0.47 | 0.75 |

**Appendix table 2. Standard errors of jail inmates who reported specific current medical problems, by gender, 2002**

| Current medical problem | Standard error for estimated percentages | | |
|---|---|---|---|
| | Total | Male | Female |
| Any problem | 0.65% | 0.72% | 1.20% |
| Arthritis | 0.48 | 0.52 | 0.99 |
| Asthma | 0.38 | 0.41 | 0.94 |
| Cancer | 0.11 | 0.10 | 0.37 |
| Diabetes | 0.22 | 0.23 | 0.46 |
| Heart problem | 0.32 | 0.34 | 0.70 |
| Hypertension | 0.45 | 0.50 | 0.81 |
| Kidney problems | 0.24 | 0.25 | 0.75 |
| Stroke | 0.26 | 0.28 | 0.40 |

**Appendix table 4. Standard errors of jail inmates with a current medical problem or an impairment, by gender and age, 2002**

| | Standard error for estimated percentages | |
|---|---|---|
| | Current medical problem | Any impairment |
| Gender | | |
| Male | 0.72% | 0.75% |
| Female | 1.20 | 1.28 |
| Age | | |
| 24 or younger | 1.04% | 1.23% |
| 25-34 | 1.16 | 1.19 |
| 35-44 | 1.31 | 1.29 |
| 45 or older | 1.93 | 2.04 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEITH MATHIS, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01155-RMU |
| | ) | |
| GEO GROUP INC., <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
<u>CERTIFICATION</u>**

# <u>EXHIBIT 2</u>

# Unpublished Decisions Part 1

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
Kristine FLYNN, Lenda Flournoy, Vernessia L.
Parker, and Debbie Ann Ramos,
Plaintiffs,
v.
Jim DOYLE, Matthew J. Frank, James Greer, David
Burnett, Kevin Kallas, Donald
Hands, Barbara Ripani, Ana Boatwright, Holly
Meier, and Steven Meress,
Defendants.
**No. 06-C-537.**

March 14, 2007.

David C. Fathi, Gouri N. Bhat, Washington, DC,
Laurence J. Dupuis, American Civil Liberties Union
of Wi Foundation, Milwaukee, WI, for Plaintiffs.

Corey F. Finkelmeyer, Francis X. Sullivan,
Wisconsin Department of Justice Office of the
Attorney General, Madison, WI, for Defendants.

### DECISION AND ORDER

Hon. RUDOLPH T. RANDA, Chief Judge.

*1 Plaintiffs Kristine Flynn, Lenda Flournoy,
Vernessia L. Parker, and Debbie Ann Ramos, on
behalf of themselves and all others similarly situated,
filed this *pro se* civil right action pursuant to 42
U.S.C. § 1983. The plaintiffs, who are incarcerated at
Taycheedah Correctional Institution (TCI) in Fond du
Lac, Wisconsin, claim that the defendants have
violated their rights under the Eighth and Fourteenth
Amendments to the United States Constitution; Title
II of the Americans with Disabilities Act (ADA), 42
U.S.C. § 12132; and Section 504 of the
Rehabilitation Act, 29 U.S .C. § 794. This Decision
and Order addresses, *inter alia,* the plaintiffs' motion
for class certification and the defendants' motion for
summary judgment.

#### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The plaintiffs move for the certification of two
classes, defined as follows: 1) The TCI Class, defined
as "all prisoners who are now or in the future will be
confined at TCI;" and 2) The ADA Subclass, defined
as "all individuals with disabilities who are now or in
the future will be confined at TCI." The defendants
oppose the plaintiffs' motion.

 TCI is the largest women's prison in Wisconsin and
currently houses over 700 prisoners. The four named
plaintiffs seek to represent the proposed TCI Class.
The TCI Class plaintiffs set forth the following
claims: 1) deliberate indifference to the plaintiffs'
serious medical, mental health, and dental needs
causing avoidable pain, mental suffering, and
deterioration of the plaintiffs' health and, in some
cases, resulting in premature death, in violation of the
Eighth Amendment; and 2) disparity in mental health
treatment for male and female prisoners in Wisconsin
Department of Corrections (DOC) custody
constituting a denial of equal protection of the laws,
in violation of the Fourteenth Amendment.

 Plaintiffs Flynn, Flournoy, and Parker seek to
represent the ADA Subclass. The ADA Subclass
plaintiffs claim that the defendants deprive them of
their rights under the ADA and the Rehabilitation Act
by, 1) failing to administer services, programs, and
activities in the most integrated setting appropriate to
needs of the subclass plaintiffs; 2) failing to make
reasonable modifications in the defendants' policies,
practices, and procedures to avoid discriminating
against the subclass plaintiffs on the basis of
disability; 3) using eligibility criteria or methods of
administration that have the effect of discriminating
against the subclass plaintiffs on the basis of
disability; and 4) failing to furnish appropriate aids,
services, devices, or assistance to afford the subclass
plaintiffs an equal opportunity to participate in and
benefit from the defendants' services, programs, and
activities. The plaintiffs seeks declaratory and
injunctive relief on their own behalf and on behalf of
those similarly situated, pursuant to Federal Rules of
Civil Procedure 23(a) and(b)(2).

 Under Federal Rule of Civil Procedure 23(a), "[o]ne
or more members of a class may sue or be sued as
representative parties on behalf of all only if (1) the
class is so numerous that joinder of all members is
impracticable, (2) there are questions of law or fact
common to the class, (3) the claims or defenses of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, to prosecute a class action, the plaintiffs must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

**\*2** The plaintiffs contend that with respect to both proposed classes, all of the requirements of Rules 23(a) and (b)(2) are met, and that the classes should be certified. Specifically, the plaintiffs assert that, 1) the classes are so numerous that joinder of all members is impracticable; 2) for both classes, there are questions of law and fact common to the class; 3) the claims of the representative plaintiffs are typical of the claims of the classes; 4) the named plaintiffs will fairly and adequately protect the interests of the classes and; 5) the requirements of Rule 23(b)(2) are satisfied for both classes.

The defendants oppose the plaintiffs' motion for class certification. According to the defendants, class certification must fail because the proposed classes are not sufficiently defined so that the class is identifiable. The defendants also contend that the plaintiffs have failed to meet their burden of establishing the Rule 23(a) requirements. In that regard, the defendants assert that the proposed classes lack requisite commonality and typicality of the asserted facts and claims, and that the named plaintiffs will not adequately represent the proposed classes.

**1. Definition of Proposed Classes**

The defendants contend that class certification must fail because the proposed classes are not sufficiently defined so that the class is identifiable. According to the defendants, the proposed TCI Class (all prisoners who are now or in the future will be confined at TCI) is not properly defined because the class would encompass inmates that have no medical or mental health needs or have never had serious medical or mental health needs. Furthermore, the defendants contend that the proposed ADA Subclass (all individuals with disabilities who are now or in the future will be confined at TCI) is too broadly defined and not sufficiently identifiable. The defendants assert that it is too broadly defined because a class member with a disability could have received proper

medical and/or mental health treatment. They maintain that the proposed ADA subclass is not sufficiently identifiable because the Court would necessarily have to address the issue of whether each potential member is a "qualified individual with a disability" to determine class membership.

Whether a class is properly defined or identifiable is not one of the requirements listed in Rule 23(a). However, "[i]t is axiomatic that for a class action to be certified a 'class' must exist." Simer v. Rios, 661 F.2d 655, 669 (7th Cir.1981). The class must be sufficiently describable so that the Court can identify with some confidence who is, and who is not, a member of the class. See, e.g., Tefel v. Reno, 180 F.3d 1286, 1304 (11th Cir.1999) (class that includes both aliens who had unsuccessfully applied for suspension of deportation and aliens who have never applied is "overly broad"); Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 n. 1 (5th Cir.1999) (class of employees alleging illness caused be defective ventilation system is not deficient because allegation of defective system or injury from it has yet to be proven on merits). If the general outlines of the class are identifiable at the outset of the litigation, a class will be deemed to exist. 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1760 (3d ed.2005); see, e.g., Carter v. Johnson, 174 F.R.D. 452, 459-61 (D.Neb.1996) (proposed class of female patients bringing an action against officials and psychiatrists of a state-supported mental health institution alleging failure to protect plaintiffs from assaults by male patients, which class included, in addition to women who were actually assaulted, women who were currently patients or would be patients and had not been assaulted, was adequately defined and ascertainable for purposes of class certification; residential treatment at the institution provided a definite boundary for determining class members, and those not assaulted alleged that they feared for their safety as a result of defendants' policies and practices).

**\*3** In this case, the proposed class members for both classes are easily defined: 1) current and future TCI prisoners, and 2) current and future TCI prisoners who have a disability. Moreover, as noted by the plaintiffs, the defendants' own records will identify which inmates have a disability. (Pls.' Reply Br. at 5 n. 2.) Finally, courts routinely certify class actions involving prisoners, including cases challenging prison health care, mental health care, and dental

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

care. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 562, 577 (10th Cir.1980) (certifying class of "all persons who are now or in the future may be incarcerated in the maximum security unit" to challenge constitutionally inadequate mental health care); *Penland v. Warren Co. Jail,* 797 F.2d 332, 333-35 (6th Cir.1986) (certifying (b)(2) class of "present and future prisoners" to challenge conditions of confinement, including health care); *Bradley v. Harrelson,* 151 F.R.D. 422, 425-27 (M.D.Ala.1993) (certifying (b)(2) class of seriously mentally ill prisoners to challenge adequacy of mental health services); *Robert E. v. Lane,* 530 F.Supp. 930, 941-44 (N.D.Ill.1981) (certifying (b)(2) class of "all persons who are or will be incarcerated at Stateville and who need or will need mental health services"); *Dean v. Coughlin,* 107 F.R.D. 331, 332-35 (S.D.N.Y.1985) (certifying (b)(2) class of "all persons who are or will be inmates" to challenge inadequate dental care); *Jones 'El v. Berge,* 2001 WL 34379611, at *12-13 W.D. Wis.2001) (certifying 23(b)(2) class of prisoners subject to "systemic" unconstitutional conditions of confinement, including inadequate medical, mental health, and dental care); *see also Hassine v. Jeffes,* 846 F.2d 169, 175-80 (3d Cir.1988) (certifying 23(b)(2) class of prisoners challenging conditions of confinement).

Based on the foregoing, the Court finds that the proposed classes are sufficiently defined.

**2. Commonality and Typicality**

The Court's analysis of the commonality and typicality requirements are closely related. To satisfy the commonality requirement, a plaintiff need only show that there is a "common nucleus of operative fact." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Similarly, to satisfy the typicality requirement, a plaintiff must show that his claim arose "from the same event or practice or course of conduct that gives rise to the claims of other class members and his ... claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983).

In the instant action, the defendants argue that the plaintiffs' claims about inadequate medical care are different from those of the entire class, and thus, do not satisfy the commonality and typicality requirements. For instance, the complaint alleges that TCI inmates suffer from inadequate medical follow up and are not promptly referred for outside medical consultation. The individual plaintiffs, however, do not claim that they suffered from these alleged deficiencies. Thus, the defendants argue, the various class members' claims of an Eighth Amendment violation stem from different factual circumstances.

*\*4 The Court would be persuaded by the defendants' argument if the plaintiffs were alleging deliberate medical indifference at the individual level, or if they were seeking monetary damages. However, deliberate indifference to serious medical needs of prisoners "may occur on an individual level, such as when a doctor intentionally mistreats an inmate ... or on an institutional level, when the prison's system of medical care is so seriously inadequate as to cause unwarranted suffering." *Cruz v. Ward,* 558 F.2d 658, 662 (2d Cir.1977), *cert. denied,* 434 U.S. 1018 (1978). Where a prisoner class seeks to challenge an entire health care system, the class must show that repeated acts of misconduct created a pattern of deliberate indifference to the inmates' serious medical needs. *See Dunigan ex rel. Nyman v. Winnebago County,* 165 F.3d 587, 591 (7th Cir.1999) ("showing of deliberate indifference through pattern of alleged neglect entails a heavy burden."). Accordingly, when alleging a pattern of misconduct, the claims of each class member need not be identical to raise common factual and legal questions about the adequacy of the entire system. *See Dean v. Coughlin,* 107 F.R.D. 331, 333 (S.D.N.Y.1985).

The commonality and typicality requirements are also more easily met when the class members only seek injunctive relief, rather than monetary damages. In class actions where the relief sought is chiefly monetary, resolution of the class claims will depend "on the intangible, subjective differences of each class member's circumstances," and "entail complex individualized determinations." *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998). Those varying determinations would potentially undermine the requirement that each class member's claim be typical and common to each other. However, when, as is the case here, the plaintiffs only seek injunctive relief, the possibility of individualized determinations is removed. *See Robert E. v. Lane,* 530 F.Supp. 930, 943 n. 17 (N.D.Ill.1981) ("differences might be relevant in computing the actual amount of compensable damage suffered by each class member. Plaintiffs, however, seek class certification only on their declaratory and injunctive demands .")

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

In the circumstances of this case, where the class is alleging a pattern of deliberate indifference to inmates' serious medical needs, and the class only seeks injunctive relief, the commonality and typicality requirements are satisfied.

### 3. Adequate Representation of Proposed Class

Although they do not dispute the ability of plaintiffs' counsel to adequately represent the proposed classes in this case, the defendants do contend that the named plaintiffs would not be adequate representatives of the class for two reasons. First, the defendants argue that the named plaintiffs' failure to advance certain claims found in the complaint demonstrates that they lack the same interest as other class members in establishing the claims alleged against the defendants. Second, the defendants maintain that the named plaintiffs have failed to ensure zealous advocacy on behalf of the classes and cannot proceed as class representatives because the named plaintiffs have failed to exhaust available administrative remedies on several of the outlined claims.

**\*5** The prerequisite of adequate class representation consists of the following factors: 1) whether the plaintiffs' attorney is qualified, experienced, and generally able to conduct the proposed litigation; 2) whether the class representatives have interests that are antagonistic to the class; and 3) whether the class representatives have a sufficient interest in the case to assure vigorous advocacy. *Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 598 (7th Cir.1993).

In this case, there is no indication that the class representatives have interests that are antagonistic to the classes. Rather, with regard to both classes, all class members are TCI inmates challenging a pattern of institutional conduct. Moreover, as explained supra., factual variances as to how the conduct affected the class members do not defeat the plaintiffs' motion. Finally, as explained *infra.,* the Court finds that the plaintiffs have exhausted administrative remedies and therefore, the defendants' arguments with respect to exhaustion are without merit.

Based on the foregoing, the plaintiffs' motion for class certification will be granted.

### *DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

On August 14, 2006, the defendants filed a motion for summary judgment. The defendants contend, 1) the complaint must be dismissed without prejudice because the plaintiffs have failed to exhaust all administrative remedies available in the Inmate Complaint Review System; 2) those claims where the plaintiffs failed to exhaust administrative remedies must be dismissed; 3) those claims where the plaintiffs have failed to state a claim upon which relief can be granted must be dismissed; and 4) the Court should stay discovery while the summary judgment motion is pending.

In response, the plaintiffs contend that, 1) the plaintiffs have properly exhausted all substantive claims raised in this action; 2) the defendants have failed to satisfy their burden to prove non-exhaustion; 3) if the Court finds there are unexhausted claims, only those claims should be dismissed, or plaintiffs should be given leave to amend their complaint; and 4) they have properly stated a claim upon which relief can be granted as to all substantive claims raised in this action. [FN1]

> FN1. On December 8, 2006, the plaintiffs filed a motion for leave to file supplemental evidentiary materials opposing the defendants' motion for summary judgment. Specifically, they seek to file proposed supplemental proposed findings and related supplemental evidence based on grievance materials in the defendants' possession that were only recently obtained by plaintiffs' counsel. When the plaintiffs filed their response to the defendants' motion for summary judgment, along with it they filed a motion for continuance pursuant to Federal Rule of Civil Procedure 56(f). The plaintiffs sought the continuance to allow them to conduct discovery necessary to oppose the defendants' motion for summary judgment, in the event that the motion was not denied outright. The Court will consider the plaintiffs' supplemental evidentiary materials and, therefore, that motion will be granted. Hence, the plaintiff's motion for a continuance will be denied as moot. Finally, the plaintiffs' unopposed motion for leave to exceed the page limit of Civil L.R.7.1(f) will be granted.

### *Standard of Review*

Summary judgment "shall be rendered forthwith if

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
(Cite as: 2007 WL 805788 (E.D.Wis.))

the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D.Wis.1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See* Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**\*6** The burden of showing the needlessness of trial--(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law--is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267;*see also* Celotex Corp., 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."); Fed.R.Civ.P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c) ], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, ... upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the nonmoving party. Johnson v. Pelker, 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record--only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991) (citation omitted).

### *Exhaustion of Administrative Remedies*
The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that

[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. Dixon v. Page, 291 F.3d 485, 488 (7th Cir.2002) (citing Perez v. Wis. Dep't of Corrs., 182 F.3d 532, 535 (7th Cir.1999)). Section1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. Woodford v. Ngo, 126 S.Ct. 2378, 2384, 2387 (2006); *see also* Pozo v. McCaughtry, 286 F.3d 1022, 1023 (7th Cir.2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. Dole v. Chandler, 438 F.3d 804, 809 (7th Cir.2006) (citing Dale v. Lappin, 376 F.3d 652, 655 (7th Cir.2004)).

**\*7** The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the DOC has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner within fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) & 310.09(6). Complaints submitted later than fourteen days after the event may be accepted for good cause. Wis. Admin. Code § DOC 310.09(6). After reviewing and acknowledging each complaint in writing, the inmate complaint examiner either rejects

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) & 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of the recommendation. Wis. Admin.Code § DOC 310.12. Within ten days after the date of the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner. Wis. Admin. Code § DOC 310.13(1). The corrections complaint examiner reviews the appeal and makes a recommendation to the Secretary of the DOC. Wis. Admin. Code § DOC 310.13(6). The Secretary may accept, adopt, or reject the correction complaint examiner's recommendation, or return the appeal to the corrections complaint examiner for further investigation. Wis. Admin. Code § DOC 310.14(2).

In class action prisoner litigation certified under Rule 23(b)(2), the PLRA's exhaustion requirement is satisfied through "vicarious exhaustion" when "one or more class members ha[s] exhausted [her] administrative remedies with respect to each claim raised by the class." _Chandler v. Crosby,_ 379 F.3d 1278, 1287 (11th Cir.2004) (quoting _Jones 'El v. Berge,_ 172 F.Supp.2d 1128, 1133 (W.D.Wis.2001)); _see also Gates v. Cook,_ 376 F.3d 323, 329-30 (5th Cir.2004); _Jackson v. District of Columbia,_ 254 F.3d 262, 268-69 (D.C.Cir.2001); _Lewis v. Washington,_ 265 F.Supp.2d 939, 941-43 (N.D.Ill.2003). Support for this rule is found in employment discrimination class action cases as well as the purpose of the PLRA itself:

The purpose behind enactment of the PLRA exhaustion requirement was "to reduce the quantity and improve the quality of prisoner suits. _Porter,_ 534 U.S. at 524, 122 S.Ct. 983. To this end, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. _Id._ at 524-25; 122 S.Ct. 983. The Porter Court noted that in some cases, prison officials may take corrective action to address an inmate's concerns, thus obviating the need for litigation. _Id._ at 525, 122 S.Ct. 983. This rationale for the PLRA exhaustion requirement is similar to the purpose behind the Title VII exhaustion requirement, which is to allow the EEOC "an opportunity to settle disputes ... before the aggrieved party [is] permitted to file a lawsuit." _Zuckerstein v. Argonne Nat'l Lab.,_ 663 F.Supp. 569, 572 (N.D.Ill.1987) (Moran, J.) (quoting _Alexander v. Gardner-Denver Co.,_ 415

U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). In the Title VII context, this purpose behind administrative exhaustion is satisfied in class action suits where there is one complying plaintiff because

**\*8** [i]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC. If it is impossible to reach a settlement with one discriminatee, what reason could there be to assume that the next one would be successful.

_Id._ (quoting _Oatis v. Crown Zellerbach Corp,_ 398 F.2d 496, 498 (5th Cir.1968)). Similarly, in the PLRA context, the purpose of affording prison officials an opportunity to address complaints internally is met when one plaintiff in a class action has exhausted his administrative remedies. To require each inmate with the same grievance to exhaust their administrative remedies would be wasteful, and "[a]s long as prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons." _Jones,_ 172 F.Supp.2d at 1133. The analogy to the Title VII exhaustion requirement is apt. The purpose behind the PLRA requirement is met when a single plaintiff in a class action has exhausted his administrative remedies, and a rule of vicarious exhaustion in PLRA cases is therefore appropriate. _Lewis,_ 265 F.Supp. at 942-43.

The parties dispute many facts. In part, the disputes are based on disagreement over what the claims are in this case. According to the defendants, the "claims" in this case consist of each instance in which the defendants' conduct affected the plaintiffs. For example, the defendants contend that the plaintiffs have failed to exhaust the following "claims":

(1) alleged failure of the defendants to take reasonable and effective steps to establish an appropriate health care system at TCI following NCCHC and LAB reports (DFOF, ¶¶ 19-20); (2) alleged high rate of chronic disease at TCI (DFOF, ¶¶ 21-22); (3) alleged dysfunctional organization of Health Services at TCI (DFOF, ¶¶ 23-24); (4) alleged need for infirmary or long-term care at TCI (DFOF, ¶¶ 35-36); (5) alleged inadequate prenatal, obstetric and post-partum care, alleged shackling during childbirth, and alleged inadequate dental care (DFOF, ¶¶ 37-40); (6) alleged increased demands on the health care staff due to the change in the admissions process (DFOF, ¶¶ 41-42); (7)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

alleged high rate of mental illness and the lack of resources allocated to address this alleged problem (DFOF, ¶¶ 43-44); (8) alleged inadequate or poorly trained mental health care staff (DFOF, ¶¶ 45-46); (9) alleged over-prescription of psychotropic medications and TCI's case management of psychotropic medications (DFOF, ¶¶ 47-48); (10) alleged failures of Monarch Unit (DFOF, ¶¶ 49-50); (11) alleged lack of TCI's inpatient capacity to treat mental illness (DFOF, ¶¶ 51- 52); (12) alleged gender-based disparities in the provision of mental health care (DFOF, ¶¶ 53-54); (13) alleged gender-based disparities in the provision of mental health care at the juvenile level (DFOF, ¶¶ 55-56); and (14) alleged discrimination on the basis of alleged disabilities of plaintiffs Flynn, Flournoy and Parker (DFOF, ¶¶ 57-58).

*9 (Defs'. Br. in Supp. of Mot. for Summ. J. at 5-6.)

According to the plaintiffs, the "claims" listed above are not claims at all but rather are examples of conduct that make up the claims in this case.

Defendants argue that plaintiffs have failed to exhaust administrative remedies as required under 42 U.S.C. § 1997e(a). But defendants' entire exhaustion argument rests on their pervasive confusion of plaintiffs' substantive claims for relief with myriad facts and evidence alleged in support, or as examples, of those claims. For example, defendants argue that no plaintiff has specifically exhausted the "claim" that defendants failed to take corrective action after the Legislative Audit Bureau (LAB) and the National Commission on Correctional Health Care (NCCHC) reports were issued documenting extremely poor health care at TCI (see Defs.' Br. at 5), and that named plaintiff Kristine Flynn has not specifically exhausted the "claim" that she was improperly taken off psychotropic medications in June 2002 (see Defs.' Br. at 13). But in a case such as this one, which seeks only prospective injunctive relief and no monetary damages, neither of those past occurrences are claims for relief that need to be exhausted--they are *examples* and *evidence* of defendants' ongoing deliberate indifference to plaintiffs' serious medical needs.

(Pls.' Br. in Resp. to Defs.' Mot. for Summ. J. at 2.)

The June 15, 2006, Screening Order in this case allowed the plaintiffs to proceed on claims under the Eighth Amendment, Fourteenth Amendment, the ADA, and the Rehabilitation Act, as set out in the complaint. (The Screening Order also directed the

defendants to respond to the plaintiffs' motion for class certification.) According to the complaint, the "claims," as identified by the defendants, are actually "Facts Giving Rise to the Claims for Relief." (See Compl. at 13-40.) The discussion concerning the plaintiffs' motion for class certification, *supra.,* also makes this clear. With this in mind, the Court will now turn to the merits of the defendants' motion for summary judgment.

### Claims

The TCI Class plaintiffs are proceeding on the following claims: 1) deliberate indifference to the plaintiff's serious medical, mental health, and dental needs in violation of the Eighth Amendment; and 2) disparity in mental health treatment for male and female prisoners in DOC custody constituting a denial of equal protection of the laws, in violation of the Fourteenth Amendment. The ADA Subclass plaintiffs claim that the defendants deprive them of their rights under the ADA and the Rehabilitation Act by, 1) failing to administer services, programs, and activities in the most integrated setting appropriate to needs of the subclass plaintiffs; 2) failing to make reasonable modifications in the defendants' policies, practices, and procedures to avoid discriminating against the subclass plaintiffs on the basis of disability; 3) using eligibility criteria or methods of administration that have the effect of discriminating against the subclass plaintiffs on the basis of disability; and 4) failing to furnish appropriate aids, services, devices, or assistance to afford subclass plaintiff an equal opportunity to participate in and benefit from the defendants' services, programs, and activities.

### Facts

*10 It is undisputed that the named plaintiffs have properly filed and appealed at least thirty-five inmate complaints related to health care issues. (PFOF ¶ 2.) ICRS tracking reports indicate that in a five and one-half year period from 1999 to mid-2004, out of 1889 inmate complaints filed related to medical care at TCI, 394 were affirmed or affirmed with modification. (PFOF ¶ 5.)

It is undisputed that plaintiff Flynn has exhausted administrative remedies with respect to the following issues: 1) that she did not receive all of her medications due to improper medication delivery by corrections officers; 2) that she did not receive adequate mental health care counseling; and 3) that she has not received prescribed pain medications.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
(Cite as: 2007 WL 805788 (E.D.Wis.))

Page 8

(DFOF ¶ 9; PFOF ¶ 14.) In addition, Flynn has exhausted on the following inmate complaints, as summarized by the ICRS system: "Needs medication for digestion that doctor stopped" (10/26/04); "Wants a high fiber diet" (10/26/04); "Inhaler and peak meter are not being kept in her room in segregation" (12/01/04); "Needs to see a specialist for female medical problems" (3/18/05); "Has not received a refill for her stool softener" (3/21/05); "Has not received copy of test result from HSU" (3/21/05); "Wants to be tested for Parkinson's disease" (3/21/05); "Has not received new order of Synthroid medication that was changed" (3/25/05); "Asking for a medication change and has not heard back from HSU" (3/25/05); "Multiple psychiatric concerns" (3/28/05); "needs to be re-evaluated by HSU" (4/1/05); "medical concerns" (4/1/05); "welbutrin has not been refilled" (4/7/05); "out of ibuprofin [sic]" (4/7/05); "needs appointment with GI specialist" (4/28/05); "has not been seen to be evaluated for egg crate mattress" (7/8/05); "wants results of x-rays" (7/8/05); and "out of medication" (7/19/05). (PFOF ¶ 15.) Plaintiff Flynn has also exhausted her administrative remedies with respect to the shortage of health care staff. (PFOF ¶ 16.)

It is undisputed that plaintiff Flournoy has exhausted administrative remedies with respect to the following three issues: 1) that she suffers from frequent sciatic pain and difficulty walking, but that this disability has never been properly treated; 2) that following foot surgery, her foot surgeon instructed TCI to keep her foot tightly wrapped, and to check regularly for proper alignment, but that she did not receive this prescribed post-surgical care; and 3) that she has been forced to wait several months for referrals to see outside physicians. (DFOF ¶ 12; PFOF ¶ 26.) In addition, Flournoy has exhausted on the following inmate complaints, as summarized by the ICRS system: "responce [sic] from security and hsu for her medical concerns" (5/27/03); "Complains about Doctor" (7/16/03); "Wants to see medical specialists for menopause, headache, nose problems, legs and feet problems, allergies, back and neck problems and skin problems. Rang her emergency bell on third shift with her request to see a Nurse for he [sic] medical problems" (1/20/04); "Needs to see Doctor for multiple medical issues (groin pain, joint disease, sciatic pain, infected toe, and a swollen heel" (7/20/04); "Medical treatment after staff called the Nurse about her leg" (1/14/05); "Was given another inmate's medication" (3/25/05); "Wants to see a Dermatologist" (4/25/05); "Was denied Resource"

(4/25/05); "dr. changed medication order" (5/12/05); "dr has not referred her to see an offsight [sic] dr." (5/12/05); "Complains of medical care at appointment with Nurse on 8/26/05" (9/1/05). (PFOF ¶ 27.) Plaintiff Flournoy has also exhausted with respect to improper medication delivery by corrections officers; the deficient sick-call process and medical follow-up system; improper or excessive medical co-payment fees; and inadequate women's health care. (PFOF ¶ 28.)

**\*11** It is undisputed that plaintiff Parker has exhausted administrative remedies on the following offender complaint, as summarized by the ICRS: "Inmate complains she was denied medical attention and that she has a fractured rib" (4/10/96). (PFOF ¶ 33 .) In addition, Parker's ICRS complaint, summarized as "Weekly weight and blood pressure checks are not being done in seg," was affirmed by the inmate complaint examiner, obviating Parker's need to appeal. (PFOF ¶ 34.)

It is undisputed that plaintiff Ramos has exhausted administrative remedies with respect to the issue that she had improperly been charged co-payment fees. (DPFF ¶ 18.) Also, Ramos exhausted on the following inmate complaints, as summarized by the ICRS system: "medical co-pay" (1/10/03); and "Feels that it is not safe to wash her clothing in the same washers as people who have been diagnosed with staph infection due to TCI not having hot water in the housing units for washing clothes" (11/18/04). (PFOF ¶ 38 .)

In addition to the undisputed facts set forth above, taken from the defendants' and the plaintiffs' proposed facts, the plaintiffs filed supplemental proposed findings of facts that identify exhausted inmate complaints not previously submitted. Affirmed grievances by plaintiff Flynn exhaust her administrative remedies on the following inmate complaints, as summarized by the ICRS system: "Was not prepped for surgery" (2/22/01); "Out of Trazadone and other carriable meds" (12/5/01); "out of medication" (10/17/02); "medication is out" (12/3/02); "out of medications" (2/3/03); "Out of medication" (3/9/04); "Did not receive meds." (6/28/04); "out of ibuprofin" (4/7/05); "welbutrin has not been refilled" (4/7/05); "out of medication" (7/19/05); "needs medical follow-up" (8/24/05); "Needs to be seen by HSU for catheterization" (4/20/06); "Delay in catherization" (4/24/06). (PSFOF ¶ 3.) Affirmed grievances filed by plaintiff

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

Flournoy exhaust her administrative remedies on the following inmate complaints, as summarized by the ICRS system: "Was not given correct dose of meds" (4/7/04); "Not being given her foot cream and hydrocortisone cream" (4/27/04); "Medication concerns" (2/2/05); "needs medical attention for her foot" (8/22/05); "Pain medication missing-- oxycodone with acetaminophen" (2/24/06). (PSFOF ¶ 5.) Affirmed grievances filed by plaintiff Parker exhaust her administrative remedies on the following inmate complaints, as summarized by the ICRS system: "Medical issues after carpal tunnel surgery" (6/8/04); "Did not receive pain medication, ice or pillow after surgery" (7/19/04); "Weekly weight and blood pressure checks are not being done in seg" (1/27/05). (PSFOF ¶ 6.)

In addition, the plaintiffs' supplemental evidentiary materials identify inmate complaints that were not coded as "Medical" by the ICRS system and therefore were not previously included, but that do in fact relate to medical or mental health care. Plaintiff Flynn has fully exhausted two inmate complaints related to her prolonged confinement in punitive segregation in lieu of appropriate and intensive psychiatric care. These grievances--coded as "Rules" and "Other," respectively--were summarized as follows by the ICRS system: "is being treated as punitive when she should not be" (7/14/04); "Questions why she is still in administrative confinement" (8/17/04). (PSFOF ¶ 10.) Plaintiff Flynn also fully exhausted two inmate complaints on medical and mental health issues that were coded as "Staff." These grievances exhaust her administrative remedies on the following issues, as summarized by the ICRS system: "Took 33 minutes for meds to be handed out" (9/21/04); and "has not heard back from PSU staff about therapy" (4/4/05). (PSFOF ¶ 12.)

**\*12** Plaintiff Parker fully exhausted an inmate complaint related to the destruction or discarding of her correspondence to psychological services and Monarch Unit staff. The grievance, coded as "Other," raises the issue of the competency and responsiveness of mental health care staff at TCI. Parker's original grievance states:

I have resided in Monarch 22 months. I have written the Monarch Treatment team several letters concerning treatment needs, mental health issues, medical issues, and problems I was having on the unit with staff ... This was all correspondence done within Taycheedah Corr. Inst. that should have been kept in my psychological and/or social

services file for documentation of my contacting necessary staff about my issues.... Many issues I wrote about were never addressed by them. For Monarch treatment team to discard letters I have written is against policy.... There have been 3 Unit Managers in the 22 months I have resided in Monarch how did 1 Unit Manager know what was going on with me from the next Unit Manager. I believe the discarding of my letters is deliberate because the team didn't want the documentation of the issues in my file at all to keep others who view my file from seeing it....
(PSFOF ¶ 14.)

Parker also filed two grievances, both coded as "Classification," related to the denial of adequate inpatient mental health care and mental health programming opportunities at TCI. One raises the issue of why she was left in segregation on the Monarch Unit and was never transferred to a mental health institution like Winnebago, as mandated by the court in her civil commitment hearings. (PSFOF ¶ 16.) The other raises the issue of why she was never afforded the opportunity to attend a drug treatment group, as required by the parole board, despite having resided in the Monarch Unit for several years with a diagnosis of special needs. *Id.* Both of these grievances were deemed beyond the scope of the ICRS system and rejected pursuant to Wis. Admin. Code § 310.08(2)(b) because "decisions made by the program review committee are not appealable through the inmate complaint review system." *Id.*

### Analysis

A purpose of the exhaustion requirement is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation. *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002); *see Smith v. Zachary,* 255 F.3d 446, 450-51 (7th Cir.2001). To provide officials with sufficient notice, inmates must file grievances at the place and time and with the information required by the prison's administrative rules. *Strong v. David,* 297 F.3d 646, 649 (7th Cir.2002). Where the rules are silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* at 650; *see Riccardo v. Rausch,* 375 F.3d 521, 524 (7th Cir.2004).

Drawing on principles of notice pleading, the Court of Appeals for the Seventh Circuit has held that, absent more stringent administrative requirements, an inmate need not state "facts, legal theories, or

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
(Cite as: 2007 WL 805788 (E.D.Wis.))

Page 10

demand relief," so long as the grievance objects "intelligibly to some asserted shortcoming." *Strong,* 297 F.3d at 650; *see Riccardo,* 375 F.3d at 524. With respect to the level of detail in an offender complaint, the DOC administrative rules require that inmate complaints "[c]ontain only one issue per complaint, and shall clearly identify the issue." Wis. Admin. Code § DOC 310.09(1)(e). Thus, the standard is whether the inmate complaint would put an official on notice of the plaintiff's claim.

**\*13** The undisputed facts reveal that the plaintiffs have filed, and fully exhausted, a multitude of inmate complaints regarding deficient medical and mental health care at TCI over the last several years. On this record, the defendants have not satisfied their burden of demonstrating that the plaintiffs failed to exhaust. To the contrary, ICRS records indicate that the plaintiffs have exhausted their administrative remedies for the purposes of this class action lawsuit. Accordingly, the defendants' motion for summary judgment for failure to exhaust administrative remedies will be denied.

### Defendants' Motion for Dismiss for Failure to State a Claim

In their motion for summary judgment, the defendants also contend that the Court should dismiss the plaintiffs' equal protection claim for failure to state an equal protection claim. They assert that the plaintiffs fail to state an equal protection claim because they do not allege that the defendants purposefully treat women differently just because they are women.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See*Fed.R.Civ.P. 12(b)(6). Dismissal of an action under such a motion is warranted if the plaintiffs can prove no set of facts in support of its claims that would entitle them to relief. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997); *see Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The essence of a Rule 12(b)(6) motion is not that the plaintiffs have pleaded insufficient facts, it is that even assuming all of their facts are accurate, they have no legal claim. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 627 (7th Cir.1999). The facts alleged in the complaint are assumed to be true, and all facts, and all reasonable inferences flowing from those facts, are read in the light most favorable to the plaintiffs. *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1326 (7th Cir.1990).

To establish a *prima facie* case of discrimination under the equal protection clause, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that they were treated differently from members of the unprotected class. *Brown v. Budz,* 398 F.3d 904, 916 (7th Cir.2005) (quoting *McNabola v. Chi. Transit Auth.,* 10 F.3d 501, 513 (7th Cir.1993)). The complaint alleges that the defendants have knowingly and recklessly failed to provide female prisoners at TCI with access to mental health services comparable to the mental health services available to male prisoners through the Wisconsin Resource Center, in violation of the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. (Compl. ¶ 1; *see also* Compl. ¶¶ 120-30, 150-56.)

There are no special pleading rules for prisoner civil rights cases. *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002) (citing *Swierkiewicz v. Sorema,* 534 U.S. 506, 512-14 (2002)). The Federal Rules of Civil Procedure require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid. *Nance v. Vieregge,* 147 F.3d 589, 590-91 (7th Cir.1998). All that needs to be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer. *Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 863 (7th Cir.2002).

**\*14** The plaintiffs need not "show" or "establish" anything to survive a motion under Rule 12(b)(6); they need only allege. *Brown,* 398 F.3d at 916 (noting the "liberal requirement of notice pleading under Rule 8, particularly with regard to Equal Protection claims"). The plaintiffs have sufficiently alleged an equal protection claim.

Based on the foregoing, the defendants' motion for summary judgment will be denied.

### DEFENDANTS' MOTION TO STAY DISCOVERY

On August 14, 2006, the defendants filed a motion to stay discovery until such time as the Court has decided their motion for summary judgment. The defendants' motion will be denied as moot.

### ORDER

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)
**(Cite as: 2007 WL 805788 (E.D.Wis.))**

**IT IS THEREFORE ORDERED** that the plaintiffs' motion to certify class (Docket # 2) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is certified as a class for injunctive and declaratory relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure concerning the legal issues described herein.

**IT IS FURTHER ORDERED** that the class is defined as follows:
(1) the TCI Class, on whose behalf representative plaintiffs bring constitutional claims in this action is defined as: "all prisoners who are now or in the future will be confined at TCI;" and
(2) the ADA Subclass, on whose behalf representative plaintiffs bring statutory claims in this action, is defined as: "all individuals with disabilities who are now or in the future will be confined at TCI."

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 20) is **DENIED.**

**IT IS FURTHER ORDERED** that the defendants' motion to stay discovery (Docket # 22) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the plaintiffs' motion for leave to file brief exceeding page limit (Docket # 38) is **GRANTED.**

**IT IS FURTHER ORDERED** that the plaintiffs' motion to continue (Docket # 39) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the plaintiffs' motion for leave to file (Docket # 50) is **GRANTED.**

**IT IS FURTHER ORDERED** that the plaintiffs' motion for leave to file (Docket # 51) is **GRANTED.**

**SO ORDERED.**

Not Reported in F.Supp.2d, 2007 WL 805788 (E.D.Wis.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Adam INGLES et al., Plaintiffs,
v.
THE CITY OF NEW YORK et al., Defendants.
**No. 01 Civ. 8279(DC).**

Feb. 20, 2003.

Current and former inmates brought action charging city prison officials with engaging in pattern and practice of excessive force. On inmates motion for certification of plaintiff class, the District Court, Chin, J., held that: (1) proposed class was sufficiently definite; (2) lead plaintiffs were adequate class representatives, and (3) prosecution of separate actions risked inconsistent judgments.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure** ☞**186.10**
170Ak186.10Most Cited Cases
Proposed class consisting of all prisoners who were or would be confined in New York City Department of Correction institutions and commands which were not already subject to court order based on prior use of excessive force litigation was sufficiently definite; although there was dispute as to extent to which prior orders had been implemented, it was clear which facilities were covered. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[2] Federal Civil Procedure** ☞**186.10**
170Ak186.10Most Cited Cases
Proposed class consisting of all prisoners who were or would be confined in New York City Department of Correction institutions and commands which were not already subject to court order based on prior use of excessive force litigation satisfied numerosity requirement for class certification; because proposed class would consist of prisoners of some twelve detention facilities throughout city, joinder was impracticable. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure** ☞**186.10**
170Ak186.10Most Cited Cases
Lead plaintiffs, in class action suit seeking injunction against use of excessive force in New York City Department of Correction institutions, were adequate class representatives, even though they were also asserting individual claims for damages, one lead plaintiff had psychiatric condition and another was being confined in punitive segregation; all plaintiffs' claims rested on same theory of liability and lead plaintiffs stood to benefit from any injunctive relief obtained. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[4] Federal Civil Procedure** ☞**186.10**
170Ak186.10Most Cited Cases
Certification of plaintiff class, in prisoner suit seeking injunction against use of excessive force in New York City Department of Correction institutions, was warranted; prosecution of separate actions risked inconsistent judgments, and injunctive relief being sought would benefit entire class. Fed.Rules Civ.Proc.Rule 23(b)(1, 2), 28 U.S.C.A.

The Legal Aid Society, Prisoners' Rights Project, By: John Boston, Jonathan Chasan, Mary Lynne Werlwas, Madeline DeLone, Brooklyn, NY-- and-- Sullivan & Cromwell LLP, By: Penny Shane, Stacy Stoller, J. Andrew Kent, New York, NY--and--Emery Cuti Brinckerhoff & Abady, By: Jonathan Abady, Ilann M. Maazel, New York, NY, for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of New York, By: Stacy Laine Matthews, Susan Scharfstein, John Graziadei, New York, NY, for Defendants.

*MEMORANDUM DECISION*

CHIN, J.

*1 In this prisoners' rights case, plaintiffs allege that defendants, the New York City Department of Correction ("DOC") and certain of its employees, engaged in a pattern and practice of excessive force in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of New York. The named plaintiffs are inmates at several DOC

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

detention facilities. They seek money damages and injunctive and declaratory relief.

In four class actions over the past fifteen years, federal courts have approved remedial orders governing the use of force at certain DOC facilities. [FN1] Plaintiffs in this case move pursuant to Fed.R.Civ.P. 23 for an order certifying a class consisting of present and future DOC inmates to seek redress for similar alleged violations at the remaining DOC locations.

> FN1.*SeeSheppard v. Phoenix,* No. 91 Civ. 4148(RPP), 2002 WL 1603138, at *10 (S.D.N.Y. July 18, 2002) (Central Punitive Segregation Unit); *Jackson v. Montemagno,* No. 85. Civ. 2384(AS) (E.D.N.Y.1991) (Order Approving Stipulation for Entry of Judgment, November 26, 1991) (Brooklyn House of Detention); *Reynolds v. Ward,* No. 81 Civ. 101(PNL) (S.D.N.Y.1990) (Order and Consent Judgment ¶¶ 42-48, October 1, 1990) (Bellevue Prison Psychiatric Ward); *Fisher v. Koehler,* 718 F.Supp. 1111 (S.D.N.Y.1989) (Correctional Institute for Men).

For the reasons set forth below, plaintiffs' motion is granted.

*STATEMENT OF THE CASE*
A. *Summary of the Facts*

DOC operates institutions on Rikers Island and in Manhattan, Queens, and the Bronx that are not currently subject to court order resulting from litigation of excessive force claims against DOC staff. [FN2] (Am.Compl.¶ 2). The individual defendants include the uniformed staff, supervisory staff, and wardens of the several DOC institutions alleged to be engaged in a pattern and practice of excessive force against plaintiffs and other inmates. (*Id.* ¶¶ 6- 17).

> FN2. According to plaintiffs, the facilities and commands that are not subject to ongoing injunctive orders are the Adolescent Reception and Detention Center ("ARDC"), Anna M. Kross Center ("AMKC"), George Motchan Detention Center ("GMDC"), George R. Vierno Center ("GRVC"), Manhattan Detention Complex ("MDC"),

North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Rose M. Singer Center ("RMSC"), West Facility, Bronx House of Detention ("BxHDM"), Queens House of Detention ("QHDM"), Transportation Division, Emergency Services Unit ("ESU") and Vernon C. Bain Correctional Facility ("VCBC" or "the Barge"). (Am.Compl.¶ 18).

Plaintiffs allege that they have suffered unjustified beatings at the hands of DOC personnel, as punishment for minor misconduct, verbal complaints, protests, or perceived disrespect. (*Id.* ¶ 19). They allege that DOC personnel routinely falsify documents and fabricate claims of provocation to cover up the assaults. (*Id.* ¶ 22). Plaintiffs contend that defendants have either ordered, participated in, or acted in complicity with or acquiescence towards this pattern of force, and that DOC training procedures establish a system-wide policy of excessive force.

B. *Plaintiffs*

Plaintiffs are twenty-two present and former DOC inmates who allege that they have suffered physical injury as a result of defendants' use of excessive force while in DOC custody. Lead plaintiffs Shawn Davis, Ed Sykes, Paul Person, Lamont Bradley, and Al Smith seek to represent the proposed class. [FN3]

> FN3. Plaintiffs added Al Smith as a proposed class representative after the motion for class certification was filed. (Supplemental Decl. in Supp. of Motion to Amend Compl., August 9, 2002).

For the purposes of this motion, I accept plaintiffs' allegations as true. *SeeEisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 222 F.3d 52, 58 (2d Cir.2000). The allegations as to the lead plaintiffs are summarized as follows:

1. *Shawn Davis*

On or about May 28, 2002, Davis returned from a court appearance in the Bronx to pre-trial detention at AMKC. Upon arriving, he asked an officer if he could receive his psychiatric medication for that day.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

The officer informed Davis that she could not deal with his problem. Davis complained to a captain, but received no response. (Am.Compl.¶¶ 57-58).

**\*2** Davis became angry and threw a plastic chair. Three correction officers then punched him, handcuffed his arms behind his back, and escorted him outside the area where another officer hit him in the stomach with a baton. Afterwards, Davis was placed alone in a cell, where four of the officers struck Davis numerous times in the face and body, causing him to fall to the floor. One officer kicked him in the left eye, causing his eyeball to rupture. (*Id.* ¶¶ 58-60). Davis alleges that he was beaten by eight officers in total.

Davis alleges that as a result of this assault he sustained severe emotional and physical injuries, including impaired vision in his left eye. (*Id.* ¶ 61).

*2. Ed Sykes*

On or about March 28, 2002, Sykes was housed in pre-trial detention in a punitive segregation area of GRVC, where he remained in his cell for 23 hours a day. The water in his cell had been turned off for two days, preventing him from flushing the toilet or washing himself. When Officer Hershaway served Sykes a meal through the food slot in his cell, Sykes held the slot open and asked for his water to be restored. Hershaway slammed the slot down on Sykes's arm, telling him that Ramos, the area captain, did not want Sykes's water turned on. Sykes then requested to go to the jail clinic. (*Id.* ¶ 64).

Defendants Hershaway, Ramos, Dice, Lewis and Yates entered the cell and handcuffed Sykes. Ramos asked Sykes if he really wanted to go to the clinic. When Sykes answered affirmatively, Ramos told Dice to "talk to him" and left the cell. Dice told Sykes that he could go to the clinic only if he was injured. Hershaway and Dice then struck Sykes in the face and body in the presence of Lewis and Yates. Dice emptied a bucket of water on Sykes, telling him that he was injured by falling in water in his flooded cell. On the way to the clinic, Dice pushed Sykes's head into a wall and slammed his face into a glass partition, gashing open his nose. Sykes's nose was sutured at the clinic, and X-rays confirmed fractures of his nose and wrist. (*Id.* ¶¶ 65-67).

An injury to inmate report prepared by Ramos, or at

his direction, claimed that Sykes's injuries occurred when he slipped and fell upon leaving his cell and when he ran into the clinic door. Sykes alleges that he has sustained emotional and physical injuries, including extensive facial scars, as a result of the assault. (*Id.* ¶¶ 68-69).

*3. Al Smith*

Following a hearing on his parole status on or about February 13, 2001, Smith was being kept in a holding pen along with other inmates at the Rikers Island Judicial Center. Some other inmates repeatedly kicked the door of the pen. Officer Givens entered the doorway and told Smith to come out, but Smith refused because he was fearful that he would be assaulted and falsely accused of kicking the door. Officers Givens, McConnon, and Doe 13 entered the pen and took Smith to a hallway, where they set him on the floor. They were joined in the hallway by Officer McKeller and Captain Cardo. Givens punched him in the eye while the remaining defendants struck him several times in the back, side, and head. (*Id.* ¶ 80).

**\*3** Afterwards, Smith was taken to an empty holding pen. He asked an officer to see a doctor, but the officer cursed at him and advised him that he was lucky to be alive. (*Id.* ¶ 81). Thereafter, Smith was taken to a clinic and treated for a possible fracture to his right orbital rim and contusions, hemorrhaging, and lacerations to his face. (*Id.* ¶ 82).

Smith alleges that he suffered severe emotional and physical injuries, including back pain, bleeding from his left outer ear and blurred vision, as a result of the assault. (*Id.*).

*4. Paul Person*

While in pre-trial detention at GRVC on or about May 2, 2000, Person was confronted in a hallway by Officers Swetokas and Mastroainni. One of them held Person while the other punched him in the nose. Additional officers arrived. While Person was handcuffed, one of the defendants kicked him in the mouth. Daniels, a captain, witnessed the assault but took no steps to protect Person. Person alleges that Swetokas and Mastroainni were angry with him for arguing with them the previous evening, and because he observed them being chastised by a captain. (*Id.* ¶¶ 140-41, 143).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

At the clinic, Person was treated for a nasal fracture, lip lacerations, back strain, and lumbar and wrist contusions. Thereafter, Person was administratively charged, and found guilty of assaulting staff. He also pled guilty to a criminal charge of harassment in the second degree. He asserts that these charges were fabricated. Person alleges that he suffered severe physical and emotional injuries as a result of the assault. (*Id.* ¶¶ 142-43).

5. *Lamont Bradley*

On or about December 5, 2001, Bradley was in pre-trial detention at GRVC, awaiting an escort officer to accompany him to the visiting room. Bradley asked Officer Chapman to expedite his escort. Half an hour later, Chapman released Bradley from his cell, and Officer R. Jackson cuffed his hands behind his back. Officer K. Jackson cursed at Bradley and punched him in the mouth, causing him to fall to one knee, and then kicked him in the back and face. While this was happening, Officers Chapman and R. Jackson observed but took no steps to protect Bradley. (*Id.* ¶¶ 171-72).

At the clinic, Bradley was treated for a large bruise and swelling to the back of his head, a contusion and swelling of the left upper eyelid, tenderness to the cheek, and three discrete lacerations to his lower lip, which were sutured. As a result of the assault, he was unable to enter the visit area. GRVC supervisor Captain Hernandez advised Bradley to tell his family that he had injured his face "playing ball." (*Id.* ¶ 173).

C. *Prior Proceedings*

This case was filed on September 5, 2001 by Adam Ingles *prose.* Ingles thereafter obtained counsel. On July 19, 2002, he filed a motion to amend the complaint, which defendants did not oppose. On July 31, 2002, plaintiffs filed this motion for class certification. On September 6, 2002, Ingles filed an amended complaint adding twenty-one additional plaintiffs and asserting class allegations.

*DISCUSSION*
A. *Class Certification*

**\*4** In moving for class certification, plaintiffs must first demonstrate that all the requirements of Fed.R.Civ.P. 23(a) have been satisfied. *See*In re VISA *Check/Mastermoney Antitrust Litig.,* 280 F.3d 124, 132-33 (2d Cir.2001); *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999). Second, plaintiffs must show that the putative class falls within one of the three categories set forth in Rule 23(b). *In re VISA Check/Mastermoney,* 280 F.3d at 133. Plaintiffs here seek certification under Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2).

Although a court must conduct a rigorous inquiry to determine whether the requirements of Rule 23 have been satisfied, *see*Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), it must accept plaintiffs' allegations as true and refrain from conducting an examination of the merits when determining the propriety of class certification. *See*Eisen, 417 U.S. at 178;*Baffa,* 222 F.3d at 58. Furthermore, because courts are given discretion to tailor the scope of the class later in the litigation, the requirements for class certification are liberally construed in the early stages of a case. *See*Woe ex rel. Woe v.. Cuomo, 729 F.2d 96, 107 (2d Cir.), *cert. denied,*469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984); *Doe v. Karadzic,* 192 F.R.D. 133, 136 (S.D.N.Y.2000) (citing cases); *see also*Weigmann v. Glorious Food, Inc., 169 F.R.D. 280, 284 (S.D.N.Y.1996).

I first address defendants' contention that plaintiffs' proposed class definition is insufficiently definite. Next I consider whether plaintiffs have satisfied the criteria for certification set forth by Rule 23(a). Finally, I decide whether the putative class falls within any of the categories set forth in Rule 23(b).

B. *Class Definition*

[1] A class is sufficiently definite if "it is administratively feasible for the court to determine whether an individual is a member." 7A C. Wright et al., *Federal Practice & Procedure* § 1760 (2d ed.1986). Here, plaintiffs propose a class consisting of all prisoners who are or will be confined in DOC institutions and commands not already subject to court order based on prior use of force litigation.

Defendants contend that plaintiffs' class definition is inadequate because plaintiffs fail to say what remedial measures in the prior cases were not implemented department-wide. The parties dispute whether DOC has refused to implement court-ordered remedies throughout its jail facilities. For the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

purposes of class certification, however, plaintiffs have clearly identified the DOC facilities covered by consent orders entered in the prior actions, and those facilities which it believes are not covered. Hence, I find the proposed class to be sufficiently definite.

### C. *Rule 23(a)*

Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*\*5Fed.R.Civ.P. 23(a).*

#### 1. *Numerosity*

[2] Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1); see*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 607 n. 8, 117 S.Ct. 2231, 138 L.Ed.2d 689(1997); *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (per curiam). Defendants concede that the numerosity requirement is met. As the putative class members would consist of prisoners of some twelve detention facilities throughout New York City, joinder is impracticable and I conclude that the numerosity requirement is satisfied.

#### 2. *Commonality*

Under Rule 23(a)(2), there must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2); see*Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001) (" 'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.' " (quoting *Marisol A.,* 126 F.3d at 376)). Here, defendants do not dispute that the commonality requirement is satisfied, and indeed plaintiffs' allegations present common questions of law and fact.

#### 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or

defenses of the class." Fed.R.Civ.P. 23(a)(3); see*Amchem,* 521 U.S. at 607 n. 11. Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson,* 267 F.3d at 155 (internal quotation omitted). The purpose of Rule 23(a)(3) "is to ensure that 'maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so interrelated [that] the interests of the class members will be fairly and adequately protected in their absence.' " *Cromer Finance Ltd. v. Berger,* 205 F.R.D. 113, 122 (S.D.N.Y.2001) (quoting *Falcon,* 457 U.S. at 158 n. 13);see*Marisol A. v. Giuliani,* 929 F.Supp. 662, 691 (S.D.N.Y.1996) (citing *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 57 (3d Cir.1994)), *aff'd,*126 F.3d 372 (2d Cir.1997).

There is no requirement that "the factual background of each named plaintiff's claim be identical to that of all class members." *Caridad,* 191 F.3d at 293;see*Cromer,* 205 F.R.D. at 122. Rather, typicality "requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad,* 191 F.3d at 293 (internal quotations omitted). Defendants do not oppose certification on this basis, and plaintiffs present claims grounded in the same legal arguments and arising from sufficiently similar events to satisfy the requirement.

#### 4. *Adequacy of Representation*

[3] To determine whether the requirement of adequacy has been satisfied, courts must look to whether "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To establish adequacy of representation, plaintiffs must show that (1) plaintiffs' counsel are competent to handle the case and (2) there are no conflicts of interest among class members. *Baffa,* 222 F.3d at 60;*Cromer,* 205 F.R.D. at 123.

*\*6* Evidence that relates to the requirements of typicality and commonality can reflect on the adequacy of representation requirement. *Amchem,* 521 U.S. at 626 n. 20 (citing *Falcon,* 457 U.S. at 158 n. 13);*Marisol A.,* 126 F.3d at 378. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

class members." *Amchem,* 521 U.S. at 625-26 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)* (citation omitted)).

Defendants do not challenge the competency of counsel; hence I will address only defendants' challenges to the named plaintiffs as adequate representatives. Defendants assert that the proposed class representatives are inadequate because a conflict of interest exists between their individual claims for damages and their class claims for institutional reform. Defendants also assert that plaintiffs Sykes, Davis, and Daniels lack the necessary personal qualities to adequately represent the class. I address each contention in turn.

a. *Conflict of Interest*

Defendants contend that the proposed class representatives do not fairly and adequately represent the class because they seek individual damages along with class-wide injunctive relief, resulting in a conflict of interest between themselves and the class. Specifically, defendants contend that plaintiffs have an incentive to settle on terms "favor[ing] their damages claims over class-wide institutional claims." (Def. Opp. at 11). This argument is rejected for several reasons. First, regardless of the relief sought, the proposed lead plaintiffs' claims rest on the same theory of liability as do the claims of other class members. Second, lead plaintiffs are incarcerated at facilities operated by the defendants, and thus they will benefit from injunctive relief as well. Third, any settlement must be approved by the Court. Fourth, to the extent any conflicts do arise, I can adjust the definition of the class at that time.

b. *Credibility*

Defendants assert that plaintiffs Davis and Sykes lack the credibility, competence, and familiarity with the claims or underlying facts required to competently interact with counsel and direct the litigation on behalf of the class. [FN4] This argument is rejected.

> FN4. Defendants also contend that Calvin Daniels lacks credibility, and that this illustrates the need to examine the credibility of the proposed lead plaintiffs. (Def. Mem. at 14). As Daniels is not a proposed lead

plaintiff, the Court does not address this argument.

To determine whether plaintiffs are adequate class representatives,

> courts have looked to factors such as their honesty, conscientiousness, and other affirmative personal qualities. If the representative displays a lack of credibility regarding the allegations [being] made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied.

*Jane B. by Martin v. N.Y.C. Dept. of Social Services,* 117 F.R.D. 64, 70- 71 (S.D.N.Y.1987) (quoting 7A C. Wright et al, *supra,* § 1766 at 308-310). Courts are reluctant, however, to deny class certification based on allegations of immorality or improper conduct not "arising out of or touching upon the very prosecution of the lawsuit." *Jane B.* at 71. As the court in *Jane B.* stated,

> *7 If the courts prevent persons with questionable moral characters from acting as class representatives, prisoners, mental patients, juvenile offenders or others capable of socially deviant behavior could never have an adequate representative and thus could never be certified.

*Id.* I reject defendants' contentions that plaintiffs Davis and Sykes are not adequate representatives. Davis's psychiatric condition does not render him unable to represent the class; nor does Sykes's confinement in punitive segregation disqualify him. *See Daniels v. City of New York,* 198 F.R.D. 409,418- 19 (S.D.N.Y.2001) (holding that one plaintiff's lack of mental competence and another's outstanding warrant for public consumption of alcohol were "minor infirmities" that did not disqualify them from acting as class representatives).

Hence, I hold that plaintiffs have satisfied the requirements of Rule 23(a).

D. *Rule 23(b)*

[4] I now consider whether the class falls within one of the categories set forth in Rule 23(b). For the reasons set forth below, I hold that plaintiffs' proposed class qualifies under Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2).

1. *Rule 23(b)(1)(A)*

Plaintiffs seek class certification under Rule

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

23(b)(1)(A), which authorizes a class action if "the prosecution of separate actions by ... individual members of the class would create a risk of ... inconsistent or varying adjudications with respect to individual members of the class." Fed.R.Civ.P. 23(b)(1)(A). Defendants contend that because Rule 23(b)(1)(A) was designed to protect their interests, and they are willing to risk incompatible judgments resulting from individual claims, it is not available to plaintiffs.

Although some courts interpret Rule 23(b)(1)(A) as protecting defendants only, clearly all litigants as well as the courts benefit from consistency in the adjudication of claims of individual class members. [FN5] Here, consistency in the adjudication of these claims is important. Hence, defendants' objection on this basis is overruled and I conclude that plaintiffs qualify for class certification under Rule 23(b)(1)(A).

> FN5. Compare Pettco Enterprises, Inc. v. White, 162 F.R.D. 151, 155 (M.D.Ala.1995), and Pruitt v. Allied Chemical Corp., 85 F.R.D. 100, 106-07 (E.D.Va.1980) (also noting that plaintiffs were primarily seeking monetary damages), and Alsup v. Montgomery Ward & Co., 57 F.R.D. 89, 92 (N.D.Cal.1972) (also noting that "there is no danger that the defendant will be faced with incompatible standards of conduct and ... such risks are imaginary") with Hernandez v. M/V Skyward, 61 F.R.D. 558 (S.D.Fla.1973) (certifying mass tort class action under Rule 23(b)(1)(A) despite defendants' objection, on grounds that denial would result in separate actions and would create the risk of inconsistent adjudications). Although the Second Circuit has not ruled on whether Rule 23(b)(1)(A) remains available where defendants refuse its protection, Professor Newberg persuasively argues that "the needs of the judicial system to avoid inconsistent adjudications in a single controversy must be respected, despite the willingness of a litigant to assume the risk." Herbert B. Newberg & Alba Conte, 1 *Newberg on Class Actions* § 4.07 (3d ed.1992).

### 2. *Rule 23(b)(1)(B)*

Plaintiffs also seek certification under Rule 23(b)(1)(B), which applies where "adjudications with respect to individual members of the class ... would

as a practical matter be dispositive of the interests of the other members not parties to the adjudications." Fed.R.Civ.P. 23(b)(1)(B). Defendants contend that (1) plaintiffs fail to demonstrate how individual actions by class members would alter the rights of other class members, and (2) plaintiffs cannot avail themselves of this subsection because the claims do not involve a limited fund that may be exhausted by individual claims. For the following reasons, I reject both contentions.

First, plaintiffs' allegations clearly illustrate that an individual adjudication would affect the interests of other putative class members. Should I grant--or deny--injunctive relief against the use of excessive force, the rights of absent class members would be determined. The question whether defendants' use of force is constitutional may be dispositive of the claims of other class members.

**\*8** Second, defendants' contention that Rule 23(b)(1)(B) applies only in "limited fund" situations where "claims are made by numerous persons against a fund insufficient to satisfy all claims" is incorrect. Karadzic, 192 F.R.D.at 139. Although the limited fund scenario is the "paradigm suit" under Rule 23(b)(1)(B), courts have also granted certification under this subsection to classes of inmates seeking injunctive relief. See, e.g., Caroline C. by and through Carter v. Johnson, 174 F.R.D. 452, 467 (D.Neb.1996); Coleman v. Wilson, 912 F.Supp. 1282, 1293 (E.D.Cal.1995); Gesicki v. Oswald, 336 F.Supp. 371, 374 (S.D.N.Y.1971). Plaintiffs may maintain a class under Rule 23(b)(1)(B).

### 3. *Rule 23(b)(2)*

Finally, plaintiffs assert that their class should be certified under Rule 23(b)(2), which provides for certification if:
> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2).

Rule 23(b)(2) was intended to assist litigants seeking wide-spread institutional reform through injunctive and/or declaratory relief. See Marisol A., 929 F.Supp. at 692 (citing Baby Neal, 43 F.3d at 58-59). In fact, several courts have found that Rule 23(b)(2) will

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 8
Not Reported in F.Supp.2d, 2003 WL 402565 (S.D.N.Y.)
**(Cite as: 2003 WL 402565 (S.D.N.Y.))**

generally be satisfied in cases where injunctive relief is sought and would benefit the entire class. *See e.g.*, *Boucher*, 1996 WL 328441, at *3; *Brown v. Guiliani*, 158 F.R.D. 251, 269 (E.D.N.Y.1994); *Non-Traditional Employment for Women v. Tishman Realty and Const. Corp.*, 1989 WL 101940, at *4 ("Since defendants have allegedly acted 'on grounds generally applicable to the class' and the court finds injunctive relief appropriate should plaintiffs prevail on their claims, plaintiffs have satisfied Rule 23(b)(2)."); *Jane B.*, 117 F.R.D. at 71.

Defendants contend that because the named plaintiffs allege only isolated past instances of excessive force by DOC officers, under *Los Angeles v. Lyons*, 461 U.S. 95, 103, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), they lack standing to pursue claims for injunctive relief. The argument is rejected, for *Lyons* is distinguishable.

In *Lyons*, the plaintiff had been placed in a chokehold by Los Angeles police officers without justification after being stopped for a minor traffic violation. He sought an injunction prohibiting Los Angeles police officers from using chokeholds, alleging that the City of Los Angeles authorized them to routinely apply chokeholds "in innumerable situations where they are not threatened by the use of any deadly force whatsoever." *Lyons*, 461 U.S. at 103. The Court held that Lyons lacked standing to seek injunctive relief because his assertion that he would be subject to a chokehold in the future was speculative. *Id.* at 107-08.

The Court found that Lyons would have to disobey the law to have contact with Los Angeles police officers again. In accordance with the assumption that individuals will conduct their activities within the law, the Court found that the likelihood that Lyons would again suffer an unjustified chokehold at the hands of Los Angeles police was too remote. *Id.* at 103 (citing *O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). In other words, Lyons was no more likely than any other citizen of Los Angeles to be subjected to a chokehold in the future. *Id.* at 108.

**\*9** For the following reasons, *Lyons* is different from this case. First, plaintiffs have alleged much more than an isolated instance of abuse by one or two DOC officers. Plaintiffs' amended complaint alleges supervisory complicity or acquiescence in abuse committed by officers and efforts by DOC personnel

to cover up unprovoked assaults. Plaintiffs contend that a policy of excessive force existed at DOC facilities, and that inmates will suffer irreparable harm as so long as the policy exists. *See* *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 75 F.Supp.2d 154, 162 (S.D.N.Y.1999) (distinguishing *Lyons* where several plaintiffs presented colorable allegations of numerous constitutional violations demonstrating the allegedly unconstitutional practices of police officers). At this stage in the litigation, that is enough to confer standing.

Second, where Lyons was a member of the public, the instant plaintiffs are prisoners subject to the continual control of DOC staff. *See* *Williams v. Wilkinson*, 132 F.Supp.2d 601, 606 (S.D.Ohio 2001) (holding *Lyons* inapplicable to prison discipline case because the prisoner "is in continual contact with corrections officers whose job it is to scrutinize closely his behavior for possible rule infractions"). Courts have held that plaintiffs who are members of "an identified class of targeted individuals" have standing. *Roe v. City of New York*, 151 F.Supp.2d 495, 503-04 (S.D.N.Y.2001) (citing *Thomas v. County of Los Angeles*, 978 F.2d 504, 508 (9th Cir.1992) (holding that Black and Latino residents within a specified area had standing to enjoin conduct aimed at them)); *Nat'l Cong. for Puerto Rican Rights*, 75 F.Supp.2d at 162 (holding that residents of a small six by seven block area had standing to enjoin a racially discriminatory stop and frisk policy). Here, plaintiffs are members of an identified class of "targeted individuals."

Hence, I hold that *Lyons* is distinguishable and that plaintiffs qualify for class certification under Rule 23(b)(2).

### CONCLUSION

The courts have concluded that class certification was appropriate in four other cases challenging the use of excessive force at DOC facilities. Here, I likewise hold that plaintiffs satisfy the criteria for class certification under Rule 23 and hence their motion for class certification is granted. Plaintiffs shall submit a proposed order on notice within five business days hereof.

SO ORDERED.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KEITH MATHIS, <u>et al.</u>,     )
           )
     <u>Plaintiffs</u>,  )
           )
  v.        )  Case No. 1:07-cv-01155-RMU
           )
GEO GROUP INC., <u>et al.</u>,    )
           )
     <u>Defendants</u>.  )
           )

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
<u>CERTIFICATION</u>**

# <u>EXHIBIT 3</u>

# Unpublished Decisions Part 2

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)

**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

Page 1

▷Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
Dennis E. JONES 'EL and Micha'el Johnson, and all
others similarly situated,
Plaintiffs,
v.
Gerald BERGE, Defendant.
**No. 00-C-421-C.**

Aug. 14, 2001.

Stephen P. Hurley, Edward R. Garvey, for Plaintiffs.

James E. McCambridge, Assistant Attorney General,
Madison, WI, for Defendants.

OPINION AND ORDER

CRABB, J.

**\*1** This is a civil action for injunctive, monetary and
declaratory relief, brought pursuant to 42 U.S.C. §
1983. Plaintiffs Dennis E. Jones 'El and Micha'el
Johnson are presently confined at the Supermax
Correctional Institution in Boscobel, Wisconsin. In
an order entered on September 25, 2000, I granted
plaintiffs' request for leave to proceed *informa
pauperis* on plaintiff Johnson's Eighth Amendment
conditions of confinement claim and inadequate
medical treatment claim and his Fourth Amendment
denial of privacy claim; plaintiff Jones 'El's Eighth
Amendment claim that he was subjected to extreme
temperatures; and plaintiffs' First Amendment claim
that they were denied certain religious items. These
individual claims will not be affected by this opinion.
I denied plaintiffs' request to proceed on all other
claims. In an order entered February 16, 2001, I
granted plaintiffs' motion for class certification under
Fed.R.Civ.P. 23(b)(2) and defined the class as "all
persons who are now, or will in the future be,
confined in the Supermax Correctional Institution in
Boscobel, Wisconsin." In the same order, I granted
plaintiffs' motion for class certification as to
plaintiffs' Eighth Amendment conditions of
confinement claim and Fourth Amendment privacy
claim and denied plaintiffs' motion as to their claims
for denial of religious items and adequate medical
care because it was unclear from plaintiffs' original

complaint that these claims affected the class as a
whole.

Now plaintiffs have filed a proposed amended
complaint in which they seek to add new plaintiffs
who will represent the class, new defendants Jon
Litscher and Does I-100 and additional claims for
denial of adequate medical, dental and mental health
care, use of excessive force, denial of religious items
and violations of due process. I conclude that
plaintiffs' claims for denial of adequate medical,
dental and mental health care and excessive force by
use of the stun gun and stun shield affect the class as
a whole. Therefore, I will grant plaintiffs' motion for
class certification as to these claims. However, I
conclude that the claim for denial of religious items
does not affect the class as a whole. The motion for
class certification as to this claim will be denied.
Also, I will dismiss plaintiffs' due process claim
because it fails to state a claim upon which relief may
be granted. Because the claims certified for class
action involve practices or policies of the Department
of Corrections for which Jon Litscher is responsible, I
will grant plaintiffs' request to add him as a
defendant. Because Does 1-100 are not necessary
defendants and adding them as defendants would
delay resolution of this case unnecessarily, I will
deny plaintiffs' request to add Does 1-100 as
defendants.

Because plaintiffs are prisoners, I will screen their
proposed complaint pursuant to the 1996 Prisoner
Litigation Reform Act, identify cognizable claims
and dismiss any claim that is frivolous, malicious or
is not a claim upon which relief may be granted. 28
U.S .C. §§ 1915A(a), (b). The screening obligation
applies at all stages of the lawsuit; therefore, each
new claim must pass the failure to state a claim
standard in order to be considered for class
certification.

**\*2** In their proposed amended complaint, plaintiffs
allege the following facts.

ALLEGATIONS OF FACT
*A. Parties*
Plaintiffs Dennis E. Jones 'El and Micha'el Johnson
are inmates at the Supermax Correctional Institution.
Additional proposed plaintiffs De'Ondre Conquest,

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad Goetsch, Edward Piscitello, Quinton L'Minggio, Lorenzo Balli, Donald Brown, Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini and Andrew Collette are also inmates at Supermax. Defendant Gerald Berge is the warden at Supermax. Additional proposed defendants are Jon Litscher, Secretary of the Wisconsin Department of Corrections, and Does 1-100, individuals who participated in the alleged violations and whose identities are unknown at this time.

### B. *Background*

Supermax opened in November 1999 in order to house "the worst of the worst" prisoners. Supermax is a 509-bed facility that currently houses approximately 365 inmates. The institution is located in Boscobel, a rural town in southwestern Wisconsin that is approximately two hours from Madison and three and one-half hours from Milwaukee. More than half of the inmates at Supermax are from southeastern Wisconsin. There is no public transportation to Boscobel and it is difficult for many families to visit inmates at Supermax.

According to Supermax's mission statement, it is designed to house inmates who demonstrate "serious behavioral problems" and to provide them the opportunity to acquire skills needed for their integration into the general prison population. Most of the inmates at Supermax have not demonstrated "serious behavioral problems." Many non-violent inmates have been transferred to Supermax to separate those with alleged gang affiliations, to ease overcrowding at other institutions, to build up population at Supermax in order to reduce the per capita cost of confining inmates there or for no apparent reason. For inmates who have demonstrated serious behavioral problems, Supermax offers no programs that teach the skills necessary to reintegrate into other institutions.

### C. *Conditions of Confinement*

Physical conditions at Supermax are designed to subject prisoners to almost total social isolation and sensory deprivation. Inmates are locked in their cells for 24 hours a day, although some inmates leave their cells up to four hours a week. The cells are made of concrete walls and a solid "boxcar" door. The cells have no windows. Inmates do not see the outdoors during their entire incarceration at Supermax.

Inmates at Supermax receive no outdoor exercise and are not permitted to go outside at all. The only exercise space accessible to inmates is a windowless concrete cell in which the temperature is the same as that of the outside air. This cell contains little or no exercise equipment. Before inmates enter and after they exit the recreation cell, they are subjected to a strip search. Because conditions are so harsh, many inmates choose not to use the recreation cell and simply remain locked in their cells 24 hours a day.

**\*3** Many inmates at Supermax are allowed only one 6-minute telephone call each month. Inmates at Supermax are permitted no family or other personal visits, other than "video visits" in which the inmate and his visitor see each other only on a video screen, which provides distorted, delayed and poor quality images. Because of the remote location of Supermax and the burdensome requirements imposed on visitors, many inmates do not even receive these "video visits." The Department of Corrections has the technology to provide distance visiting by video, which would allow families to visit an inmate without traveling to Supermax, but has failed to provide that option to families.

Inmates' cells are illuminated 24 hours a day and inmates are instructed to sleep without covering their heads. Those who do not comply are awakened hourly throughout the night by security staff. These conditions result in chronic sleep deprivation that manifest themselves in physical symptoms, including chronic headaches and eye pain, and psychological symptoms, including confusion and depression.

Inmates are monitored 24 hours a day by security staff both in person and by video camera. As a result, male inmates are sometimes watched at close range by female security staff as they undress, shower, masturbate, urinate and defecate. Female security staff have sometimes commented on inmates' genitals within the hearing of inmates.

Like all other inmates at Supermax, plaintiff Johnson has been subjected to all of these conditions of confinement and has suffered physical and psychological pain and physical injury as a result.

Because of poor temperature control at Supermax, inmates are subjected to both extreme heat and extreme cold. Like all other inmates at Supermax, plaintiffs Jones 'El and Johnson have been subjected to these extreme temperatures and have suffered

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

physical and psychological pain and physical injury
as a result.

### D. *Cell Searches and Strip Searches*

Inmates at Supermax are subjected to searches of
their cells, as well as strip searches and body cavity
searches on a frequent basis. Often searches are not
conducted for legitimate security purposes but for the
purpose of humiliating and harassing inmates. Like
all other inmates at Supermax, plaintiff Johnson has
been subjected to these searches. He has undergone at
least 22 of these searches, including four in a single
month.

### E. *Medical, Dental and Mental Health Care*

Inmates at Supermax do not receive adequate
medical, dental and mental health care. An October
2000 report by the National Commission on
Correctional Health Care noted a "backlog of mental
health and dental requests." The report noted that
there were many grievances filed by inmates "due to
serious issues regarding delayed dental and
psychiatric services and in general [they are] being
denied medical treatment." The report also noted a
"great deal of nursing staff turnover," and observed
that there was no continuous "quality improvement
program" for health services at Supermax.

#### 1. *Medical care*

**\*4** Medical care at Supermax is provided by a
private, for-profit contractor. According to a May
2001 report by the Wisconsin Legislative Audit
Bureau, this contractor has not provided the medical
services contracted for at Supermax. Inmates at
Supermax do not receive necessary treatment for
painful, debilitating and sometimes life-threatening
conditions. The Legislative Audit Bureau concluded
that over one-quarter of Supermax inmates suffer
from chronic illnesses. Defendant has failed to
provide medical staff and other resources to care
properly for the serious medical needs of these
chronically ill inmates.

Plaintiff De'Ondre Conquest suffers from terminal
stomach cancer. Since entering Supermax, he has lost
56 pounds. He requires catheterization with the
assistance of medical staff personnel in order to
urinate. On one occasion, no one came to catheterize
him all day. He also must take strong medication to
control pain caused by his disease. One of the
medications, Oxycodone, is to be taken as needed, up

to once every three hours. He often fails to receive
his Oxycodone as needed and as a result, he suffers
severe pain.

Plaintiff Luis Nieves suffers from epilepsy. On July
31, 2000 at 4:00 pm, he told a nurse that he felt the
initial symptoms of a seizure but the nurse did
nothing. He then pushed the emergency call button; a
nurse arrived at his cell fifteen minutes later. The
nurse told Nieves that she would inform Dr. Jones
about his problem and had Nieves fill out some
paperwork. No other medical staff came to his cell
until 9:45 p.m. when the nurse returned to deliver
medication. By that time, Nieves had already suffered
a seizure. On September 28, 2000, Nieves felt
another seizure coming on. He was refused medical
attention because the video camera in his cell was
covered. The next morning, he suffered a seizure.

Plaintiff Scott Seal has a torn rotator cuff in his
shoulder. Dr. Jones told him to rest the shoulder and
take anti-inflammatory drugs. Seal did this for
several months but the pain continued. Dr. Riley
examined Seal's shoulder for surface defects but did
not conduct any further exams or tests. It has been
nine months since Seal reported the shoulder injury.
His pain continues but he has received no other
medical treatment for his injury.

Plaintiff Alex Figueroa was transported from
Supermax to the University of Wisconsin-Madison
Hospital in January 2001 to have a kidney stone
removed. During the procedure, his kidney was
punctured. On the ride back to Supermax, he was
vomiting and bleeding out of a tube that drained from
his kidneys. After returning to Supermax, he was in
severe pain, saw blood in his urine and broke out in
hives from his medication. On January 23 and 24,
2001, he pressed his emergency call button because
he was in severe pain. On both days, no one
responded for an hour and a half. When staff did
respond, they treated his pain but did nothing about
the blood in his urine.

#### 2. *Dental care*

**\*5** Although it was originally planned that Supermax
would have at least one full-time dentist, it now has
only four hours a week of dentist time. Even inmates
with painful and debilitating dental conditions must
wait months for treatment.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

Plaintiff Johnson was denied access to a toothbrush at Supermax. Instead, he was instructed to brush his teeth with a contraption that is fitted on the end of the finger and has small plastic spikes rather than bristles. When he tried to brush his back teeth, the device slipped off his finger and choked him. The use of this device has also caused him to suffer bleeding gums and lacerations. As a result of the use of this device and the denial of needed dental care, Johnson suffered extreme pain and developed a dental condition known as pericoronitis. This suffering was not unique to Johnson; the October 2000 report by the National Commission on Correctional Health Care noted "a number of complaints regarding the inadequacy of the toothbrush" provided to Supermax inmates.

Plaintiff Jones 'El suffered an abscess after medical staff would not provide him with a needed root canal. Because of delays in dental care, he has suffered extreme pain, bleeding gums and cavities.

Plaintiff Robert Sallie has only canines and one back molar and has been directed by his dentist to wear a denture to enable him to eat solid foods. Beginning in December 1999, his denture needed repair but Supermax staff refused to have the work done. As a result, he was unable to use his denture to chew his food and suffered painful gums from eating without his denture. On July 13, 2000, Sallie again asked staff to repair his denture. He was told that because the dentist is at Supermax for a limited number of hours, he sees only inmates with emergencies. Sallie's problem was not considered an emergency, so he was placed on a waiting list. He made an additional complaint on August 29, 2000 and was again told that the dentist works on an emergency basis only.

Plaintiff Luis Nieves has tried to receive dental services since he arrived at Supermax but his requests have been denied. He was told that the dentist has a limited schedule and was on a three-week vacation. Nieves could not be seen because his condition was not an emergency. No dental personnel examined him to make that determination.

Plaintiff Chad Goetsch has asked to have his teeth cleaned but his requests have been refused. He complained after waiting eighteen months but was told that because the dentist sees patients on a priority basis only, he can clean teeth only if he has time.

### 3. Mental health care

Initially, the Department of Corrections had a policy that no mentally ill inmates would be transferred to Supermax. That policy has been abandoned, if it was ever in effect. Although the Department of Corrections maintains no statistics on the number of inmates who have been diagnosed with a mental illness, the Legislative Audit Bureau concluded that at least 15% of Supermax inmates are mentally ill. Numerous inmates at Supermax hear voices and are obsessed with suicidal thoughts; others smear feces, swallow metal objects, cut their flesh, attempt suicide by drug overdose, try to hang themselves and otherwise try to harm or kill themselves.

*6 The October 2000 National Commission on Correctional Health Care report noted that two out of three psychologist positions, as well as the only psychiatrist position, were vacant. As Supermax was planned, it was to have a full-time psychiatrist. Currently it has only four hours of psychiatrist time each week; as recently as October 2000, it had two hours of psychiatrist time each week. Because defendants failed to provide adequate qualified staff and other mental health resources, the needs of inmates with serious mental illnesses have gone untreated.

Plaintiff Christopher Scarver has been incarcerated at Supermax since April 11, 2000. He has suffered from mental health problems such as anxiety and hearing voices for many years and in 1992 was diagnosed as having either schizophrenia or bipolar disorder. Since his transfer to Supermax, his mental health problems have worsened. He has begun to feel suicidal. On May 12, 2001, Scarver attempted suicide by swallowing 30 tablets of Thorazine. He is not receiving adequate psychiatric treatment at Supermax and is unable to advance through the level system because of his illness.

Plaintiff Scott Seal suffers from severe depression and anxiety. At Supermax, Dr. Hagen gave him a book to enhance his mental health but it was confiscated by guards because Seal's level at the time (level one) did not allow any programming. He had also taken the drug Paxil to control his symptoms but the medication was switched as a cost-saving measure.

Plaintiff Benjamin Biese has been diagnosed with

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

multiple mental illnesses, including bipolar disorder, obsessive compulsive disorder and severe personality disorder. Biese has been in poor mental health since the age of six. He has received treatment for these conditions at Mendota Mental Health Institute. As a result of lengthy waiting periods to see the psychiatrist at Supermax, Biese has not received appropriate psychiatric care. His symptoms, including impulsiveness and drastic mood swings, have intensified since his placement at Supermax.

### F. *Excessive Force*

Physical force is an everyday occurrence at Supermax. This force is directed disproportionately at mentally ill inmates, although not exclusively. Because of the sensory deprivation, social isolation and lack of adequate mental health services at Supermax, many inmates become mentally ill or their pre-existing mental illnesses worsen. Custodial staff are not properly trained in the identification and management of mentally ill inmates. When inmates manifest their illness by self harm or other disruptive behaviors, Supermax staff often respond with force rather than with appropriate mental health interventions.

Custodial staff at Supermax shock inmates with electroshock weapons, including the "Ultron II." The Ultron II is an electroshock weapon that emits a powerful and painful electric shock, often leaving burn marks on the skin. Use of the Ultron II constitutes potentially lethal force, particularly with inmates who have heart trouble or other chronic health conditions. Recently the Virginia Department of Corrections suspended use of the Ultron II after it was implicated in the death of an inmate.

*7 Plaintiff Andrew Collette has many chronic mental health problems, including impulse control disorder, antisocial personality disorder and hearing voices. He was prescribed medication for bipolar disorder in August 2000. He has had the Ultron II stun gun and "stun shield" used on him on numerous occasions. On October 27, 2000, guards came to his cell because he had covered his cell windows and video camera. When Collette would not comply with orders, he was stunned 10-15 times with the stun shield. A nurse refused to provide treatment for the pain and injuries caused by the stun shield.

Plaintiff Christopher Scarver has a serious mental illness. On December 10, 2000, a guard observed Scarver trying to cut himself with a razor. The guard

sprayed mace at him. Scarver was given a citation for destruction of property, referring to the razor.

Upon returning to his cell, plaintiff Luis Nieves noticed that some of his property was missing and asked to see a supervisory officer. The guard shoved Nieves into his cell forcefully and shut the door, without removing his handcuffs. On another occasion, while Nieves was being strip searched, a guard grabbed Nieves's head roughly and pressed a finger into his neck in an effort to force Nieves to open his mouth. Nieves received a bruise on his neck from the incident and had to take pain medication. On September 16, 2000, Nieves was told that he was going to be "placed in control." While he was kneeling down, a "cell extraction team" entered his cell to restrain him. They slammed his head against the wall and Nieves lost consciousness briefly. When he regained consciousness, he was being handcuffed and taken out of the cell.

### G. *Denial of Religious Items*

The Department of Corrections and Supermax receive federal financial assistance. At Supermax, inmates of various religious faiths are denied access to sacred texts and objects that are necessary to their religious exercise.

Plaintiffs Jones 'El and Johnson are Muslim. They have been denied hardcover Korans (holy books), kufis (head coverings) and prayer rugs. These objects are necessary for their religious observance.

Plaintiff Edward Piscitello asked to participate in a Bible correspondence course but was told that Supermax does not allow inmates to participate in any correspondence courses. He was told to view this restriction as an incentive to behave and get transferred back to a less restrictive facility. Because Piscitello has been placed at Supermax ostensibly for his own protection, rather than for any behavioral problems, it is highly unlikely that he would be released from Supermax for good behavior.

Plaintiff Quinton L'Minggio has been a Muslim since 1988 and speaks and writes Arabic. He was denied access to certain religious materials, including Muslim books, that he needed for his study of Islam and for daily prayers. He was not allowed to participate in a Muslim feast held at the end of Ramadan because he complained that it was not being held at the correct time. The fact that female

Not Reported in F.Supp.2d                                                                                        Page 6
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

officers can see him nude when he is showering violates his religious beliefs.

**\*8** Plaintiff Lorenzo Balli is Native American. He asked to keep sacred Native American items in his cell, such as eagle feathers, a headband, a drum, sage, cider and sweet grass, which are necessary to his religious practice and which he believes pose no threat to security. Balli was denied these items.

Plaintiff Donald Brown is a devout Christian. On December 14, 1999, Supermax officers told him he would not receive dinner unless he submitted to a cell search because he was going on paper restriction, under which inmates are allowed to keep only one paper item in their cell at a time. He submitted to the search. When he returned to his cell, he discovered that the officers had not removed a large stack of legal papers and a full roll of toilet paper but had removed his Bible.

### H. *Due Process*

At Supermax, inmates are subjected to a regime of deprivation and enforced idleness that is unique in the Department of Corrections. Plaintiffs are subjected to denial of privileges, restrictions on protected and discretionary activities and limitations on educational and employment opportunities that are more strict than those at any other Wisconsin prison. Access to legal materials and legal counsel is far more restricted at Supermax than at any other Wisconsin prison. Supermax inmates are also subject to a unique behavior modification program, known as the "level system."

For plaintiffs who are or will be eligible for discretionary release, placement at Supermax results inevitably in plaintiffs' spending more time in confinement than had they not been placed at Supermax. This is because of the length of time required to complete the program at Supermax, the stigma that attaches to any inmate who has been confined at Supermax for any reason and the resulting reluctance of defendants and other Department of Corrections officials to grant discretionary release to persons who have been confined at Supermax.

Through its legislature and governor, the State of Wisconsin intended that Supermax house only the "worst" and most dangerous inmates in the Wisconsin prison system. The majority of plaintiffs

do not meet these mandatory criteria for placement at Supermax. Before being placed at Supermax, plaintiffs were denied due process hearings to determine whether they met the criteria for placement at Supermax and whether the decision to transfer to Supermax was based on credible and reliable evidence.

Plaintiff Donald Brown has been incarcerated at Supermax since December 12, 1999. In November 1994, he was placed in administrative confinement. He participated in many counseling programs and became a devout Christian. He regretted his past mistakes and believed he had turned his life around. On May 11, 1999 at an administrative confinement hearing, the committee unanimously recommended release from administrative confinement pending completion of a clinical treatment program at the Wisconsin Resource Center, a mental health treatment facility for inmates. The committee recommended unanimously that Brown be transferred to the Wisconsin Resource Center in medium security and noted that he had not misbehaved since November 1994. Nevertheless, Brown was transferred to Supermax on December 12, 1999. Records from the Department of Corrections Social Services state that he was supposed to go to the Wisconsin Resource Center but instead was transferred to Supermax when it opened. A note in his Supermax file dated October 10, 2000 states that "no one knows why he's here" and a note dated October 24, 2000 states that there are "no good explanations" for why he is at Supermax.

**\*9** Plaintiff De'Ondre Conquest is a non-violent offender imprisoned for a drug charge, with no history of violence in or out of the prison system. In addition, he has terminal cancer. He was transferred to Supermax because he allegedly sold his pain medication to another inmate.

Plaintiff Scott Seal is incarcerated for driving after his license was revoked. He has no history of violence in or out of custody. He was transferred to Supermax because he had a consensual sexual relationship with a female guard at Oshkosh Correctional Institution, causing him to be erroneously labeled "predatory to staff."

Plaintiff Lashawn Logan was transferred to Supermax on January 10, 2001, when he was only 17 years old. He was incarcerated for car theft and possession of THC with intent to deliver. He has no

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                            Page 7
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

history of violent behavior but was transferred to Supermax for possible gang affiliation.

Plaintiff Edward Piscitello is housed at Supermax ostensibly for his own protection. Since his incarceration in 1991, he has committed no violent acts and exhibited no behavioral problems in the prison system. He has had no problems with other inmates and does not believe placement at Supermax is necessary for his protection. He was told by the Program Review Committee that he would be transferred to Supermax; no incident preceded that determination.

Plaintiff Benjamin Biese was incarcerated at Supermax from February 16, 2000 to February 15, 2001. He was then transferred to Mendota Mental Health Institute to receive treatment for his multiple mental illnesses, including bipolar, obsessive compulsive and severe personality disorders. On June 25, 2001, Mendota staff told him that he was being transferred back to Supermax. He was given no explanation for the transfer.

Plaintiff Jason Pagliarini is a non-violent offender, having been convicted of auto theft and burglary when he was 18 years old. On October 10, 2000, he was transferred to Supermax from Jackson Correctional Institution, a medium security facility, for accepting money from the girlfriend of another inmate. At his program review committee hearing, the committee denied him the opportunity to speak on his own behalf and told him that the decision to transfer him had been made two weeks prior to the hearing. Pagliarini has no history of violent behavior while incarcerated and no prior juvenile record.

OPINION

### A. *Additional Plaintiffs*

In their amended complaint, plaintiffs Jones 'El and Johnson add several named plaintiffs to the action: De'Ondre Conquest, Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad Goetsch, Edward Piscitello, Quinton L'Minggio, Lorenzo Balli, Donald Brown, Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini and Andrew Collette. These plaintiffs are not seeking damages on an individual basis. Instead, the additional named plaintiffs are inmates at Supermax and are functioning as representatives of the class. Although plaintiffs do not allege facts relating to each of the additional proposed plaintiffs regarding each claim that will be certified for class action, these

individuals are members of the class by virtue of being inmates at Supermax and will be added as plaintiffs.

### B. *Additional Defendants*

**\*10** In the amended complaint, plaintiffs bring suit against an additional defendant, Jon Litscher, in his official capacity. As Secretary of the Department of Corrections, Litscher is responsible for the administration of the entire department; he has the authority and duty to change any policy, practice or custom employed by the department and its agents that violates plaintiffs' constitutional rights. Plaintiffs' allegations allow an inference to be drawn that the alleged violations resulted from a policy, pattern, practice or custom of the Department of Corrections. *See*http://www.westlaw.com/Find/Default.wl?rs=FIPR1.0&vr=2.0&DB=506&FindType=Y&ReferencePositionType=S&SerialNum=1994129243&ReferencePosition=735*Baxter v. Vigo County School Corp.,* 26 F.3d 728, 735 (7th Cir.1994). Accordingly, Litscher will be added as a defendant.

Plaintiffs also bring suit against Does 1-100, individuals whose identities are currently unknown to plaintiffs. Plaintiffs allege that these individuals are personally liable for the alleged violations. *Vance v. Peters,* 97 F.3d987, 991 (7th Cir.1996) (quoting *Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1248 (7th Cir.1994)) (" 'Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." '). However, Does 1-100 are not necessary defendants. Because the claims involve practices and policies of the Department of Corrections, an injunction directed at defendants Berge and Litscher would satisfy plaintiffs' request for injunctive relief. Moreover, the addition of Does 1-100 would require further amended complaints and delay resolution of this case unnecessarily. Accordingly, I will deny plaintiffs' request to add Does 1-100 as defendants.

### C. *Standard for Class Action*

Fed.R.Civ.P. 23 requires a two-step analysis to determine whether class certification is appropriate. *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). Plaintiffs bear the burden of showing that these requirements have been met. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Retired Chicago Police Association v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). Plaintiffs must satisfy the four prerequisites in Rule 23(a) as to each of their claims: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequate representation). *Id.* Plaintiffs must also demonstrate that the additional claims are suitable for treatment as a class action under subdivision (b)(2), which is invoked when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

**\*11** Rule 23(b)(2) requires the presence of two factors: "(1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class and (2) final injunctive or corresponding declaratory relief must be requested for the class." 7A Charles Wright et al., *Federal Practice and Procedure* § 1775, at 447-48 (2d ed.1986, Supp.2000). The first factor is met when "the party opposing the class has acted in a consistent manner toward members of the class so that his actions may be viewed as part of a pattern or activity, or has established or acted pursuant to a regulatory scheme common to all class members." *Id.* at 449. Rule 23(b)(2) requires that the challenged conduct be premised on a ground that is applicable to the entire class, but it is not necessary that all the class members be aggrieved by or desire to challenge defendants' conduct in order for some of them to seek relief under Rule 23(b)(2). *Id.; see also* Fed.R.Civ.P. 23 Advisory Committee's Note.

The second requirement of Rule 23(b)(2) is satisfied because plaintiffs have requested the court to enjoin defendants from continuing to violate their constitutional rights and to declare that defendants have violated their constitutional rights. The fact that plaintiffs Jones 'El and Johnson seek to recover monetary damages for themselves does not defeat certification under Rule 23(b)(2). *Jefferson v. Ingersoll International Inc.,* 195 F.3d 894, 897 (7th Cir.1999) ("It is an open question in this circuit-and in the Supreme Court-whether Rule 23(b)(2) *ever* may be used to certify a no-notice, no-opt-out class when

compensatory or punitive damages are in issue.") (internal citations omitted).

### D. *Claims Certified in Previous Order*

In the order entered February 16, 2001, I determined that plaintiffs' conditions of confinement and privacy claims satisfy the requirements of Rule 23(a) and (b)(2); the policies and practices of the prison that are the subject of these claims affect all inmates at the institution in a "generally applicable" manner. The allegations of fact underlying these claims have changed slightly in the amended complaint.

### 1. *Conditions of confinement*

In the September 25 order, this court summarized plaintiffs' conditions of confinement claim as including the following allegations:

> constant illumination; hourly bed checks throughout the night; extreme temperatures; confinement in their cells for 24 hours a day; a lack of windows in their cells; limited use of the phone; visits by video screen; constant monitoring; insufficient time in recreational facilities and inadequate recreational facilities.

I noted that prisoners are entitled to "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Regardless of the merit of plaintiffs' claims individually, the determination whether prison conditions violate the Eighth Amendment requires a court to consider the totality of the conditions of confinement, considering things such as security and feasibility as well as the length of confinement. *Gutierrez v. Peters,* 111 F.3d 1364, 1374 (7th Cir.1997); *DeMallory v. Cullen,* 855 F.2d 442, 445 (7th Cir.1988). The rationale for examining the prisoner's conditions as a whole is that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise--for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

**\*12** In the amended complaint, in addition to reiterating the claims making up the totality of circumstances claim in their original complaint, plaintiffs allege further that they are monitored by female security staff 24 hours a day who have

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

sometimes commented on inmates' genitals within the hearing of inmates. This additional fact will not be considered part of plaintiffs' conditions of confinement claim for several reasons. First, it does not relate to the over-arching concern behind the totality claim, the sensory deprivation and social isolation imposed upon inmates. Second, if plaintiffs are arguing that monitoring by female guards causes them humiliation and mental anguish, this claim would be a claim in tort for monetary relief that is not available under the Prison Reform Litigation Act. 42 U.S.C. § 1997e(c). Finally, the Seventh Circuit has held that a female guard's monitoring of a naked inmate neither violates the inmate's right of privacy nor constitutes cruel and unusual punishment, as long as the monitoring policy was not adopted to embarrass or humiliate the inmate. *Johnson v. Phelan,* 69 F.3d 144 (7th Cir.1995). There are no allegations supporting an inference that female guards were hired at Supermax for the purpose of embarrassing and humiliating inmates. Therefore, the facts underlying the totality of the circumstances claim remain identical to the ones alleged in plaintiffs' original complaint.

### 2. Privacy

In the order of February 16, 2000, I certified for class action plaintiffs' claim for privacy under the Fourth Amendment. The allegations in the amended complaint are almost identical to those in plaintiffs' original complaint: inmates are subjected to cell, strip and body cavity searches on a frequent basis and not always for legitimate security purposes but rather to humiliate and harass inmates. In addition, under the liberal pleading requirements of Fed.R.Civ.P. 8(a), I construe plaintiffs' allegations regarding monitoring by female guards to relate to their privacy claim as well. However, as noted above, that plaintiffs are observed by female correctional officers does not state a violation under the Fourth Amendment. *Id.* Therefore, plaintiffs' motion to amend their complaint to add a claim that their right to privacy is being violated by the presence of female guards will be denied. The facts underlying the privacy claim remain identical to the ones alleged in plaintiffs' original complaint.

### E. *Eighth Amendment: Inadequate Medical, Dental and Mental Health Care*

The Eighth Amendment requires the government " 'to provide medical care for those whom it is punishing by incarceration." ' *Snipes v. Detella,* 95

F.3d 586, 590 (7th Cir.1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To state a claim warranting constitutional protection, a plaintiff must allege facts from which it can be inferred that he had a serious medical need (objective component) and that prison officials were deliberately indifferent to this need (subjective component). *Estelle,* 429U.S. at 104;*seealsoGutierrez,* 111 F.3d at 1369. Attempting to define "serious medical needs," the Court of Appeals for the Seventh Circuit has held that they encompass not only conditions that are life-threatening or that carry risks of permanent, serious impairment if left untreated, but also those in which the deliberately indifferent withholding of medical care results in needless pain and suffering. *Id.* at 1371. The Supreme Court has held that deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

**\*13** To state a claim of cruel and unusual punishment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 106. Inadvertent error, negligence, gross negligence or even ordinary malpractice are insufficient grounds for invoking the Eighth Amendment. *Vance,* 97 F.3d at 992;*seealsoSnipes,* 95 F.3d at 590-91;*Franzen,* 780 F.2d at 652-53.

In the order of September 25, 2000, I granted plaintiff Johnson leave to proceed on his claim that he received inadequate dental care for his oral pain, pericoronitis and bleeding gums. In the order of February 16, 2001, I determined that the allegations of fact in the original complaint regarding the claims for inadequate medical and dental care were specific to the named plaintiffs and did not certify the claim for class action. In their amended complaint, plaintiffs allege that Supermax provides inadequate medical, dental and mental health care on a systemic level.

Plaintiffs allege that the medical care at Supermax is provided by a private, for-profit contractor that does not provide medical staffing sufficient to treat inmates at Supermax. Plaintiffs give examples in their amended complaint of situations in which inmates with serious medical needs, such as pain resulting from stomach cancer and from kidney

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

stones, did not receive prompt medical attention despite the inmates' having asked medical staff for treatment. Similarly, plaintiffs with serious dental and mental health needs, such as abscesses in need of root canals and suicidal tendencies, have not received medical attention despite their requests for treatment. (For the purpose of determining class certification, I am considering the individual problems as examples of a systemic problem but not as a basis for any action as to the particular inmate alleging a cause of action based on his problem.) Plaintiffs have alleged facts sufficient to establish that defendants are deliberately indifferent to their serious medical needs.

This claim for deliberate indifference to serious medical needs involves factual and legal issues that are common to all members of the class. Fed.R.Civ.P. 23(a). The question whether defendants' inadequate staffing violates plaintiffs' rights under the Eighth Amendment is generally applicable to the class. Fed.R.Civ.P. 23(b)(2). Therefore, plaintiffs' claim for inadequate medical, dental and mental health care will be certified as part of the class action.

#### F. *Eighth Amendment: Excessive Force*
Plaintiffs' claim of the use of excessive force is new in the proposed amended complaint. The central inquiry in analyzing an excessive force claim for constitutional validity is whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine whether force was used appropriately, a court considers factual allegations revealing the safety threat perceived by the officers, the need for the application of force, the relationship between that need and the amount of force used, the extent of the injury inflicted and the efforts made by the officers to mitigate the severity of the force. *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In their amended complaint, plaintiffs allege that security guards regularly control inmates by using electroshock devices known as the "Ultron II" and the "stun shield" rather than by utilizing less harmful behavior control methods. In addition, plaintiffs allege that guards use inappropriate physical force when responding to self-harm and disruptive behavior of mentally ill inmates. Plaintiffs have alleged facts regarding use of the Ultron II and the stun shield sufficient to state a claim against defendants.

**\*14** Plaintiffs' allegation that defendants use physical force inappropriately with respect to mentally ill inmates is not amenable for consideration in a class action. Claims of excessive physical force require a case-by-case analysis of the circumstances in order to determine whether the amount of force used in each scenario was commensurate with the perceived need for force, taking into consideration the extent of the inmate's injury and the effort made by the officers to mitigate the force. *Whitley,* 475 U.S. at 321. Because the inquiry is highly individualized, plaintiffs' claim that the physical force used against mentally ill inmates at Supermax is excessive does not pass the typicality or commonality prerequisites to class certification under Fed.R.Civ.P. 23(a).

In contrast, plaintiffs' excessive force claim is suitable for class action as to defendants' use of the Ultron II stun gun and the stun shield. Although the distinction between these devices is not clear from the complaint, I assume that both are electroshock devices capable of emitting potentially lethal force. Plaintiffs allege that these electroshock devices cause great pain and often leave burn marks on the skin. Without examining the details of each class member's experience with the stun gun and the stun shield, I will certify this claim for class action only as to the question whether use of the stun gun and stun shield constitutes excessive force under any circumstances.

#### G. *First Amendment: Denial of Religious Items and Religious Land Use and Institutionalized Persons Act*
In the order of September 25, 2000, I granted plaintiffs Jones 'El and Johnson leave to proceed on their free exercise of religion claim in which they alleged that defendants denied them use of various religious items. In the amended complaint, plaintiffs allege that the restriction on religion is systemic at Supermax in violation of both the free exercise clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S .C. § 2000cc.

I find that this claim is not appropriate for treatment in a class action because it does not satisfy the prerequisites of numerosity, commonality and typicality under Fed.R.Civ.P. 23(a). In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court enunciated the proper standards to be applied in considering prisoners' free exercise claims. The Court held that prison restrictions that infringe on an inmate's

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

exercise of his religion will be upheld if they are reasonably related to a legitimate penological interest. *Id.* at 349 (applying same standard to free exercise claims that applies where prison regulations impinge on inmates' constitutional rights). *See also Sasnett v. Litscher,* 197 F.3d 290, 292 (7th Cir.1999) ("Nothing in [*Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ] authorizes the government to pick and choose between religions without any justification."). The Court of Appeals for the Seventh Circuit has identified several factors which can be used in applying the "reasonableness" standard:

**\*15** 1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;

2. whether there are alternative means of exercising the right in question that remain available to prisoners;

3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and

4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. *Al-Alamin v. Gramley,* 926 F.2d 680, 685 (7th Cir.1991) (quoting *Williams v. Lane,* 851 F.2d 867, 877 (7th Cir.1988)) (additional quotation marks omitted).

In the amended complaint, plaintiffs allege that defendants do not allow them to keep various religious items in their cells, including hardcover Korans, kufis (head coverings), prayer rugs, Bibles, Bible correspondence materials, Muslim books, eagle feathers, headbands, drums, sage, cider and sweet grass. If this claim were certified for class action, it would be necessary to perform an individual analysis of each factor applied to each of these items, defeating the prerequisites of typicality and commonality. These items represent several different religions practiced by inmates at Supermax. However, there has been no showing that the religions represent those of the entire class or that a sufficient number of inmates practice a form of these religions that require these items, defeating the numerosity prerequisite. This claim requires too much individualized analysis to be certified for class

action.

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, holds the government to a higher standard than the free exercise clause of the First Amendment. The act states that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling state interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). For each religious item listed in the amended complaint, this court would have to determine whether the burden is substantial, whether the state has a compelling interest in denying its use and whether the means of denying its use is the least restrictive. Despite the fact that these inquiries are not identical to those under the First Amendment, the nature of the inquiry under the Religious Land Use act is just as individualized. For the same reasons as those stated above, I find that plaintiffs' claim for denial of religious items fails to satisfy the prerequisites of commonality and typicality under Rule 23(a).

*H. Fourteenth Amendment: Due Process*

**\*16** The Fourteenth Amendment prevents the state from depriving someone of life, liberty or property without due process of law--usually in the form of notice and some kind of hearing by an impartial decision maker. A procedural due process violation against government officials requires proof of inadequate procedures *and* interference with a liberty or property interest. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). In *Sandin v. Conner,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that liberty interests "will be generally limited to freedom from restraint which ... imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." After *Sandin,* in the prison context, protectible liberty interests are essentially limited to the loss of good time credits because the loss of such credit affects the duration of an inmate's sentence. *See Wagner v. Hanks,* 128 F.3d 1173, 1176 (7th Cir.1997) (when sanction is confinement in

Not Reported in F.Supp.2d                                                                                  Page 12
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

disciplinary segregation for period not exceeding remaining term of prisoner's incarceration, *Sandin* does not allow suit complaining about deprivation of liberty).

In their amended complaint, plaintiffs allege that the solitary confinement, denial of privileges, additional regulations and restrictions on protected and discretionary activities, the limitation on educational and employment opportunities, the lack of access to legal materials and legal counsel and the behavior modification program at Supermax impose an atypical and significant hardship on plaintiffs in relation to the ordinary incidents of prison life in the Wisconsin prison system. In short, plaintiffs contend that they have a liberty interest in remaining out of Supermax and that they were denied due process hearings before their placement there.

Although the conditions of confinement may violate plaintiffs' right to be free from cruel and unusual punishment, the conditions do not implicate a liberty interest under the Fourteenth Amendment. Plaintiffs allege that prisoners who are placed at Supermax serve more time in confinement than had they not been placed at Supermax. However, prisoners do not have a liberty interest in remaining out of segregation status so long as that period of confinement does not exceed the remaining term of their incarceration. *Wagner,* 128 F.3d at 1176. Plaintiffs also allege that the majority of inmates at Supermax do not meet the mandatory criteria for placement there: those who have demonstrated that they pose a high risk of escape, assaultive misconduct or other conduct likely to cause harm to themselves or others. Although defendant may not be following a Department of Corrections policy, this conduct does not infringe upon a liberty interest. Plaintiffs do not allege that they are held at Supermax beyond the term of their incarceration or that they have lost good time credits because of their placement at Supermax. *Id.* Plaintiffs have not alleged facts sufficient to establish that remaining out of Supermax implicates a liberty interest under *Sandin.* This claim will be dismissed for failed to state a claim upon which relief may be granted.

### I. Notice to the Class

**\*17** Pursuant to Rule 23(d)(2) and in accordance with the February 16, 2001 order, notice of the amendment to this class action must be provided because the allegations certified for class action have changed. The following amended notice is consistent

with this order and will be distributed to inmates and posted in accordance with this order.

The United States District Court determined on August 14, 2001, that this action is a class action brought on behalf of all persons who are now, or will in the future be, confined in the Supermax Correctional Institution in Boscobel, Wisconsin. The defendants in this case are Supermax Warden Gerald Berge and Department of Corrections Secretary Jon Litscher.

The complaint in this action alleges as follows:

1. That the totality of the conditions at Supermax constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Such conditions include constant illumination; hourly bed checks throughout the night; extreme temperatures; confinement of prisoners in their cells for 24 hours a day; a lack of windows in cells; limited use of the phone; visits by video screen; constant monitoring; insufficient time in recreational facilities and inadequate recreational facilities.

2. That Supermax prisoners are subjected to cell searches, strip searches and body cavity searches without cause in violation of the Fourth Amendment to the United States Constitution.

3. That the systemic inadequacies of the provision of medical, dental and mental health care at Supermax constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment to the United States Constitution.

4. That use of the stun gun and the stun shield constitutes excessive force in violation of the Eighth Amendment to the United States Constitution.

The United States District Court has not yet decided whether these allegations are true or to what relief, if any, the plaintiffs are entitled.

This suit seeks a judgment declaring that the alleged conditions at Supermax are unconstitutional and enjoining the defendant from engaging in the policies and practices that cause such conditions. Because the relief sought by plaintiffs is injunctive, class members may not opt out of the class. At the same time, this case does not prevent inmates from bringing separate lawsuits to present their claims for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 13
Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)
**(Cite as: 2001 WL 34379611 (W.D.Wis.))**

damages. However, except under exceptional circumstances, most such cases will likely be stayed until after the court has ruled on the constitutionality of the alleged practices and procedures at issue in this case.

The class is represented by Edward Garvey and Pamela McGillivray of Garvey & Stoddard; David C. Fathi of the National Prison Project of the ACLU Foundation; Howard Eisenberg, Dean and Professor of Law at Marquette University Law School; Micabil Diaz Martinez, Legal Director of the ACLU of Wisconsin; and Robin Shellow of the Shellow Group. All correspondence should be addressed to:

    **\*18** Garvey & Stoddard, S.C.
    634 W. Main Street, Suite 101
    Madison, WI 53703

Every inmate may write to Judge Barbara Crabb if he has concerns about how the case is being handled by the attorneys for the class. Such correspondence should be addressed to:

    The Honorable Barbara B. Crabb
    United States District Court, Western District of Wisconsin
    U.S. Courthouse
    120 N. Henry Street
    Madison, WI 53703

This notice must remain posted at Supermax Correctional Institution and will be distributed to prisoners upon their admission to Supermax until this action has ended.

### ORDER

IT IS ORDERED that

1. Plaintiffs' motion for class certification under Fed.R.Civ.P. 23(b)(2) is GRANTED as to their claims for deliberate indifference to serious medical needs, including medical, dental and mental health care, and for excessive force by use of the stun gun and stun shield.

2. De'Ondre Conquest, Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad Goetsch, Edward Piscitello, Quinton L'Minggio, Lorenzo Balli, Donald Brown, Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini and Andrew Collette are added as plaintiffs.

3. Jon Litscher is added as a defendant.

4. In all other respects, plaintiffs' motion to amend their complaint is DENIED.

5. Defendants must distribute a copy of the notice set forth in this order to all current inmates at Supermax Correctional Institution by September 1, 2001, and to all incoming inmates upon their arrival at Supermax. Also, defendants must post notice in the law library or libraries in the institution no later than September 1, 2001.

Not Reported in F.Supp.2d, 2001 WL 34379611 (W.D.Wis.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Mark SHOOK and Dennis Jones, on behalf of
themselves and all others similarly
situated, Plaintiffs,
and
James Vaughan, Shirlen Mosby, Thomas Reinig,
Lottie Elliott, and Victor
Siegrist, Intervenor Plaintiffs,
v.
The BOARD OF COUNTY COMMISSIONERS OF
the COUNTY OF EL PASO and Terry Maketa, in
his official capacity as Sheriff of El Paso County,
Defendants.
**Civil Action No. 02-cv-00651-RPM.**

June 28, 2006.

David Cyrus Fathi, National Prision Project,
Washington, DC, Mark Silverstein, American Civil
Liberties Union, Thomas S. Nichols, Davis, Graham
& Stubbs LLP, Denver, CO, Plaintiffs and Intervenor
Plaintiffs.

Gordon Lamar Vaughan, Sara Ludke Cook, Vaughan
& Demuro, Jay Allen Lauer, El Paso County
Attorney's Office, Colorado Springs, CO, for
Defendants.

ORDER DENYING CLASS CERTIFICATION

RICHARD P. MATSCH, Senior District Judge.

**\*1** In the five complaints filed in this action, the
original plaintiffs and intervening plaintiffs
("plaintiffs") have alleged sufficient facts to support
their claims that the protection against cruel and
unusual punishment granted to them by the Eighth
Amendment to the United States Constitution, made
applicable to state and local governments by the
Fourteenth Amendment, was violated by acts and
omissions of employees and agents of the Sheriff of
El Paso County, Colorado while the plaintiffs were
inmates housed in the El Paso County Jail. More
particularly, the allegations identify each of these
plaintiffs as persons with serious mental health needs
which were not met, resulting in harm to them.They
do not seek damages for such harm; they ask only for

declaratory and injunctive relief on behalf of a class,
comprising "all persons with serious mental health
needs who are now, or in the future will be, confined
in the El Paso County Jail," or alternatively, "all
persons who are now, or in the future will be,
confined in the El Paso County Jail."

The motion for certification of a class under
Fed.R.Civ.P. 23(b)(2), filed June 17, 2005, is
opposed by the defendants and the issues have been
adequately briefed. The motion is denied because the
plaintiffs have not met the requirements of Rule
23(a)(2) and (3). The questions of law or fact are not
sufficiently common to either of the classes for which
certification is sought and the claims and defenses are
not typical of either class as identified. Additionally,
the plaintiffs have not shown that the defendants have
acted or refused to act on grounds generally
applicable to either of the putative classes in a
manner that would make appropriate the broad
injunctive relief or corresponding declaratory relief
requested as necessary to support certification under
Rule 23(b)(2).

The Jail houses recent arrestees, persons awaiting
trial, and persons convicted and sentenced to terms of
two years or less. The Jail comprises two buildings,
both located in Colorado Springs--the Criminal
Justice Center and the Metro Detention Center. The
five complaints [FN1] allege the following facts in
support of the plaintiffs' individual claims: Plaintiff
Mark Shook asserts that he suffers from a form of
autism known as Asperberger's Syndrome, as well as
bipolar disorder. He alleges that before his arrival at
the Jail in fall 2001, he regularly took two anti-
psychotic drugs prescribed by his psychiatrist. He
complains that after he arrived at the Jail he had no
access to any medications, and when after three
weeks he finally did see a doctor, the doctor would
not prescribe his regular medications because they
were not on the Jail's list of approved medications.

> FN1. The five complaints are (1) the class
> action complaint of plaintiffs Mark Shook
> and Dennis Jones, filed on April 2, 2002, (2)
> the complaint in intervention of James
> Vaughan and Shirlen Mosby; (3) the
> plaintiffs' supplemental class action
> complaint; (4) the complaint in intervention

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
(Cite as: 2006 WL 1801379 (D.Colo.))

Page 2

of Thomas Reinig and Lottie Elliott, and (5) the complaint in intervention of Victor Siegrist. James Robillard, one of the original plaintiffs, moved to withdraw and was dismissed from this action on December 3, 2002.

Plaintiff Dennis Jones states that he has been diagnosed as bipolar and suffers from depression, anxiety, and suicidal thoughts. He asserts that before he entered the Jail in September 2001, he was prescribed two drugs to control his symptoms. Mr. Jones complains that after he was confined, Jail officials denied him access to any medications for nearly a month. He alleges that when he finally obtained a prescription, he received only one of the drugs he needed and the dosage was insufficient to provide relief for his symptoms. In addition, he complains that the Jail staff who monitored the levels of his medication took blood samples too soon or too long after he received his medication for the tests to be accurate.

**\*2** Plaintiff-intervenor Shirlen Mosby states that she is bipolar and has experienced numerous attacks of anxiety, depression, feelings of hopelessness, and suicidal thoughts. She alleges that during her confinement, Jail officials improperly placed her in special detention cells and belittled her condition. She also alleges that she was able to attempt suicide three times because of inadequate supervision at the Jail.

Plaintiff-intervenor James Vaughan asserts that he is bipolar and suffers from nearly continuous conditions of depression, anxiety, and "racing thoughts." He claims that he was deprived of any medication for many days after he arrived at the Jail as a pretrial detainee, and that he had inadequate access to psychiatric care while there. In addition, he complains that he did not receive the blood tests necessary to monitor the anti-depressant medication he required.

Plaintiff-intervenor Thomas Reinig alleges that he has a history of psychiatric hospitalizations and diagnoses dating to the early 1990s, and has been diagnosed with schizoaffective disorder and paranoid schizophrenia. His was incarcerated in the Jail as a pretrial detainee in September 2003, and for a period between March and June 2004 was sent to the state psychiatric hospital in Pueblo, Colorado. At the Jail he was prescribed a variety of psychiatric

medications and listed as a potential suicide risk. Mr. Reinig complains of having been confined eight times in a toiletless special detention cell, sometimes while restrained with handcuffs and leg irons. He also complains that several times Jail staff-subjected him to shocks from a taser and threatened him with the use of the taser on additional occasions. In addition, he alleges that Jail authorities have strapped him into the Jail's restraint chair, and on other occasions have threatened the use of the restraint chair. [FN2]

> FN2. Mr. Reinig is the prisoner identified as "Prisoner No. 13" in the Supplemental Complaint. (¶¶ 37-38).

Plaintiff-intervenor Lottie Elliott states that she arrived at the Jail on November 18, 2004, after having spent three days on the psychiatric ward of St. Francis Hospital after a suicide attempt on November 15, 2004. She alleges that she was released to the Jail with a prescription written by the hospital psychiatrist for the administration of an anti-psychotic medication. She complains that the Jail's medical staff changed her medications without consulting her or warning her of possible side effects of the new drugs. After she complained for several days, Jail staff permitted her family to pick up the previously written prescription form from her property, fill it at a community drugstore, and bring the medications to the Jail. She alleges that ten days passed before she began receiving the medications prescribed by the hospital psychiatrist, and the dosage administered by Jail staff was inadequate. Ms. Elliott alleges that her requests for additional medication were unanswered until she met with the Jail's psychiatrist and by then she had been incarcerated for approximately four weeks and had attempted suicide. [FN3]

> FN3. Ms. Elliott is the prisoner identified in the supplemental complaint as "Prisoner No. 7." (¶¶ 2223).

**\*3** Plaintiff-intervenor Victor Siegrist alleges that he suffers from schizoaffective paranoid disorder (bipolar type) and seizures. His complaint states that he has been confined in the Jail since April 27, 2005, except for periods when he was in Memorial Hospital and in the Colorado Mental Health Institute at Pueblo for reasons related to this mental health problems. He alleges that during his confinement at the Jail he was deprived of necessary medications. He also alleges that he was held for periods of time in cells having no sink or toilet. He complains of being forced to attend

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

court appearances in a humiliating suicide gown and of being subjected to shocks from a taser. In addition, he alleges that the defendants failed to protect him adequately from the risk of self-harm. He asserts that at the Mental Health Institute at Pueblo, he received medications that stabilized his condition, but upon his return to the Jail, his medication was changed without his having been examined by a doctor. He maintains that he observed and experienced inadequate mental health staffing at the Jail.

The complaint and supplemental complaint describe various incidents that occurred at the Jail between 1999 and 2005 involving persons identified as "Prisoners 1-14." The plaintiffs allege that those incidents show administrative deficiencies, such as inadequate staffing and training, that increase the risk of mental and physical harm to mentally ill inmates, including the risk of self-harm.

The plaintiffs seek an order enjoining the defendants to:
• provide sufficient numbers of mental health and custody staff, with adequate training, to provide for the serious mental health needs of class members;
• provide safe and appropriate housing for prisoners with serious mental health needs;
• discontinue use of the "special detention cells" to house prisoners exhibiting signs of mental illness;
• provide inpatient psychiatric care for prisoners whose serious mental health needs require it;
• cease using restraints, pepper spray, and electroshock weapons ("tasers") against prisoners exhibiting signs of mental illness in circumstances that pose a substantial risk of serious harm to such prisoners;
• implement an adequate system to provide appropriate medication to prisoners whose serious mental health needs require it and to monitor the effects of that medication; and
• provide adequate screening and precautions to prevent self-harm and suicide.
(Supplemental Compl. ¶ 68).

The plaintiffs seek to represent the proposed class, and they bear the burden of proving that the requirements of Rule 23 are satisfied. *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988). To determine whether this action should proceed as a class action, the court must first determine whether the four threshold requirements of Rule 23(a) are met. *Adamson v. Bowen,* 855 F.2d 668, 675 (10th Cir.1998). Rule 23(a) provides:

*4 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the representative parties and (4) the representative parties will fairly and adequately protect the interests of the class.

If those requirements are met, "[the court] must then examine whether the action falls within one of the three categories of suits set forth in Rule 23(b)." *Adamson,* 855 F.2d at 675. Plaintiffs seek certification pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class as a whole."

There is no need to identify those who are or may become members of a class for certification under Rule 23(b)(2), which does not require notification, but there must be a sufficient definition to develop the contours for identifying the issues sought to be adjudicated and determine whether those issues are within the court's jurisdictional and institutional competence to grant the relief requested.

The plaintiffs' claims are sufficient to state a claim for damages under 42 U.S.C. § 1983 making officials liable for constitutional violations caused by them. They do not request damages. Injunctive relief is a recognized form of equitable relief under that statute. The form of the injunction must comply with the requirements of Rule 65(d), as follows:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Fed.R.Civ.P. 65(d). The plaintiffs recognize that limitation and allege that class certification is necessary because the plaintiffs are no longer in the Jail facilities and their individual exposure to the claimed violations is not likely to reoccur. They contend that if future violations are to be prevented, the court must enter its orders under Rule 23(b)(2).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

There are three flaws in the class approach to the claims sought to be adjudicated in this civil action. First, the inherent complexities in determining what persons present a need for treatment of mental disorders while confined. Second, the limitations on this court's ability to adjudicate the factual and legal issues in a manageable way. Third, the inability of the court to fashion the remedy requested, given the requirements of Rule 65(d) and the jurisdictional limitations imposed by the Prison Litigation Reform Act ("PLRA") in 18 U.S.C. § 3626.

**\*5** That statute did not alter or amend Rule 23 but it did restrict the court's ability to provide equitable relief of the kind requested in this case. Accepting that there maybe prospective relief for the benefit of a class of persons beyond the named plaintiffs, the restriction clearly stated is that the order must be narrowly drawn and "extend no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

The plaintiffs candidly state that their purpose in pursuing this class action is to determine the "scope of prisoner's constitutional rights to mental health services" and identify it as the legal question that is common to the entire class of "Jail prisoners with serious mental health needs." That statement misapprehends the established law. Implicit in that statement is the assumption that the Constitution affirmatively creates a right to mental health services or treatment. It does not. The Constitution prohibits denial of treatment for medical needs, including mental health needs, of which jail officials are aware.

The interest protected by the Eighth Amendment is highly individualistic and case specific in character. Broadly stated, the courts have interpreted its prohibition of cruel and inhuman punishment to equate the failure to provide medical treatment for serious medical needs of prisoners with such punishment, if that failure results from a deliberate indifference on the part of the prison officials. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Proof of a violation of this protection requires a showing that the prisoner has some particular need for medical treatment that is "serious" and that the prison officials were deliberately indifferent to it. Id.; see also Riddle v. Mondragon, 83 F.3d 1197, 1203 (10th Cir.1996) "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention." Riddle, 83 F.3d at 1202 (internal quotations and citations omitted).

Deliberate indifference is more than the failure to provide that attention. There must be a showing that the officials have knowledge that the prisoner has a condition requiring special treatment or care and, with such knowledge, disregard it resulting in excessive risk to the prisoner's health. In an action for damages, the plaintiff must show actual physical injury resulting from-- that is caused by--the failure of care. If treatment is provided but it is below the relevant standard of care, there is no constitutional claim. Deliberate indifference is more than negligence. A claim for relief under § 1983 is based on the Constitutional violation, not the law of torts. Under the PLRA, there is no justiciable claim if there is no physical injury. "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

**\*6** To proceed with the plaintiff's claims in this case would require an expansion of this well established law to interpret the Eighth Amendment as mandating prison officials to take affirmative action to prevent or protect against the possibility of an occurrence of a violation in the future. When determining whether an action should proceed as a class action, the court should refrain from evaluating the merits of the plaintiffs' claims, Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir.1982), but the court may consider whether the plaintiffs' definition of the class and their statement of the common legal questions differ from established law. Furthermore, the court may consider the nature of the plaintiffs' claims and how the proof or defense of such claims relates to the standards of Rule 23.

Medical needs in the physical sense are more identifiable than those arising from mental or emotional conditions because medical needs in the physical sense are largely identifiable objectively. In contrast, mental disorders are more difficult to categorize, and indeed the term "mental disorder" is not subject to precise boundaries. The Manual of the American Psychiatric Association states, "although this manual provides a classification of mental disorders, it must be admitted that no definition adequately specifies precise boundaries for the concept of 'mental disorder.' " American Psychiatric

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

Association, *Diagnostic and Statistical Manual of Mental Disorders,* xxi (4th ed. 1994) ("DSM-IV"). The American Psychiatric Association recognizes that its descriptions of behaviors and symptoms that categorize various mental disorders classify disorders, not classes of people. The DSM-IV states, "A common misconception is that a classification of mental disorders classifies people, when actually what are being classified are disorders that people have." DSM-IV at xxii. That Manual specifically avoids using classifications of mental disorders to refer to classes of people, emphasizing instead the individual nature of mental disorders. *See id.* That reference work further cautions that its descriptions of behaviors characterizing various mental disorders "may not be wholly relevant to legal judgments...." DSM-IV at xxvii.

The terminology used by the plaintiffs in their pleadings does not match the language of the DSM-IV. Most of the named plaintiffs are identified as having some form of Bipolar Disorder. That is but one of the 16 major diagnostic classes in the Manual and it is subclassified into 4 types of disorders (Bipolar I Disorder, Bipolar II Disorder, Cyclothymia, and Bipolar Disorder Not Otherwise Specified) with separate criteria sets. *See* DSM-IV at 35066. Consider the complexity of this description of the Diagnostic Features of Bipolar I Disorder:

There are six separate criteria sets for Bipolar I Disorder: Single Manic Episode, Most Recent Episode Hypomanic, Most Recent Episode Manic, Most Recent Episode Mixed, Most Recent Episode Depressed, and Most Recent Episode Unspecified. Bipolar Disorder I, Single Manic Episode, is used to describe individuals who are having a first episode of mania. The remaining criteria sets are used to specify the nature of the current (or most recent) episode in individuals who have had recurrent mood episodes.

*7 The essential feature of Bipolar I Disorder is a clinical course that is characterized by the occurrence of one or more Manic Episodes ... or Mixed Episodes.... Often individuals have also had one or more major Depressive Episodes.... Episodes of Substance-Induced Mood Disorder (due to the direct effects of a medication, other somatic treatments for depression, a drug of abuse or toxin exposure) or of Mood Disorder Due to a General Medical Condition do not count toward a diagnosis of Bipolar I Disorder. In addition, the episodes are not better accounted for by a Schizoaffective Disorder and are not superimposed

on Schizophrenia, Schizophreniform Disorder, Delusional Disorder, or Psychotic Disorder Not Otherwise Specified. Bipolar I Disorder is subclassifed in the fourth digit of the code according to whether the individual is experiencing the first episode (i.e., Single Manic Episode) or whether the disorder is recurrent. Recurrence is indicated by either a shift in the polarity of the episode or an interval between episodes of at least 2 months without manic symptoms. A shift in the polarity is defined as a clinical course in which a Major Depressive Episode evolves into a Manic Episode or a Mixed Episode or in which a Manic Episode or a Mixed Episode evolves into a Major Depressive Episode. In contrast, a Hypomanic Episode that evolves into a Manic Episode or a Mixed Episode, or a Manic Episode that evolves into a Mixed Episode (or vice versa), is considered to be only a single episode. For recurrent Bipolar I Disorders, the nature of the current (or most recent) episode can be specified (Most Recent Episode Hypomanic, Most Recent Episode Manic, Most Recent Episode Mixed, Most Recent Episode Depressed, Most Recent Episode Unspecified).

DSM-IV at 35051. Manic, or major depressive episodes may range from mild to severe. *Id.* at 351. According to the DSM-IV, the majority of individuals with Bipolar I Disorder return to a fully functional level between episodes. *Id.* at 352.

Although not specifically mentioned in Rule 23, a prerequisite of a class action is that there must be a class. 7A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 1760 (3d ed.2005). While it is true that notice to members of a Rule 23(b)(2) class is not required, every Rule 23 class must have a defined boundary. Certification of a nebulous class would result in numerous procedural problems. Compliance with class-wide injunctive relief would be impossible to monitor, if it would even be possible to enter an order meeting the requirements of Rule 65(d). In addition, certification of a vaguely defined class would lead to uncertainty about the preclusive effect of the action.

The plaintiffs seek certification of a class comprised of "all persons with *serious mental health needs,* who are now, or in the future will be, confined in the El Paso County Jail," but the term "serious mental health needs" is vague. The plaintiffs have not offered any definition of that term. There are many varieties and degrees of mental disorders, and those who operate Jails are not required to offer treatment

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

or alter their custody procedures for every psychological problem exhibited by prisoners. *See, e.g., Riddle,* 83 F.3d at 1204 (plaintiffs who claimed that prison lacked adequate treatment for prisoners suffering from deviant sexual compulsions failed to satisfy the *Estelle* requirement of showing "serious medical need").

**\*8** As discussed above, "serious medical need" has been defined as a condition that has been diagnosed by a physician as mandating treatment or one that is so obvious that a lay person would recognize it as needing medical attention, but that standard is of little use in defining the class in this action. The Constitution does not require that each Jail inmate receive an extensive mental health evaluation by a physician or mental health professional at the time of intake. Whether an inmate is obviously suffering from a serious medical condition due to a mental disorder depends on the events and circumstances giving rise to that prisoner's claim of deliberate indifference. "All persons with *serious mental health needs* who are now, or in the future will be, confined in the El Paso County Jail" is a group that is too amorphous to proceed as a class, even one under Rule 23(b)(2).

The plaintiffs have proposed an alternative class defined as "all persons who are now, or in the future will be, confined in the El Paso County Jail." The fact that the plaintiffs have proposed an alternative class definition suggests that they foresee the procedural problems that will inevitably result if the class were to be defined as "all persons with serious mental health needs, who are now, or in the future will be, confined in the El Paso County Jail." The plaintiffs' alternative class definition, however, is too broad. There are no allegations that the defendants' actions or inactions violate the Eighth Amendment rights of every Jail inmate. The plaintiffs do not claim, for example, that the use of a taser or pepper spray to subdue a prisoner constitutes cruel and unusual punishment in every instance, their complaint is about the use of such devices to restrain prisoners who suffer from severe mental illness. The issue is then whether the proposed class of "all persons with serious mental health needs who are now, or in the future will be, confined in the El Paso County Jail" meets the requirements of Rule 23.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. The plaintiffs allege that the El Paso County Jail regularly

houses 1,000 inmates or more, and its population has been as high as 1,312. The plaintiffs cite national statistics showing that approximately 20% of jail prisoners have some kind of mental illness. They assert that this statistic shows that Rule 23(a)(1)'s numerosity requirement is met. Their proposed class, however, is comprised of those with *serious* mental health needs. That group is not defined. The plaintiffs instead emphasize "impracticability," arguing that the fluid nature of a Jail population renders individual claims impracticable. The plaintiffs assert that "unless a class is certified, the conditions under which mentally ill and suicidal prisoners are confined at the El Paso County Jail are effectively immunized from judicial review." The public records of this court contradict that assertion. Conditions at the El Paso County Jail have been and are the subject of individual actions. [FN4] The question is whether the plaintiffs have satisfied all of the requirements of Rule 23.

> FN4. The supplemental complaint includes allegations regarding the suicides of Jail prisoners Brian Bennett and Marca Wilson. Civil Action No. 03-cv-00492-RPM, an action for damages against the Board of County Commissioners of El Paso County and others arising out of the death of Brian Bennett was dismissed based on stipulations submitted on March 17, 2004 and April 27, 2004. Civil Action No. 03-cv-01919-RPM, an action for damages brought by the statutory heir of Marca Wilson against the Board of County Commissioners of El Paso County and others is pending in this court.

**\*9** Rule 23(a)(2) requires that there be questions of law or fact common to the class. This prerequisite is met if there is single issue of law or fact common to the class. *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1288 (10th Cir.1999). Certification under Rule 23(b)(2) of a claim seeking the application of a common policy is not precluded merely because the claims of individual class members differ factually, but when the claims of the named plaintiffs arise from diverse factual situations and the remedies they seek are based on diverse legal theories, commonality is lacking. See *Hart,* 186 F.3d at 1288-90.

The facts common to the class are that the plaintiffs and putative class members suffer from mental illness and were confined in the El Paso County Jail. Other than those common features, the circumstances

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

giving rise to the class members' claims vary greatly. These differences are significant because the facts relevant to the determination of whether an Eighth Amendment violation occurred varies depending on the type of violation alleged. Plaintiff Reinig, for example, complains of being shocked by a taser. Determination of this complaint would require inquiry into whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm. *See Hudson v. McMillian,* 503 U.S. 1, 67 (1992); *Mitchell v. Maynard,* 80 F.3d 1433, 1440 (10th Cir.1996). Plaintiff Mosby complains of being held in a toiletless special detention cell. A claim of that type requires evaluation of the duration and severity of the alleged deprivation. *See Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir.1998). Lottie Elliott alleges that she was able to attempt suicide several times. A claim for failure to protect against the risk of self-harm involves factual issues about the prison official's knowledge of the inmate's mental condition and the care and security provided to the inmate. *See Barrie v. Grand County, Utah,* 119 F.3d 862, 864 (10th Cir.1997). Evaluation of the claims asserted on behalf of the class would require examination of the unique circumstances surrounding each incident alleged to constitute a constitutional deprivation.

  The proposed class suffers from the same deficiency as the proposed class in *Hart.* In that case, the United States Court of Appeals for the Tenth Circuit Court of Appeals stated, "Other than all being disabled in some way and having had some sort of contact with New Mexico's child welfare system, no common factual link joins these plaintiffs." 186 F.3d at 1289. Similarly, in this action, there is no single question of fact common to the class.

Rule 23(a)(2)'s commonality requirement may also be met by showing a common question of law, but commonality requires more than that the claims of class members be bound by a broad legal theme. Rule 23(a)(2) is not satisfied by generalized allegations of policy failures or systemic deficiencies. *See Hart,* 186 F.3d at 1289. The plaintiffs have not identified any common legal question applicable to the class, rather they assert an assortment of alleged constitutional violations. No single policy, custom, procedure or alleged administrative deficiency unites the claims of the plaintiffs or the putative class members. An inmate's suicide or suicide attempt does not by itself show deliberate indifference on the part of the Jail's staff and administrators, nor does the use

of pepper spray or tasers necessarily show an Eighth Amendment violation. Trial of the claims asserted on behalf of the class would require separate evaluation of all of the circumstances surrounding each incident, including the behavior exhibited by the prisoner, the knowledge of prison staff regarding the prisoner's condition, and the response of the Jail staff.No single claim or legal issue could be resolved on a class basis.

*10 The plaintiffs contend that "scope of prisoners' constitutional rights to mental health services is a legal question common to the entire class of Jail prisoners with serious mental health needs." (Pls.' mot. for class certification at 7). The plaintiffs' objective is to have this court prescribe Jail practices for the humane treatment of mentally ill prisoners, but that broad objective does not satisfy the commonality requirement. The plaintiffs' request for class-wide remedies does not mean there are legal questions common to the entire class. The plaintiffs are seeking relief far wider than that necessary to redress the constitutional torts alleged.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims of the class." The claims may arise from differing fact situations, but must be "based on the same legal or remedial theory." *Adamson,* 855 F.2d at 676. This standard "is closely related to the test for the common-question prerequisite in subdivision (a)(2)." 7A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 1764.

  The plaintiffs fail to satisfy the typicality prerequisite for the same reasons that they fail to satisfy the commonality prerequisite. The plaintiffs' claims and the claims of the putative class members arise under the Eighth Amendment, but their claims are not based on any single course of conduct, and there is no legal issue which, if resolved, would control the claims of the class. The plaintiffs request seven categories of injunctive relief on behalf of the class, but such relief is requested on the basis of an assortment of claims.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this prerequisite, the plaintiffs must show that their interests are aligned with those of the persons they seek to represent and that they will vigorously prosecute the class through qualified counsel. *Rutter & Wilbanks Corp. v. Shell Oil Co.,*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

314 F.3d 1180, 1187-88 (10th Cir.2002). The plaintiffs are represented by qualified counsel associated with the American Civil Liberties Union of Colorado and the ACLU National Prison Project. Plaintiffs and their counsel have vigorously pursued this case since it was commenced in 2002, and no conflicts between plaintiffs or their counsel and other class members have been identified. In this regard the plaintiffs have shown that they would be adequate class representatives, but they have failed to satisfy Rule 23(a)'s commonality and typicality requirements, and they have not adequately defined the class.

The plaintiffs have not met the threshold requirements of Rule 23(a). For many of the same reasons, the plaintiffs fail to satisfy the requirement that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Significantly, for a class to be certified pursuant to Rule 23(b)(2), the opposing party's actions or inactions must be "generally applicable" to the class.

*11 As discussed above, the plaintiffs do not complain of a written policy or standard procedure or practice to which all class members are subject. The plaintiffs do not complain of lack of conduct that is premised on grounds applicable to the entire class. Instead they contend that a number of separate incidents collectively show administrative deficiencies amounting to deliberate indifference. The problem is that there are unique factual circumstances relevant to each incident alleged by the plaintiffs, and determination of whether the alleged incidents show a policy or custom of deliberate indifference would require separate assessment of each incident alleged by the plaintiffs as an example of such indifference. Notably, the allegations with respect to the persons identified as Prisoners 1-14 arise from distinct acts. The defendants' responses to those claims draw from each prisoner's Jail history and medical files. The individual nature of the asserted claims and the individual nature of the defenses to those claims renders this action unmanageable as a class action. "The vehicle of class litigation must ultimately satisfy practical as well as purely legal considerations." Shook v. El Paso County, 386 F.3d 963, 973 (10th Cir.2004).

The facts alleged in the complaints could support individual claims for relief, but those allegations do not show that final injunctive relief or declaratory relief with respect to the class as a whole is appropriate. The plaintiffs request this court to enter an order addressing matters such as the propriety of using tasers and pepper spray to subdue mentally ill prisoners, the propriety of temporarily holding mentally ill prisoners in special detention cells, when and by whom mental health evaluations and treatment should be provided, the types of psychiatric medication that should be made available to prisoners, how such medication should be prescribed and administered, the numbers of mental health and custody staff that should be employed at the Jail, and the type of training that should provided to Jail employees. Some of these matters, such as the use of pepper spray and tasers, cannot be addressed prospectively on a class-wide basis. Whether the use of such devices with particular prisoners comports with the Eighth Amendment must be evaluated on the basis of individual circumstances, and if a violation occurred, a remedy to address the harm suffered by the affected prisoner or prisoners can be fashioned. The broad relief sought by the plaintiffs shows that they are not simply seeking to redress past constitutional torts and prevent there recurrence, rather they want this court to set standards for Jail practices with respect to mentally ill prisoners. This court is not the appropriate decision maker to determine what constitutes "adequate" training for Jail staff, or what medications should be on the Jail's list of approved medications, or how many employees are needed for "sufficient" Jail staffing. This court must respect its constitutional boundaries and refrain from usurping the role of prison administrators.

*12 The plaintiffs argue that the Tenth Circuit's opinion in Ramos v. Lamm, 639 F.2d 559 (10th Cir.1980) shows that a Rule 23(b)(2) class action is an appropriate method for litigating disputes about the constitutionality of prison conditions. Ramos v. Lamm must be read within the context of its facts and subsequent developments in the law. Ramos depended upon a factual showing that the State of Colorado was operating a prison facility that was so outdated and poorly managed that all aspects of confinement there warranted condemnation as cruel and inhuman punishment, requiring an order that it be closed unless remedial measures were taken to bring it into conformity with court directed standards. Those standards were altered on appeal. There can be no doubt that the orders entered in that case are well

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　　Page 9
Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)
**(Cite as: 2006 WL 1801379 (D.Colo.))**

beyond the limitations of the PLRA and no equivalent remedy could now be provided. Additionally, both the Tenth Circuit and the Supreme Court have subsequently more clearly identified what can be characterized as the deliberate indifference that gives rise to a claim of violation of the Eighth Amendment.

The PLRA did not add new elements to the class certification process, and the PLRA's limitations on broad prospective relief are not determinative of the class certification issue, but neither can those limitations be ignored. If this court does not have the authority to grant the injunctive relief requested, the purpose of proceeding as a class action is defeated. Rule 23(b)(2) necessarily presumes that the court has the power to grant "appropriate final injunctive relief or corresponding declaratory relief appropriate to the class as a whole." Thus, the definition of the class is the critical element in determining what relief is appropriate.

When subdivision (b)(2) was added to Rule 23, one of its purposes was to facilitate class action suits seeking the enforcement of civil rights, but that historical fact does not mean that every purported class action alleging constitutional violations is suitable for class adjudication. Here the proposed class is vague, the claims of deliberate indifference arise from a variety of factual circumstances and legal theories, the plaintiffs' claims are based on conduct not generally applicable to the class, and class-wide injunctive relief is not appropriate.

Based on the foregoing, it is

ORDERED that the plaintiffs' motion for class certification is denied.

Not Reported in F.Supp.2d, 2006 WL 1801379 (D.Colo.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.