# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEITH MATHIS, REON HOLLOWAY, DAVID ROGERS, BENJAMIN HAMILTON, CARL BUTLER, HAROLD ROBINSON, CHARLES LEWIS, JOHN DOE, JOHN ROE, and JIMMIE FOWLER, individually and on behalf of others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 07-1155 (RMU) |
| GEO GROUP, INC.; UNITED STATES OF AMERICA, through its department, the FEDERAL BUREAU OF PRISONS; and HARLEY LAPPIN, in his official capacity as Director of the UNITED STATES BUREAU OF PRISONS, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## REPLY IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

## TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 4

I.     PLAINTIFFS FAIL TO STATE AN EIGHTH AMENDMENT CLAIM
       AGAINST FEDERAL DEFENDANTS ................................................................ 4

       A.     Plaintiffs' Attempt To Apply A Subjective "State Of Mind" Standard To
              The BOP Is Wholly Illogical And Contrary To Circuit And Supreme Court
              Precedent ................................................................................................. 4

       B.     Plaintiffs' Eighth Amendment Claim Cannot Properly Rest On Their
              Mischaracterization Of The Provisions Of The Contract Between The
              BOP And GEO Group ............................................................................... 8

       C.     The Bop Is Permitted – And Here, Is Required – To Delegate The
              Responsibility To Provide Inmate Medical Care To A Private Entity .................. 11

II.    PLAINTIFFS FAIL TO STATE A REHABILITATION ACT CLAIM ................ 14

       A.     The Procurement Contract Between The BOP And GEO Does Not
              Constitute Federal Financial Assistance Within The Meaning Of Section 504 ...... 14

       B.     Plaintiffs Have Not Pled A Claim Under The "Conducted By" Clause
              Of Section 504, And Any Assertion Of Such A Claim Would Be Futile .............. 17

       C.     Plaintiffs Have Failed To Clarify How Their Allegations Of Poor Medical
              Care State A Claim Of Discrimination By Reason Of Disability .......................... 18

III.   THE ALLEGEDLY DISABLED PLAINTIFFS ARE BARRED BY SOVEREIGN
       IMMUNITY FROM SEEKING DAMAGES FROM THE BOP UNDER THE
       REHABILITATION ACT .................................................................................. 20

IV.    THOSE PLAINTIFFS WHO ARE NO LONGER INMATES AT RIVERS
       SHOULD BE DISMISSED FROM THIS CASE ON GROUNDS OF STANDING
       AND MOOTNESS ............................................................................................ 23

V.     TRANSFER OF THIS CASE TO THE EASTERN DISTRICT OF NORTH
       CAROLINA IS WARRANTED ...................................................................................... 24

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

Allison v. Howard Univ., 209 F. Supp. 2d 55 (D.D.C. 2002) .........................................................18

*Baker v. Dist. of Columbia, 326 F.3d 1302 (D.C. Cir. 2003) ...................................................1, 6, 7

Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971) .................................................5

Brown v. Dist. of Columbia, No. 04-2195, 2005 WL 3276267 (D.D.C. Aug. 2, 2005) .................7

Bryant v. Madigan, 84 F.3d 246 (7th Cir. 1996) ..........................................................................18

Cason v. Dist. of Columbia Dep't of Corrs., 477 F. Supp. 2d 141 (D.D.C. 2007) .......................5, 6

City of Canton v. Harris, 489 U.S. 378 (1989) ...............................................................................6

Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001) .........................................................................13

Cuco v. Fed. Med. Ctr.-Lexington,
      No. 05-232, 2006 WL 1635668 (E.D. Ky. Jun. 9, 2006) (unpublished) ..............................19

DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377 (10th Cir. 1990) ..........................16

*Dorsey v. United States Dep't of Labor, 41 F.3d 1551 (D.C. Cir. 1994) .................3, 20-21, 22, 23

Farmer v. Brennan, 511 U.S. 825 (1994) .......................................................................................5

Fed. Employees for Non-Smokers' Rights (FENSR) v. United States,
      446 F. Supp. 181 (D.D.C. 1978) .......................................................................................17

Fisher v. United States, 441 F.2d 1288 (3d Cir. 1971) ............................................................. 9-10

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992) ...................................................22

*Lane v. Pena, 518 U.S. 187 (1996) ........................................................................3, 20, 21, 22

Lathers v. Penguin Indus., Inc., 687 F.2d 69 (5th Cir. 1982) ......................................................... 9

*Logue v. United States, 412 U.S. 521 (1973) ........................................................................8, 9, 13

*Macharia v. United States, 238 F. Supp. 2d 13 (D.D.C. 2002) ................................................. 9, 10

McNally v. Prison Health Servs., 46 F. Supp. 2d 49 (D. Me.1999) ...................................................19

Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978) ...............................................7

Muller v. Hotsy Corp., 917 F. Supp. 1389 (N.D. Iowa 1996) ............................................................16

People by Vacco v. Mid Hudson Med. Group, 877 F. Supp. 143 (S.D.N.Y. 1995) ........................15

Rashad v. Doughty, No. 00-6088, 2001 WL 68708 (10th Cir. 2001) (unpublished) ..........................18

Redd v. Rubin, 34 F. Supp. 2d 1 (D.D.C. 1998) ................................................................................18

Rogers v. Johnson-Norman, 466 F. Supp. 2d 162 (D.D.C. 2006) ....................................................10

Shirk v. Garrow, 505 F. Supp. 2d 169 (D.D.C. 2004) ......................................................................17

United States v. Univ. Hosp., 575 F. Supp. 608 (E.D.N.Y. 1983) ....................................................15

West v. Atkins, 487 U.S. 42 (1988) ...............................................................................................2, 12

## STATUTES

28 U.S.C. § 1404(a) ............................................................................................................................24

29 U.S.C. § 794(a) .................................................................................................................14, 20, 22

29 U.S.C. § 794a ..........................................................................................................................21, 22

42 U.S.C. § 1983 ..................................................................................................................................6

National Capital Revitalization and Self-Government Improvement Act ("Revitalization Act"),
    Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734-37 (1997) ..............................................13

## REGULATIONS

28 C.F.R. § 39.130 ........................................................................................................................17-18

28 C.F.R. § 41.3 ..............................................................................................................................3, 15

45 C.F.R. § 84.3(h) ............................................................................................................................15

Federal Acquisition Regulation, 48 C.F.R. Ch. I ..............................................................................16

## INTRODUCTION

As explained in federal defendants' memorandum in support of their motion to dismiss, a claim that Eighth Amendment violations have occurred at the Rivers Correctional Institution ("Rivers"), a private prison operated by codefendant GEO Group, Inc. ("GEO Group" or "GEO") under contract with the Federal Bureau of Prisons ("BOP"), is insufficient to state a claim that the BOP or its Director (collectively, "BOP" or "federal defendants") have <u>committed</u> the alleged violations. Despite the authorities cited by federal defendants on this issue, plaintiffs continue to argue in their opposition memorandum that actions of GEO Group or its employees or contractors are somehow directly imputed to federal defendants because federal defendants allegedly "knew" about the claimed inadequate medical care provided to inmates at Rivers. However, no authority supports the notion that a subjective state of mind can be ascribed to a federal agency, and for this reason a controlling D.C. Circuit opinion directs that even where a predicate Eighth Amendment violation has been established, a government entity can only be deemed to have committed that violation if the entity's policy or custom was the moving force behind the violation. <u>Baker v. Dist. of Columbia</u>, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

Despite this Circuit precedent, plaintiffs renounce any intention of ascribing the allegedly inadequate medical care to a BOP policy or custom. Instead, they point to the contract through which the BOP procured GEO Group's services in housing BOP inmates and claim that this contract contemplated such a high degree of BOP involvement in Rivers' daily operations that the BOP is essentially the one running things there; in other words, they argue that the contract proves that the contract may as well not exist. This claim is implausible on its face, and indeed a review of the actual terms of BOP-GEO contract reveals that plaintiffs have mischaracterized the

-1-

nature of the BOP's involvement at Rivers. While the BOP retains the authority to ensure Rivers personnel comply with basic background requirements for security purposes, and imposes compliance requirements on GEO Group, the BOP does not oversee day-to-day operations at Rivers, including the provision of medical care. Duties in that regard are clearly delegated to GEO Group by the BOP-GEO contract.

Plaintiffs argue that through this delegation federal defendants are seeking to evade their constitutional responsibilities, in violation of principles set forth in West v. Atkins, 487 U.S. 42 (1988). The truth is that federal defendants have little choice but to delegate to a private prison the responsibilities that accompany the activity of housing inmates, in light of their statutory obligation to house a certain percentage of D.C. inmates in a private prison. The BOP could not fulfill this statutory mandate without, as a practical necessity, delegating to that private prison all the responsibilities that would otherwise be carried out by the BOP, including the provision of medical care. Furthermore, the Supreme Court in West simply decided that the contractor could be held liable for violating an inmate's Eighth Amendment rights. Plaintiffs' extensive discussion of why the Court should recognize that contractors such as GEO Group must qualify as government actors ultimately has little bearing on the question of whether the BOP can be held responsible for GEO's alleged actions.

Plaintiffs also fail to overcome the defects in their Rehabilitation Act claim.[1]  Plaintiffs attempt to counter the well established rule that money paid for goods or services is not "Federal financial assistance" within the meaning of the Act by suggesting discovery might reveal that the

---

[1]Only a subset of the plaintiffs actually allege Rehabilitation Act claims. For the sake of convenience, the term "plaintiffs" will be used to refer to this subset as well as to all plaintiffs.

BOP-GEO contract does in fact provide a subsidy to GEO.  However, the BOP-GEO contract is a procurement contract that was awarded after a competitive bidding process.  This type of contract clearly does not provide any form of subsidy and is expressly excluded from the definition of "financial assistance" that appears in a regulation of the Department of Justice, which governs the BOP.  See 28 C.F.R. § 41.3(e).  Plaintiffs' alternative suggestion that they could still bring a claim based on the theory that Rivers medical care is an activity "conducted by" the BOP would require them to amend their Complaint.  In any case, however, plaintiffs have not offered any authority for their implicit suggestion that the BOP can be held vicariously liable under the Rehabilitation Act for something undertaken by a private contractor.  Moreover, plaintiffs' attempt to clarify how they have been discriminated against by reason of their alleged disabilities in fact serves only to confuse the issue.  Plaintiffs first describe physical obstructions faced by those who are confined to wheelchairs.  They then inexplicably focus on deficiencies in medical care, rather than on the architectural barriers that they allege obstruct access, as the cause of the alleged problem.  Plaintiffs have not succeeded in stating a claim that any of them were provided with a different standard of medical care at Rivers because of their disabilities.

Plaintiffs concede that if their claim that the BOP provides GEO with financial assistance fails, they are barred by sovereign immunity from seeking damages based on alleged violations of Section 504 of the Rehabilitation Act.  They fail to acknowledge that the same is true even if they raise a claim based on activities "conducted by" the BOP.  However, the Supreme Court decision on which plaintiffs rely, Lane v. Pena, 518 U.S. 187 (1996), did not overrule the D.C. Circuit opinion in Dorsey v. United States Dep't of Labor, 41 F.3d 1551 (D.C. Cir. 1994), and under Dorsey, plaintiffs cannot seek damages from federal defendants in regard to Rehabilitation Act

-3-

claims under either clause of Section 504.

Plaintiffs refuse to concede that the seven of them who are no longer at Rivers have no equitable claims available. However, their suggestion that class allegations can save their claims from mootness is without merit, particularly in light of the highly disparate nature of their allegations, which require individualized, fact-specific inquiry. Where five of the ten were not at Rivers at the time the Complaint was filed, and all seven were no longer there at the time plaintiffs filed for class certification, these Article III issues should be considered before plaintiffs' motion to certify a class and subclass.

Finally, plaintiffs attempt to dismiss the arguments raised by federal defendants in support of their alternative motion to transfer because federal defendants chose not to repeat the full discussion that has already occurred in connection with GEO Group's identical motion. Instead of engaging in unnecessary repetition, federal defendants have sought to emphasize the importance of the fact that the relevant actions occurred in the Eastern District of North Carolina, and the relevant evidence is located there – at least for proper plaintiffs who remain at Rivers.

## ARGUMENT

I.    **PLAINTIFFS FAIL TO STATE AN EIGHTH AMENDMENT CLAIM AGAINST FEDERAL DEFENDANTS**

A.    **Plaintiffs' Attempt To Apply A Subjective "State Of Mind" Standard To The BOP Is Wholly Illogical And Contrary To Circuit And Supreme Court Precedent**

As explained in federal defendants' opening brief, in order to state a claim that a government agency has exhibited "deliberate indifference" to an inmate's serious medical need in violation of the Eighth Amendment, a plaintiff must identify a custom or policy of the

government agency and allege that that custom or policy has caused the constitutional harm. Fed. Defs.' Op. Br. at 18-19. Despite controlling authority on this point, plaintiffs eschew this standard and instead base their Eighth Amendment claim against the BOP entirely on the suggestion that the BOP "is <u>directly</u> liable for the injuries detailed in the Complaint" because the BOP "must have known" of a substantial risk of serious harm through its "on-site supervision and control over activities at the Rivers facility." Pls.' Opp. at 8, 10. Plaintiffs' position cannot be sustained because it would require a court to impute a subjective "state of mind" to a federal agency. Plaintiffs erroneously attempt to apply to the BOP the subjective standard of "deliberate indifference" that the Supreme Court applied to federal prison officials sued in their individual capacities. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994) (considering claims brought under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971)).

Plaintiffs' contention finds no support in any precedent of this or any other court. The subjective standard for claims against individuals looks to the "state of mind" of the prison official, requiring that the official "know[] of and disregard[] an excessive risk to inmate health or safety." <u>Id.</u> As the Supreme Court in <u>Farmer</u> recognized, "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." <u>Id.</u> at 841. For this reason, plaintiffs' proposed standard is simply unworkable and has never been applied to prison facilities, much less to government agencies that contract with those facilities.[2] Indeed, the D.C. Circuit has expressly rejected this

---

[2]Plaintiffs cite <u>Cason v. Dist. of Columbia Dep't of Corrs.</u>, 477 F. Supp. 2d 141, 144-45 (D.D.C. 2007), in support of their cited standard. <u>See</u> Pls.' Opp. at 10. The pro se plaintiff in <u>Cason</u> named the D.C. Department of Corrections ("DOC") as a defendant, along with prison officials. The court dismissed the DOC and substituted the District of Columbia as the proper defendant because a District agency "is not a suable entity." <u>Cason</u>, 477 F. Supp. 2d at 143 n.2.

standard in the context of actions asserted under 42 U.S.C. § 1983 against the District of

Columbia, in a case cited in federal defendants' opening brief but ignored by plaintiffs.  Baker v.

Dist. of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  Plaintiffs' assertion that the BOP

"must have known of the substantial risk of serious harm alleged in the Complaint" is therefore a

nonstarter.[3]

Instead, the standard consists of two separate steps.  Id. (describing "two-step inquiry").

First, plaintiffs must "state[] a claim for a predicate constitutional violation," which requires both

that the alleged harm at issue is sufficiently serious and that prison officials "had subjective

knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate

health or safety" that arose from that need.  Id.  This first step establishes a claim of

constitutional harm but does not identify anyone other than the individual prison officials as

responsible for that harm.  To state a claim that a public or private entity was responsible, a

plaintiff must proceed to the second step.  The second step requires a plaintiff to allege the

existence of "a policy or custom" that was the "'moving force' behind the constitutional

---

The court in Cason had no occasion to further analyze the nature of the District's liability, as
distinct from that of its officials, because it found that the plaintiff had not stated an Eighth
Amendment claim against prison officials and thus dismissed the case.  Id. at 145.  The D.C.
Circuit has made clear that once an Eighth Amendment harm is established, the liability of the
District depends not on the District's "state of mind" but on whether "a policy or custom of the
District of Columbia caused the constitutional violation alleged."  Baker v. Dist. of Columbia,
326 F.3d 1302, 1306 (D.C. Cir. 2003).

[3] Notably, plaintiffs have specifically renounced any intention to state a claim that the
BOP is liable in a "supervisory" capacity, that the BOP is liable based on "constructive
knowledge," or that the BOP is liable on the basis of a standard parallel to that of municipal
liability.  Pls.' Opp. at 8.  Yet, their "must have known" standard appears indistinguishable from
the "should have known" constructive knowledge standard, and, as explained below, the
municipal liability standard is the only standard that can properly apply in this case.

violation." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)).  The "policy or custom" must of course be that of the entity against whom the claim is asserted.  See id. (specifying that the "policy or custom" must be that "of the District of Columbia" where the claim was against the District).[4]  Here, where the BOP does not itself operate the facility where the alleged constitutional violations occurred, nor employ or contract with the prison officials or medical professionals who allegedly committed them, the standard for asserting such a claim must be particularly high.

Plaintiffs have not met that standard here and, as noted above, have expressly renounced any intention of asserting a claim based on a BOP custom or policy.  See Pls.' Opp. at 8 ("Plaintiffs have n[ot] alleged . . . that a theory of 'municipal liability' should apply to . . . federal Defendants.").  Instead, they simply argue that provisions in the BOP-GEO contract indicate such a high degree of BOP oversight of GEO operations that the BOP "must have known" of the violations they allege.  Pls.' Opp. at 10.  They then suggest that Eighth Amendment liability automatically follows because the BOP "failed to take steps to prevent or mitigate" the risk that it must have known about.  Id.  However, an assertion that the BOP "must have known" (which is simply another way of saying "should have known") is plainly insufficient to establish a claim that the BOP has instituted a custom or policy that is the "moving force" behind the allegedly unconstitutional Rivers "pill line" or any other alleged violations.

---

[4]This Court has previously adopted this analysis when analyzing whether a plaintiff had adequately stated a claim of Eighth Amendment violation against the District of Columbia under 42 U.S.C. § 1983.  See Brown v. Dist. of Columbia, No. 04-2195, 2005 WL 3276267, at *3 (D.D.C. Aug. 2, 2005) (holding that "the District cannot be held liable . . . unless 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 (1978))).

**B.    Plaintiffs' Eighth Amendment Claim Cannot Properly Rest On Their Mischaracterization Of The Provisions Of The Contract Between The BOP And GEO Group**

As explained in federal defendants' opening brief, GEO Group operates the Rivers prison as an independent contractor pursuant to a written contract between the BOP and GEO. Fed. Defs.' Op. Br. at 15-16. Based on the similar status of a county jail which housed federal prisoners pursuant to a contract with the BOP, the Supreme Court held in Logue v. United States, 412 U.S. 521 (1973), that the United States was not liable under the Federal Tort Claims Act, 28 U.S.C. § 1346 for negligent actions of the county jail's employees. 412 U.S. at 532. While no FTCA claims are at issue here, federal defendants have argued that GEO's independent contractor status means that actions of GEO and its employees cannot automatically be imputed to the BOP, as plaintiffs appear to allege. In their opposition memorandum, plaintiffs attempt to refute GEO Group's independent contractor status by claiming that the provisions of the BOP-GEO contract allowing the BOP to monitor GEO's contract compliance operate in such a way that the BOP has "substantial oversight and authority over GEO," and that BOP employees "are in a position 'to physically supervise' contract performance at Rivers." Pls.' Opp. Mem. at 17.

The suggestion that GEO Group is somehow not an independent contractor has no merit. The D.C. Circuit's opinion in Cannon v. United States, 645 F.2d 1128 (D.C. Cir. 1981), usefully draws the distinction between prison facilities that operate as an agency of a particular government and those that operate as independent contractors. There, the court held that the plaintiff, an inmate at the Lorton Reformatory, should have sued the District of Columbia, "his immediate jailer," rather than the United States, for injuries he suffered while incarcerated. Id. at 1142. The court in Cannon noted that, on the one hand, Lorton did qualify as an agency of the

-8-

District, which was responsible for promulgating the rules and regulations that governed Lorton's operations.  Id. at 1135.  On the other hand, Lorton's relationship to the United States was the "functional equivalent" of a contractor relationship because, although Lorton inmates were "in the custody" of the BOP, the District was the entity that exercised physical control over the day-to-day supervision of inmates and their conditions of confinement.  Id. at 1140-42 & n.53.

Plaintiffs' claim here that, despite the existence of an actual written contract, GEO Group is not the functional equivalent of a contractor should be rejected.  Plaintiffs mischaracterize their own allegations, and the BOP-GEO contract, when they assert in their opposition memorandum that the contract "gave the federal Defendants control over GEO's hiring decisions, recordkeeping, and many other aspects of day-to-day operation at Rivers."  See Pls.' Opp. at 10. The truth is that, while the contract does provide for limited BOP monitoring and review of GEO decisions, and requires that GEO hire only those who pass drug and background checks unless the BOP approves a waiver, the contract does not give the BOP "control" over "day-to-day operation[s]" at Rivers.  "Broad supervisory control, even on a daily basis, does not suffice to demonstrate control over the physical performance of the contractor."  Macharia v. United States, 238 F. Supp. 2d 13, 27 (D.D.C. 2002) (holding that the United States did not exercise supervision and control over Embassy security guards working for an independent contractor where contract provisions closely resembled those at issue here); see also Lathers v. Penguin Indus., Inc., 687 F.2d 69, 73 (5th Cir. 1982) (holding that contract provisions allowing government to "prescribe safety standards" and " perform safety inspections" did not indicate that the government had the responsibility for day-to-day supervision over contract performance); Fisher v. United States, 441 F.2d 1288, 1292 (3d Cir. 1971) (holding that activities of

-9-

government inspectors designed to ensure contractor's compliance with the terms of the contract did not amount to government control over the contractor's activities).

The BOP-GEO contract did require GEO, prior to the start of the contract term, to develop plans, policies and procedures and to submit these to the BOP Contracting Officer "for review and concurrence prior to issuance of the [Notice to Proceed with the contract]."  Contract Statement of Work ("SOW") at 5-6.[5]  These plans, policies, and procedures are not to be modified by GEO "without the prior written acknowledgment of the CO."  Id. at 6.  The contract also sets forth certain hiring standards with the stated aim of ensuring "professionalism and personal integrity" in contractor staff.  Id. at 10.  Among other things, similar to the contract at issue in Macharia, 238 F. Supp. 2d at 28, the BOP-GEO contract requires that GEO provide the BOP with applicants' fingerprints so that the BOP can initiate FBI name and fingerprint checks.  SOW at 12.  Following successful checks, the contract requires GEO to conduct urinalysis drug testing and limited background investigations of those to whom GEO decides to offer conditional employment.  Id. at 12-13.  In circumstances  where the background check reveals negative information, such as a prior criminal history, and GEO submits a "request for waiver" to the CO, the contract gives the BOP authority to decide whether or not to grant the waiver.  Id. at 14.

While imposing a host of requirements on GEO in connection with general administration, fiscal management, training, records, information systems, security and control,

---

[5]While plaintiffs have submitted a copy of the contract in previous briefing, see Fed. Defs.' Op. Br. at 4 n.2, it is attached here for convenience as Exhibit A. Based on plaintiffs' quotation and citation of the contract in their Complaint, and their reliance on the terms of the contract in their opposition memorandum, the contract is "incorporated in the complaint," and the Court may therefore consider the contract without converting federal defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6)  into a motion for summary judgment.  Rogers v. Johnson-Norman, 466 F. Supp. 2d 162, 165 n.3 (D.D.C. 2006) (internal quotation omitted)).

and other matters, including the provision of health care, the contract states that "[t]he BOP anticipates a nominal number of BOP staff will be on-site to monitor contract performance and manage other BOP interests associated with operation of the private facility." Id. at 25.  The contract also "reserves [the BOP's] rights to conduct announced and unannounced inspections" at any time in order to assess contract compliance.  Id. at 7.

None of these provisions come close to indicating that the BOP engages in the kind of day-to-day oversight over medical treatment that plaintiffs now allege, nor is it practically feasible that a federal agency can maintain that level of control over the everyday actions of its contractor's employees.  Rather, as detailed in federal defendants' opening brief, Fed. Defs.' Op. Br. at 4-5, the contract imposes obligations on the contractor GEO Group to provide inmates with medical care, in effect delegating the responsibility for daily oversight of Rivers medical personnel to GEO.  While the contract imposes certain compliance mechanisms such as requiring that Rivers maintain JCAHO accreditation, it does not provide for day-to-day BOP supervision over the Rivers health care system.

**C.    The BOP Is Permitted – And Here, Is Required – To Delegate The Responsibility To Provide Inmate Medical Care To A Private Entity**

Plaintiffs next argue that GEO Group is a government actor "because the federal Defendants vested GEO with th[e] Constitutional responsibility" to provide adequate medical treatment to Rivers inmates.  Plaintiffs here attempt to respond to federal defendants' argument in their opening brief that the BOP could not be held to have vicariously committed an unconstitutional act to the extent that act was allegedly committed, in the first instance, by a private actor, whose actions do not implicate the Constitution.  Fed. Defs.' Op. Br. at 16.  Federal

defendants have further explained, however, that the BOP cannot be held vicariously liable in any event.  In other words, even if the Court were to find that GEO Group performs a public function or is otherwise acting under color of federal law, that finding would only allow plaintiffs to bring their Eighth Amendment claims against GEO Group, not against the BOP.  For the reasons explained here and in federal defendants' opening brief, the allegation that GEO Group is a government actor is insufficient to state a claim that the BOP has committed an Eighth Amendment violation.

Plaintiffs base their claim that GEO Group is a government actor on the Supreme Court's opinion in West v. Atkins, 487 U.S. 42 (1988).  In West, the Court held that a private physician under contract with a State to provide medical care to inmates acted under color of state law, for purposes of a § 1983 claim against the physician.  Id. at 56.  The Court in West stated that "[c]ontracting out prison medical care does not relieve the State of its Constitutional duty to provide adequate medical treatment to those in its custody, and it does  not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."  Id.  Taken in context, this sentence simply restates West's holding that inmates may vindicate their Eighth Amendment rights by suing a private contractor that has taken on a public function.  As plaintiffs acknowledge, West essentially held that the constitutional duty, though not relieved, is transferred to the private physician, through his contract with the State, which "vests" him with the State's constitutional obligations.  Pls.' Opp. Mem. at 13; cf. West, 487 U.S. at 56  ("The State bore an affirmative obligation to provide adequate medical care to [plaintiff]; the State delegated that function to [a physician]; and [the physician] voluntarily assumed that obligation by contract.").  West did not hold that the government entity that contracted with the private

-12-

physician to provide medical care was itself subject to suit. Thus, West does not address the issue here, and plaintiffs are incorrect when they state that West is "controlling authority" on that point. See Pls.' Mem. Opp. at 14.

Plaintiffs recognize in their opposition memorandum that the BOP has "delegated to GEO a Constitutional duty to provide adequate medicare care" to those inmates that are in BOP custody but are housed in the GEO Group facility at Rivers. Pls.' Opp. Mem. at 2. They do not challenge this delegation as per se unconstitutional, nor can they. As explained in the BOP's opening brief, the BOP entered into a contract with a private facility to house D.C. Code felony offenders pursuant to its statutory mandate under the National Capital Revitalization and Self-Government Improvement Act ("Revitalization Act"), Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734-37 (1997). The constitutionality of that statutory requirement has not been challenged, and no court, as far as federal defendants are aware, has ever held that the government may not contract with a private entity to house inmates in its custody.[6]

Thus, while plaintiffs proceed at length to argue that GEO Group is a government actor, Pls.' Opp. Mem. at 12-18, their argument misses the point because it fails to explain on what basis the BOP should be held accountable for the actions allegedly committed by GEO Group and its employees.[7] Contrary to plaintiffs' assertions, federal defendants have not argued that the

---

[6]An electronic database search of judicial decisions reveals that a significant number of states have entered into contracts to house inmates at private prisons. The BOP has contracted with private facilities other than Rivers to perform tasks including housing federal inmates as well as operating halfway houses. E.g., Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 63 n.1 (2001). It has also in the past contracted with state and local facilities to perform this task. See Logue, 412 U.S. at 529.

[7]Plaintiffs' argument on this point is also simply confusing. It makes no sense to assert that the BOP has vested its affirmative duty in another entity and then to argue that the BOP,

existence of a contract between the BOP and GEO Group "insulates the[] [BOP] from liability" for Eighth Amendment violations at Rivers in all circumstances. However, federal defendants do maintain that the existence of a contract delegating the provision of inmate medical care to a private prison changes the nature of the BOP's constitutional duty. As discussed, any Eighth Amendment claim against the BOP must be based on a custom or policy of the BOP that allegedly caused the alleged injury. Where medical care is being provided, in the first instance, by employees or independent contractors of a private prison, it remains necessary for a claimant to point to a custom or policy of the BOP, rather than the contractor, that is allegedly deficient. As discussed, the only alleged customs or policies cited by plaintiffs, such as the requirement that Rivers inmates obtain their medications by standing in a "pill line," are those of the Rivers facility, not the BOP. Plaintiffs have therefore failed to state an Eighth Amendment claim against the BOP.

## II.    PLAINTIFFS FAIL TO STATE A REHABILITATION ACT CLAIM

### A.    The Procurement Contract Between The BOP And GEO Does Not Constitute Federal Financial Assistance Within The Meaning Of Section 504

Section 504 of the Rehabilitation Act only applies to programs and activities that either "receiv[e] Federal financial assistance" or are "conducted by" an executive branch agency or the United States Postal Service. 29 U.S.C. § 794(a). Plaintiffs' Complaint rests its claim on the first possibility, asserting that the BOP has "provid[ed] funding and financial assistance" to GEO Group and Rivers, and that "GEO operates a 'program or activity receiving Federal financial

---

rather than the other entity, is responsible for carrying out that same duty. Plaintiffs once again fail even to acknowledge that the existence of a private contractor charged with providing adequate medical care necessarily – as both a legal and a practical matter – changes the nature of the BOP's obligations in that regard.

assistance.'" Compl. ¶¶ 73-74. However, as explained in federal defendants' opening brief, the

exchange of money for services through a procurement contract, such as that between the BOP

and GEO Group, does not constitute "financial assistance" within the meaning of Section 504.

Fed. Defs.' Op. Br. at 10-12. Indeed, Department of Justice regulations, which govern the BOP,

expressly exclude procurement contracts from the scope of this provision. 28 C.F.R. § 41.3(e)

("Federal financial assistance means any grant, loan, contract (other than a procurement contract

or a contract of insurance or guaranty) . . . .").

In their opposition memorandum, plaintiffs provide no authority to the contrary. Instead,

they cite cases holding that federal funding through Medicare and Medicaid programs qualifies as

federal financial assistance under Section 504. However, those decisions relied on the fact that

Medicare and Medicaid reimbursements, unlike procurement contracts, were not expressly

excluded from the Department of Health and Human Service's definition of federal financial

assistance in 45 C.F.R. § 84.3(h), which is identical to the DOJ's definition. People by Vacco v.

Mid Hudson Med. Group, 877 F. Supp. 143, 149 (S.D.N.Y. 1995); United States v. Univ. Hosp.,

575 F. Supp. 608, 612 (E.D.N.Y. 1983). These cases reasoned that the Medicare and Medicaid

programs were more like federal program grants, provided to recipients in order that those

recipients provide a service to the ultimate program beneficiaries, than they were like

procurement contracts. See id. In arguing that the BOP contract with GEO is analogous to

Medicare and Medicaid reimbursements, plaintiffs turn the reasoning of those cases on its head.

They suggest that all money that the federal government provides to others for the purpose of

providing medical care is analogous to Medicare and Medicaid assistance, and argue that the

BOP-GEO contract fits within this category because it requires GEO to provide medical care as a

-15-

part of the operations involved in housing BOP inmates at Rivers.  Pls.' Opp. Mem. at 23-24.

However, the contractual requirement that GEO provide inmates with medical care cannot change the fact that the contract is a procurement contract.  Through this contract, the BOP acquired GEO Group's services in housing inmates in BOP custody in a GEO Group-operated facility.  The bidding process it followed was in accord with the Federal Acquisition Regulation, 48 C.F.R. Ch. I.  See Contract section B, at 2 (ex. A).

Plaintiffs suggest that it would be inappropriate to decide this issue on a motion to dismiss because discovery may provide plaintiffs with information showing that GEO actually receives a subsidy from the BOP rather than simply payment for services.  Pls.' Opp. Mem. at 25.  Plaintiffs cite no examples of courts requiring discovery in order to conclude that a procurement contract does not provide a subsidy.  As the DOJ regulation's express exclusion implicitly recognizes, procurement contracts by their nature are intended to provide nothing more than payment for goods or services.  In a similar case, the Tenth Circuit ruled that it was unnecessary for the court "to scrutinize the fair market value of every transaction as if we were article III accountants."  DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1382 (10th Cir. 1990).  The court held that the government's intent to reduce costs by replacing government security guards with private guards, and its use of a competitive bidding process, sufficed to show the absence of "financial assistance" within the meaning of Section 504.  Id. at 1382-83; see also Muller v. Hotsy Corp., 917 F. Supp. 1389, 1417-18 (N.D. Iowa 1996) (citing cases and agency regulations showing that the weight of authority declined to consider contracts for goods or services as providing federal financial assistance).  The same factors are present here, and this Court should accordingly hold that plaintiffs have failed to state a Rehabilitation Act claim.

-16-

**B.     Plaintiffs Have Not Pled A Claim Under The "Conducted By" Clause Of Section 504, And Any Assertion Of Such A Claim Would Be Futile**

Plaintiffs argue in their opposition memorandum that even if the BOP has not provided federal financial assistance to GEO Group within the meaning of Section 504 of the Rehabilitation Act, they have nevertheless "allege[d] facts sufficient to conclude" that the provision of medical care to Rivers inmates "constitutes a federally conducted 'program or activity.'"  Pls.' Opp. Mem. at 25.  However, plaintiffs' Complaint does not actually allege that the relevant language of Section 504 applies here.  As noted above, the Complaint limits its Section 504 claim to the "Federal financial assistance" clause of § 794.  See Compl. ¶¶ 73-74.  Courts have not allowed plaintiffs to effectively amend their pleadings by asserting a new claim in a response memorandum that they failed to assert in their complaint.  See, e.g., Fed. Employees for Non-Smokers' Rights (FENSR) v. United States, 446 F. Supp. 181, 184 n.1 (D.D.C. 1978) (holding plaintiff failed to state a claim under 29 U.S.C. § 706 when plaintiff's complaint only cited § 704).  Rather, the complaint itself "must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Shirk v. Garrow, 505 F. Supp. 2d 169, 173 (D.D.C. 2004) (internal quotation omitted).  Federal defendants were not on notice that plaintiffs sought to assert a claim that GEO Group's provision of medical care constituted a program or activity "conducted by" the BOP and therefore did not address this supposed claim in their motion to dismiss.

Moreover, plaintiffs' supposed claim under Section 504's "conducted by" language would also be subject to dismissal.  In their attempt to assert that GEO Group's medical care activities constitute a program or activity "conducted by" the BOP, plaintiffs rely on a DOJ regulation, 28

-17-

C.F.R. § 39.130(b)(1), which states that an agency may not discriminate on the basis of disability, "directly or through contractual, licensing, or other arrangements," in "providing any aid, benefit, or service." Pls.' Opp. Mem. at 26. Plaintiffs cite Redd v. Rubin, 34 F. Supp. 2d 1 (D.D.C. 1998), in support of the idea that this language somehow makes a federal agency vicariously liable for discriminatory actions of its contractor. Redd is inapposite, however, because in that case a federal agency employee was directly involved, through her duties in administering the contract, in the allegedly discriminatory actions. The regulation nowhere indicates that the actions of contractors are to be automatically imputed to the agency. Here, there is no basis for imputing the alleged Rehabilitation Act violations committed by GEO Group personnel to federal defendants.

### C.    Plaintiffs Have Failed To Clarify How Their Allegations Of Poor Medical Care State A Claim Of Discrimination By Reason Of Disability

As explained in federal defendants' opening brief, plaintiffs' allegations of inadequate medical care are insufficient to state a Rehabilitation Act claim, which requires that a claimant assert he was discriminated against "solely by reason of his disability." Allison v. Howard Univ., 209 F. Supp. 2d 55, 63 (D.D.C. 2002). It is well established that claims of inadequate medical care or medical malpractice fail as assertions of disability-based discrimination under the Rehabilitation Act or ADA. Rashad v. Doughty, No. 00-6088, 2001 WL 68708, at *1 (10th Cir. 2001) (unpublished) (recognizing that "the failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation"); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its

disabled prisoners" and that the statute "does not create a remedy for medical malpractice");

Cuco v. Fed. Med. Ctr.-Lexington, No. 05-232, 2006 WL 1635668, at *43 (E.D. Ky. Jun. 9,

2006) (unpublished) (holding plaintiff failed to state a Rehabilitation Act claim where her claim

of exclusion from medical services failed to establish a "demonstrable nexus between the

plaintiff's disability and the exclusion complained of"); McNally v. Prison Health Servs., 46 F.

Supp. 2d 49, 58 (D. Me.1999) (recognizing the distinction between "claims that the medical

treatment received for a disability was inadequate from claims that a prisoner has been denied

access to services or programs because he is disabled").

　　　　Plaintiffs' opposition memorandum only adds confusion to the analysis.  Plaintiffs focus

their discussion of this point primarily on alleged architectural barriers in the Rivers facility.  See

Pls.' Opp. Mem. at 20 (asserting allegations related to "the lack of ramps to common areas, the

lack of accessible bathrooms and showers, the lack of accessible dining halls and classrooms, and

the lack of gym equipment usable by persons with disabilities").  They then allege that disabled

inmates fail to receive required medical treatment.  Id. at 21.  There is no obvious connection

between these two points.  One might hypothesize that plaintiffs are attempting to argue that, if

Rivers provided plaintiffs with physical therapy and other medical treatment, they would no

longer require wheelchairs and instead could travel freely through the Rivers facility without

regard to architectural barriers.  However, even if this argument were not far too speculative, it is

inconsistent with plaintiffs' contention, discussed above, that the prison health care system at

Rivers is the "program or activity" that the BOP is allegedly conducting, and to which plaintiffs

are allegedly denied meaningful access.  Id. at 25.  Plaintiffs do not appear to contend that the

alleged lack of ramps at Rivers prevents disabled inmates from accessing Rivers' health care

-19-

services.  Plaintiffs' arguments on this point are simply too incoherent to state a claim that they

have been discriminated against by reason of their alleged disabilities.

Moreover, not all of the plaintiffs who raise Rehabilitation Act claims are confined to

wheelchairs; those who are not would presumably not require ramps.  Thus, even if those

plaintiffs who are confined to wheelchairs can be said to state Rehabilitation Act claims based on

the alleged lack of ramps and other architectural barriers, the claims of the other plaintiffs should

be dismissed.

**III.    THE ALLEGEDLY DISABLED PLAINTIFFS ARE BARRED BY SOVEREIGN
        IMMUNITY FROM SEEKING DAMAGES FROM THE BOP UNDER THE
        REHABILITATION ACT**

Plaintiffs acknowledge that they are barred, under the Supreme Court's decision in <u>Lane</u>

<u>v. Pena</u>, 518 U.S. 187 (1996), from seeking damages from the BOP under the Rehabilitation Act

if their Complaint is construed as alleging a violation of 29 U.S.C. § 794(a) based on

discrimination in a "program or activity" that is "conducted by" the BOP.  Pls.' Opp. Mem. at 30

n.8.  They argue, however, that a Rehabilitation Act claimant may recover damages from a

federal agency where the claim alleges discrimination in a program or activity receiving financial

assistance from the agency.  <u>Id.</u> at 27.[8]  More specifically, they contend that § 794a(a)(2) makes

available the "remedies, procedures and rights set forth in Title VI of the Civil Rights Act of

1964," and "[t]hose remedies include awards of monetary damages."  Pls.' Opp. Mem. at 28.

As the D.C. Circuit made clear in <u>Dorsey v. United States Dep't of Labor</u>, 41 F.3d 1551

_____

[8] As federal defendants demonstrated above, the BOP is not a provider of financial
assistance within the meaning of § 794(a).  But even if BOP's contract with GEO were deemed
to be Federal financial assistance, plaintiffs' claim for damages would still plainly be barred by
sovereign immunity for the reasons set out above.

(D.C. Cir. 1994), regardless of whether an *implied* private right of action for damages may be brought against a *nonfederal* entity under Title VI, a claim for damages may not be brought against a *federal agency* in the absence of *explicit* authorization by Congress:

> Even if there is an implied right of action for damages under Title VI, and thus under section 504, it cannot exist as against the federal government. The federal government's waiver of sovereign immunity must be "unequivocally expressed" and the statutory provision containing the expression must "establish unambiguously that the waiver extends to monetary claims." [citation omitted]. Because a section 504 private right of action for damages - against anyone - must be judicially implied from a statute that is silent on the subject, Dorsey is unable to point to any explicit language in the Rehabilitation Act (or in Title VI) waiving the Government's sovereign immunity. He therefore cannot prevail. While private rights of action may be implied, waivers of sovereign immunity may not.

Dorsey, 41 F.3d at 1555.

While plaintiffs suggest otherwise, Pls.' Opp. Mem. at 28-29, nothing in the Supreme Court's subsequent decision in Lane v. Pena is to the contrary. In Lane, the Supreme Court concluded that the waiver of sovereign immunity in § 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), was inapplicable because, in that case, the Department of Transportation was not acting as a "Federal provider of . . . assistance" within the meaning of that section. The Court simply did not address what remedies would be available in circumstances where an agency is acting as a Federal provider of assistance. Through selective quotation, plaintiffs erroneously assert that the Court "explained" that Congress has waived sovereign immunity for damages claims against "Federal provider[s] of financial assistance." Pls.' Opp. Mem. at 29 (quoting Lane, 518 U.S. at 192-93). Instead, the Court merely noted that "Whatever might be said about the somewhat curious structure of the liability and remedy provisions, it cannot be disputed that a reference to 'Federal provider[s]' of financial assistance in § 505(a)(2) does not,

-21-

without more, establish that Congress has waived immunity against monetary damages beyond the narrow category of § 504(a) violations committed by federal funding agencies acting as such – that is, by 'Federal provider[s].'" Lane, 518 U.S. at 193. Thus, while the Court held that the waiver of immunity was indisputably not applicable outside the narrow category of "Federal provider[s]," it plainly did not hold that Congress has waived immunity for claims of damages (as opposed to equitable relief) against Federal providers.

Indeed, in the very next paragraph, the Court contrasted the "lack of clarity" in § 505(a)(2)'s "Federal provider" provision with the explicit waiver of the federal government's sovereign immunity from compensatory damage claims in § 505(a)(1) (relating to employment discrimination claims). Moreover, the Court reaffirmed the basic proposition that a waiver of the federal government's sovereign immunity must be unequivocally expressed in the statutory text which had formed the basis for the D.C. Circuit's decision in Dorsey. 518 U.S. at 192. As the D.C. Circuit explained in Dorsey, nothing in the statutory text of Title VI (and hence nothing in the text of § 505(a)(2) of the Rehabilitation Act) explicitly authorizes an award of damages. The Court in Lane also dismissed reliance upon cases, such as Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992) – which is cited by plaintiffs here, Pls.' Opp. Mem. at 28 – as "misplaced." Lane, 518 U.S. at 196. As the Court explained, "when it comes to an award of money damages, sovereign immunity places the Federal Government on an entirely different footing than private parties." Id. Moreover, "[§] 505(a)(2) itself indicates congressional intent to treat federal Executive agencies *differently* from other § 504(a) defendants for purposes of remedies." Id. at 197.

Consequently, far from supporting plaintiffs' assertion that Congress has waived

sovereign immunity for damages, the reasoning of the Supreme Court in Lane compels the conclusion that Title VI does *not* waive the federal government's immunity from an action for damages. Because the remedies available against the federal government under 29 U.S.C. § 794a(a)(2) are coextensive with those available against the Government under Title VI, § 794a(a)(2) also cannot provide a waiver. In any event, because Lane did not rule on the question of whether damages may be recovered against a "Federal provider," Dorsey remains controlling authority on this issue. Plaintiffs' argument to the contrary is without merit.

IV.    **THOSE PLAINTIFFS WHO ARE NO LONGER INMATES AT RIVERS SHOULD BE DISMISSED FROM THIS CASE ON GROUNDS OF STANDING AND MOOTNESS**

As explained in federal defendants' opening brief, the five plaintiffs who were no longer at Rivers at the time plaintiffs' Complaint was filed lack standing to pursue equitable relief. Fed. Defs.' Op. Br. at 22-23. Similarly, the equitable claims of these five and the two additional plaintiffs who were released or transferred from Rivers after the Complaint was filed but prior to plaintiffs' filing of their Motion for Class Certification are moot. Because, for the reasons stated in the previous section, equitable claims are the only claims against federal defendants at issue in this case, the claims of these individuals against federal defendants should be dismissed.[9]

The only argument to the contrary offered by plaintiffs has to do with the fact that they

---

[9]Plaintiffs assert that "the seven Named Plaintiffs" who are no longer at Rivers "indisputably have live claims for money damages." Pls.' Opp. Mem. at 30. Plaintiffs' Complaint does not seek money damages based on alleged Eighth Amendment violations. Thus, with respect to federal defendants, the only damages claims at issue are those asserted by the plaintiffs with alleged disabilities under the Rehabilitation Act. However, as explained, these claims are barred by sovereign immunity. Plaintiffs have also sought damages from codefendant GEO Group based on the alleged Rehabilitation Act violations as well as state law violations. Federal defendants do not address the viability of those claims.

seek to certify this case as a class action.  However, both federal defendants and GEO Group

have opposed class certification on the basis that the claims at issue in this case are highly

individualized and heavily fact-dependent.  Plaintiffs assert that the problems at Rivers are

"systemic."  However, as federal defendants discussed in their opposition to class certification,

this assertion rests on scattered examples that, for the most part, have very little in common with

each other.  For purposes of their motion to certify a class, plaintiffs rely on the disparate claims

of ten individuals as sufficient to demonstrate a systemic breakdown.  Now, they rely on

assertions of a systemic breakdown to save the individual claims of seven out of ten plaintiffs

from dismissal.  In this situation, it is most appropriate to consider the merits of the individual

plaintiffs' claims first before proceeding to consider whether class certification is appropriate.

See Fed. Defs.' Op. Br. at 24.[10]

## V.    TRANSFER OF THIS CASE TO THE EASTERN DISTRICT OF NORTH CAROLINA IS WARRANTED

Plaintiffs seek to undermine federal defendants' arguments in support of transfer by

suggesting that federal defendants have failed to analyze nine of the eleven factors relevant to a

decision to transfer a case to another district pursuant to 28 U.S.C. § 1404(a).  As federal

defendants pointed out in their opening brief, however, all relevant factors have already been

discussed in briefing submitted to this Court by codefendant GEO Group and by plaintiffs in

---

[10]To the extent plaintiffs seek to insinuate that federal defendants have somehow manipulated plaintiffs' release or transfer dates as a means of extinguishing their claims, this suggestion is without foundation and is belied by the fact that five of the named plaintiffs had left Rivers before the Complaint was filed, and that three of the named plaintiffs remain at Rivers. Moreover, the previously-submitted Declaration of James R. Schluter (attached as ex. 1 to federal defendants' opening brief) clearly indicates that inmate releases have taken place based on plaintiffs' sentences and had nothing to do with the filing of plaintiffs' lawsuit.

connection with GEO Group's motion to dismiss.  In order to avoid unnecessary repetition, federal defendants adopted GEO Group's arguments on these issues.  <u>See</u> Fed. Defs.' Op. Br. at 26 ("As codefendant GEO Group has argued, the relevant factors warrant transfer under the circumstances of this case.").  Then, rather than repeating the entire analysis, federal defendants emphasized the most compelling factors in favor of transfer.  Specifically, federal defendants have pointed to the fact that all events relevant to plaintiffs' claims occurred at Rivers.  Also, even though seven of the ten plaintiffs are no longer at Rivers, the witnesses and evidence most relevant to plaintiffs' claims of ongoing systemic deficiencies remain at Rivers as well.  For the reasons previously stated by federal defendants and by GEO Group, transfer is appropriate.

## **<u>CONCLUSION</u>**

For the foregoing reasons as well as those set forth in federal defendants' opening brief, plaintiffs' claims against federal defendants should be dismissed or, in the alternative, transferred to the Eastern District of North Carolina.

Dated: December 3, 2007                    Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director

/s/ Kathryn L. Wyer
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. NW, Room 7218
Washington, D.C.  20001
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Federal Defendant*s

# EXHIBIT A

BOP-GEO contract excerpts

## PART I - THE SCHEDULE

### SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS

**B.1  SERVICES AND PRICES/COSTS**

CONTRACTOR-OWNED/CONTRACTOR-OPERATED CORRECTIONAL
FACILITY WITHIN 300 MILES OF THE UNITED STATES CAPITOL
BUILDING, WASHINGTON, D.C.

(a)  Offeror will provide, by the terms and conditions
identified in this Request for Proposal (RFP) and any
resulting contract, all necessary personnel, equipment,
materials, supplies, and services (except as may be
furnished by the Government as specifically identified
within the RFP) and do all things necessary for, or
incident to, the management and operation of
comprehensive corrections services.

These comprehensive corrections services will serve a
population principally consisting of District of
Columbia sentenced felons.

Award resulting from this RFP will be of the Fixed
Price contract type for services incorporating an
Award-Fee provision.  At the sole discretion of the
Government an Award-Fee may be issued to the contractor
in recognition of superior quality performance. (See
Section H.3 for additional information)

The period of performance for any contract which the
Government may award under the terms and conditions of
this RFP will be for a three-year base period, with
seven one-year options to extend.  Potentially, the
contract could have a 10 year contract period.

(b)  PRICING INSTRUCTIONS

The Government will evaluate price according to the
Price evaluation factor in Section M.5 of the
solicitation.

For purposes of this solicitation, offerors must submit
an offer for the total three-year base period
requirement and each option period. Prices submitted on
a single year basis will not be considered for award.

**B.1 (Continued)**

Pursuant to Federal Acquisition Regulation (FAR) 52.217-5, Evaluation of Options, the Government's evaluation of price shall be inclusive of options.

For each performance year of the multiyear base period, the Government will notify the contractor that funds are available for performance no later than the first day of the following program year. If the contractor is not notified funds are available, cancellation of the contract will occur within 60 days of the following program year.

Accordingly, program years two and three of the base period are subject to cancellation in the event funds are not available. The cancellation ceilings for these program years are as follows:

Program Year 2 - 30% of the Total Base Period Price

Program Year 3 - 15% of the Total Base Period Price

Offerors should carefully consider and give particular attention to the multiyear features of this solicitation. Any cancellation and related contractor claim for costs will be according to FAR 52.217-2, Cancellation Under Multiyear Contracts (See Section I of the solicitation) and the cancellation ceilings set forth above.

(c)  <u>PRICING SCHEDULE</u>

For purposes of price evaluation and according to the above instructions, offerors must enter their proposed prices on the attached Pricing Schedules as provided below.

► **Three Year Base Period** - For the base period, offerors must submit one fixed price. The price will be for providing all services as required by the RFP for an Average Daily Inmate Population (equivalent to 95 % of designated bed space) as stated in the individual schedules. Monthly payment shall be based upon the contractor's fixed price divided by 36 (the number of months within the performance period).

**B.1 (Continued)**

> **Fixed Incremental Unit Price** - Offerors must submit an
> incremental unit price which will apply only when the
> when the total number of inmate days, in a monthly
> payment period, exceeds 95% of the designated bed
> space.  Population will not exceed 115% of the
> designated bed space. (See Section G.2)

> **Option Periods** - Offerors must follow the directions
> provided above for each option period.  Monthly payment
> will be based upon the contractor's fixed price divided
> by 12 (the number of months within the an option
> performance period).

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

II.   EXPLANATION OF STATEMENT OF WORK TERMS . . . . . . . . . . 2

III.  OBJECTIVE . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.  Performance Requirements . . . . . . . . . . . . . . 5
      B.  Contract Compliance . . . . . . . . . . . . . . . . . 6
      C.  General Administration . . . . . . . . . . . . . . . 7
      D.  Fiscal Management . . . . . . . . . . . . . . . . . . 9
      E.  Personnel . . . . . . . . . . . . . . . . . . . . . . 10
      F.  Training and Staff Development . . . . . . . . . . . 17
      G.  Case Records . . . . . . . . . . . . . . . . . . . . 19
      H.  Information Systems and Research . . . . . . . . . . 19
      I.  Physical Plant . . . . . . . . . . . . . . . . . . . 22
      J.  Security and Control . . . . . . . . . . . . . . . . 25
      K.  Safety and Emergency Procedures . . . . . . . . . . . 29
      L.  Discipline . . . . . . . . . . . . . . . . . . . . . 30
      M.  Inmate Rights . . . . . . . . . . . . . . . . . . . . 30
      N.  Reception and Orientation . . . . . . . . . . . . . . 31
      O.  Classification . . . . . . . . . . . . . . . . . . . 32
      P.  Health/Mental Health Care . . . . . . . . . . . . . . 32
      Q.  Social Services . . . . . . . . . . . . . . . . . . . 36
      R.  Work and Correctional Industries . . . . . . . . . . 36
      S.  Academic and Vocational Education . . . . . . . . . . 37
      T.  Recreation and Activities . . . . . . . . . . . . . . 38
      U.  Telephone . . . . . . . . . . . . . . . . . . . . . . 38

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    I.    INTRODUCTION

2    The National Capital Revitalization and Self-Government
3    Improvement Act of 1997 mandates that the Bureau of Prisons house
4    a portion of the District of Columbia sentenced felon population
5    in private contract facilities.

6    The Bureau of Prisons has proceeded to comply with this mandate
7    by identifying the appropriate populations to fulfill the
8    requirement from the overall District of Columbia sentenced felon
9    population.

10   The attached SOW identifies the technical and programmatic
11   details for a low security adult male population.

1

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    II.  EXPLANATION OF STATEMENT OF WORK TERMS

2    ACA - American Correctional Association.  The private, nonprofit
3    organization that administers the only national accreditation
4    program for all components of adult and juvenile corrections.
5    Its purpose is to promote improvement in the management of
6    correctional agencies through the administration of a voluntary
7    accreditation program and the ongoing development and revision of
8    relevant, useful standards.

9    BOP - Federal Bureau of Prisons.

10   BOPDOCS - The electronic document management system for the BOP
11   containing policy, regulations and directives.

12   CO - Contracting Officer.  The Government employee, by virtue of
13   a Contracting Officer's Warrant, empowered to negotiate, award,
14   administer, cancel or terminate contracts on behalf of the United
15   States Government.

16   Contract Award - The date the CO awards the contract.  For the
17   purposes of the contract, the date the CO signs the Standard Form
18   (SF) 33, Solicitation, Offer and Award or the SF 26, Contract
19   Award.

      COR - Contracting Officer's Representative.  The Government
21   employee designated in writing by the CO authorized to perform
22   certain limited functions on behalf of the CO.  The extent of COR
23   responsibilities are outlined in Section G of the contract and
24   the COR Designation Letter, a copy of which will be provided to
25   the contractor subsequent to contract award.

26   COTR - Contracting Officer's Technical Representative.
27   Government staff designated in writing by the CO who assist the
28   COR in the performance of duties.  The extent of COTR
29   responsibilities are delineated in writing by the CO and will be
30   provided to the contractor subsequent to award.

31   Credentials - Documents providing primary source verification
32   including education, training, licensure, experience, board
33   certification and qualifications of an employee.

34   DC - District of Columbia.

35   DCDOC - District of Columbia Department of Corrections.

2

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    DOJ - Department of Justice.

2    DHO - Discipline Hearing Officer.  The Government-trained
3    contractor employee responsible for conducting discipline
4    hearings.

5    Emergency - Any significant disruption of normal institution
6    procedure, policy or activity including but not limited to:
7    inmate disturbances; work or food strike; food borne illness;
8    escape; fire; natural disaster; or other serious incident.

9    FBI - Federal Bureau of Investigation.

10   Former Inmate - A person who has been found guilty of committing
11   a felony or misdemeanor for whom less then one year has elapsed
12   since release from custody or any type of supervision.

13   HSU - Health Services Unit.  The organizational unit providing
14   routine and emergency health care.  The HSU is the designated
15   part of the institution delivering care to inmates on an
16   ambulatory or observation basis.

17   Inmate - An individual confined under the auspices and authority
18   of the BOP or under supervision of a Federal court.

     Inmate Records - Information concerning an inmate's personal,
20   criminal and medical history, behavior and activities while in
21   custody.  This may include, but is not limited to: detainers;
22   personal property receipts; visitor lists; photographs;
23   fingerprints; disciplinary infractions and actions taken;
24   grievance reports; work assignments; program participation;
25   miscellaneous correspondence; forms prescribed by Government
26   policy, etc.

27   JCAHO - Joint Commission on Accreditation of Health Care
28   Organizations.

29   Lethal Force - The force a person uses with the purpose of
30   causing/or which they know, or should know, would create a
31   substantial risk of causing death or serious bodily harm.

32   NTP - Notice to Proceed.  The written official notice signed by
33   the CO which authorizes the contractor to proceed with the
34   contract.  The contractor shall begin accepting inmates within 30
35   days after issuance of the NTP.

3

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

OAR - Operational Availability Rate.  The monthly rate for computer services/resource components which is a percentage calculated by dividing the accumulated monthly down time hours by the total number of hours of operation for a given month.

Prime Contractor - The entity to which the Government has awarded the contract.

Professional Staff - Staff employed in the Medical, Educational, Religious and Psychological disciplines.

P.S. - Program Statement.  A BOP written directive that establishes policy in a given area.

Safety Equipment - Including but not limited to fire fighting equipment (e.g., chemical extinguishers, hoses, nozzles, water supplies, alarm systems, portable breathing devices, gas masks, fans, first aid kits, stretchers) and alarm systems.

Sensitive Information - Any information which could affect the national interest, law enforcement activities, the conduct of Federal programs or the privacy to which individuals are entitled under Section 552a of Title 5, U.S.C.

SENTRY - The BOP's on-line, real time data base system, used primarily for maintaining information about Federal inmates.  It contains information about sentencing, work assignments, admission/release status and other special assignments for monitoring inmate status.  The SENTRY system also includes property management and other modules which address most aspects of incarceration.

Subcontract - Any agreement entered into by the prime contractor with another entity to provide services and supplies to accomplish performance of the contract.

USMS - United States Marshals Service.

Warden - The contractor's official, regardless of title (e.g., Chief Executive Officer (CEO) or Facility Administrator) who has ultimate responsibility for the overall management and operation of the institution.

Additional definitions are contained in the ACA Standards for Adult Correctional Institutions.

4

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   III. OBJECTIVE

2   A.  Performance Requirements

3   This SOW sets forth the contract performance requirements for the
4   comprehensive management and operation of a contractor-owned/
5   contractor-operated corrections facility for a low security adult
6   male population.

7   Housing facilities shall be provided to accommodate at least
8   1,200 low security beds at a single site.  In addition, the
9   institution shall include a special housing unit (segregation)
10  with a capacity of at least 10% of the institution's rated
11  capacity.

12  The contractor shall ensure that the institution is operated in a
13  manner consistent with the mission of the BOP.  It is the mission
14  of the BOP to protect society by confining offenders in the
15  controlled environments of prison and community-based facilities
16  that are safe, humane, cost-efficient, and appropriately secure,
17  and that provide work and other self-improvement opportunities to
18  assist offenders in becoming law-abiding citizens.

19  The institution shall be located within a 300 mile radius of the
20  United States Capitol, Washington, D.C.

21  Contract performance shall be for a three-year base period with 7
22  one-year options, exercised unilaterally by the Government, for a
23  potential term of ten years.

24  Within 365 days following contract award, the contractor shall
25  notify the CO it is ready to accept inmates and assume full
26  responsibility for the operation, maintenance and security of the
27  institution.

28  It is essential that the contractor be fully prepared to accept
29  responsibility for performing the requirements of the contract,
30  thus ensuring the safety and security of the community.
31  Therefore, the BOP will perform numerous assessments to ensure
32  contract compliance prior to issuance of the NTP (See Contract
33  F.2).

34  Unless otherwise specified, all plans, policies and procedures,
35  including those identified in the ACA standards, shall be
36  developed by the contractor and submitted in writing to the CO

5

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  for review and concurrence prior to issuance of the NTP.  Once
2  concurrence has been granted, these plans, policies and
3  procedures shall not be modified without the prior written
4  acknowledgment of the CO.

5  If the BOP determines the contractor is capable of accepting
6  inmates, the NTP will be issued.  The contractor shall begin
7  accepting inmates within 30 days after issuance of the NTP.

8  It is anticipated that the BOP will predominantly designate
9  individuals committed as DC sentenced felons to the institution.
10 However, the BOP may designate any inmate within its custody
11 utilizing the same designation criteria as used at other BOP
12 facilities.  P.S. 5100.06, Security Designation and Custody
13 Classification Manual, outlines the procedures for designating
14 inmates.

15 Designations to the institution are anticipated to occur at an
16 estimated rate of 40 inmates per week.  The estimated weekly
17 designation of 40 inmates to the institution will result in the
18 population meeting the 1,200 bed requirement in 30 weeks.  The
19 institution designation schedule of 40 inmates per week is an
20 estimate only.  Actual designations will depend upon many
21 factors, including but not limited to, the contractor's ability
22 to provide services in accordance with the SOW; the sentencing of
   offenders by the DC and Federal Courts; the designation of
24 offenders by the BOP.

25 Unless otherwise indicated, the contractor shall furnish all
26 personnel, management, equipment, supplies and services necessary
27 for performance of all aspects of the contract.

28 Unless explicitly stated otherwise, the contractor is responsible
29 for all costs associated with and incurred as part of providing
30 the services outlined in this contract.

31 B.  Contract Compliance

32 All services and programs shall comply with the SOW; the U.S.
33 Constitution; all applicable Federal, state and local laws and
34 regulations; applicable Presidential Executive Orders (E.O.); all
35 applicable case law, consent decrees, and Court Orders.  Should a
36 conflict exist between any of the aforementioned standards, the
37 most stringent shall apply.  When a conflict exists and a
38 conclusion cannot be made as to which standard is more stringent,

6

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   the CO shall determine the appropriate standard.  The contractor
2   shall comply with and implement any applicable changes to BOP
3   policy, DOJ regulations, Congressional mandate, Federal law, DC
4   law, or E.O.  Should the Government invoke such changes the
5   contractor retains its rights and remedies under the terms and
6   conditions of the contract.

7   The BOP reserves its rights to conduct announced and unannounced
8   inspections of any aspect of contract performance at any time and
9   by any method in order to assess contract compliance.

10  C.  General Administration

11  Unless otherwise specified by the CO, the contractor is required
12  to perform in accordance with the most current edition of the ACA
13  <u>Standards for Adult Correctional Institutions</u> and <u>Standards</u>
14  <u>Supplement</u>.

15  The contractor shall obtain ACA accreditation within 24 months of
16  NTP and shall maintain continual compliance with the above
17  referenced ACA standards and supplements during performance of
18  the contract, unless otherwise specified by the BOP.  Once full
19  accreditation has been obtained, the contractor shall maintain
    this accreditation throughout the life of the contract, inclusive
    of any option year exercised.  Failure to perform in accordance
22  with contract requirements and to obtain ACA accreditation within
23  24 months of NTP will, at a minimum, result in a reduction of the
24  contract price.

25  Accomplishment of some ACA standards is augmented by BOP policy
26  and/or procedure.  In these instances, the SOW identifies and
27  provides direction for the enhanced requirements.

28  The contractor is responsible for a Quality Control Program (QCP)
29  which ensures all requirements of this SOW are achieved.  The
30  specific requirements for the QCP are detailed in Section J,
31  Attachments 2, 3, and 4 of the contract.

32  Several sections of this SOW require the contractor to maintain a
33  system of records identical to the BOP's.  The contractor shall
34  not establish a separate system of records without prior written
35  concurrence by the CO.  This requirement is necessary to maintain
36  consistency of inmate records as inmates transfer throughout the
37  BOP.

7

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  All records related to contract performance shall be retained in
2  a retrievable format for the duration of the contract.  Except as
3  otherwise expressly provided in this SOW, the contractor shall,
4  upon request of the CO or upon completion or termination of the
5  resulting contract, transmit to the Government any records
6  related to the performance of the contract.

7   The contractor shall protect, defend, indemnify, save and hold
8   harmless the United States Government, the BOP and its employees
9   or agents, from and against any and all claims, demands,
10  expenses, causes of action, judgments and liability arising out
11  of, or in connection with, any negligent or intentional acts or
12  omissions of the contractor, its agents, subcontractors,
13  employees, assignees or any one for whom the contractor may be
14  responsible.  The contractor shall also be liable for any and all
15  costs, expenses and attorneys fees incurred as a result of any
16  such claim, demand, cause of action, judgment or liability,
17  including those costs, expenses and attorneys fees incurred by
18  the United States Government, the BOP and its employees or
19  agents.  The contractor's liability shall not be limited by any
20  clause or limits of insurance set forth in the resulting
21  contract.

22  In awarding the contract, the Government does not assume any
23  liability to third parties, nor will the Government reimburse the
24  contractor for its liabilities to third parties, with respect to
25  loss due to death, bodily injury, or damage to property resulting
26  in any way from the performance of the contract or any
27  subcontract under this contract.

28  The contractor shall be responsible for all litigation, including
29  the cost of litigation, brought against it, its employees or
30  agents for alleged acts or omissions.

31  The CO shall be notified in writing by the contractor of all
32  litigation pertaining to this contract and provided copies of
33  said litigation within five working days of the filing.  The
34  contractor shall cooperate with Government legal staff and/or the
35  United States Attorney regarding any requests pertaining to
36  Federal or contractor litigation.

37  Policies and procedures shall be developed which ensure a
38  positive relationship is maintained with all levels of Federal,
39  state, and local governments.  Procedures shall include a

8

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    tracking system which ensures all Congressional/Judicial
2    inquiries and program recommendations are responded to in a
3    timely and accurate manner.  All Judicial/Congressional
4    inquiries and contractor responses, specifically related to an
5    inmate, shall be made part of the inmate's central file.

6    The CO shall be notified when a request is made for inmate or
7    employee interviews or facility visits by any representative of
8    the media as defined by P.S. 1480.03, <u>Contact with News Media</u>.
9    The contractor shall coordinate all public information related
10   issues with the CO and clear, in advance, all press statements
11   and releases.

12   The contractor shall ensure its employees agree to use
13   appropriate disclaimers clearly stating the employees' opinions
14   do not necessarily reflect the position of the BOP or DOJ in any
15   public presentations they make or articles they write that relate
16   to any aspect of contract performance or prison operations.

17   D.  Fiscal Management

18   The commissary shall be operated by the contractor as a privilege
19   to inmates.  Any revenues earned in excess of those needed for
    commissary operations shall be used solely to benefit inmates in
    accordance with P.S. 4500.04, <u>Trust Fund/Warehouse/Laundry</u>
22   <u>Manual,</u> Chapter 4504.  The commissary shall make available gender
23   specific items for purchase that are not required to be furnished
24   by the contractor.  Inmates shall have the opportunity to
25   purchase from the commissary at least once a week.  The
26   contractor shall ensure that inmates spend no more on purchases
27   than the BOP spending limit excluding those items listed in P.S.
28   4500.04, <u>Trust Fund/Warehouse/Laundry Manual</u>, Chapter 4526.  The
29   contractor shall maintain an inventory of items stocked in the
30   commissary and ensure that no prohibited items in accordance with
31   P.S. 4500.04, <u>Trust Fund/Warehouse/Laundry Manual</u>, Chapter 4522
32   are stocked.  The commissary inventory shall be provided to the
33   CO upon request.  The sales price for commissary items shall be
34   computed in accordance with P.S. 4500.04, <u>Trust Fund/Warehouse/</u>
35   <u>Laundry Manual</u>, Chapter 4523.

36   Inmates are permitted to receive funds from outside sources
37   (e.g., from family, friends, bank accounts).  Either outside
38   funds or those generated from work may be used to pay for
39   products and services from the commissary.

9

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1 Procedures shall be established for transfer of inmate funds upon
2 release from the institution, transfer to another institution or
3 when an inmate requests a funds transfer to an outside source.
4 Transfer of inmate funds shall occur within five working days
5 upon release from the institution, transfer to another
6 institution or when an inmate requests a funds transfer to an
7 outside source.  The contractor shall be responsible for
8 maintenance of inmate accounts including, but not limited to,
9 posting inmate pay, Financial Responsibility Program (in
10 accordance with P.S. 2011.06, <u>Financial Responsibility Program</u>,
11 <u>Inmate, Processing Payments</u>, and P.S. 5380.05, <u>Financial</u>
12 <u>Responsibility Program, Inmate</u>) Cost of Incarceration Fee (in
13 accordance with P.S. 2011.07, <u>Cost of Incarceration Fee,</u>
14 <u>Accounting For</u>, and P.S. 5380.03, <u>Cost of Incarceration Fee</u>).

15 E.  Personnel

16 It is essential that all contractor personnel meet the highest
17 standards of professionalism and personal integrity.

18 The contractor shall make a *bona fide* offer of employment, on a
19 right of first refusal basis, to qualified DCDOC employees who
20 apply as a result of being impacted by an agency-wide reduction-
21 in-force (RIF) as a result of The National Capital Revitalization
22 and Self-Government Improvement Act of 1997.  The only conditions
23 for employment are that applicants meet the minimum requirements
24 identified within the contract.  All such employees hired by the
25 contractor shall be offered positions at salaries and benefits
26 comparable to their latest DCDOC position.

27 The contractor shall develop written standards of conduct, to
28 include those standards outlined in Section J, Attachment 6.
29 These standards shall be maintained as a part of the contractor's
30 Personnel Policy Manual.  The contractor, its employees and
31 volunteers are expected to adhere to standards of employee
32 conduct and integrity while both on and off duty.  The contractor
33 shall follow procedures in Section J, Attachment 6 in the
34 reporting and investigation of standards of conduct violation(s).

35 Prior to employees entering on duty (EOD) at the institution, the
36 contractor shall ensure the following steps are completed for
37 each applicant as noted below:

38     1.  A pre-employment interview.

10

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

2. Law enforcement agency checks covering the past five years.
3. Employment vouchering for the last five years.
4. Employment Eligibility Verification (DOJ-INS Form I-9).
5. Credit check. (For employment purposes as described in the Fair Credit Reporting Act).
6. FBI Name and Fingerprint forms completed.
7. National Crime Information Center (NCIC) check.
8. National Law Enforcement Telecommunications (NLETS) check.
9. Conditional Offer of Employment.
10. Urinalysis.
11. Questionnaire for Public Trust Positions (SF-85P or approved equivalent) - all applicants receiving conditional offer.
12. Supplemental Questionnaire for Selected Positions (OPM Form 85P-S or approved equivalent).
13. Notify CO of scheduled EOD and Limited Background Investigation (LBI) initiation.

Contractor responsibilities subsequent to EOD:

14. Notification to CO of actual EOD within 24 hours.
15. Receipt and review of LBI report.
16. Notification to CO of decision regarding employment.

The contractor shall utilize the Pre-employment Interview Questionnaire and Guidelines of Acceptability (Guidelines) for job applicants as noted in Step 1 above (Guidelines will be made available to the contractor after contract award). There may be occasions where a job applicant's past behavior is unacceptable as defined by the Guidelines, but the contractor still desires to select the applicant. In this case, the contractor shall request the Guidelines be waived. This waiver request shall be submitted to the CO in writing and include: 1) the details and circumstances surrounding the applicant's behavior which is outside the Guidelines; 2) the reason(s) why the applicant should receive further consideration; and, 3) the availability of other suitable applicants.

The contractor shall fingerprint all applicants using BOP supplied forms. Completed fingerprint forms and the SF 85P and SF 85P-S (or equivalents) with original signatures and dates

11

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  shall be submitted to the CO for each applicant offered
2  conditional employment.  The BOP will initiate the National
3  Agency Check which includes the FBI name and fingerprint check.
4  The BOP will ordinarily advise the Warden or designee of the
5  results of name and fingerprint checks within 90 working days of
6  submission to the FBI.

7  The contractor shall complete Steps 1 - 6 on each prospective
8  employee prior to submitting information required by Steps 7 and
9  8 to the CO for completion.

10  The Warden or designee shall be the contractor's liaison for the
11  processing of data required for the BOP to conduct NCIC/NLETS,
12  name and fingerprint checks.  The information listed below shall
13  be provided for each on-site applicant, to include subcontractor
14  personnel and volunteers:  full name (with aliases, maiden name
15  if applicable, or other names used); date of birth; gender; place
16  of birth; social security number and race.  Included with this
17  information, the Warden or designee shall certify Steps 1 - 6
18  above have been accomplished with satisfactory results for each
19  applicant.

20  The BOP may require additional information to process NCIC/NLETS
21  and name checks, therefore, the contractor's employment
22  application document shall contain information regarding
23  applicant height; weight; eye and hair color; markings, scars and
24  tattoos; citizenship; driver's license number and State of issue;
25  and current address.

26  The contractor shall keep the BOP apprised of the volume of
27  applicants.  The BOP will ordinarily advise the Warden or
28  designee of the results of applicant NCIC/NLETS checks within
29  seven working days following receipt of accurate and complete
30  NCIC/NLETS data from the contractor.

31  Based upon the Warden's certification and the results of the
32  NCIC/NLETS, the BOP will grant conditional approval for the
33  applicant to work under the terms of this contract.  Upon receipt
34  of this approval, the contractor may grant the applicant a
35  conditional offer of employment.  The contractor shall provide
36  the CO with advance written notification of all employees'
37  scheduled EOD.  Written notification of all on-site employees
38  actual EOD shall be provided to the CO within 24 hours of an
39  employee reporting to work.

12

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  All applicants who are offered conditional employment by the
2  contractor shall be subject to urinalysis testing in accordance
3  with P.S. 3735.02, <u>Drug free Workplace</u>, Section 13.  If the test
4  result is positive, the applicant shall be prohibited from
5  working with Federal inmates.  All applicants who have been
6  offered conditional employment by the contractor shall complete
7  the SF 85P or approved equivalent.  Additionally, those employees
8  who will be authorized to carry weapons in the course of their
9  employment under this contract shall complete the SF 85P-S or
10  approved equivalent.  The contractor shall ensure that all
11  employees who will be issued or authorized to carry firearms meet
12  all requisite requirements for possessing a firearm.
13  Accordingly, pursuant to 18 U.S.C. 922(g)(9), employees who have
14  been convicted of a misdemeanor crime of domestic violence are
15  not authorized to carry or use a firearm under performance of
16  this contract.  The information contained on the contractor
17  developed form will become part of the background investigation
18  for these selected positions.

19  The contractor shall ensure a LBI check, as prescribed in the
20  Scope and Coverage of a Limited Background Investigation (Section
21  J, Attachment 7) is requested and all appropriate information
22  received, by the contractor-designated entity responsible for
23  completing the LBI, prior to an employee's EOD.

24  Within one year of each on-site employee's EOD, the contractor
25  shall receive, review, identify and resolve derogatory
26  information contained on the LBI results using the Adjudication
27  Standards for Resolving Limited Background Investigations and
28  Periodic Reinvestigations, outlined in Section J, Attachment 8 of
29  the contract.  The contractor shall make a determination
30  regarding the employee's suitability for employment under this
31  contract. Investigations with little or no derogatory information
32  will be reviewed and forwarded to the CO within 90 days of the
33  investigation completion date.  Investigations requiring
34  resolution of derogatory information will be forwarded within 180
35  days of the investigation completion date.  Extended adjudication
36  time frames may be requested from the CO on a case-by-case basis.

37  In the event the LBI identifies derogatory information, the
38  contractor's determination regarding the retention of an employee
39  shall be in writing and forwarded by the Warden to the CO with
40  copies of the information obtained in Steps 1 - 5, 12 and 15.
41  There may be occasions where derogatory information contained in
42  the employee's LBI is unacceptable as defined by the

13

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Acceptability Standards, but the contractor still desires to
2  retain the employee.  In such cases, the contractor shall submit
3  a written request for waiver of the Acceptability Standards to
4  the CO which includes the details and circumstances surrounding
5  the employee's behavior and the reason(s) why the employee should
6  be retained.

7  The BOP will be the final approval authority for all contractor
8  staff who work with Federal inmates under the terms of this
9  contract.  No individual who is under supervision or jurisdiction
10  of any parole, probation or correctional authority shall be
11  employed under this contract.  Persons with previous misdemeanor
12  criminal convictions or a felony conviction, who are not under
13  supervision, may be considered for employment; however, the BOP
14  shall be the approval authority in all such cases.  The BOP may
15  give consideration to such factors as criminal history, time
16  elapsed since conviction(s) and subsequent adjustment in the
17  community.

18  The contractor shall ensure all employees are reinvestigated
19  periodically, as prescribed in the Scope and Coverage of a
20  Periodic Reinvestigation in Section J, Attachment 8 of the
21  contract.  Employees will be required to complete required
22  investigative forms and fingerprint cards for submission to the
   BOP.  The BOP will initiate the National Agency Check, which
   includes the name and fingerprint checks.  Upon receipt, review,
25  and resolution of any derogatory information contained in the
26  reinvestigation report, the Warden shall forward to the CO a
27  written determination regarding the employee's continued
28  employment under this contract.  A copy of the reinvestigation
29  report shall be attached to the Warden's written request.

30  Should the institution staff turnover rate exceed an acceptable
31  level, as determined by the CO, or repetitive NCIC/NLETS or
32  fingerprint checks are necessary due to contractor error, the
33  actual cost of processing the NCIC/NLETS, name and fingerprint
34  checks shall be withheld from amounts due the contractor.

35  The contractor shall ensure all employment practices are in
36  compliance with U.S. Department of Labor requirements in addition
37  to applicable state and local requirements.

38  In the absence of a collective bargaining agreement, the
39  contractor shall enter into a written employment agreement with

14

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  each employee assigned to work within the institution.  This
2  agreement shall provide that, in recognition of the public safety
3  requirements for uninterrupted services in the institution and in
4  return for adequate consideration, including an employee
5  grievance procedure, the employee agrees not to strike or
6  otherwise interrupt normal operations at the institution without
7  giving 10 days advance written notice.

8   The contractor shall ensure that a contingency plan covering work
9   actions or strikes is included as a part of its Personnel Policy
10  Manual.

11  In the event the contractor negotiates collective bargaining
12  agreements applicable to the work force under the contract, the
13  contractor shall use its best efforts to ensure such agreements
14  contain provisions designed to assure continuity of services.
15  All such agreements entered into during the contract period of
16  performance should provide that grievances and disputes involving
17  the interpretation or application of the agreement will be
18  settled without resorting to strike, lockout or other
19  interruption of normal operations.

20  For this purpose, each collective bargaining agreement should
21  provide an effective grievance procedure with arbitration as its
22  final step, unless the parties mutually agree upon some other
23  method of assuring continuity of operations.  As part of such
24  agreements, management and labor should agree to cooperate fully
25  with the Federal Mediation and Conciliation Service.  The
26  contractor shall include the substance of this requirement in any
27  subcontracts for protective services.

28  All personnel files shall be available to the CO upon request.
29  Personnel files (e.g., background checks, verification of
30  training, experience, and professional credentials) shall be kept
31  current and maintained for the duration of the contract.

32  Personnel requirements of this contract shall apply to all
33  on-site subcontractor personnel and volunteers.

34  The following essential personnel and respective minimum
35  qualification requirements are considered critical for
36  performance of this contract.

15

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Project Coordinator - Knowledge and experience within the
2  last five years in planning and executing large, complex,
3  projects similar in nature to the requirements of this
4  contract.

5  Warden(s) - Knowledge of program objectives, policies,
6  procedures and requirements for managing a secure
7  correctional facility.  A minimum of 10 years experience in
8  corrections or related field with experience in the
9  management of a correctional facility at the Associate
10 Warden level or above.

11 Associate Warden(s) - Knowledge of program objectives,
12 policies, procedures and requirements for managing a
13 correctional facility.  A minimum of 10 years experience in
14 corrections or related field with experience in the field of
15 corrections at the level of mid-management.

16 Within 15 days of contract award, the contractor shall submit a
17 written request to the CO for conditional employment approval of
18 the Project Coordinator.  Within 180 days of contract award, the
19 contractor shall submit a written request to the CO for
20 conditional employment approval of the Warden(s) and Associate
1  Warden(s).

22 The essential personnel listed below are commonly referred to as
23 department heads.  Minimum qualification requirements for the
24 following essential personnel are: knowledge of program
25 objectives, policies, procedures and duties specific to the
26 position; a minimum of five years of supervisory/management
27 experience in a field directly related to the specific duties of
28 the position.
29
30 Case Management Coordinator
31 Chief Correctional Supervisor
32 Administrator, Religious Services
33 Correctional Shift Supervisors
34 Computer Services Manager
35 Facility Manager/Administrator
36 Food Service Administrator
37 Inmate Systems/Records Office Manager
38 Medical Services Administrator
39 Quality Control Specialist

16

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1        Safety/Environmental Specialist

2        The Administrator, Religious Services shall be certified by the
3        American Correctional Chaplains Association (ACCA) or meet
4        certification standards established by ACCA.

5        Daily correctional staff assignment rosters which reflect both
6        scheduled and actual assignments, by shift and for each post,
7        shall be maintained.

8        The number and type of staff described in the contractor's
9        staffing plan accepted in the resulting contract shall be
10       maintained as the minimally acceptable staff compliment
11       throughout the term of the contract.  Any and all requests to
12       reduce staffing levels or staff utilization shall be submitted in
13       writing to the CO for approval prior to implementation.

14       F.  Training and Staff Development

15       Upon the contractor's written request to the CO, the Government
16       will provide the following initial specialized training at the
17       contractor's facility, on a one-time basis, at no cost to the
18       contractor:

19       1.  Records Office Training (Records Office Staff)
20            a.  Movement Coordination Training - 8 hours
21            b.  Maintenance, Retirement and Disposal of Inmate Files -
22                8 hours

23       2.  Correctional Programs (Affected Staff)
24            a.  Case Management/Central Inmate Monitoring - 40 hours
25            b.  Disciplinary Procedures - 24 hours
26            c.  Disciplinary Hearing Officer Training - 80 hours
27                (mandatory, as described in Section J of the SOW)

28       3.  Other
29            a.  SENTRY Training - Inmate Systems; Education;
30                Correctional Services; Financial Management;
31                Correctional Programs, Health Services; Other staff -
32                (40 hours)

17

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1       b.   Human Resource Management (24 hours) - For contractor's
2               human resource management staff. To include background
3               investigation issues.

4       c.   Self-Study Courses
5           1.   Judgment and Commitment File Training
6           2.   Detainer/Writs/Interstate Agreement on Detainers
7                Training
8           3.   SENTRY General Use Technical Reference Manual
9           4.   Receiving and Discharge Training
10         5.   Inmate Funds Management Training
11         6.   Mail Management Training
12         7.   Population Accountability Training
13         8.   New Mail Room Officer's Self Study Course and
14                Survival Skills Training
15         9.   New Receiving and Discharge Officer's Self Study
16                Course and Survival Skills Training
17       10.   Central Inmate Monitoring Certification
18                Correspondence Course

19 The contractor may request, at its expense, additional training
20 to supplement the initial BOP provided training.

21 The contractor shall develop and implement a comprehensive staff
22 training program addressing the institution's sexual
23 abuse/assault prevention and intervention program. Written
24 policy, procedure, and practice shall provide that all staff
25 receive such training prior to entry on duty and on an annual
26 basis as part of the institution's in-service training plan.
27 Pre-service and in-service training shall be augmented with
28 specialized training for appropriate staff (e.g., case managers,
29 counselors, psychology services, chaplaincy, correctional
30 officers, investigatory officials, health/mental health care,
31 etc.)
32
33 The contractor shall provide disturbance control training to the
34 appropriate staff. Certified disturbance control instructors
35 shall be used to conduct training in disturbance control
36 procedures. Certification shall be from a CO-approved Federal,
37 state or county training academy or program. The use and
38 carrying of weapons for training shall meet all Federal, state
39 and local laws and regulations.

18

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    G.  Case Records

2    All inmate files (e.g., central files, medical files and judgment
3    and commitment files) are to be prepared, maintained, retired and
4    disposed of in accordance with the BOP format. Policy and
5    procedures shall be developed to ensure the confidentiality and
6    security of all inmate files (e.g., judgment and commitment
7    files, central files, U.S. Parole Commission mini-files) in
8    accordance with P.S. 5800.07, <u>Inmate Systems Management Manual</u>,
9    P.S. 5800.11, <u>Central File, Privacy Folder and Parole Mini-Files)</u>
10    and in accordance with all applicable Federal provisions (e.g., 5
11    U.S.C. 552 and 552a).

12    The contractor shall interact with other agencies to satisfy
13    outstanding inmate obligations including, but not limited to:  1)
14    processing of Federal and state writs; 2) administration of the
15    Interstate Agreement on detainers; 3) detainer inquiries; 4)
16    lodging and removal of detainers; and 5) coordination of
17    transfer/inmate movement in and out of the institution in
18    accordance with P.S. 5800.07, <u>Inmate Systems Management Manual</u>,
19    Chapter 8; P.S. 5130.05, <u>Detainers and the Interstate Agreement</u>
20    <u>on Detainers</u>; P.S. 5875.08, <u>Transfers of Inmates to State Agents</u>
21    <u>for Production on State Writs</u>; and, P.S. 5800.08, <u>Receiving and</u>
22    <u>Discharge Manual</u>.

23    The contractor shall:  1) maintain inmate judgment and commitment
24    files; 2) maintain file accountability and security; 3) respond
25    to inmate inquiries; 4) respond to outside requests for
26    information; 5) verify release methods and dates prior to an
27    inmate's release; and other related functions.

28    The contractor shall comply with the Privacy Act of 1974,
29    (5 U.S.C. 552a) and 28 CFR, Parts 16 and 513.

30    No inmate shall be admitted to, or released from, institution
31    custody without prior BOP approval.

32    H.  Information Systems and Research

33    The BOP's Information System environment includes mainframe,
34    local area network (LAN) and wide area network (WAN) components.

35    The BOP's mainframe software environment exists in an internally-

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  developed application named SENTRY which is used to support
2  institution operations.  The contractor shall provide and
3  maintain hardware and software to access SENTRY, in the manner
4  referenced in this SOW, to operate the institution.

5  The technical hardware environment in which computer services are
6  to be performed consists of IBM-compatible Personal Computers
7  (PCS) operating on a LAN.  In addition to providing for the
8  inter-connection of PC workstations, the LAN also provides
9  connections to a BOP centralized gateway which connects to an
10  IBM-compatible mainframe computer located in a DOJ data center.

11  All network operating system hardware not furnished by the
12  Government must remain compatible with BOP equipment throughout
13  the life of the contract.

14  Contractor provided hardware and software necessary to
15  participate in the BOP's information system environment is
16  provided at Section J, Attachment 15.

17  All network operating system software, applications software and
18  configurations not furnished by the Government shall be the same
19  release, version and configuration currently specified by the CO
20  throughout the life of the contract. The contractor shall adhere
21  to P.S. 1237.10, <u>Network Standards</u> and its associated Technical
22  Reference Manual (TRM).

23  The contractor shall ensure that the inmate "automated system of
24  records" is compatible with standard BOP facility and operational
25  requirements.

26  Examples of the procedures for which the contractor shall use
27  SENTRY include, but are not limited to: admissions and releases;
28  inmate counts; medical data; inmate classification and
29  programming; education data; discipline data; the victim/witness
30  program; and, as directed by the BOP, sentence computations
31  including good time and United States Parole Commission actions.
32  The contractor has the option to use SENTRY for any other
33  procedures as approved by the CO.

34  The contractor shall adhere to P.S. 1237.11, <u>Information Security</u>
35  <u>Programs</u> which governs such areas as: security for and access to
36  sensitive information and systems; minimum personnel security
37  pre-requisites for computer system users and administrators; and

20

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   security and access to computer rooms, etc.  The contractor shall
2   monitor all security procedures to ensure compliance.

3   The contractor shall ensure fundamental information technology
4   resources (e.g., computer hardware, network and operating system
5   software and telecommunications facilities) used in performance
6   of this contract function properly and are maintained in good
7   operating condition.  A minimum OAR of 97% is required for all
8   such resource components.  The contractor shall ensure that such
9   resources shall be compatible with existing and planned BOP
10  equipment, systems and data exchange functions.

11  GroupWise shall be configured as a secondary domain to the BOP
12  primary domain and shall have no physical or logical connections
13  to any external mail system.  The contractor's network shall have
14  no physical or logical connectivity to any external systems
15  except the BOP WAN, unless specifically approved in advance by
16  the CO.

17  Advance approval from the CO shall be obtained for all proposed
18  research projects.  These include projects conducted by the
19  contractor, subcontractors, or any other party.  The CO shall be
20  kept advised of the progress of all research projects, have total
    access to all documents, and be provided a copy of the final
    report prior to any publication.

23  The contractor is required to participate in any research task
24  pursued by the BOP and shall gather and provide any information
25  requested.  Contractor participation is anticipated to be
26  primarily in the area of gathering and submitting statistical
27  information.  Research data shall be provided to the Government
28  through SENTRY and/or through the automated data entry facilities
29  of the BOP's General Retrieval System (GRS) or other means as
30  specified by the BOP.  The BOP will provide software for the GRS.
31
32  At the discretion and request of the CO, the contractor shall
33  distribute the Staff Prison Social Climate Survey to a sampling
34  of staff (ranging from 35 to 100 percent).  The Government shall
35  determine the survey sample.  The contractor shall allow staff to
36  complete the survey (generally 45 minutes) while in a paid
37  status, collect the surveys and provide them to the CO.

38  At the discretion of, and compensated by, the Government, an
39  independent evaluator, may interview and/or administer surveys to

21

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    staff and inmates.

2    I.  Physical Plant

3    The institution shall be designed, constructed, operated and
4    maintained to ensure that inmates are housed in a safe, secure,
5    and humane manner.  All equipment, supplies and services shall be
6    contractor furnished except as otherwise noted.

7    The contractor shall design, construct, operate and maintain the
8    entire physical plant in accordance with all applicable Federal,
9    state and local laws, regulations, guidelines, policies,
10   building, and zoning codes.  In the event of any conflict of
11   codes, regulations, or requirements between Federal, state and
12   local, the most stringent shall apply.  In the event there is
13   more than one reference to a safety, health or environmental
14   requirement in an applicable law, standard, code, regulation or
15   Government policy, the most stringent requirement shall apply.

16   As a minimum standard for populations of a low security level and
17   above, the contractor shall design and construct the institution
18   perimeter security fence, institution housing unit outer
19   walls/roofs/floors and egress doors and locks in accordance with
٢    BOP design standards.  The BOP standards are provided in Section
١    J, Attachment 14).

22   The institution shall provide the appropriate mix of dorm and
23   celled housing commensurate with the security needs of the
24   District of Columbia low security population.

25   The contractor shall provide and maintain an electronic security
26   alarm system which will alert staff of any unauthorized access to
27   the institution secure perimeter.

28   The institution shall comply with 40 U.S.C. 619, which stipulates
29   compliance with nationally recognized codes and comply with the
30   latest edition in effect on the date of proposal submission of
31   one of the following codes:

32        (1)  The Uniform Building Code (UBC), with the State of
33             location's Amendments.
34        (2)  The Building Officials and Code Administrators (BOCA)
35             National Building Code (NBC).

22

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1        (3)  The Standard Building Code (SBC).

2    In the event the jurisdiction in which the institution is located
3    does not mandate use of UBC, BOCA NBC or SBC, then the
4    institution shall comply with the BOCA NBC.

5    Fire protection and life safety issues shall be governed by the
6    latest edition of the National Fire Protection Association (NFPA)
7    101, Code for Safety to Life from Fire in Buildings and
8    Structures and the applicable National Fire Codes (NFC).  Should
9    conflicts exist between the NBC and NFCs, the NFCs shall apply.

10   E.O. 12699, "Seismic Safety of Federal and Federally Assisted or
11   Regulated New Building Construction," requires all new Federally
12   owned or occupied buildings to comply with appropriate seismic
13   design and construction standards.  The seismic safety
14   requirements as set forth in either the 1991 International
15   Conference of Building Officials (ICBO), the UBC; the 1992 BOCA,
16   NBC (or the 1992 Amendments to the Southern Building Code
17   Congress) or SBC are the minimum standards.  Should the codes
18   applicable for the state in which the institution is located be
19   more stringent than the other codes set forth herein, the state
20   codes shall prevail.

21   The institution shall comply with the requirements of the
22   Architectural Barriers Act of 1968, and the Rehabilitation Act of
23   1973 as amended.  The standards for institution accessibility by
24   physically handicapped persons as set forth in Attachment 7 -
25   "Uniform Federal Accessibility Standards/Fed Std. - 795, 4/01/88
26   Edition" (UFAS) shall apply.  All areas of the institution site
27   and buildings shall meet these requirements.

28   Activities which are implemented, in whole or in part, with
29   Federal funds must comply with applicable legislation and
30   regulations established to protect the human or physical
31   environment and to ensure public opportunities for review.
32   Contractor shall remain in compliance with Federal statutes
33   during the performance of the contract, including but not limited
34   to the Clean Air Act, Clean Water Act, Endangered Species Act,
35   Resource Conservation and Recovery Act, and other applicable
36   laws, regulations, and requirements.

37   Contractor shall be responsible for and shall indemnify and hold
38   Government harmless for any and all spills, releases, emission,

23

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1 and discharges of any toxic or hazardous substance, any
2 pollutant, or any waste, whether sudden or gradual, caused by or
3 arising under the performance of the contract or any substance,
4 material, equipment, or facility utilized therefor.  For the
5 purposes of any environmental statute or regulation, contractor
6 shall be considered the "operator" for any facility utilized in
7 the performance of the contract, and shall indemnify and hold the
8 Government harmless for the failure to adhere to any applicable
9 law or regulation established to protect the human or physical
10 environment.  Contractor shall be responsible in the same manner
11 as above regardless of whether activities leading to or causing a
12 spill, release, emission or discharge is performed by contractor,
13 its agent or designee, an inmate, visitor, or any third party.

14 If the contractor spills or releases any substance into the
15 environment, the contractor shall immediately report the incident
16 to the CO.  The liability for the spill or release of such
17 substances rests solely with the contractor and its agent.

18 A safety program shall be maintained and in compliance with all
19 applicable Federal, state and local laws, statutes, regulations
20 and codes.  The contractor shall comply with the requirements of
21 the <u>Occupational Safety and Health Act of 1970</u> and all codes and
22 regulations associated with 29 CFR 1910 and 1926.

24 Fire Alarm Systems and Equipment - All fire detection,
25 communication, alarm, annunciation, suppression and related
26 equipment shall be operated, inspected, maintained and tested in
27 accordance with the most current edition of the applicable
28 National Electric Codes and Life Safety Codes.

29 The contractor shall provide outside lighting sufficient to
30 illuminate the entire institution and secure perimeter with at
31 least 1.5 candle power per square foot.

32 Final, completed, design/construction documents shall be
33 submitted to the CO by the contractor in accordance with the date
34 identified within the contractor's construction schedule.  The
35 construction schedule shall be updated to reflect current
36 progress and submitted to the CO on a monthly basis.  BOP staff
37 will make periodic visits during construction to verify
38 contractor progress and compliance with contract requirements.
39 As-built drawings and current drawings of the buildings and site
40 utilities shall be maintained in a secure location during

24

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   construction and contract performance.  These updates shall be
2   provided to the CO within 30 days of any changes made.  Site
3   utilities include, but are not limited to: water and sewer lines;
4   gas lines; tunnels; steam lines; chilled water lines; recording
5   layouts; elevations; modifications; additions; etc.  Two copies
6   of the As-built drawings shall be provided to the CO in AUTOCAD
7   release 14.0 on a CD-ROM no later than 180 days after issuance of
8   the NTP.

9   Promptly after the occurrence of any physical damage to the
10  institution (including disturbances), the contractor shall report
11  such damage to the CO.  It shall be the responsibility of the
12  contractor to repair such damage, to rebuild or restore the
13  institution consistent with the master design and construction
14  specifications for the facility at no cost to the Federal
15  Government.  Any deviation from the original design and
16  construction specifications shall require the prior concurrence
17  of the CO.

18  The BOP anticipates a nominal number of BOP staff will be
19  on-site to monitor contract performance and manage other BOP
20  interests associated with operation of the private facility.
21  With BOP concurrence, the contractor shall designate
22  approximately 2,500 square footage of administrative office space
    for BOP staff operations.  BOP office space shall be climate
    controlled and located consistent with the administrative office
25  space for contractor staff.  The contractor shall be responsible
26  for all maintenance and costs associated with space designated
27  for BOP staff.

28  The contractor shall provide no less than 10 parking spaces
29  reserved for Government use.

30  J.  Security and Control

31  At least one inmate count every 24 hours shall be a stand-up
32  count. SENTRY shall be used for reporting all counts.  All counts
33  shall be documented in separate logs and maintained in the inmate
34  housing unit, control center and shift supervisor's office for a
35  minimum of 30 days.

36  Policy and procedures for the maintenance and security of keys
37  and locking mechanisms shall be developed.  The procedures shall
38  include, but are not limited to: method of inspection to expose

25

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    compromised locks or locking mechanisms and method of replacement
2    for all damaged keys and/or locks; a preventive maintenance
3    schedule for servicing locks and locking mechanisms and method of
4    logging all work performed on locks and locking mechanisms;
5    policy for restricting security keys from 24-hour issue or
6    removal from the institution; and method of issuing emergency
7    keys.  Emergency keys shall be available for ALL areas of the
8    institution to which emergency access or egress may be necessary.
9    The procedures shall include the notification of CO in the event
10   any keys or mechanisms are compromised.

11   Staff responsible for lock maintenance shall receive training and
12   be certified from a CO-approved training program specializing in
13   the operation of locks and locking mechanisms.

14   The contractor shall provide constant armed perimeter
15   surveillance of the facility.  Surveillance may be provided via a
16   minimum of two motorized security patrols or a system of towers.

17   The contractor shall implement policy and procedures which
18   prohibit inmates from approaching within 20 feet of the alarmed
19   secure perimeter fence.

      Policy and procedures shall require that controlled tools and
      equipment be classified by security risk and those most likely to
22   be used in an escape or as a weapon be issued to inmates only
23   under direct staff supervision.

24   The contractor is responsible for the movement/transportation of
25   all inmates designated to the institution within a 300 mile
26   radius of the contract facility.  Examples of circumstances
27   requiring inmate movement/transportation include, but are not
28   limited to: outside medical care; funeral and bedside trips;
29   transfer or movement to/from other Government facilities; and
30   airlift sites.  The contractor's transportation procedures shall
31   ensure staff and inmate security and safety.  The contractor
32   shall utilize restraint equipment identical to the BOP's when
33   one-for-one equipment exchange is required (e.g., airlifts).

34

35   Contractor developed procedures regarding clothing for inmates
36   transferred from the institution to other Government facilities
37   shall incorporate the following conditions: khaki shirts and
38   pants allowing for use of restroom facilities while in
39   restraints; no hard sole or hard toe shoes; and, transportation

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  clothing must be kept separate from regular institution clothing.
2  Transportation clothing collected from inmates transferred to the
3  institution may be laundered, stored and reused.  However,
4  sufficient and appropriate transfer clothing shall be available
5  at all times and the contractor shall not rely on the clothing
6  collected from transferred inmates to meet the needs of supplying
7  transportation clothing.

8  Policies and procedures for collecting, analyzing and
9  disseminating intelligence information regarding issues affecting
10  safety, security and the orderly running of the institution shall
11  be developed.  Examples of such information would include, but
12  are not limited to: gang affiliations; domestic terrorist groups;
13  tracking of inmates having advanced skills in areas of concern
14  (locksmiths, gunsmiths, explosives, computers, etc.); narcotics
15  trafficking; mail and correspondence; inmate financial
16  information; inmate telephone calls; visiting room activity; and
17  actions of high profile inmates.  The contractor shall share all
18  intelligence information it obtains with the BOP.

19  The contractor shall submit to the CO a proposed inventory of
20  intervention equipment (e.g., weapons, munitions, chemical
21  agents, electronics/stun technology, etc.) intended for use
22  during performance of this contract.  The intervention equipment
23  inventory must be approved by the CO prior to issuance of the
24  NTP.  Any proposed revision to the approved intervention
25  equipment inventory must be submitted in writing to the CO for
26  approval prior to implementation.  P.S. 5500.09, <u>Correctional
27  Services Manual</u> contains guidance regarding current BOP standards
28  for intervention equipment.

29  The contractor shall obtain the appropriate authority from state
30  or local law enforcement agencies to use force as necessary,
31  (consistent with applicable policies of the Federal government)
32  to maintain the security of the institution.  The use of force by
33  the contractor shall at all times be consistent with all
34  applicable policies of the Federal government.  (All use of
35  lethal force by the contractor or any other authority shall be in
36  compliance with P.S. 5558.12, <u>Firearms and Badges</u> and P.S.
37  5568.04, <u>After Action Reporting and Review</u>.)

38  All use of less-lethal force by the contractor or any other
39  authority shall be in compliance with P.S. 5566.05, <u>Use of Force
40  and Application of Restraints on Inmates</u>.

27

●                    ●

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  The contractor shall make provisions for obtaining arrest
2  authority from local and/or state law enforcement agencies such
3  that an officer or employee of the contractor may:

4      (1)  make arrests on or off facility property without
5           warrant for the following violations regardless of
6           where the violation may occur: assaulting officers,
7           escape, attempted escape and assisting escape;

8      (2)  make arrests on facility property without warrant for
9           the following violations: theft, depredation of
10          property, contraband, mutiny and/or riot, and trespass;
11          and;

12     (3)  arrest without warrant for any other offense committed
13          on institution property if necessary to safeguard
14          security, good order or Government property;

15 if such officer or employee of the contractor has reasonable
16 grounds to believe that the arrested person is guilty of such
17 offense and if there is likelihood of such person's escaping
18 before an arrest warrant can be obtained.  If the arrested person
19 is a fugitive from custody, such prisoner shall be returned to
   custody.

21 The contractor shall comply with the policy and procedures for
22 establishment of a sexual abuse/assault program as contained in
23 P.S. 5324.04, Sexual Abuse/Assault Prevention and Intervention
24 Program.

25 The contractor shall report all criminal activity related to the
26 performance of this contract.  The contractor shall report
27 criminal activity to the appropriate law enforcement
28 investigative agency (e.g., BOP, FBI, USMS, state, and local
29 authorities).

30 The contractor shall immediately report all serious incidents to
31 the CO.  Serious incidents include, but are not limited to the
32 following:  activation of disturbance control team(s);
33 disturbances (including gang activities, group demonstrations,
34 food boycotts, work strikes, work-place violence, civil
35 disturbances/protests); staff use of force including use of
36 lethal and less-lethal force (includes inmates in restraints more
37 than eight hours); assaults on staff/inmates resulting in

28

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  injuries requiring medical attention (does not include routine
2  medical evaluation after the incident); fights resulting in
3  injuries requiring medical attention; fires; full or partial
4  lockdown of the institution; escape; weapons discharge; suicide
5  attempts; deaths; hunger strikes; adverse incidents that attract
6  unusual interest or significant publicity; adverse weather
7  impacting security of the institution (e.g., fence damage, power
8  outages, severe flooding); bomb threats; central inmate
9  monitoring cases admitted to a community hospital; witness
10 security cases taken outside the institution; significant
11 environmental problems that impact institution operations;
12 transportation accidents (airlift, bus, etc.) resulting in
13 injuries, death or property damage; and sexual assaults.

14 Immediately following CO notification, the contractor shall
15 report any serious incident using WAN Form 583, <u>Report of</u>
16 <u>Incident</u> completed in accordance with P.S. 5500.09, <u>Correctional</u>
17 <u>Services Manual</u>.

18 The BOP may investigate any incident pertaining to performance of
19 this contract.  The contractor shall cooperate with the
20 Government on all such investigations.

   The contractor shall maintain a urine surveillance program which
   complies with P.S. 6060.05, <u>Urine Surveillance to Detect and</u>
23 <u>Deter Illegal Drug Use.</u>  A laboratory certified by the National
24 Institute of Drug Abuse of the Department of Health and Human
25 Services shall be utilized to test urine samples.

26 The contractor's contraband control procedures shall include
27 frequent pat searches of inmates and the use of supervised walk-
28 through and hand-held metal detectors at all compound gates and
29 entrances to housing units.

30 K.  Safety and Emergency Procedures

31 The contractor shall submit an institution emergency plan to be
32 fully operational prior to issuance of the NTP.  The plan shall
33 receive the concurrence of the CO prior to implementation and
34 shall not be modified without the written concurrence of the CO.

35 The contractor shall have written agreements with appropriate
36 state and local authorities that provide for notification and

29

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    requests for assistance in the event of incidents that may have
2    an adverse impact on the community.

3    The emergency plan shall include provisions for two or more
4    disturbance control teams.  Protective clothing and equipment for
5    each team member and 30% of all additional institution staff,
6    shall be provided by the contractor and maintained in a secure
7    location outside the secure perimeter of the low security
8    institution.

9    Any decision by the BOP or other Federal agencies to provide
10   and/or direct emergency assistance at the institution will be at
11   the discretion of the Federal agencies.  The contractor shall
12   reimburse the Federal agency(ies) for any and all expenses
13   incurred as a result of providing such assistance.

14   The CO shall be notified immediately in the event of an escape.
15   Attempts to apprehend the escapee(s) shall be in accordance with
16   the Emergency Plan.  The contractor shall follow notification
17   practices and procedures as set forth in P.S. 5553.05,
18   <u>Escapes/Deaths Notification</u> and WAN Form 583, <u>Report of Incident,</u>
19   shall be submitted.

20   L.  Discipline

21   The contractor shall comply with the policy and procedures for
22   inmate discipline as contained in 28 CFR 541 and P.S. 5270.07,
23   <u>Discipline and Special Housing Units</u>.  The contractor's DHO and
24   alternate shall be trained and certified by the BOP prior to
25   acceptance of inmates.  All data regarding the discipline
26   incident report process shall be entered into SENTRY.

27   M.  Inmate Rights

28   The contractor shall stock and provide inmates with BOP
29   administrative remedy forms to accommodate any claims directly
30   related to BOP matters (e.g. sentence computation; designation
31   and transfer issues; prior custody).

32   The contractor shall ensure religious services program standards
33   as established by the Religious Freedom Restoration Act are
34   maintained.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    N.    Reception and Orientation

2    The contractor shall comply with P.S. 5800.08, <u>Receiving and</u>
3    <u>Discharge Manual,</u> when entering inmate admission and release
4    data.

5    The search of inmates admitted to, or released from, low or
6    higher security institutions shall include a strip search
7    performed by contractor staff.  The search shall be conducted by
8    persons of the same gender, except in exigent circumstances.

9    Inmates shall be fingerprinted using Government supplied forms
10   and submitted to the FBI in accordance with P.S. 5040.04, <u>FBI</u>
11   <u>Forms, Submission to the FBI,</u> and P.S. 5800.08 <u>Receiving and</u>
12   <u>Discharge Manual</u>.

13   The intake process shall include, at a minimum, medical and
14   social screening prior to inmate release to the general
15   population.  Psychological screening shall be provided for each
16   inmate within 24 hours of arrival at the institution.

17   The contractor shall ensure all requirements related to P.S.
     5180.04, <u>Central Inmate Monitoring Manual</u> are maintained.

19   In the event an inmate is transferred to or from a foreign
20   country,  28 CFR 527 and 18 U.S.C. 4100, et seq. shall be
21   followed.

22   The contractor is advised that P.S. 5580.05, <u>Personal Property,</u>
23   <u>Inmate,</u> provides procedures related to inmate property.  Property
24   of inmates transferred to other correctional facilities from the
25   institution shall meet the requirements of P.S. 5580.05, <u>Personal</u>
26   <u>Property</u>.  Property accompanying an inmate transferred from the
27   institution that is outside the scope of P.S. 5580.05 shall be
28   returned to the institution at the contractor's expense for
29   appropriate disposition(also at the contractor's expense).  All
30   inmate personal property shall be inventoried and a BOP Form 383,
31   <u>Inmate Personal Property Form</u> completed upon inmate admission and
32   discharge.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    O.    Classification

2    The contractor shall ensure classification and program review of
3    inmates in accordance with the requirements contained in P.S.
4    5322.10, <u>Classification and Program Review of Inmates</u>, P.S.
5    5100.06, <u>Security Designation and Custody Classification Manual</u>
6    and 28 CFR 524 are accomplished.  In addition, the contractor
7    shall enter and keep current all required BOP SENTRY transactions
8    and written documentation related to the classification and
9    program review of inmates, progress reports and central inmate
10   monitoring system.  A system of records and review to ensure
11   compliance with P.S. 5100.06, <u>Security Designation and Custody</u>
12   <u>Classification Manual,</u> and related transactions shall be
13   developed and maintained.

14   The contractor shall follow all applicable provisions related to
15   the <u>Violent Crime Control and Law Enforcement Act of 1994</u> (P.L.
16   103-322), ensuring all notification requirements are
17   accomplished.

18   A financial responsibility system mandating inmates establish a
19   financial plan to meet legitimate financial obligations in
20   accordance with 28 CFR 505 (P.L. 102-395) and 545.10 shall be
21   developed and maintained.

22   The contractor shall develop policy and procedures concerning
23   victim and/or witness notification which meet the requirements
24   outlined in 28 CFR 551 and the <u>Victim and Witness Protection Act</u>
25   <u>of 1982.</u>

26   P.    Health/Mental Health Care

27   The contractor shall provide all essential health services while
28   meeting the applicable standards and levels of quality
29   established by the ACA and the designated BOP ambulatory health
30   care accreditation provider, JCAHO.  In addition, the contractor
31   shall adhere to all applicable Federal, state and local laws and
32   regulations governing the delivery of health services and
33   establish the necessary quality controls to ensure all policies
34   and procedures are designed and implemented in a manner to
35   promote orderly and efficient delivery and management of health
36   services to the inmate population.

32

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   The contractor shall obtain full accreditation by JCAHO for the
2   institution within 24 months of NTP and shall maintain continual
3   compliance with applicable JCAHO standards during performance of
4   the contract.  Once full accreditation has been obtained, the
5   contractor shall maintain this accreditation throughout the life
6   of the contract, inclusive of any option year exercised.  The
7   contractor shall be responsible for all costs associated with
8   obtaining and maintaining full accreditation by JCAHO.

9    The provision of medical services commensurate to the level of
10   care available in the community is an essential component of
11   successful performance under the contract.  The contractor is
12   referred to the following list of P.S's and TRM's as guides to
13   the BOP's standard of health care delivery:

| | | |
|---|---|---|
| 14 | P.S. 6000.05 | "Health Services Manual (HSM)" |
| 15 | P.S. 6010.01 | "Psychiatric Treatment and Medication, |
| 16 | | Administration Safeguards For" |
| 17 | P.S. 6080.01 | "Autopsies, Authority to Order" |
| 18 | P.S. 6100.01 | "Health Promotion and Disease Prevention |
| 19 | | for Inmates" |
| 20 | P.S. 6190.02 | "Infectious Disease Management" |
| 21 | TRM 011-01 | "Pharmacy Technical Reference Manual" |
| | TRM 008.02 | "Sentry Medical SMD/MDS Technical |
| 23 | | Reference Manual" |
| 24 | P.S. 5310.12 | "Psychology Services Manual" |
| 25 | P.S. 5324.03 | "Suicide Prevention Program Statement" |
| 26 | P.S. 5310.13 | "Management of Mentally Ill inmates" |
| 27 | P.S. 5324.04 | "Sexual Assault Prevention/Intervention |
| 28 | | Program" |

29   Administration - Prior to issuance of NTP, the contractor shall
30   designate a health services Point of Contact (POC) who shall be
31   responsible for the delivery of health services under the
32   contract.  The POC shall have full authority to act on behalf of
33   the contractor on all matters relating to the operation of the
34   health services portion of the contract.  An alternate may be
35   designated; however, the contractor shall identify those times
36   when the alternate shall be the primary POC.

37   All health care services shall be provided within the HSU.  For
38   cases of emergency and other medically necessary situations,
39   arrangements (i.e., subcontracts) shall be made with local health

33

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

care providers to obtain essential health services.

2    Services - The contractor shall have written plans and procedures
3    for providing urgent medical, health, mental health and dental
4    services.  The plan shall include, but is not limited to, the
5    following: (1) 24 hour a day, seven day a week emergency medical,
6    health, mental health and dental care; (2) initial health
7    screening; (3) health appraisal examination; (4) daily triaging
8    of complaints; (5) sick call procedures; (6) special medical
9    programs and services for, but not limited to, inmates with
10   chronic needs or requiring convalescent care; (7) mental health
11   and substance abuse services; (8) staffing/health care
12   specialists; (9) ancillary services - radiology, laboratory,
13   etc.; (10) dental services - routine and emergency; (11)
14   pharmaceutical services and supplies; (12) optometric services;
15   (13) health education; (14) medical diets; (15) infectious
16   diseases; and (16) quality control/peer reviews.

17   Infectious Disease - The contractor shall comply with all OSHA
18   regulations and BOP infectious disease requirements in the
19   delivery of health care services.  All inmates shall be screened
20   for Tuberculosis within 48 hours of intake and annually
21   thereafter.  Screening shall consist of either a PPD (Mantoux
22   method) or PA chest x-ray as clinically indicated.

     Inmate Death - In the event an inmate death occurs, the
24   contractor shall immediately notify the CO and submit a written
25   report within 24 hours.  The contractor shall fingerprint (right
26   thumb or right index) the deceased and staff performing the
27   fingerprinting shall date and sign the fingerprint card to ensure
28   that positive identification has been made.  The fingerprint card
29   shall then be hand delivered to the CO.

30   Personal property of a deceased inmate shall be inventoried and
31   forwarded to the designated family member, the nearest of kin or
32   the Consular Officer of the inmate's country of birth.

33   If death is due to violence, an accident surrounded by unusual or
34   questionable circumstances, or is sudden and the deceased has not
35   been under immediate medical supervision, the contractor shall
36   notify the coroner of the local jurisdiction to request review of
37   the case, and if necessary, examination of the body.  The
38   contractor shall establish coroner notification procedures
39   outlining such issues as performance of an autopsy, who will

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  perform the autopsy, obtaining state-approved death certificates
2  and local transportation of the body. In the event an autopsy is
3  conducted, the contractor shall ensure the body is turned over to
4  the designated family member, the nearest of kin or the Consular
5  Officer of the offender's country of birth.

6  In the event the deceased inmate is indigent, the Government will
7  reimburse the contractor for reasonable burial costs as approved
8  in advance by the CO.

9  Medical Records - Consistency in content and format of medical
10  records of inmates transferring between the institution and other
11  Government facilities is a critical component of care for
12  inmates.

13  The contractor shall adhere to the HSM, Chapter 5, Sections 1
14  through 17 - Health Records, in preparing, formatting,
15  documenting, maintaining, releasing and all medicolegal aspects
16  of an inmate's medical record. The contractor is responsible for
17  supplying medical record folders, consistent with the
18  specification provided by the BOP, only for those inmates who are
19  new designations into the institution or in cases where
20  transferred medical records cannot be located. The Government
    shall provide to the contractor all applicable Government forms
    necessary to document an inmate's medical record.

23  The contractor shall adhere to HSM, Chapter 2, Section 3 -
24  Sensitive Medical Data\Medical Duty Status Reporting for the
25  reporting and accountability of medical data on all inmates
26  assigned to the institution. This includes utilizing the SMD/MDS
27  TRM on BOPDOCS.

28  Medical Transfers - Prior to admitting an inmate to an outside
29  medical facility for inpatient care, with the exception of
30  emergency cases, the contractor shall obtain pre-certification
31  approval of the BOP's Office of Medical Designations and
32  Transportation (OMDT). The contractor shall submit this request
33  for approval to OMDT via the BOP's SENTRY computer system using
34  the request procedures established in accordance with HSM,
35  Chapter 7. A copy shall also be sent to the CO.

36  In emergency cases, the contractor shall submit the above
37  mentioned request to OMDT within 24 hours of the inmate's
38  admission for inpatient care to an outside medical facility.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  The contractor shall adhere to Chapter 7, Section 2 of the HSM
2  regarding transfers and medical designations of inmates assigned
3  to the institution.  Medical designation to BOP Medical Referral
4  Centers or other Government facilities will be at the sole
5  discretion of the BOP.  In order to transport an inmate, the
6  patient must be in stable condition.

7  Other - The contractor shall furnish prescription eyeglasses to
8  any inmate who requires them.

9  Q.  Social Services

10 Written procedures ensuring all inmates are considered for
11 release to community-based programs consistent with 18 U.S.C.
12 3624 and P.S. 7310.03, <u>Community Corrections Center Utilization</u>
13 <u>and Transfer</u> shall be established.

14 The contractor shall develop and administer a furlough program
15 for eligible inmates consistent with the following statutory
16 provisions: 18 U.S.C. 4082 and 3622 and 28 CFR 570.

17 Written procedures shall be developed which ensure that prior to
   release, inmates have adequate clothing, transportation to their
   release destination and are provided an appropriate gratuity.

20 No later than eleven months prior to projected release a final
21 and specific release plan which includes a community-based
22 program shall be formulated for each inmate.

23 R.  Work and Correctional Industries

24 Inmate labor shall be used in accordance with the inmate work
25 plan developed by the contractor.  The inmate work plan may
26 include work or program assignments for industrial, maintenance,
27 custodial, service or other jobs.  The inmate work program shall
28 not conflict with any other requirement of the contract and must
29 comply with all applicable laws and regulations.

30 A contractor operated and managed industrial program providing
31 productive opportunities for the inmate population to improve
32 work habits and vocational skills is encouraged.

36

●                              ●

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   Inmates shall not be used to perform the responsibilities or
2   duties of an employee of the contractor.  Appropriate safety/
3   protective clothing and equipment shall be provided to the inmate
4   population as appropriate.  Inmates shall not be assigned work
5   considered hazardous or dangerous.  This includes, but is not
6   limited to, areas or assignments requiring great heights, extreme
7   temperatures, use of toxic substances and unusual physical
8   demands.

9   As applicable, inmates shall be paid identical rates of pay as
10  those established by P.S. 5251.04, <u>Inmate Work and Performance</u>
11  <u>Pay Program</u> and 28 CFR 545.20.

12  S.  Academic and Vocational Education

13  The contractor shall develop an English-as-a-Second-Language
14  (ESL) program for limited English proficient inmates to improve
15  their oral and written English communication skills until the
16  inmate functions at the eighth grade equivalency level in
17  accordance with P.S. 5350.24, Section 6, <u>English-as-a-Second</u>
18  <u>Language Program</u> and as mandated by the <u>Comprehensive Crime</u>
19  <u>Control Act of 1990.</u>

20  The contractor shall ensure literacy programs and records are in
21  compliance with the <u>Violent Crime Control and Law Enforcement Act</u>
22  <u>of 1994</u> and the <u>Prison Litigation Reform Act of 1996</u> and are
23  consistent with procedures established by the BOP.

24  The contractor shall administer the Adult Basic Learning
25  Examination and the Spanish Assessment of Basic Education, Second
26  Edition, to measure eighth grade equivalency for all inmates for
27  proper program placement in accordance with P.S. 5310.15, Section
28  5a, <u>Minimum Standards for Administration, Interpretation and Use</u>
29  <u>of Education Tests</u>.

30  The contractor shall develop and make available to all inmates an
31  education program which addresses the subject of sexual
32  assault/sexual abuse.  The content of the educational program
33  must include topics such as: recognizing behaviors that are
34  inappropriate, harassing, or assaultive; how to seek protection;
35  privacy rights; medical/psychological programs for victims of
36  abuse; how to make confidential reporting of sensitive issues to
37  institution staff, the BOP, or the OIG.  The contractor shall
38  augment the educational program by distributing informational

37

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    posters and pamphlets to the inmate population.

2    A comprehensive parenting education program to promote and build
3    family relationships shall be made available for voluntary
4    attendance by the inmate population.

5    The contractor shall provide General Education Development (GED)
6    testing by becoming a GED testing center through the GED Testing
7    Service or by securing GED testing services through a local
8    provider.

9    The contractor shall utilize the SENTRY Education Data System
10   (EDS) to enter the required information pertaining to individual
11   inmate participation and progress in the institution education
12   program. The contractor is referred to the SENTRY Education TRM
13   as a guide to the use of the SENTRY EDS.

14   T.   Recreation and Activities

15   The contractor shall comply with Section 611 of P.L. 104-208,
16   Title I, Section 101(a) (the Zimmer Amendment), which addresses
17   use of recreational equipment and materials by Federal inmates.

     The contractor shall ensure that correctional staff are assigned
19   in sufficient numbers to supervise all inmate recreation
20   activities.

21   U.   Telephone

22   The contractor shall provide a telephone system for inmates
23   capable of accommodating both debit and collect phone calls. The
24   contractor shall establish procedures that permit inmates to make
25   telephone calls, including in cases of emergency or inmate
26   indigence.

27   All inmates, with the exception of inmates in the Special Housing
28   Unit or Control Unit, shall be allowed a minimum of 120 minutes
29   of collect calling per month unless telephone privileges have
30   been suspended as part of a disciplinary sanction.

31   Inmates in the Special Housing Unit or Control Unit are entitled
32   to a minimum of one social call per month.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  The system shall prevent inmates from calling any telephone
2  number not included on the inmate's official telephone list.
3  This list shall be generated within five working days of the
4  inmate's arrival and contain up to 30 telephone numbers that the
5  inmate is authorized to call via debit or collect procedures,
6  except as otherwise authorized by the Warden for good cause.

7  The contractor shall ensure and document that any individual
8  placed on an inmate's telephone list receives notice that they
9  have been placed on such list.  The notice shall advise the
10 individual of the procedures for removal from the inmate's
11 telephone list.  The contractor shall ensure that the telephone
12 numbers of an inmate's crime victim or victims are not included
13 on the inmate's official telephone list.  The contractor shall
14 allow each inmate the opportunity to update their telephone list
15 up to three times per month, except as otherwise authorized by
16 the Warden for good cause.

17 If authorized to do so under applicable law, the contractor shall
18 monitor and record inmate telephone conversations.  If inmate
19 telephone conversations can be monitored under applicable law,
20 the contractor shall provide notice to inmates of the potential
21 for monitoring.  However, the contractor shall also provide
22 procedures for inmates to be able to place unmonitored telephone
   calls to their attorneys of record.

24 Telephone rates shall not exceed the dominant carrier tariff rate
25 and shall conform to all applicable Federal, state and local
26 telephone regulations.

27 Any income received by the contractor from collect calls which is
28 in excess of expenses incurred, to include refunds/rebates from
29 carriers, shall offset the cost of this contract.  The contractor
30 shall provide the CO  with copies of any contracts between the
31 contractor and the inmate telephone system provider(s).  The
32 contractor shall provide the CO with all documentation in support
33 of any agreement that the contractor has regarding income,
34 refunds, rebates and other monetary or nonmonetary reimbursements
35 involving the inmate telephone system.  The contractor shall also
36 provide the CO with copies of all invoices and other
37 documentation of expenses incurred and income received in regards
38 to the inmate telephone system with its monthly request for
39 contract payment and apply the credit against the monthly
40 payment.  The CO shall also have total access to all telephone
41 operation records.

39